ORIGINAL

FILED
JUN 6 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HORN & ASSOCIATES, INC. | ) | |
| v. | ) | No. 08-415 C |
| THE UNITED STATES | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, Horn & Associates, Inc., by counsel, and respectfully shows and alleges as follows:

1. Jurisdiction is conferred on this Court by 28 U.S.C. § 1491(a)(1) and (2), as well as by 41 U.S.C. § 609(a)(1). This claim is based on an express written contract with the United States of America, acting by and through the National Aeronautics & Space Administration ("NASA").

2. Plaintiff, Horn & Associates, Inc. ("Horn") is a veteran owned small business, organized and existing under the laws of Utah, with its principal place of business in Salt Lake City, Utah. Horn is a recovery auditing firm.

3. NASA is a government agency with headquarters in Washington, D.C. and Space Flight Centers spread throughout the country. NASA contracts for supplies, services and construction through its headquarters and through the various Space Flight Centers and in turn makes payments on the contracts at the respective Payment Centers.

## BACKGROUND

### *What is Recovery Auditing?*

4. Recovery auditing is a concept that began over 30 years ago in the private sector. The purpose of a recovery audit is to recover overpayments and under-deductions caused by various types of payment errors. While engaging the services of trained and motivated experts on a contingency fee basis to collect overpayments from their suppliers and service providers, companies experience no risk because there are no up-front costs and the contingency fee is only paid out after the overpayment is collected. The concept presents a win-win situation with the net recoveries going directly to the bottom line of a company. Virtually every publicly traded or privately held company in the United States regularly commissions contingency-based audits of their paid invoices.

5. Recovery auditing during these past 30 years has demonstrated that overpayments for large corporate organizations have averaged between 1/10th and 3/10ths of a percent of sales. This confirms that recovery auditing is a benefit to a $10 billion a year corporation when it may recover the lost $10 million to $30 million with no overhead costs or up front risks.

6. The overpayments or improper payments take many forms including data entry mistakes, duplicate payments, missed discounts, and overlooked pricing agreements among others. By using proprietary software and proven auditing techniques, the recovery auditor reviews client invoices, contract terms and conditions, purchase orders, receiving documents, databases, and correspondence to identify overpayments or under-deductions.

*Statutory Framework*
*Requiring Recovery Auditing by the Federal Government*

7. Departments of federal, state, county, and municipal government, like all other large organizations, function with a high volume of suppliers, transactions, and budget dollars. Congress has recognized that the various agencies of the Executive Branch are no less likely to make improper or incorrect payments than the private sector. Essentially, the government has recognized that the same problem with improper payments exists not only in the private sector, but also occurs in the federal government.

8. Therefore, on December 28, 2001, Congress enacted Section 831 of the Defense Authorization Act for Fiscal Year 2002 (31 U.S.C. §§ 3561-3567), Identification of Errors Made by Executive Agencies in Payments to Contractors and Recovery of Amounts Erroneously Paid, better known as the "Recovery Auditing Act." The Recovery Auditing Act requires federal agencies entering into contracts exceeding $500,000,000 in a fiscal year to carry out a cost-effective program for identifying and recovering any amounts erroneously paid to contractors. In addition, Section 831 directs the Office of Management and Budget ("OMB") to issue guidelines for the enforcement of this Act.

9. Congress also enacted the Improper Payments Information Act of 2002 ("IPIA"), aimed at improving the accuracy of federal payments, and thus reducing overpayments. The IPIA directs the head of each agency to "annually review all programs and activities that it administers and identify all such programs and activities that may be susceptible to significant improper payments." Pub. L. No. 107-300, 116 Stat. 2350 (Nov. 26, 2002).

10. As required, OMB issued guidance to the Executive Departments with Memorandum M-03-07, Programs to Identify and Recover Erroneous Payments to

Contractors, dated January 16, 2003. This memorandum states that a required element of Section 831 of the Defense Authorization Act is "the use of recovery audits and recovery audit activities." These guidelines provide, among other things, that all classes of contracts and contract payments should be considered for recovery audits. OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, OMB MEMO. NO. M-03-07, PROGRAMS TO IDENTIFY AND RECOVER ERRONEOUS PAYMENTS TO CONTRACTORS (2003).

11. Recovery auditing identifies payment errors – defined by OMB, M-03-07 as "errors resulting from duplicate payments; errors on invoices or financing requests; failure to reduce payments by applicable sales discounts, cash discounts, rebates, or other allowances; payments for items not received; mathematical or other errors in determining payment amounts and executing payments; and the failure to obtain credit for returned merchandise" – and provides assistance in the recovery of the erroneous payment from the supplier or contractor that received the erroneous payment. Id. at SEC. II, DEFINITIONS, (D).

12. OMB concluded on June 19, 2003, that a conservative estimate of the federal payment error rate is just below four percent. See OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, 2003-22, OMB ISSUES INSTRUCTIONS TO AGENCIES AND STATES FOR COMBATING WASTE, FRAUD, AND ABUSE IN FEDERAL PROGRAMS (2003). By doing so, OMB concluded that four percent of all contract payments by government agencies are erroneous payments subject to being recovered under the Recovery Auditing Act. As recently as January 23, 2008, the GAO reported that the federal error rate is still about four percent. See U.S. GEN. ACCOUNTING OFFICE, GAO-08-377R, IMPROPER PAYMENTS: FEDERAL EXECUTIVE BRANCH AGENCIES' FISCAL YEAR 2007 IMPROPER PAYMENT ESTIMATE REPORTING (2008). This is an error rate far greater than what typically occurs in the private sector.

13. A memorandum was issued on December 29, 2005, from the Defense Contract Audit Agency ("DCAA") regarding guidance on recovery audits. This memorandum explained the recovery audit process and that "DCAA should normally have no role in most recovery audits." The reason that DCAA should have no role in recovery audits is because DCAA's role is to perform contract audits for the purpose of determining if amounts claimed by contractors are in accord with the contract. On the other hand, a recovery audit is a post-payment review of the books and records of a government agency as opposed to the records of a government agency's contractor. Thus, DCAA would typically have no role in recovery audits for NASA. See DEFENSE CONTRACT AUDIT AGENCY, DEPT. OF DEFENSE, MEMO. NO. 05-PPD-076(R), PPD 730.5.13.1, MEMORANDUM FOR REGIONAL DIRECTORS, DCAA DIRECTOR, FIELD DETACHMENT, DCAA (2005).

14. NASA was in particular need of the work of a recovery auditor as evidenced by the following status report.

> Over the past several years, auditors have repeatedly reported on NASA's weak financial management and unreliable financial data. In three of the past four years, independent auditors reported that they were unable to express an opinion on NASA's financial statements. For example, for fiscal year 2003, NASA made $565 billion in adjustments – more than 37 times its total budget for that year – to correct errors and make other changes to its accounting records. The auditors could not find adequate documentation to support these adjustments.

HOUSE SCIENCE AND TECHNOLOGY COMMITTEE STATUS REPORT, HOUSE SCIENCE COMMITTEE HEARING CHARTER: FINANCIAL MANAGEMENT AT NASA: CHALLENGES AND NEXT STEPS, (OCT. 26, 2005).

15. On August 10, 2006, OMB issued a memorandum, M-06-23, consolidating three guidance memoranda (M-03-13; M-03-07; M-03-12) for the implementation of IPIA and the

Recovery Auditing Act, resulting in the issuance of Appendix C to OMB Circular A-123. In this memorandum, OMB defined improper payments to be:

> [A]ny payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are any overpayment or underpayment (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, and payments that are for the incorrect amount. In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an error.

OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, OMB MEMO. NO. M-06-23, ISSUANCE OF APPENDIX C TO OMB CIRCULAR A-123 (2006).

16. OMB Appendix C, Part I. Improper Payments Information Act Reporting, Section E, imposes reporting requirements for agencies directing agencies to report to the President and Congress through their annual Performance and Accountability Report ("PAR") an estimation of annual improper payments. See id.

17. In addition, OMB Appendix C, Part II. Recovery Auditing, Section F, stated that because recovery auditing is an "integral part of the agency's internal control over contract payments," therefore requiring independent consideration, the agency's inspector general had no role in recovery auditing. See id.

18. NASA, by virtue of the dollar amounts of its contracts in each fiscal year, was required to follow the new enforcement guidelines set out in Appendix C to OMB Circular A-123 in order to comply with government-wide IPIA compliance and the Recovery Auditing Act.

SOLICITATION, PROPOSAL, AND AWARD OF CONTRACT

19. On June 12, 2003, the General Services Administration ("GSA") awarded Contract No. GS-23F-0258N to Horn for the furnishing of "Recovery Audits." The GSA contract was a blanket purchase agreement (the "BPA") under which various executive agencies could solicit offers to contract for recovery auditing services for their various agencies.

20. The BPA was modified three times adding various administrative and wording changes. The first modification to the BPA occurred on or about August 16, 2003, the second occurred on or about November 18, 2003, and included a Termination for the Government's Convenience clause, and finally the third modification occurred on or about November 2, 2004.

21. NASA issued Request for Quote NNH04068239Q for Audit Recovery Services ("RFQ" or "Solicitation for Offers" used interchangeably hereafter) on or about July 23, 2004, soliciting "signed and dated offers" to contract due by August 9, 2004.

22. NASA's Solicitation for Offers included the following "Objective," on page 8:

> This Statement of Work (SOW) requires the Contractor to support NASA's CFO in the area of recovery audits. This SOW requires the Contractor to: (1) identify lost funds due to overpayments; (2) establish an Automated Tracking System (ATS) to track debts; (3) identify the reason(s) for overpayments; (4) recover identified overpayments; and (5) provide recommendations for preventing future overpayments.

23. NASA's Solicitation for Offers included a Scope of Work on page 9 within the SOW that stated the following: "The contractor shall perform recovery-auditing services at all 10 NASA Centers for the period beginning October 1, 1997 through September 30, 2003. The audits will be conducted on payments made from all <u>fixed</u> <u>price</u> <u>contracts</u>." (Emphasis added.)

24. Notwithstanding, NASA's Solicitation for Offers stated in Subtask 3.3, page 11 – Description of process for identifying, calculating, and recommending debts for NASA posting as receivables – "The contractor shall identify all lost funds, discrepancies and improprieties. The contractor shall calculate the proper amount to be collected."

25. Horn submitted an offer to contract with its Proposal for Professional Services to Provide Recovery Auditing Services dated August 4, 2004.

26. Horn stated in its offer to contract, page 12, that, in order to do a complete audit and increase recoveries to NASA, Horn would need "access to <u>all contracts</u>, agreements and documents that would reflect pricing, terms, allowances, rebate programs, etc." (Emphasis added.)

27. NASA accepted Horn's offer and issued the contract for Recovery Audit Services to Horn on December 23, 2004, as Purchase Order No. NNH05CC28D (the "Purchase Order" or "Contract" used interchangeably hereafter) under the BPA. Exhibit ("Ex.") 1.

28. The Purchase Order description read: "Recovery Audit Services in accordance with Attachment A, Statement of Work for the period of December 23, 2004, through December 22, 2005," and incorporated by reference the terms and conditions of the BPA and all its modifications.

29. The Purchase Order called for Horn to receive a contingent fee of 13.5 percent based upon the recovery by NASA of improper payments through the recovery audit process.

30. Attachment A, the SOW to the Contract, provided a Scope of Work consistent with Horn's offer that stated, "[t]he contractor shall perform a primary audit recovery on <u>all contract payments</u> for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments." (Emphasis added.)

31. Four options to extend the term of the Contract were included in the Purchase Order to extend the audit recovery period to include fiscal years 2004-2005, 2006, 2007, and 2008.

32. On September 1, 2005, NASA exercised Option 1 and awarded Amendment One of the Contract to Horn which extended the period of recovery audit performance by Horn for another year through September 30, 2006, adding payments for review that would include those made during fiscal years 2004 and 2005.

33. Under the terms of the offer by Horn and the acceptance by NASA, both NASA and Horn intended that all contracts be audited for recovery of overpayments and under-deductions. Moreover, and consistent with the offer from Horn, NASA provided downloaded data to Horn for recovery auditing activities on all contracts. In consideration of this offer and acceptance, Horn was to receive a percentage fee of every recovered dollar returned to NASA.

34. Furthermore, the Contract between NASA and Horn is in complete accord with the OMB guidelines regarding recovery audit activity which state that the scope of recovery auditing shall be "all classes of contracts and contract payments." See OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, OMB MEMO. NO. M-06-23, ISSUANCE OF APPENDIX C TO OMB CIRCULAR A-123 (2006) (Emphasis added.)

## CONTINGENCY FEE CONTRACTS FOR RECOVERY AUDITS

35. Horn was awarded the Contract with NASA for recovery audit activity on a contingency fee basis of 13.5 percent of all amounts actually recovered by NASA.

36. As stated in OMB M-03-12, contingent fee contracts are allowed for recovery audits. See OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, OMB MEMO. NO. M-03-12, ALLOWABILITY OF CONTINGENCY FEE CONTRACTS FOR RECOVERY AUDITS (2003).

37. Recovery audit contractors working on a contingent fee basis assume all the financial risks as they receive no compensation unless an improper payment is actually recovered. Only then does the recovery audit contractor receive a percentage of the recovered amount.

38. Because a recovery auditing firm will bear significant financial risk, it will evaluate the potential of recoverable claims prior to bidding on such a job.

39. In this instance, Horn estimated that the potential auditable dollars were in the range of $45 billion. This estimate was based on an annual NASA budget of $15 billion. Horn believed that approximately 50 percent of the budget would be auditable dollars for that six year period. Taking into consideration the published government error rate of 4 percent, Horn then estimated that, if recovered, a 13.5 percent contingent fee with a four percent payment error rate on 50 percent of the NASA budget would cover Horn's expenses and provide a reasonable profit for the risk involved.

## CONTRACT PERFORMANCE

40. The Purchase Order named Mr. Melvin DenWiddie as the Contracting Officer's Technical Representative ("COTR").

41. Following the award of the Purchase Order at the end of December, 2004, NASA (including Mr. DenWiddie) and Horn met for the initial Project Kick-off Meeting (the "Project Kick-off Meeting" or "Pre-Audit Planning Meeting" used interchangeably hereafter) as required by the SOW, on February 8, 2005, in Washington, D.C.

42. The purpose of the February 8, 2005, Project Kick-off Meeting was to meet the requirements of the SOW by reviewing Horn's Recovery Audit Project plan (the "Recovery Audit Project Plan" or "Pre-Audit Planning Guide" used interchangeably hereafter). The Pre-

Audit Planning Guide is a written recording of the audit process to be implemented at the Space Flight Centers (the "Space Flight Centers" or "Payment Centers" used interchangeably hereafter), as reviewed and approved at the Project Kick-off Meeting with NASA Headquarters. The Pre-Audit Planning Guide then was to serve as the tool for conducting detailed audits of NASA' s financial processes and for performing the recovery audits.

43. The Project Kick-off Meeting was also a forum for Horn and NASA to discuss any vendors or areas of contracting that were off-limits to the recovery audit process.

44. No limitations to Horn's recovery audit activity were discussed during the initial Project Kick-off Meeting in Washington, D.C.

45. Mr. DenWiddie stated at the February 8, 2005, meeting that NASA Headquarters needed to make the NASA Payment Centers aware of the upcoming recovery audits and educate them on what they should expect from Horn's activities.

46. In the meantime, Gwendolyn Sykes, NASA CFO at the time, sent an email (believed to have been prompted by Mr. DenWiddie) on or about March 4, 2005, to the Payment Centers; Horn was not copied on this email, nor was Horn even aware of its existence. The email was to explain the recovery audit process and what the Payment Centers may expect from Horn's audit activities.

47. However, the email memorandum from Gwendolyn Sykes incorrectly informed the Payment Centers that Horn would be conducting an examination of payment records of fixed price contracts only under its recovery auditing Contract for improper payments.

48. Horn scheduled and met with the nine Payment Centers, in addition to the initial Project Kick-off Meeting with NASA Headquarters, to review the Pre-Audit Planning Guide, the tool developed and approved by NASA at the Project Kick-off Meeting in accordance with

the SOW. These meetings took place from April 1, 2005, through May 17, 2005, a period of time after the incorrect memorandum had been sent to each Payment Center by Gwendolyn Sykes. However, no Payment Center, nor NASA Headquarters, indicated to Horn that there were any limitations on the scope of Horn's recovery audit review under its Contract during any of the Pre-Audit Planning Meetings. In addition, all data furnished to Horn for the performance of recovery audit services included payments on all types of contracts.

49. In fiscal year 2003, NASA converted its accounting data from 10 separate systems to a single integrated system. A goal of this one system was to produce auditable financial statements, a goal still not met in fiscal year 2006. See NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, PERFORMANCE AND ACCOUNTABILITY REPORT FISCAL YEAR 2006.

50. In order to address deficiencies in the accounting system, NASA updated its system with the Systems Applications and Products Version Update (the "SAP") to the most recent version.

51. Horn was not aware, at the time of its offer to contract, that the accounting system would be changed during the course of its recovery audit, creating much additional and unnecessary work by Horn. However, Horn, at a significant additional cost to Horn, developed its own program that allowed Horn to work with the previous Legacy system and the SAP system as if they were one program.

52. By July 2005, Horn had received Legacy Systems and SAP systems data from each Payment Center that was supposed to be sufficient to allow Horn to begin the audit recovery process. However, the SAP data provided was incorrectly filtered by NASA so that it prevented, in some instances, and severely impaired in other instances, the recovery audit process by Horn.

53. Horn was forced to request that the SAP data be collected again from the Payment Centers and correctly filtered before Horn could begin the recovery audit process.

54. It was not until August 2005 (eight months after award of the Horn Contract), that Horn finally received the SAP data from the NASA Payment Centers in the required format to begin the recovery audit process. This was an unnecessary NASA caused delay to Horn's performance of the Contract. In addition this was a failure by NASA to cooperate with the terms of Horn's Contract.

55. On or about November 2005, the Payment Center's CFO began to require Horn to obtain the individual Contracting Officer's (the "CO") approval of any claim for recovery. This caused problems for Horn's recovery audit process because the CO was often the individual who had authorized the payment. Thus, this put the CO in the position of approving or denying a claim for recovery on an improper payment that the CO had likely authorized in the first instance. NASA created a situation that materially impacted and hindered Horn's performance of the Contract because it was difficult for the CO to fulfill his duties impartially, objectively, and without bias.

56. In addition, the Purchase Order, as noted in the Final Decision of the Contracting Officer regarding Horn's claim, directed Horn to provide claims for recovery to NASA's CFO and the Payment Center Deputy CFO for Finance for approval, not the CO. Therefore, this insertion of the CO into the process was in direct violation of the Contract and a breach thereof.

57. Horn requested that NASA Headquarters instruct the Payment Centers to comply with the Contract terms and require that only the Payment Center Deputy CFO approve claims, not the Payment Centers' COs. However, despite Mr. DenWiddie's indications that he would

resolve this matter, no resolution of this approval process occurred, and the COs failed to cooperate with the terms of the Contract and continued approving or denying Horn's claims for recovery.

58. On or about July 2006, almost 18 months into Horn's performance, June Boeckel of the Johnson Space Center informed Horn that they would not approve or process claims for improper payments on any contract payment except those from fixed price contracts. Ms. Boeckel further stated that she would approve no claims against "my customers" as she referred to the contractors to NASA. This was the first time that Horn had been explicitly informed of such an improper limitation on its Contract for the recovery audit services.

59. Horn had not been previously provided with any reason for such an incorrect position taken by Johnson Space Center. Ms. Boeckel then stated that the basis for this incorrect position was the Gwendolyn Sykes memo of March 4, 2005, a memorandum that Horn had never seen, and a memorandum that was never brought up for discussion at any Payment Center Pre-Audit Planning Meeting.

60. During a weekly Wednesday conference call between Payment Centers, Johnson Space Center informed the other Payment Centers of the position it was taking regarding approving and processing claims for improper payments on only fixed price contracts.

61. Following such conference calls between Payment Centers regarding the contractually improper decision to limit approval and processing of claims to fixed price contracts, other Payment Centers began limiting the claims processing in the same manner, a direct breach of Horn's Contract. NASA also breached the implied duty to cooperate by refusing to review, approve, and process claims presented by Horn in accordance with the terms of the Contract. In addition, NASA breached the implied duty to not hinder

performance of the Contract by severely interfering with Horn's performance and by acting to destroy Horn's expectations under the terms of the Contract.

62. NASA purposefully and intentionally frustrated and hindered Horn's performance of its Contract by refusing to process claims submitted by Horn, and by refusing to correct the improper statement made by NASA which effectively led to a constructive partial termination of Horn's Contract for the convenience of NASA.

63. In addition, this improper decision by the Payment Centers to limit Horn's recovery audit activity to fixed price contracts fatally infected the recovery audit process, was a breach of contract, a breach of the implied duty of NASA to not hinder or delay Horn in performance of the Contract, and, among several things, led to the current claims situation.

64. Despite the breaches by the other Payment Centers, Marshall Space Flight Center continued to review, approve, and process claims on all contract types including cost contracts. This inconsistency between the Payment Centers further exacerbated the ongoing problems.

65. Horn was not copied on the March 4, 2005, email from Gwendolyn Sykes, and thus had not known of this contractually-improper decision until it was raised in the summer of 2006, by the Payment Centers as justification to improperly limit Horn's recovery audit activity and severely breach the Contract.

66. Once the Payment Centers began limiting the scope of Horn's Contract, Horn made monthly trips to Washington, D.C. to request Mr. DenWiddie to have NASA correct this contractually-improper position by instructing the Payment Centers to comply with the terms of its Contract. However, NASA failed to cooperate, failed to act in good faith, and failed to correct this improper position regarding the terms of the Contract.

67. NASA, at the Goddard Space Flight Center, improperly delayed performance by Horn from June 16, 2006 to July 17, 2006 by refusing to allow Horn auditors onto the facility. This lack of access was allegedly due to the expiration of passes. Even if so, NASA improperly delayed, failed to cooperate, and was unreasonable when it stalled in replacement of new passes. This delay improperly obstructed Horn's ability to conduct recovery audit work for over thirty days at Goddard Space Flight Center.

68. Mr. DenWiddie had previously provided Horn with an excellent recommendation to the Department of Transportation on November 1, 2005. And later, Mr. DenWiddie provided Horn with another excellent recommendation on June 30, 2006, stating "your overall performance has been outstanding and we are very pleased to have you on our team."

69. However, Mr. DenWiddie retired on June 30, 2006, with no resolution to the audit recovery claim approval process yet issued by NASA. This all occurred shortly before Horn was to learn that the second option on its Contract would not be exercised. Thus, Horn's Contract period was set to expire September 30, 2006.

70. Horn was not given notice of who the new COTR was to be as required by the Contract. Although seemingly a ministerial task, the reality was that this left Horn with no regular source of contact at NASA to help resolve these improper Contract limitations, further impeding the recovery audit process. Horn has never received notice of the identity of a new COTR.

71. With no immediate contact at NASA, Horn sent emails on or about July 17 and 21, 2006 to both Terry Bowie and Carrie Causey at NASA Headquarters asking for assistance to "clear up the misunderstanding on contracts to be audited." However, no assistance was forthcoming and NASA failed to cooperate and failed to act in good faith.

72. On or about July 21, 2006, Carrie Causey informed Horn via email that "the CO (Dean Patterson) will provide Horn & Associates precise directions pertaining to the JSC [Johnson Space Center] issue next week after we have met." The Johnson Space Center issue was the improper limitation on recovery auditing of only fixed price contracts.

73. Five days later, on or about July 26, 2006, following Mr. DenWiddie's prior excellent recommendations of Horn's outstanding performance, one being only 26 days earlier, NASA through Mr. Patterson, issued an email to Horn stating that "in light of performance concerns that NASA has regarding Contract NNH05CC28D, you are advised to restrict your current audit recovery reviews to fixed price contracts." The alleged performance concerns, which are totally inconsistent with the excellent recommendations described above, were not set out by Mr. Patterson verbally or in the email.

74. Horn was not provided any clarification as to whether these alleged "performance concerns" regarded auditing of particular contract types or whether they regarded Horn's performance in general. However, in less than one month's time following this email, Horn was notified that Option 2 of the contract would not be exercised.

75. On or about August 3, 2006, a meeting between NASA and Horn occurred to discuss contract performance issues at the Payment Centers. In attendance at the August 3, 2006, meeting for NASA were Dean Patterson, NASA Procurement Manager, Carrie Causey, another Procurement Manager, Andrea Davis, NASA Contract Specialist, and Charles McIntosh, NASA Branch Manager and Assistant to Terry Bowie, Deputy CFO of NASA. Mike Lowery, Tom Horn, and Marie Beckey were present on behalf of Horn. At the meeting Dean Patterson stated that he was replacing Janet Langweil as the Contracting Officer. While

NASA alleged that Horn had missed certain deadlines, Horn demonstrated with copies of documents that all such deadlines had been met.

76. Mr. Patterson ultimately revised his position at the August 3, 2006, meeting by acknowledging that the scope of work from the RFQ had been expanded when the Purchase Order was issued to Horn such that no contract restrictions for Horn's recovery auditing existed, meaning the Purchase Order called for review of payments from all contracts. Dean Patterson explicitly stated that Horn should not worry because NASA "will make [Horn] whole."

77. In addition, NASA, through Dean Patterson, agreed to issue a directive to the Payment Centers requiring the Payment Centers to allow Horn to audit all contracts in accordance with the terms of the Purchase Order. However, NASA, through Dean Patterson, refused to give Horn a copy of this directive saying that the directive was intended "for internal government distribution only."

78. Shortly thereafter, on or about August 24, 2006, Horn received a letter from Dean Patterson indicating that NASA would not be exercising the second option on its Contract. Thus, Horn's Contract with its first option exercised was set to expire on September 30, 2006.

79. With only a month to go on its Contract period, Horn was still encountering resistance with the Payment Centers refusing to review, approve and process Horn's claims on improper payments. NASA had in essence, constructively terminated a significant portion of Horn's Contract for its own convenience and in so doing, breached the Contract by not properly notifying Horn of such actions.

80. Then, on or about September 5, 2006, Horn was informed by Dean Patterson in a phone call that Horn's Contract did cover the audit of all contract types and payments made by

NASA. Horn was also informed by Dean Patterson that he had notified all Payment Centers that Horn's Contract did in fact cover audit of all contract types and payments.

81. However, on or about September 8, 2006, Horn informed Dean Patterson that various Payment Centers indicated that they had been instructed by Dean Patterson of other Contract limitations to Horn's Contract and to not accept claims on other contract types, all contrary to the Purchase Order. All these improper limitations further prove that NASA breached its duty of fair dealing, acted unreasonably, and constructively terminated its Contract, in part, without officially notifying Horn of the termination.

82. These other inappropriate limitations to Horn's Contract were to "not accept claims on certain contract types and that claims should be denied on: 1) open contracts subject to final review by closeout; 2) contracts with provisional rates pending audit by DCAA; 3) contracts with provisions for advance payments to non-profit organizations that conduct research and development work; and 4) contracts that authorize progress payments." All such limitations severely restricted the scope of the Contract with only a few weeks left on the Contract period.

83. Again, Horn's Purchase Order, with the first option to extend contract time exercised, was set to expire on September 30, 2006, just weeks after Dean Patterson agreed to inform the Payment Centers that the scope of the Purchase Order included recovery audits of all contracts.

84. This delay and refusal by all Payment Centers in processing Horn's claims of improper payments continued the fatal impact on Horn's recovery audit process, breached the express Contract, breached the implied duties of the Contract, and effectively acted as a constructive partial termination for the convenience of NASA further breaching the Contract by not compensating Horn for the constructive termination.

## RESULTS OF THE RECOVERY AUDIT WORK

85. In spite of the improper impediments raised by NASA, Horn identified approximately $121 million of claims for various classifications of improper payments. Each claim was submitted to NASA with supporting documentation proving the improper payment. Yet to date, only $197,285.47 dollars of claims have been processed by the Payment Centers.

86. On or about November 16, 2006, NASA issued its Performance and Accountability Report ("PAR") for Fiscal Year 2006. NASA reported that its recovery audit activity resulted in finding $256,254.53 in identified improper payments based on a review of $57,439,000,000.00 in payments by NASA in fiscal years 1997-2005, a period of time encompassing Horn's recovery audit contract with NASA (with the addition of fiscal year 1997).

87. Horn was the only private recovery auditing entity reviewing contract payments by NASA for fiscal years 1998-2005, and thus the only recovery auditing activity that could have provided the information included in NASA's PAR, with the exception of fiscal year 1997.

88. Horn did not provide the information NASA furnished to Congress. The information furnished to Congress for fiscal years 1998-2005 accordingly was false.

89. Horn reviewed approximately $15 billion of the contract payments for the fiscal years of 1998-2005, a period of time from October 1, 1997 through September 30, 2005.

90. On or about December 21, 2006, NASA, by Mr. Patterson, determined that of the approximately $121 million reported by Horn as being improper payment claims, all but approximately $246,000.00 of the claimed improper payments lacked sufficient documentation for NASA to proceed with the recovery process or NASA had decided that the claim was not a recoverable improper payment.

91. Horn responded on or about December 27, 2006, stating that each of the claims submitted as improper payments were submitted in triplicate with supporting background information as required by NASA. In addition, Horn offered to meet personally with the necessary officials from NASA to conduct a formal review of all claims and explain the basis for the claims and the reasons why the claims were recoverable improper payments. Furthermore, OMB M-06-23 in its definition of erroneous payments, stated that "[i]n addition, where an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an error." OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, OMB MEMO. NO. M-06-23, ISSUANCE OF APPENDIX C TO OMB CIRCULAR A-123 (2006).

92. NASA refused Horn's offer of a formal review of all claims.

93. On or about January 31, 2007, a meeting occurred between NASA and Horn to discuss Horn's audit findings. Present from NASA were Dean Patterson, Contracting Officer; Andrea Davis, Contract Specialist; and Bruce Ward, Senior Advisor, CFO's Office at NASA Headquarters. Present for Horn were Mike Lowery; Marie Beckey, DC audit manager; and Dan Lizana, senior auditor. Horn presented information showing it had uncovered approximately $81 million in improper, erroneous overpayments plus an additional $40 million of interest and penalty claims, a total of approximately $121 million of valid recoverable payment errors. However, NASA categorically denied by class approximately $60 million in claims and dismissed for no express reason, other claims presented by Horn. The meeting came to an abrupt end with no substantive review of claims.

94. At the end of Horn's Contract period, Horn had presented NASA with over 400 claims for recovery in 15 different classes. The claims fell into the following classes:

Obligations Overpaid; Prompt Pay Interest Calculation Errors; Statement Claims; Payment Errors; Cash Discounts; Regular Duplicate Payments; Award Fees Overpaid; Interest on Overpayments; Prepayment Discounts; Pricing Claims; Miscellaneous Charges; and Tax Charged in Error.

95. Despite NASA's hindrance of the Contract and refusal to cooperate with Horn's recovery audit process, Horn found the following recovery audit claim potentials at each NASA Payment Center included in the recovery audit process: Ames - $138,536.17; Dryden - $12,443.76; Glen - $17,318.44; Goddard - $97,799,329.39; Johnson - $20,183,307.33; Kennedy - $2,915,935.08; Langley - $40,451.99; and Marshall - $272,041.50. The total recovery audit claim potentials for all Payment Centers were $121,379,363.66.

96. The differences in claim potentials found at each Payment Center listed above is partially a reflection of the size of the Payment Center and therefore the amount of contract payments administered by the Center, but more importantly, it is a reflection of the lack of cooperation by particular Payment Centers with Horn. Cooperation was so lacking at times that Horn was forced to reassign audit team members to other locales.

97. Despite the lack of cooperation by NASA, the failure to review, approve, and process claims for overpayments on all contracts, and other breaches of the Contract, Horn still found the recovery audit claim potentials of $121 million listed previously.

98. As stated above, overpayment and improper payment claims fall into various classes. The following subparagraphs describe a few of these classes of claims found by Horn as well as illustrate many of the inconsistencies throughout NASA at the various Payment Centers. For the entire duration of Horn's Contract, the individual Payment Centers looked to NASA headquarters for approval of the audit process, but NASA headquarters failed to resolve

the inconsistency between the centers. Consequently the inconsistency between the Payment Centers in processing claims was great, as shown below.

a. Duplicate payments occur where two or more payments for the exact item, invoice, service, or performance are made. These overpayments are a common error made by automated payment systems. Overpayments are typically the easiest error to detect and the simplest error to explain, and thus recover, however this was not always the case.

   i. For example, Horn's Claim Number 2195 is for a duplicate payment by Goddard Space Flight Center to Global Science & Technologies, Inc., in the amount of $481,219.30. The original payment was made on 11/19/03 and stamped paid. The duplicate payment was made on 12/24/03 and stamped paid. Horn presented this information to NASA. NASA contacted Global Science & Technologies and they confirmed it was a duplicate payment. Yet, Global Science & Technologies said that the duplicate payment would not be repaid because it had some small invoices open, so the duplicate payment would be used to offset those invoices. No such offset was ever accomplished with proper accounting to Horn's account. And, to Horn's knowledge nothing has been done to collect this improper payment. Furthermore, when Horn asked for details as to why this claim had not been collected, the answer given was that "it is not among the items approved by the centers."

   ii. On the other hand, at John H. Glenn Research Center, Horn's Claim Number 2249 is a duplicate payment by Datastream Systems Inc., which

readily refunded the money to NASA. This claim showed invoice number 07158, dated 10/15/97 that was paid once on 12/10/97 in the amount of $6,475.00; yet it was paid again on 5/7/98 in the amount of $8,711.54. The first invoice was short paid due to a deduction of unauthorized travel expenses. NASA paid the precise same invoice on these two occasions. However, at John H. Glenn Research Center, Horn was allowed to work directly with the supplier and after explanation to the supplier that NASA had paid the invoice twice the supplier readily refunded the money to NASA.

iii. Horn has identified $953,150 of overpayments for this class of duplicate payments.

b. Cash discounts result where the contractor offers an invoice payment reduction if payment is made prior to a specific date. So, if the early payment discount is not taken, then the payment is considered erroneous and subject to recovery. There exists much confusion and inconsistency between Payment Centers on how to even compute the cash discounts. Johnson Space Center, Kennedy Space Center and Ames Research Center computed cash discounts based on the date of the supplier's invoices. Marshall Space Flight Center computed the cash discount date from the date of the receipt of the invoice. Goddard Space Flight Center and Glenn Research Center computed the cash discount date from the latter of the invoice date, receipt of invoice date, or receipt of goods or services date.

i. An example of a cash discount earned but not taken is Horn's Claim Number 1065 for Goddard Space Flight Center to Honeywell Technology Solutions in the amount of $179,343.87. The invoices from Honeywell Technology Solutions, totaling $89,671,032.65, carried a cash "discount rate" of .002 if paid by a specific date. Goddard paid these invoices within the cash discount terms stated, yet Goddard did not take the cash discount offer. The Payment Center denied Horn's claim with no explanation.

ii. Claim number 1997 from Johnson Space Center, in the amount of $1,059.05 is from an invoice from Dauphin North America which carried 1 ½ % terms if paid within 20 days. The invoices were paid promptly by NASA with no deduction for cash discount. This claim was collected from the supplier promptly after the presentation of Horn's claim.

iii. Horn has identified $1,898,881 in overpayments for this class of cash discounts.

c. Rebates earned but not taken are another type of claims class similar to cash discounts. As defined by FAR Subpart 32.9, a discount is an invoice payment reduction offered by the contractor if payment is made prior to its due date. Discounts are often used interchangeably with rebate or refund. Under the IPIA, if the rebate or discount is not taken by the government, then the payment is considered to be an improper payment and is subject to recovery.

i. A rebate to reduce cost of a product or service on a variable basis is foreign to all the Payment Center's accounting processes. Since the invoice processor would never check to see if an earned rebate was taken, if the CO does not physically reduce the price on the voucher or invoice, the rebate will not be taken.

ii. At Marshall Space Flight Center, a rebate offered by Silicon Graphics Federal Inc., in the amount of $48,875.18 was offered and accepted, but yet NASA paid the full amount of the invoice without deducting the rebate.

d. Pricing claims result where any item on an invoice is billed at a different rate than the contract rate and the invoice is paid by NASA.

i. For example, Praxair claim number 1998 in the amount of $37,750.00, and claim number 1999 in the amount of $32,501.79, both dated 4/18/06, at Kennedy Space Center involved rental charges for 500 liter dewars (liquid nitrogen/storage containers), as well as residual credit. Praxair had charged rental rates beyond those allowed in the contract. When Horn pursued these claims with NASA, Horn was informed that "the claims were not approved by the center," without any further explanation.

ii. However, Horn's Claim Number 2296 from Marshall Space Flight Center, dated 2/6/06, in the amount of $30,250.46 is a pricing claim where the hourly wages were billed and paid at an incorrect rate compared to the rate set in the contract for services. Horn provided the

exact same type of backup data to support this claim as was presented to the Kennedy Space Center whereby NASA refused to process the claim for Praxair. This company that made the incorrect billing was very cooperative with the Horn auditors and Marshall Space Flight Center. As a result, NASA and thereby Horn, were able to collect on this claim.

iii. Horn has identified $1,456,209 in overpayments for this class of pricing claims during its abbreviated review period.

e. Award fees overpaid happen when a payment center pays out more in provisional payments than were earned for a specific time period. This type of overpayment would occur because, as the payment center would become aware of the overpayment, they would deduct it from the next award fee payment issued in the following payment period. However, when they subtracted the provisional award fee payment from the earned award fee for the payment period, they would often take the new credit from the bottom line of the later invoice which resulted in a portion of the improperly paid award fee being perpetuated through the later payments on the contract. Thus, NASA failed to receive the full credit for the overpayment. As a result, NASA ends up paying the vendor more than amounts earned for the time periods in question.

i. At Goddard Space Flight Center, Horn found this class of overpayment in four instances. The claims were initially approved by the Goddard Space Center's management and referred to the Center's CO. However, the CO had been replaced by another CO who wanted to wait until the contract was closed for final review before collecting. This overpayment

occurred almost two years earlier, leaving the government with money due. Horn's Claim Number 2292, dated 7/28/06 in the amount of $150,880.00 is such an example of an award fee overpayment. This claim has been approved for payment, but to date Horn has not been paid on it.

ii. Horn has identified only $187,675.13 in overpayments for this class of claims because the stalling by Goddard Space Center in pursuing these claims forced Horn to refocus its audit recovery efforts elsewhere.

f. Statement audits and open credits are classes of claims that involve reviewing vendor's statements. Horn's recovery audit services included a review of statements from all vendors identified by NASA. Vendor's statements typically show a complete listing of open items including invoices, credits and unapplied cash items. The Recovery Auditing Act attempted to simplify the process for both vendors and the federal agencies dealing with overpayments and the return of these funds. Now, if the contract in which the overpayment or underpayment occurred is still open, the recovered funds (less the recovery auditor's fee) is returned to the contract. If however, the contract is closed, the funds (less the recovery auditor's fee) are returned to the Department of the Treasury. Either way, the recovery auditor is compensated for finding the overpayment that resulted in a repayment to the government. Problems and inconsistencies arose however at the Payment Centers because each Payment Center had its own rules regarding the handling of checks and credit memos. For example, Goddard Space Flight Center automatically returned all checks that could not be identified

to a specific contract or overpayment within 48 hours. As a result, on numerous occasions checks for open credit memos or overpayments identified by Horn were returned because the Payment Centers' rules did not provide for appropriate directions regarding how to deal with checks sent to the Payment Centers as a result of the recovery audit work.

i. Horn's Claim Number 2581, dated 8/23/06, in the amount of $72,882.32, included a statement from Hamilton Sundstrand that reflected almost $730,000.00 of open credits dating back to 12/31/96. This was a situation where the vendor, totally aware that credits were due to NASA for almost 10 years, was content to keep the money and wait to see if NASA ever closed out the contracts. Part of the reason vendors were content to wait and not refund the government, was that as in this case, Johnson Space Center was not charging its suppliers interest on the loss of use of the overpayment money.

ii. Horn however, was successful in recovering Claim Number 2593, dated 8/01/06 in the amount of $62,711.25 at Marshall Space Flight Center. The amount of this claim reflects three open credits from SAP Public Services, dated March and June of 2004. Once contacted regarding this open credit, SAP cooperated with researching these items and authorized payment to the Marshall Space Flight Center. This money had been lost to NASA for over two years and possibly would have remained as such if not for the recovery audit work of Horn.

iii. By the end of Horn's contract period for recovery audit work, 80% of the NASA vendors had provided Horn with their statements. Horn's review was only partially completed due to the breaches by NASA of Horn's Contract. Still, Horn was able to identify $943,214.00 in overpayments for this class of claims.

g. Interest on overpayment claims represents a significant portion of Horn's findings at Goddard Space Flight Center, Kennedy Space Center, and Johnson Space Center. Each overpayment identified by Horn has a corresponding interest claim. A contractor's inappropriate and improper use of erroneously paid government funds results in an interest claim by the government. Horn calculated interest from the date of the overpayment or duplicate payment to the date of the individual Horn claim based on the U.S. Treasury Rates, Pub. L. No. 92-41, 85 Stat. 97 (2000). NASA Payment Centers were very proficient in following guidelines regarding interest payments due to contractors on invoices paid by NASA more than 30 days beyond the guidelines defined in the Prompt Payment Act. On the other hand, NASA was loathe to recover interest from the same contractors, referred to repeatedly by the Payment Centers as "my customers," when they had received payments erroneously and thereby had improper use of the government's money. For example, when interest claims were presented to Goddard Space Flight Center and Johnson Space Center by Horn, the Payment Centers' response was that they were given no guidance by NASA Headquarters to approve interest claims.

i. Horn's Claim Number 2417 is an example of a vendor who responded to Horn's claim for interest on overpayments. This claim is from Johnson Space Center, dated 4/10/06 in the amount of $11,057.79, and it is for the recovery of interest on seven overpayments.

ii. Horn has identified $40,619,543.71 in actual dollar amount of interest owed to NASA due to hundreds of millions of overpayments retained over 30 days by suppliers.

h. Payment Errors is a class of claim types where the overpayment does not fall into any specific category. These types of errors often involve mathematical errors, vouchers that have over-billed on cost, or some reason why the invoice was paid at a higher amount than should have been paid. Horn's findings resulted in a number of overpayments in this class whereby the indirect rates on some vouchers were double and triple the approved rates. As stated previously, the DCAA audits the amounts claimed by contractors to determine if those amounts are in compliance with the terms of the contractor's contract. As a result, individual contract payments were rarely reviewed by DCAA for the purpose of recovering improper payments. Therefore, Horn's recovery audit findings in this class are beneficial to NASA as DCAA would not typically be looking for these overpayment errors.

i. For example, in one instance NASA received a check in the amount of $700,000.00 for a downward rate adjustment. After an audit of all the vouchers, up to the date of the check, the contractors actually owed

another $700,000.00 for the reimbursement of costs in excess of the agreed rates.

ii. In another type of payment error, Horn's Claim Number 2227, dated 4/18/06, in the amount of $135,709.82, addresses several adjustments on voucher #16, for the billing period from 2/20/99 to 3/05/99. On 3/12/99, Space Gateway Support informed NASA of the overbilling and that it would be adjusted on voucher #17. Yet no adjustment was made on voucher #17 nor on any later voucher. However, Kennedy Space Center informed Horn that the overpayment had been recovered despite the lack of any documentation establishing this.

i. Although Horn has not addressed all claim classes in this Complaint, these claims are all addressed in the Final Report (the "Final Report" or "Final Management Report" used interchangeably) as required by the SOW and submitted by Horn to NASA in June of 2007. The remaining claim classifications, not addressed in the Complaint, are: Rebate Claims - $48,875; Tax Charged in Error - $17,570; Miscellaneous Charges added to Invoice in Error - $6,815; Sales Tax Overcharge - $323; and Short Shipped - $129.

99. On or about February 9, 2007, NASA and Horn met for the last time. The same persons were in attendance as attended the January 31, 2007, meeting between NASA and Horn (Dean Patterson, Andrea Davis, Bruce Ward, from NASA, and Mike Lowery, Marie Beckey, and Dan Lizana from Horn).

100. At the February 9, 2007, meeting, NASA agreed to supply Horn with a list of Horn's claims with comments by NASA as to whether the claim was approved or denied and if denied, why it was denied. However, a complete report has never been provided to Horn.

101. NASA, by Mr. Patterson, issued a letter dated March 13, 2007, stating that as a result of Horn's recovery audit work, only $221,310.39 had been approved for debt collection under the contract and that Horn's fee on this amount would be remitted once these claims were collected. In addition, the letter notes that Horn had been paid $7,862.71 to date in fees. Since the date of the final denial letter, January 25, 2008, Horn has received an additional $18,770.81 in fees.

102. The NASA letter of March 13, 2007, expressly admitted that the Contract gave Horn the right to review all contracts, all the while discussing various improper limitations that NASA placed on Horn's recovery audit process. In addition, this letter points out that, while Horn may *identify* all lost funds and *recommend* debts to be collected, NASA has the ultimate decision with this regard. However, while NASA may have had some discretion, such a decision must be grounded in fact and law.

103. Mr. Patterson went on to say in his March 13, 2007 letter that NASA had a "fiduciary duty to the contracting community for fair dealing." The letter continues explaining that this fiduciary duty includes identifying valid payment errors and the avoidance of recovery actions unless valid proof exists of such erroneous payments. Horn submitted valid proof of such erroneous payments to NASA along with an offer to review and explain, in person, the justification for recovery of such claims. NASA however, refused this offer of a personal review of valid claims.

104. In addition, Horn was owed a fiduciary duty by NASA to cooperate with the terms of its Contract and for NASA to act in good faith and fair dealing. The preceding paragraphs illustrate numerous breaches of these duties.

105. The letter of March 13, 2007 from Mr. Patterson also stated that it was the final agency position with respect to the issues between NASA and Horn.

106. Horn submitted its Final Management Report in June of 2007.

107. On or about July 19, 2007, NASA through Mr. Patterson, acknowledged receipt of Horn's Final Management Report by letter.

108. NASA, on July 26, 2007, then issued its Administrative Report Card declaring that Horn's performance under the Purchase Order was "outstanding."

## DAMAGES

### *Expectation Damages*

109. As a direct and proximate result of NASA's breaches of the Contract, Horn has suffered considerable damages and sustained injuries.

110. NASA's own PAR – the required report under OMB Circular A-136 for IPIA reporting to the President and Congress, along with the testimony of NASA to the Senate Subcommittee – is a reasonable basis for computation of Horn's damages.

111. NASA's PAR expressly states that NASA had contract payments on all types of contracts for fiscal years 1997-2005 in the amount of $57,439,000,000.00.

112. A certain percentage of all contract payments, if made in the private sector, would involve overpayments or improper/erroneous payments. A certain percentage of payments made in the federal sector similarly result in overpayments or improper payments. However, OMB's pronouncement dated June 19, 2003, establishes that the Government's error rate for

making erroneous payments is far greater than private industry and is just below four percent. See OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, OMB MEMO. NO. 2003-22, OMB ISSUES INSTRUCTIONS TO AGENCIES AND STATES FOR COMBATING WASTE, FRAUD, AND ABUSE IN FEDERAL PROGRAMS (2003).

113. At least 90 percent of payments identified as being erroneous are ultimately recovered by the entity or agency that has contracted for the recovery audit when that entity aggressively pursues the claims.

114. With the dollar information from the preceding paragraphs, it is a simple mathematical equation to determine what percentage of recovered payments, based on the contingency fee Contract (13.5%), that Horn would have recovered but for the breach by NASA.

115. But for the breaches of the Contract by NASA, Horn would have received $279,000,000.00 in its recovery auditing activities. These damages are a direct computation of Horn's 13.5% fee of 90% recovered dollars of the 4% erroneous payments of the $57 billion in payments by NASA.

*Alternative 1 - Constructive Partial Termination for Convenience*

116. As shown above, NASA constructively terminated, in part, the Contract for its own convenience when it improperly breached the Contract by limiting Horn's recovery auditing review to less than all contract payments, when it refused to review, approve, and process claims, when it failed to properly terminate Horn's Contract, and when it failed to provide Horn the proper compensation under the termination for convenience clause.

117. As a direct and proximate result of NASA's constructive partial termination for convenience, Horn has suffered considerable damages and sustained injuries.

118. The Termination for the Government's Convenience clause is found in section (l), page 3 of the second modification to the BPA, dated 11/18/2003. The Termination for the Government's Convenience clause states the following:

> The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

119. Despite NASA's breaches of the Contract, Horn was able to identify approximately $121 million in erroneous payments at the time of NASA's constructive partial termination of Horn's Contract for NASA's convenience.

120. Horn will prove that at least 90 percent of erroneous payments are recovered in both the private and public sector. Horn's contingency fee of 13.5 percent of this 90 percent collectible amount is $14,700,000.00.

121. Horn is also entitled to recover its costs incurred on the portion of work not covered by the claims totaling $121 million. The reasonable costs of this work had a value of $2,899,550.00.

122. Horn has been damaged in the amount of $17,599,550.00 due to NASA's constructive partial termination for convenience.

*Alternative 2 – Reliance Damages*

123. As a direct and proximate result of Horn's reasonable reliance on the Contract, and reliance that NASA would not breach its own Contract, Horn has suffered considerable damages and sustained injuries.

124. In reliance on the existence of the Contract between NASA and Horn, Horn incurred costs associated with its performance of the Contract that Horn would not have incurred had it not performed the Contract with NASA. These costs total $7,028,200.96 and are a good faith approximation of time, manpower, and expenses incurred on the project.

125. When a recovery audit is based on a contingency fee of a percent of recovered claims, there is no contractual obligation to maintain detailed records of time, manpower, or expenses incurred in the recovery auditing process.

126. However, as in this case, when the recovery auditing Contract is breached, in order to state a sum certain in a claim for damages, the breached party must make a good faith approximation of the time, manpower, and expenses incurred on the project. And because damage calculations are not an exact science, approximate damages may be established so long as there is a reasonable basis for the damages computation.

127. Horn has in good faith, made a fair and reasonable approximation of time, manpower, and expenses incurred on this project by Horn, its employees, and subcontractors based on expense records, time diaries, and calendars. Horn submits that these reasonable costs are $7,028,200.96.

CERTIFIED CLAIM

128. Because NASA's letter of March 13, 2007 stating that it was the final agency position, was not responding to a certified claim, Horn prepared and submitted a certified

claim for review by NASA on or about November 20, 2007, stating a sum certain owed to Horn for its recovery auditing activities. Ex. 2 (excluding exhibits originally attached to claim).

129. On or about January 25, 2008, Horn received the Contracting Officer's Final Decision denying Horn's claim in its entirety. Ex. 3.

130. The denial of this claim was in error and subject to appeal to this Court.

## FIRST CAUSE OF ACTION - BREACH OF CONTRACT

131. Horn realleges and reincorporates all prior paragraphs of this Complaint as if set forth in full herein.

132. There was a valid contract based on mutuality of intent, an offer by Horn, acceptance by NASA in the form of the award of the Contract, and consideration.

133. It was reasonably foreseeable that Horn would experience damages if NASA breached the Contract due to the significant risk that Horn assumed upon entering into a contingency fee Contract with NASA and by increasing manpower in order to meet the demands of the Contract.

134. NASA breached the terms of the Contract by issuing a memorandum in direct violation of the terms of the Contract. NASA further breached the implied duties of the Contract by failing to correct the contractually-improper position stated in the memorandum of March 4, 2005, by Gwendolyn Sykes, leading to a frustration and hindrance of Horn's Contract.

135. NASA breached the Contract by refusing to review, approve, and process claims submitted by Horn on overpayments made by NASA. NASA further breached the implied

duties of the Contract by failing to timely respond to Horn's request for assistance in removing and correcting the limitations on its scope of Contract.

136. NASA breached the Contract by improperly placing additional limitations on the scope of the Contract while at the same time misrepresenting to Horn that NASA had directed the Payment Centers to comply with the terms of Horn's Contract.

137. NASA breached the Contract by failing to provide Horn with written notice of who the new COTR was to be, therefore failing to provide Horn with a designated person to facilitate communications between Horn and NASA, ultimately resulting in frustration and hindrance of Horn's ability to perform under its Contract.

138. NASA breached the Contract by failing to enforce the terms of the Contract to require the Payment Center CFOs to review claims submitted by Horn, not the CO.

139. NASA breached the terms of the Contract and the implied duties to act in good faith and fair dealing when NASA delayed providing Horn with proper data for the recovery auditing process. In addition, NASA breached the implied duties of the Contract to cooperate and not to frustrate or hinder Horn's performance of its Contract.

140. NASA breached the terms of the Contract and the implied duties to cooperate and to not hinder performance of the Contract when NASA denied Horn access to Goddard Space Flight Center for approximately thirty days.

141. NASA breached the Contract by constructively terminating the Contract in part and failing to pay Horn the proper termination damages in accordance with the Contract.

142. Horn should be put in the same economic position it would have been in but for NASA's improper breaches of the Contract.

143. All conditions, covenants, and terms of the Contract to be performed by Horn have been performed or have otherwise been excused by operation of law.

144. As a direct and proximate result of NASA's breaches of the Contract, Horn has suffered damages, as described in more detail above, in the amount of $279,000,000.00.

WHEREFORE, Horn prays for relief as set forth below.

## SECOND CAUSE OF ACTION
## CONSTRUCTIVE PARTIAL TERMINATION FOR CONVENIENCE

145. Horn realleges and reincorporates all prior paragraphs of this Complaint as if set forth in full herein.

146. As shown above, Horn has been damaged by NASA's breaches in its refusal to review, approve, and process valid recovery claims identified by Horn.

147. NASA's actions, in addition to being breaches of the Contract, acted to constructively terminate in part, Horn's Contract for the convenience of NASA by improperly removing substantial classes of contract payments for which Horn was to provide a recovery audit.

148. Horn has been damaged by NASA's failure to properly terminate the Contract and pay Horn the proper termination damages in accordance with the Termination for the Government's Convenience clause of the Contract.

149. As a direct and proximate result of NASA's constructive partial termination for convenience, Horn has suffered damages, as described in more detail above, in the amount of $17,599,550.00.

WHEREFORE, Horn prays for relief as set forth below.

## THIRD CAUSE OF ACTION - EQUITABLE RELIEF

150. Horn realleges and reincorporates all prior paragraphs of this Complaint as if set forth in full herein.

151. In reliance on the existence of the Contract between NASA and Horn, Horn incurred costs associated with its performance of the Contract that Horn would not have incurred had it not performed the Contract with NASA.

152. Horn, at a minimum, should receive compensation for its actual costs incurred in its attempt to perform the Contract despite the numerous breaches of the Contract by NASA.

153. Horn has in good faith, made a fair and reasonable approximation of time, manpower, and expenses incurred on this project by Horn, its employees, and subcontractors.

154. As a direct and proximate result of Horn's reasonable reliance on the Contract, and Horn's reasonable reliance that NASA would not breach its own Contract, Horn has suffered damages, as set forth in more detail above, in the amount of $7,028,200.96.

WHEREFORE, Horn prays for relief as set forth below.

## PRAYER

WHEREFORE, Horn prays the Court grant the following relief:

1. That Horn have judgment on the First Cause of Action against NASA and be awarded damages in the amount of $279,000,000.00.

2. Alternatively, that Horn have judgment on the Second Cause of Action against NASA and be awarded damages in the amount of $17,599,550.00.

3. Or alternatively, that Horn have judgment on the Third Cause of Action against NASA and be awarded damages in the amount of $7,028,200.96.

4. For a trial on all issues so triable.

5. For an award of reasonable attorneys' fees as allowed by the Equal Access to Justice Act. 5 U.S.C. § 504; 28 U.S.C. § 2412 (2006).

6. For interest as allowed by the Contract Disputes Act. 41 U.S.C. § 611 (2006).

7. That Horn receive such other and further relief that the Court deems just and proper.

This the 5th day of June, 2008.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: [signature]
William H. Gammon
NC Bar No. 5618
E-Mail: bill.gammon@nelsonmullins.com
Kelli Goss Hopkins
NC Bar No. 36824
E-Mail: kelli.hopkins@nelsonmullins.com
4140 Parklake Avenue / GlenLake One
Second Floor
Post Office Box 30519 (27622-0519)
Raleigh, NC 27612
Tel: (919) 877-3809
Fax: (919) 877-3142

Attorneys for HORN & ASSOCIATES, INC.