# ORDER FOR SUPPLIES OR SERVICES

PAGE OF PAGES 3

IMPORTANT: Mark all packages and papers with contract and/or order numbers.

| | |
|---|---|
| 1. DATE OF ORDER: 2/23/04 | 2. CONTRACT NO. (If any): GS-23F-0258N |
| 3. ORDER NO.: NNH05CC28D | 4. REQUISITION/REFERENCE NO.: 4200068239 |
| 5. ISSUING OFFICE (Address correspondence to): NASA/Headquarters Procurement Office | 6. SHIP TO: a. NAME OF CONSIGNEE; b. STREET ADDRESS; c. CITY; d. STATE; e. ZIP CODE; f. SHIP VIA |
| 7. Mail Code 210.H, Attn: Janet Langweil, Ph. 301-286-3807<br>Greenbelt, MD 20771 | |
| 7. a. NAME OF CONTRACTOR: Horn & Associates, Inc. | 8. TYPE OF ORDER |
| b. COMPANY NAME: Attn: Tom Horn | ☐ a. PURCHASE<br>REF YOUR:<br>Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated. |
| c. STREET ADDRESS: 3690 E. Ft. Union Blvd., Suite 202 | ☐ b. DELIVERY – Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract. |
| d. CITY: Salt Lake City  e. STATE: UT  f. ZIP CODE: 84121 | |
| 9. ACCOUNTING AND APPROPRIATION DATA: PR: 4200068239 $1.00 B/NC: HAX PPC: KY | 10. REQUISITIONING OFFICE: NASA/HQ, CFO |

11. BUSINESS CLASSIFICATION (Check appropriate box(es))

☒ a. SMALL ☐ b. OTHER THAN SMALL ☐ c. DISADVANTAGED ☐ d. WOMEN-OWNED

| 12. F.O.B. POINT | 14. GOVERNMENT B/L NO. | 15. DELIVER TO F.O.B. POINT ON OR BEFORE (Date) | 16. DISCOUNT TERMS |
|---|---|---|---|
| NASA/Headquarters, CFO Office | | | |
| 13. PLACE OF: a. INSPECTION; b. ACCEPTANCE | | | |

## 17. SCHEDULE (See reverse for Rejections)

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| | Recovery Audit Services in accordance with Attachment A, Statement of Work for the period of December 23, 2004 through December 22, 2005.<br><br>This action obligates $1.00 for the purpose of creating a record in NASA's SAP system.<br><br>Accordingly: | | | | | |

| | | |
|---|---|---|
| SEE BILLING INSTRUCTIONS ON REVERSE | 18. SHIPPING POINT: N/A<br>19. GROSS SHIPPING WEIGHT: N/A<br>20. INVOICE NO. | 17(h) TOT. (Cont. pages) |
| | 21. MAIL INVOICE TO:<br>a. NAME: NASA/Goddard Space Flight Center, Cost & Accounting Department<br>b. STREET ADDRESS (or P.O. Box): Greenbelt Road, Mail Code 155, Bldg. 17<br>c. CITY: Greenbelt d. STATE: MD e. ZIP CODE: 20771 | $1.00 — 17(i) GRAND TOTAL |

22. UNITED STATES OF AMERICA BY (Signature) ▶ [signature]

23. NAME (Typed) Janet S. Langweil
TITLE: CONTRACTING/ORDERING OFFICER

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition not usable

Computer Generated

OPTIONAL FORM 347 (REV. 6/95)
Prescribed by GSA/FAR 48 CFR 53.213(e)

EXHIBIT
1

tabbles'

This Order is issued in accordance with the General Services Administration Schedule 520 Financial and Business Solutions. This Order is subject to all the terms and conditions of the contractor's GSA Schedule Contract GS-23F-0258N and as amended by the clauses contained herein.

**SCOPE OF WORK (GSFC 52.211-91) (FEB 1991)**

The Contractor shall provide all resources (except as may be expressly stated in this task order as furnished by the Government) necessary to perform the work specified in the SOW, Attachment A.

(End of clause)

**2. PROVISION FOR PRICING AND PAYMENT**

The amount of the Contingency Fee for this order is 13.5%. Payments to the contractor for services under this order will be based on a Contingency Fee Basis after NASA has recovered and received funds for the basic requirements as set forth in the Statement of Work (SOW). There will be no out-of-pocket expenses, costs or other financial obligations or liabilities incurred by NASA, other than the fees identified in this order.

**3. ORDER AMOUNT INCREASE/DECREASE**

The Government shall have the right to unilaterally increase the amount of this Order at any time in order to provide sufficient funds to cover the anticipated contingency fee that will be due the Contractor upon recovery of overpayments for the term of this order. Additional funds will be obligated on appropriate modifications based on the amount of overpayments recovered and will signed by the Contracting Officer.

The Government shall also have the right to unilaterally decrease the amount of this Order in the same manner as above.

**4. INVOICES - SUBMISSION OF (GSFC 52.232-95) (AUG 2000)**

Invoices shall be prepared in accordance with the Prompt Payment clause of this contract and submitted to the Cost and Commercial Accounts Department, Code 155, NASA/Goddard Space Flight Center, Greenbelt, MD 20771. For purposes of the Prompt Payment Act, the above office is considered to be the "Designated Billing Office" and the "Designated Payment Office".

(End of clause)

**5. CONTRACTOR CONTINGENCY FEES**

Contractor's Contingency Fee, as reflected in the schedule contract, shall become part of this Order. This Order need not be modified to reflect any modifications made by the GSA Contracting Officer including changes to labor rates in accordance with other contract clauses (e.g. Price Reductions Clause (GSAR 558.238-76 or Economic Price Adjustment (GSAR 552.216-71).

**6. PLACE OF PERFORMANCE–SERVICES (GSFC 52.237-92) (OCT 1988)**

The services specified by this contract shall be performed at the contractor's facility and at any location(s) deemed necessary by the Government.

(End of clause)

**7. PERIOD OF PERFORMANCE**

The period of performance of this order shall be for 12 months from the effective date of award.

**8. ACCEPTANCE–SINGLE LOCATION (GSFC 52.246-92) (SEPT 1989)**

The Contracting Officer or authorized representative will accomplish acceptance of deliverables at NASA Headquarters, Washington, DC. For the purpose of this clause, the Contracting Officer Technical Representative named in this contract is the authorized representative. The Contracting Officer reserves the right to unilaterally designate a different Government agent as the authorized representative. The Contractor will be notified by a written notice or by a copy of the delegation of authority if different representative is designated.

(End of clause)

**9. HANDLING OF DATA (GSFC 52.203-90) (JAN 1995)**

(a) In the performance of this contract, it is anticipated that the Contractor may have access to, be furnished, or use the following categories of data (which may be technical data, computer software, administrative, management information, or financial, including cost or pricing):

(1) Data of third parties which the Government has agreed to handle under protective arrangements; and

(2) Government data, the use and dissemination of which, the Government intends to control.

(b) In order to protect the interests of the Government and the owners, licensors and licensees of such data, the Contractor agrees, with respect to any such third party or Government data that is either marked with a restrictive legend, specifically identified in this contract, or otherwise identified in writing by the Contracting Officer as being subject to this clause, to:

(1) Use, disclose, and reproduce such data only to the extent necessary to perform the work required under this contract;

(2) Allow access to such data only to those of its employees that require access for their performance under this contract;

(3) Preclude access and disclosure of such data outside the Contractor's organization; and

(4) Return or dispose of such data, as the Contracting Officer may direct, when the data is no longer needed for contract performance.

(c) The Contractor agrees to inform and instruct its employees of its and their obligations under this clause and to appropriately bind its employees contractually to comply with the access, use, disclosure, and reproduction provisions of this clause.

(d) In the event that data includes a legend that the Contractor deems to be ambiguous or unauthorized, the Contractor may inform the Contracting Officer of such condition. Notwithstanding such a legend, as long as such legend provides an indication that a restriction on use or disclosure was intended; the Contractor shall treat such data pursuant to the requirements of this clause unless otherwise directed, in writing, by the Contracting Officer.

(e) Notwithstanding the above, the Contractor shall not be restricted in use, disclosure, and reproduction of any data that:

> (1) is, or becomes, generally available or public knowledge without breach of this clause by the Contractor;
>
> (2) Is known to, in the possession of, or is developed by the Contractor independently of any disclosure of, or without reference to, proprietary, restricted, confidential, or otherwise protectible data under this clause;
>
> (3) Is rightfully received by the Contractor from a third party without restriction;
>
> (4) Or is required to be produced by the Contractor pursuant to a court order or other Government action.

If the Contractor believes that any of these events or conditions that remove restrictions on the use, disclosure, and reproduction of the data apply, the Contractor shall promptly notify the Contracting Officer of such belief prior to acting on such belief, and, in any event, shall give notice to the Contracting Officer prior to any unrestricted use, disclosure, or reproduction of such data.

(End of clause)

## 10. 1852.204-76 SECURITY REQUIREMENTS FOR UNCLASSIFIED INFORMATION TECHNOLOGY RESOURCES (JULY 2002)

(a) The Contractor shall be responsible for Information Technology security for all systems connected to a NASA network or operated by the Contractor for NASA, regardless of location. This clause is applicable to all or any part of the contract that includes information technology resources or services in which the Contractor must have physical or electronic access to NASA's sensitive information contained in unclassified systems that directly support the mission of the Agency. This includes information technology, hardware, software, and the management, operation, maintenance, programming, and system administration of computer systems, networks, and telecommunications systems. Examples of tasks that require security provisions include:

(1) Computer control of spacecraft, satellites, or aircraft or their payloads;

(2) Acquisition, transmission or analysis of data owned by NASA with significant replacement cost should the contractor's copy be corrupted; and

(3) Access to NASA networks or computers at a level beyond that granted the general public, e.g. bypassing a firewall.

(b) The Contractor shall provide, implement, and maintain an IT Security Plan. This plan shall describe the processes and procedures that will be followed to ensure appropriate security of IT resources that are developed, processed, or used under this contract. The plan shall describe those parts of the contract to which this clause applies. The Contractor's IT Security Plan shall be compliant with Federal laws that include, but are not limited to, the Computer Security Act of 1987 (40 U.S.C. 1441 et seq.) and the Government Information Security Reform Act of 2000. The plan shall meet IT security requirements in accordance with Federal and NASA policies and procedures that include, but are not limited to:

(1) OMB Circular A-130, Management of Federal Information Resources, Appendix III, Security of Federal Automated Information Resources;

(2) NASA Procedures and Guidelines (NPG) 2810.1, Security of Information Technology; and

(3) Chapter 3 of NPG 1620.1, NASA Security Procedures and Guidelines.

(c) Within 60 days after contract award, the contractor shall submit for NASA approval an IT Security Plan. This plan must be consistent with and further detail the approach contained in the offeror's proposal or sealed bid that resulted in the award of this contract and in compliance with the requirements stated in this clause. The plan, as approved by the Contracting Officer, shall be incorporated into the contract as a compliance document.

(d)(1) Contractor personnel requiring privileged access or limited privileged access to systems operated by the Contractor for NASA or interconnected to a NASA network shall be screened at an appropriate level in accordance with NPG 2810.1, Section 4.5; NPG 1620.1, Chapter 3; and paragraph (d)(2) of this clause. Those Contractor personnel with non-privileged access do not require personnel screening. NASA shall provide screening using standard personnel screening National Agency Check (NAC) forms listed in paragraph (d)(3) of this clause, unless contractor screening in accordance with paragraph (d)(4) is approved. The Contractor shall submit the required forms to the NASA Center Chief of Security (CCS) within fourteen (14) days after contract award or assignment of an individual to a position requiring screening. The forms may be obtained from the CCS. At the option of the government, interim access may be granted pending completion of the NAC.

(2) Guidance for selecting the appropriate level of screening is based on the risk of adverse impact to NASA missions. NASA defines three levels of risk for which screening is required (IT-1 has the highest level of risk):

(i) **IT-1** -- Individuals having privileged access or limited privileged access to systems whose misuse can cause very serious adverse impact to NASA missions. These systems include, for example, those that can transmit commands directly modifying the behavior of spacecraft, satellites or aircraft.

(ii) **IT-2** -- Individuals having privileged access or limited privileged access to systems whose misuse can cause serious adverse impact to NASA missions. These systems include, for example, those that can transmit commands directly modifying the behavior of payloads on spacecraft, satellites or aircraft; and those that contain the primary copy of "level 1" data whose cost to replace exceeds one million dollars.

(iii) **IT-3** -- Individuals having privileged access or limited privileged access to systems whose misuse can cause significant adverse impact to NASA missions. These systems include, for example, those that interconnect with a NASA network in a way that exceeds access by the general public, such as bypassing firewalls; and systems operated by the contractor for NASA whose function or data has substantial cost to replace, even if these systems are not interconnected with a NASA network.

(3) Screening for individuals shall employ forms appropriate for the level of risk as follows:

(i) IT-1: Fingerprint Card (FC) 258 and Standard Form (SF) 85P, Questionnaire for Public Trust Positions;

(ii) IT-2: FC 258 and SF 85, Questionnaire for Non-Sensitive Positions; and

(iii) IT-3: NASA Form 531, Name Check, and FC 258.

(4) The Contracting Officer may allow the Contractor to conduct its own screening of individuals requiring privileged access or limited privileged access provided the Contractor can demonstrate that the procedures used by the Contractor are equivalent to NASA's personnel screening procedures. As used here, equivalent includes a check for criminal history, as would be conducted by NASA, and completion of a questionnaire covering the same information as would be required by NASA.

(5) Screening of contractor personnel may be waived by the Contracting Officer for those individuals who have proof of --

(i) Current or recent national security clearances (within last three years);

(ii) Screening conducted by NASA within last three years; or

(iii) Screening conducted by the Contractor, within last three years, that is equivalent to the NASA personnel screening procedures as approved by the Contracting Officer under paragraph (d)(4) of this clause.

(e) The Contractor shall ensure that its employees, in performance of the contract, receive annual IT security training in NASA IT Security policies, procedures, computer ethics, and best practices in accordance with NPG 2810.1, Section 4.3 requirements. The contractor may use web-based training available from NASA to meet this requirement.

(f) The Contractor shall afford NASA, including the Office of Inspector General, access to the Contractor's and subcontractors' facilities, installations, operations, documentation, databases and personnel used in performance of the contract. Access shall be provided to the extent required to carry out a program of IT inspection, investigation and audit to safeguard against threats and hazards to the integrity, availability and confidentiality of NASA data or to the function of computer systems operated on behalf of NASA, and to preserve evidence of computer crime.

(g) The Contractor shall incorporate the substance of this clause in all subcontracts that meet the conditions in paragraph (a) of this clause.

(End of clause)

## 11. LIMITED RELEASE OF CONTRACTOR CONFIDENTIAL BUSINESS INFORMATION (GSFC 52.203-91) (JUN 2002)

(a) NASA may find it necessary to release information submitted by the Contractor, either in response to this solicitation or pursuant to the provisions of this contract, to individuals not employed by NASA. Business information that would ordinarily be entitled to confidential treatment may be included in the information released to these individuals. Accordingly, by submission of this proposal, or signature on this contract or other contracts, the Contractor hereby consents to a limited release of its confidential business information (CBI).

(b) Possible circumstances where the Agency may release the Contractor's CBI include, but are not limited to, the following:

(1) To other Agency contractors and subcontractors, and their employees tasked with assisting the Agency in handling and processing information and documents in the evaluation, the award or the administration of Agency contracts, such as providing both preaward and post award audit support and specialized technical support to NASA's technical evaluation panels;

(2) To NASA contractors and subcontractors, and their employees engaged in information systems analysis, development, operation, and maintenance, including performing data processing and management functions for the Agency.

(c) Except where otherwise provided by law, NASA will permit the limited release of CBI under subparagraphs (1) or (2) only pursuant to non-disclosure agreements signed by the assisting contractor or subcontractor, and their individual employees who may require access to the CBI to perform the assisting contract).

(d) NASA's responsibilities under the Freedom of Information Act are not affected by this clause.

(e) The Contractor agrees to include this clause, including this paragraph (e), in all subcontracts at all levels awarded pursuant to this contract that require the furnishing of confidential business information by the subcontractor.

(End of clause)

## 12. OPTION TO EXTEND SERVICES – 52.217-8 (AUG 1989)

The Government may require continued performance of services within the limits and at the rates specified in the order. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within the period specified in the schedule. (Notice shall be given within 30 days before contract completion).

**13. OPTION TO EXTEND THE TERM OF THE CONTRACT – 52.217-9 (MAR 2000)**

(a) The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

| Option Year | Period of Performance | Audit Recovery Period | Contingency Fee |
|---|---|---|---|
| | 10/1/05 – 9/30/06 | 2004- 2005 | 13.5% |
| 2 | 10/1/06 – 9/30/07 | 2006 | 13.5% |
| 3 | 10/1/07 – 9/30/08 | 2007 | 13.5% |
| 4 | 10/1/08 – 9/30/09 | 2008 | 13.5% |

(End of clause)

**14. CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE**

The Contracting Officer's Technical Representative for this order is Mr. Melvin DenWiddie, at NASA Headquarters, Code BFZ, telephone number 202-358-0983.

**15. IN ADDITION TO THE GSA CONTRACT SCHEDULE CLAUSES, THIS DELIVERY ORDER IS SUBJECT TO THE FOLLOWING CLAUSES:**

NASA FAR SUPPLEMENT CLAUSES:

1852.204-74 CENTRAL CONTRACTOR REGISTRATION (MAY 2002)

1852.215-84 OMBUDSMAN (OCT 2003)--Alternative I (JUN 2000). The installation Ombudsman is Olga M. Dominguez, Code OJ, at 202-358-2800, fax number: 202-358-3068. Before consulting with any Ombudsman, interested parties must try to resolve their concerns with the Contract Specialist or the Contracting Officer. (DO NOT CALL THE OMBUDSMAN FOR SOLICITATION REQUESTS/INFORMATION)

1852.223-72 SAFETY AND HEALTH (SHORT FORM) (APR 2002)

1852.223-75 MAJOR BREACH OF SAFETY OR SECURITY (FEB 2002)

1852.242-72 OBSERVANCE OF LEGAL HOLIDAYS (AUG 1992)

(End of by Reference Section)

**16. LIST OF ATTACHMENTS (GSFC 52.211-101) (OCT 1988)**

The following attachments constitute part of this contract:

| Attachment | Description | Date | No. of Pages |
|---|---|---|---|
| A | Statement of Work | 06/27/04 | 15 |
| B | Contingency Fee Schedule | 12/13/04 | 1 |

(End of clause)

# ATTACHMENT A - STATEMENT OF WORK

## RECOVERY AUDIT

### Background

The Office of the Chief Financial Officer (CFO) of the National Aeronautics and Space Administration (NASA) is responsible for all financial management activities of the agency. These activities include: (1) establishing and implementing accounting standards and principles; (2) implementing internal control standards; (3) defining and implementing cash management policies and operating procedures; (4) the preparation of auditable financial statements; and (5) providing financial management guidance and support to the ten NASA centers. The CFO is responsible for formulating and monitoring budget execution.

The Office of the CFO is responsible for the agency's financial management system, the Integrated Financial Management Program (IFMP). IFMP is consists of eight components: (1) Core Financial; (2) Resume Management; (3) Travel Management; (4) Position Description Management; (5) Human Resources module; (6) Budget Formulation module; (7) Contract Administration module; and (8) Asset Management module. Implementation of IFMP was completed in June 2003.

NASA must comply with several performance reporting acts. These acts include: (1) The CFO Act of 1990; (2) the Government Performance Act of 1993; (3) the Government Management Reform Act of 1994; (4) the Federal Financial Management Improvement Act of 1996; and (5) the Debt Collection Improvement Act of 1996. To comply with these acts NASA must continuously improve their business practices.

### Objective

This Statement of Work (SOW) requires the Contractor to support the National Aeronautics and Space Administration's Chief Financial Officer in the area of recovery audits. This SOW requires the Contractor to (1) to identify lost funds due to overpayments; (2) to establish an Automated Tracking System (ATS) to track debts; (3) define the reasons for overpayments; (4) recover identified overpayments, and (5) provide recommendations for preventing future overpayments.

### Scope of Work

The contractor shall perform a primary audit recovery on all contract payments for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments. The tasks outlined below provide the details of the effort.

# ATTACHMENT A - STATEMENT OF WORK

## RECOVERY AUDIT

**Task 1 – Attending Project Kick-off Meeting**

Upon contract award, the Contractor shall review appropriate background information of the National Aeronautics and Space Administration. NASA is interested in establishing a pilot program at one or more NASA Centers to develop the policies and procedures that will be required to implement the recovery audit contract NASA wide.

The kick-off meeting will include appropriate NASA CFO staff and other relevant personnel to discuss the program, and to evaluate and clarify the project needs and expectations. The Contractor shall come prepared to: (1) request additional information needed to accomplish the tasks in this SOW; and (2) discuss the concepts for accomplishing the tasks in this SOW.

**Task 2 – Obtaining In-Depth Knowledge of the National Aeronautics and Space Administration**

To gain a thorough knowledge of NASA, the Contractor shall: (1) meet with relevant project staff; (2) review documentation as required; and (3) visit the appropriate Centers and facilities that house the documents that will be needed by the Contractor. The Contractor shall submit a Letter of Findings documenting the knowledge gained. At the end of the FY 2004 review, the Contractor may propose additional methods to improve or expand the recovery audit in a non-intrusive manner.

**Task 3 – Preparing a Recovery Audit Project Plan**

Based on the results of Task 1 and Task 2, the Contractor shall prepare and deliver a detailed Project Plan for performing the Recovery Audit. The Project Plan will be viewed as the strategy for conducting a detailed audit of NASA's financial processes and performing the recovery audit. The initial delivery of the Project Plan will be in draft with both a hardcopy and electronic version. The Contractor will incorporate the NASA's comments into the final document.

The Project Plan will should include, but is not limited to, the following subtasks

1 description of the processes to be evaluated
2. strategy for identifying lost funds
3. Description of process for identifying, calculating, and recommending debts for NASA posting as receivables.
4. strategy for establishing an Automated Tracking System
5. methodology for categorizing errors
6. plan for recovering debts that have been verified and approved by NASA
7. quality control plan; and
8. description of management reports

## ATTACHMENT A - STATEMENT OF WORK

## RECOVERY AUDIT

The requirements for each subtask are discussed below.

**Subtask 3.1 - Description of the processes to be evaluated**

The description of the processes to be evaluated shall include: (1) process inputs; (2) activities performed within the process; and (3) process outputs.

**Subtask 3.2 - Strategy for identifying lost funds**

The strategy for identifying lost funds should address all tasks required to identify lost funds due to overpayment. At a minimum, the strategy should include: (1) a methodology for identifying documents for auditing; (2) a plan for acquiring and verifying only the documents and data in the possession of NASA; (3) a process for obtaining and analyzing financial data required for the audit; (4) criteria and outline for analyzing discrepancies; (5) review of payment processing procedures; and (6) outline of the audit process.

The audit process shall include analyzing discrepancies between obligation (procurement) documents, invoices, receiving reports, and NASA payment documents. The NASA and the Contractor will agree upon a mutually acceptable method for retrieving the documents reviewed. The Contractor will be responsible for retrieving documents for review.

Other tasks that may be include in the strategy for identifying lost funds are: (1) reviewing paid invoices for proper calculations; (2) comparing receiving reports to amounts actually paid; (3) reviewing invoices for duplicate payments; (4) reviewing invoices for payment of improper charges such as taxes or transportation charges.

**Subtask 3.3 - Description of process for identifying, calculating, and recommending debts for NASA posting as receivables**

The contractor shall identify all lost funds, discrepancies and improprieties. The contractor shall calculate the proper amount to be collected. The Contractor shall provide a list of all recommended debts to the NASA CFO and the appropriate Center Deputy CFO for Finance. The Center Deputy CFO shall be responsible for posting approved debts to the accounting system.

Individual debts must be for amounts of $100 or greater and cannot consist of more than two unique invoices.

For each debt recommended for collection, the Contractor shall:

1. provide documentation to support that the claim is owed
2. provide the original accounting classification of the improper payment
3. calculate the total amount of the debt. Total amount of the debt should include:

## ATTACHMENT A - STATEMENT OF WORK

## RECOVERY AUDIT

a. Principle (original) amount of the debt
b. Accrued interest for debts greater than days past due.
c. Penalties for debts over 90 days past due.
d. Administrative costs associated with tracking the unpaid debt.

NASA will review and verify all debts. All debts will be posted by NASA within a reasonable time. Once the NASA has verified the debt and posted the debt to the accounting system, NASA will provide the contractor a claim number for tracking purposes.

NASA will pay the contractor's fee monthly based on the amount debts collected.

**Subtask 3.4 - Establish an Automated Tracking System (ATS)**

The Contractor shall establish an Automated Tracking System (ATS). The ATS shall provide detail records of all debts identified and track all collection activities. The ATS must track all debts from posting in the accounting system through final collection or debt closeout. The ATS must comply with all the requirements of the Debt Collection Improvement Act of 1996.

The Automated Tracking System must:
1. Be in the form of database that will be shared with the NASA.
2. Provide details of outstanding receivables and collections necessary for updating the NASA accounting system and for preparing the quarterly Treasury Report On Receivable (TROR).
3. Be updated daily.
4. Allow for ad hoc queries and reports by the NASA.

NASA will work with the Contractor to determine what data will be input by the Contractor and what data will be input by NASA personnel.

**Subtask 3.5 - Methodology for categorizing errors**

The Contractor shall categorize each overpayment into error classes to facilitate analysis of improper payments. The Contractor shall record an error class for each debt identified. Error class will be used for generating reports and providing management reports.

Error classes may include, but are not limited to:
(1) Invoices with incorrect calculations
(2) Invoices paid for incorrect amount
(3) Multiple payments of one invoice
(4) Multiple invoices for a single charge (i.e. different invoice numbers)
(5) Duplicate invoice due to multiple address

(6) Duplicate invoice with different invoice date
(7) Invoice with improper taxes
(8) Invoice with improper transportation charges
(9) Non-receipt of goods or services detailed on invoice
(10) Improper discounts
(11) Open credits.

**Subtask 3.6 - Plan for recovering debts that have been verified and approved by NASA**

The procedures for recovering overpayments should include all the tasks required to recover debts identified in subtask 3.3. The plan for recovering debts must comply with the: (1) Freedom of Information Act of 1966; (2) Debt Collection Improvement Act of 1996; (3) Title 31, Money and Finance; (4) OMB Circular No. A-129, Policies for Federal Credit Programs and Non-Tax Receivable; and (5) other applicable state or territorial laws and regulations.

The plan for recovering debts should include procedures to:

(1) Draft debt notices and other form letters in compliance with applicable regulations for NASA's approval.
(2) Obtain NASA approval of draft letters and documents.
(3) Send notices in accordance with the Debt Collection Improvement Act.
(4) Locating missing debtors.
(5) Obtain credit reports.
(6) Send out dunning letters.
(7) Determine the ability of debtor to pay.
(8) Submit recommendations, with justification, to NASA for debt compromise or rescheduling
(9) Submit recommendations, with justification, to NASA for payment extensions.
(10) Recommending claims against bankrupt debtors when applicable.
(11) Submit recommendations, with justification, to NASA for debt write-off and closeout.
(12) Return files to the NASA
(13) Suspend collection activities when directed by NASA when an account is in litigation or arbitration, or when the debt is contested.
(14) Notify debtors that debts will be sent to the Department of Treasury for administrative offset.
(15) Making follow-up phone calls to delinquent or non-responsive debtors.
(16) Maintaining records of all activities

## ATTACHMENT A - STATEMENT OF WORK

## RECOVERY AUDIT

**Subtask 3.7 - Quality Control Plan**

The Contractor shall prepare an internal quality control plan to ensure the highest level of performance and compliance are achieved from the identification of the debt to the collection of the debt and all information on each debt is properly recorded and tracked. The Quality Control Plan shall define procedures to assist in: (1) monitoring the collection process; (2) monitoring the effectiveness of collection activities; (3) defining quality standards that will be established and applied; (4) identifying how problems will be identified and managed; (5) ensuring compliance with the DCIA; and (6) managing and reducing backlogs.

**Subtask 3.8 - Description of management reports**

The Contractor shall provide reports to NASA's management detailing all recovery activities. The Contractor shall submit all reports to the NASA no later than seven calendar days after the end of the reporting period (month).

The Contractor will provide to the NASA the following reports

(1) Debtor Report. The debtor report shall provide to NASA, monthly updates of individual debts. The Debtor Report should include updates of activities on the individual debts and current status of individual debts. The report should include the following for each debt: (1) the NASA assigned claim number; (2) name and address of debtor; (3) tax identification number; (4) beginning balance; (5) payments during the reporting period; (6) adjustments during the reporting period; (7) ending balance; (8) account status; and (9) any applicable comments to support activities during the reporting period. For accounts that are classified as uncollectable, the Debtor Report shall identify the reason why the account is uncollectable. The Debtor Report will be used by NASA to determine which accounts NASA should write-off and/or closeout.

(2) Activity Report. The Activity Report shall summarize all activities for the reporting period (month) and show results of cumulative activities. The Activity Report will include number and amount of debtor accounts. Reported data will be broken down and reported by NASA Center.

**Task 4 – Implementing the Recovery Audit Project Plan**

Upon approval by NASA, the Contractor shall implement the Recovery Audit Project Plan.

The Recovery Audit Project Plan will be subject to revision during the period of the contract. The Contractor may update the project plan with the approval of NASA as long as the project plan remains within the scope of this contract.

## ATTACHMENT A - STATEMENT OF WORK

## RECOVERY AUDIT

**Task 5 – Developing Recommendations for Improvements to the NASA debt collection process.**

The Contractor shall analyze the results of the review of NASA's financial process and the data collected during the recovery audit to develop recommendations for improving debt collection processes. The Contractor shall prepare and deliver a draft and final Letter of Findings documenting the recommendations. The Contractor will incorporate NASA's comments into the final document.

V **Deliverables**

The Contractor shall prepare and deliver monthly status reports to NASA for each month of the contract. The status report shall document the progress made during the last reporting period and address the tasks the Contractor expects to accomplish in the next reporting period. The Status Report shall include data showing the number of overpayments identified the dollar value of overpayments identified, the amount of recovered funds, and the Contractors fee for the reporting period.

Data from the Monthly Status Reports will be used by the NASA to determine if the recovery audit contract is beneficial to the agency and if the contract should be renewed Contractor shall adhere to the following schedule of deliverables:

- **Monthly Status Report.** The Contractor shall provide NASA a monthly status report within 10 working days following the end of each calendar month. This report shall include:

  -- List of Improper payments found by Contractor/Vendor and Fiscal Year
  -- Amount of Improper Payment
  -- Total Payments by dollar amount
  -- Under Payments by dollar amount
  -- Over Payments by dollar amount
  -- Total Erroneous Payments
  -- Preparation of Inquiry Letter to Contractor or Vendor
  -- Statistically valid estimate of the annual amount of erroneous
  -- Payments in Programs and activities
  -- Brief explanation of the cause or reason for the Improper Payment
  -- Suggestions for eliminating or minimizing Improper Payments

- **Final Report** The contractor shall provide a final report on Audit Recovery Findings for Fiscal Years 1998 through 2003 within 12 months after contract award. The Final Report should summarize information provided in each monthly status report by fiscal year.

**ATTACHMENT A - STATEMENT OF WORK**

**RECOVERY AUDIT**

## VI. Electronic and Information Technology Accessibility Standards

**§ 1194.21 Software applications and operating systems.**

(a) When software is designed to run on a system that has a keyboard, product functions shall be executable from a keyboard where the function itself or the result of performing a function can be discerned textually.

(b) Applications shall not disrupt or disable activated features of other products that are identified as accessibility features, where those features are developed and documented according to industry standards. Applications also shall not disrupt or disable activated features of any operating system that are identified as accessibility features where the application programming interface for those accessibility features has been documented by the manufacturer of the operating system and is available to the product developer.

(c) A well-defined on-screen indication of the current focus shall be provided that moves among interactive interface elements as the input focus changes. The focus shall be programmatically exposed so that assistive technology can track focus and focus changes.

(d) Sufficient information about a user interface element including the identity, operation and state of the element shall be available to assistive technology. When an image represents a program element, the information conveyed by the image must also be available in text.

(e) When bitmap images are used to identify controls, status indicators, or other programmatic elements, the meaning assigned to those images shall be consistent throughout an application's performance.

(f) Textual information shall be provided through operating system functions for displaying text. The minimum information that shall be made available is text content, text input caret location, and text attributes.

(g) Applications shall not override user selected contrast and color selections and other individual display attributes.

(h) When animation is displayed, the information shall be displayable in at least one non-animated presentation mode at the option of the user.

(i) Color coding shall not be used as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element.

(j) When a product permits a user to adjust color and contrast settings, a variety of color selections capable of producing a range of contrast levels shall be provided.

**ATTACHMENT A - STATEMENT OF WORK**

**RECOVERY AUDIT**

(k) Software shall not use flashing or blinking text, objects, or other elements having a flash or blink frequency greater than 2 Hz and lower than 55 Hz.

(l) When electronic forms are used, the form shall allow people using assistive technology to access the information, field elements, and functionality required for completion and submission of the form, including all directions and cues.

**§ 1194.22 Web-based intranet and internet information and applications.**

(a) A text equivalent for every non-text element shall be provided (e.g., via "alt", "longdesc", or in element content).

(b) Equivalent alternatives for any multimedia presentation shall be synchronized with the presentation.

(c) Web pages shall be designed so that all information conveyed with color is also available without color, for example from context or markup.

(d) Documents shall be organized so they are readable without requiring an associated style sheet.

(e) Redundant text links shall be provided for each active region of a server-side image map.

(f) Client-side image maps shall be provided instead of server-side image maps except where the regions cannot be defined with an available geometric shape.

(g) Row and column headers shall be identified for data tables.

(h) Markup shall be used to associate data cells and header cells for data tables that have two or more logical levels of row or column headers.

(i) Frames shall be titled with text that facilitates frame identification and navigation.

(j) Pages shall be designed to avoid causing the screen to flicker with a frequency greater than 2 Hz and lower than 55 Hz.

(k) A text-only page, with equivalent information or functionality, shall be provided to make a web site comply with the provisions of this part, when compliance cannot be accomplished in any other way. The content of the text-only page shall be updated whenever the primary page changes.

## ATTACHMENT A - STATEMENT OF WORK

## RECOVERY AUDIT

(l) When pages utilize scripting languages to display content, or to create interface elements, the information provided by the script shall be identified with functional text that can be read by assistive technology.

(m) When a web page requires that an applet, plug-in or other application be present on the client system to interpret page content, the page must provide a link to a plug-in or applet that complies with §1194.21(a) through (l).

(n) When electronic forms are designed to be completed on-line, the form shall allow people using assistive technology to access the information, field elements, and functionality required for completion and submission of the form, including all directions and cues.

(o) A method shall be provided that permits users to skip repetitive navigation links.

(p) When a timed response is required, the user shall be alerted and given sufficient time to indicate more time is required.

Note to §1194.22: 1. The Board interprets paragraphs (a) through (k) of this section as consistent with the following priority 1 Checkpoints of the Web Content Accessibility Guidelines 1.0 (WCAG 1.0) (May 5, 1999) published by the Web Accessibility Initiative of the World Wide Web Consortium:

| Section 1194.22 Paragraph | WCAG 1.0 Checkpoint |
|---|---|
| (a) | 1.1 |
| (b) | 1.4 |
| (c) | 2.1 |
| (d) | 6.1 |
| (e) | 1.2 |
| (f) | 9.1 |
| (g) | 5.1 |
| (h) | 5.2 |
| (i) | 12.1 |
| (j) | 7.1 |
| (k) | 11.4 |

2. Paragraphs (l), (m), (n), (o), and (p) of this section are different from WCAG 1.0. Web pages that conform to WCAG 1.0, level A (i.e., all priority 1 checkpoints) must also meet paragraphs (l), (m), (n), (o), and (p) of this section to comply with this section. WCAG 1.0 is available at http://www.w3.org/TR/1999/WAI-WEBCONTENT-19990505.

**ATTACHMENT A - STATEMENT OF WORK**

**RECOVERY AUDIT**

**§ 1194.23 Telecommunications products.**

(a) Telecommunications products or systems which provide a function allowing voice communication and which do not themselves provide a TTY functionality shall provide a standard non-acoustic connection point for TTYs. Microphones shall be capable of being turned on and off to allow the user to intermix speech with TTY use.

(b) Telecommunications products which include voice communication functionality shall support all commonly used cross-manufacturer non-proprietary standard TTY signal protocols.

(c) Voice mail, auto-attendant, and interactive voice response telecommunications systems shall be usable by TTY users with their TTYs.

(d) Voice mail, messaging, auto-attendant, and interactive voice response telecommunications systems that require a response from a user within a time interval, shall give an alert when the time interval is about to run out, and shall provide sufficient time for the user to indicate more time is required.

(e) Where provided, caller identification and similar telecommunications functions shall also be available for users of TTYs, and for users who cannot see displays.

(f) For transmitted voice signals, telecommunications products shall provide a gain adjustable up to a minimum of 20 dB. For incremental volume control, at least one intermediate step of 12 dB of gain shall be provided.

(g) If the telecommunications product allows a user to adjust the receive volume, a function shall be provided to automatically reset the volume to the default level after every use.

(h) Where a telecommunications product delivers output by an audio transducer which is normally held up to the ear, a means for effective magnetic wireless coupling to hearing technologies shall be provided.

(i) Interference to hearing technologies (including hearing aids, cochlear implants, and assistive listening devices) shall be reduced to the lowest possible level that allows a user of hearing technologies to utilize the telecommunications product.

(j) Products that transmit or conduct information or communication, shall pass through cross-manufacturer, non-proprietary, industry-standard codes, translation protocols, formats or other information necessary to provide the information or communication in a usable format. Technologies which use encoding, signal compression, format transformation, or similar techniques shall not remove information needed for access or shall restore it upon delivery.

**ATTACHMENT A - STATEMENT OF WORK**

**RECOVERY AUDIT**

(k) Products which have mechanically operated controls or keys, shall comply with the following:

(1) Controls and keys shall be tactilely discernible without activating the controls or keys.

(2) Controls and keys shall be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. The force required to activate controls and keys shall be 5 lbs. (22.2 N) maximum.

(3) If key repeat is supported, the delay before repeat shall be adjustable to at least 2 seconds. Key repeat rate shall be adjustable to 2 seconds per character.

(4) The status of all locking or toggle controls or keys shall be visually discernible, and discernible either through touch or sound.

**§1194.24 Video and multimedia products.**

(a) All analog television displays 13 inches and larger, and computer equipment that includes analog television receiver or display circuitry, shall be equipped with caption decoder circuitry which appropriately receives, decodes, and displays closed captions from broadcast, cable, videotape, and DVD signals. As soon as practicable, but not later than July 1, 2002, widescreen digital television (DTV) displays measuring at least 7.8 inches vertically, DTV sets with conventional displays measuring at least 13 inches vertically, and stand-alone DTV tuners, whether or not they are marketed with display screens, and computer equipment that includes DTV receiver or display circuitry, shall be equipped with caption decoder circuitry which appropriately receives, decodes, and displays closed captions from broadcast, cable, videotape, and DVD signals.

(b) Television tuners, including tuner cards for use in computers, shall be equipped with secondary audio program playback circuitry.

(c) All training and informational video and multimedia productions which support the agency's mission, regardless of format, that contain speech or other audio information necessary for the comprehension of the content, shall be open or closed captioned.

(d) All training and informational video and multimedia productions which support the agency's mission, regardless of format, that contain visual information necessary for the comprehension of the content, shall be audio described.

(e) Display or presentation of alternate text presentation or audio descriptions shall be user-selectable unless permanent.

ATTACHMENT A - STATEMENT OF WORK

RECOVERY AUDIT

**§ 1194.25 Self contained, closed products.**

(a) Self contained products shall be usable by people with disabilities without requiring an end-user to attach assistive technology to the product. Personal headsets for private listening are not assistive technology.

(b) When a timed response is required, the user shall be alerted and given sufficient time to indicate more time is required.

(c) Where a product utilizes touchscreens or contact-sensitive controls, an input method shall be provided that complies with §1194.23 (k) (1) through (4).

(d) When biometric forms of user identification or control are used, an alternative form of identification or activation, which does not require the user to possess particular biological characteristics, shall also be provided.

(e) When products provide auditory output, the audio signal shall be provided at a standard signal level through an industry standard connector that will allow for private listening. The product must provide the ability to interrupt, pause, and restart the audio at anytime.

(f) When products deliver voice output in a public area, incremental volume control shall be provided with output amplification up to a level of at least 65 dB. Where the ambient noise level of the environment is above 45 dB, a volume gain of at least 20 dB above the ambient level shall be user selectable. A function shall be provided to automatically reset the volume to the default level after every use.

(g) Color coding shall not be used as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element.

(h) When a product permits a user to adjust color and contrast settings, a range of color selections capable of producing a variety of contrast levels shall be provided.

(i) Products shall be designed to avoid causing the screen to flicker with a frequency greater than 2 Hz and lower than 55 Hz.

(j) Products which are freestanding, non-portable, and intended to be used in one location and which have operable controls shall comply with the following:

(1) The position of any operable control shall be determined with respect to a vertical plane, which is 48 inches in length, centered on the operable control, and at the maximum protrusion of the product within the 48 inch length (see Figure 1 of this part).

(2) Where any operable control is 10 inches or less behind the reference plane, the height shall be 54 inches maximum and 15 inches minimum above the floor.

(3) Where any operable control is more than 10 inches and not more than 24 inches behind the reference plane, the height shall be 46 inches maximum and 15 inches minimum above the floor.

(4) Operable controls shall not be more than 24 inches behind the reference plane (see Figure 2 of this part).

**§ 1194.26 Desktop and portable computers.**

(a) All mechanically operated controls and keys shall comply with §1194.23 (k) (1) through (4).

(b) If a product utilizes touchscreens or touch-operated controls, an input method shall be provided that complies with §1194.23 (k) (1) through (4).

(c) When biometric forms of user identification or control are used, an alternative form of identification or activation, which does not require the user to possess particular biological characteristics, shall also be provided.

(d) Where provided, at least one of each type of expansion slots, ports and connectors shall comply with publicly available industry standards.

**Subpart C -- Functional Performance Criteria**

**§ 1194.31 Functional performance criteria.**

(a) At least one mode of operation and information retrieval that does not require user vision shall be provided, or support for assistive technology used by people who are blind or visually impaired shall be provided.

(b) At least one mode of operation and information retrieval that does not require visual acuity greater than 20/70 shall be provided in audio and enlarged print output working together or independently, or support for assistive technology used by people who are visually impaired shall be provided.

(c) At least one mode of operation and information retrieval that does not require user hearing shall be provided, or support for assistive technology used by people who are deaf or hard of hearing shall be provided.

**ATTACHMENT A - STATEMENT OF WORK**

**RECOVERY AUDIT**

(d) Where audio information is important for the use of a product, at least one mode of operation and information retrieval shall be provided in an enhanced auditory fashion, or support for assistive hearing devices shall be provided.

(e) At least one mode of operation and information retrieval that does not require user speech shall be provided, or support for assistive technology used by people with disabilities shall be provided.

(f) At least one mode of operation and information retrieval that does not require fine motor control or simultaneous actions and that is operable with limited reach and strength shall be provided.

**Subpart D Information, Documentation, and Support**

**§ 1194.41 Information, documentation, and support.**

(a) Product support documentation provided to end-users shall be made available in alternate formats upon request, at no additional charge.

(b) End-users shall have access to a description of the accessibility and compatibility features of products in alternate formats or alternate methods upon request, at no additional charge.

(c) Support services for products shall accommodate the communication needs of end-users with disabilities.

## ATTACHMENT B

## CONTINGENCY FEE SCHEDULE

| Period | Audit Recovery | Fee Percentage | |
|---|---|---|---|
| Base Year | 1998- 2003 | Contractor Percentage of Recovery | 13.5% |
| Option Year 1 | 2004 | Contractor Percentage of Recovery | 13.5% |
| Option Year 2 | 2005 | Contractor Percentage of Recovery | 13.5% |
| Option Year 3 | 2006 | Contractor Percentage of Recovery | 13.5% |
| Option Year 4 | 2007 | Contractor Percentage of Recovery | 13.5% |

November 20, 2007

Dean S. Patterson, Procurement Manager
Janet S. Langweil, Contracting/Ordering Officer
Carrie Causey, Procurement Manager
NASA/Headquarters Procurement Office
Mail Code 210.H
Greenbelt, MD 20771

**Re: Contract No. GS-23F-0258N/Order No. NNH05CC28D**
**Horn & Associates, Inc.**
**Certified Claim**

Dear Mr. Patterson, Ms. Langweil, and Ms. Causey:

Horn & Associates, Inc. ("Horn") hereby submits this certified claim under Purchase Order No. NNH05CC28D (the "Purchase Order" or "contract" used interchangeably) issued by the National Aeronautics and Space Administration ("NASA"). The Purchase Order is part of Contract No. GS-23F-0258N issued by the General Services Administration ("GSA") for the performance of recovery audit services by Horn. This claim is to recover fees and costs incurred by Horn for which Horn received no compensation due to material breaches of the contract by NASA. As will be set forth below in detail, Horn is entitled to recover significant sums.

## BACKGROUND

### What are Recovery Audit Services?

Virtually every publicly traded or privately held company in the United States has commissioned a contingency-based audit of their paid invoices for prior years ("A/P audit"). The concept started over 30 years ago and has spread through most of the European countries and throughout the Pacific Rim. Manufacturers and retailers, already operating on thin margins, were quick to grasp the concept of having a group of highly trained and motivated experts identify and collect overpayments to their suppliers and service providers. With no "up front" costs, and with commissions paid only after the overpayments are collected, the concept presented a win-win situation with the net recoveries going directly to the bottom line of a company.

Experience during these past 30 years has demonstrated that overpayments for large corporate organizations have averaged between 1/10th and 3/10ths of a percent of sales. While no one can fault an A/P operation correctly processing 99.7% to 99.9% of transactions, a chief financial officer ("CFO") of a $10 billion a year corporation sees the benefit of recovering the lost $10 million to $30 million, with a zero budget project without any additional headcount.

EXHIBIT 2

The overpayments or improper payments take many forms including data entry mistakes, duplicate payments, missed discounts, overlooked pricing agreements, and such. By using proprietary software and proven auditing techniques, the recovery auditor reviews client invoices, contract terms and conditions, purchase orders, receiving documents, databases, and correspondence to identify overpayments or under-deductions.

**Statutory Framework Requiring Recovery Audits by the Federal Government**

Departments of the federal, state, county and municipal government, like all other large organizations, function with a high volume of suppliers, transactions and budget dollars. The 'life cycle' of any procurement transaction offers many opportunities for payment errors. Congress has recognized that the various agencies of the Executive Branch are no less likely to make improper or incorrect payments than the private sector. This is nothing more than a recognition that the same problem with improper payments exists not only in private industry but also in the federal government.

As noted above, the typical percentage of overpayments for large corporate organizations is in the .1% to .3% range. However, experience has shown that the federal government has a far worse percentage of such overpayments or erroneous payments. Of note, the Office of Management and Budget ("OMB") concluded that "[b]ased on audits performed [through June of 2003], Administration officials conservatively estimate the federal payment error rate to be just below **four percent**." (Emphasis added). (Exhibit ("Ex.") 1). It is noteworthy that the federal payment error rate is approximately 40 times greater than the experience found of such overpayments or improper payments in the private sector.

In light of this large number of dollars being lost through improper payments, Congress recognized the need for such recovery audits by passing Section 831 of the Defense Authorization Act for Fiscal Year 2002. This section added a new subchapter to the U.S. Code (31 U.S.C. §§ 3561-3567) that requires federal agencies that enter into contracts exceeding $500,000,000 in a fiscal year to carry out a "cost-effective program for identifying any errors made in paying the contractors and for recovering any amounts erroneously paid to the contractors." Thus, recovery audits became mandated for certain federal agencies like NASA. (Ex. 2).

OMB issued additional guidance to the executive departments with a Memorandum (M-03-07) dated January 16, 2003. (Ex. 3). That memorandum indicated that "[a]ll classes of contracts and contract payments should be considered for recovery audits." While it allowed agency heads to exclude certain classes of contracts and contract payments, it provided no real substantial information about how such a limitation on contract classes or payments should be made. It cautioned against having such recovery auditing practices conflicting with other programs so that contractors might be subject to

duplicative auditing. Notably, the Defense Contract Audit Agency ("DCAA"), which has certain audit responsibilities involving NASA contracts, concluded that

> Since the focus of these [recovery audits] is of the DoD Component's books and records, DCAA would not normally become involved in recovery audit effort... As distinguished from the recovery audit, a contract audit is normally performed for the purpose of determining if amounts claimed by contractors are in compliance with the terms of the contract and applicable laws and regulations... DCAA should normally have no role in most recovery audits.

DCAA Memorandum PPD 730.5.13.1, dated December 29, 2005. (Ex. 4, p.1).

OMB provided further guidance with its Memorandum M-06-23, dated August 10, 2006. (Ex. 5, p.2). It identified improper payments or payment errors as follows:

> An improper payment is any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements. Incorrect amounts are overpayments and underpayments (including inappropriate denials of payment or service). An improper payment includes any payment that was made to an ineligible recipient or for an ineligible service, duplicate payments, payments for services not received, payments that are for the incorrect amount. In addition, when an agency's review is unable to discern whether a payment was proper as result of insufficient or lack of documentation, this payment must also be considered an error.

In other words, such improper payments include duplicate payments, errors on invoices or financing requests, failure to reduce payment applicable discounts, cash discounts or other allowances, payments for items not received, mathematical errors, failure to obtain credit for returned items, and other similar errors. The OMB memorandum imposed reporting requirements for the agencies. It specifically noted that, similar to DCAA's not having a role in recovery auditing, the agency's inspector general had no role either.

**<u>NASA's Poor Financial Management – Need for Recovery Auditing Services</u>**

NASA is a federal agency that was/is particularly in need of the work of a recovery auditor, as its financial system is challenged, at best. The House Science and Technology Committee, Subcommittee on Space and Aeronautics, offered the following statements in a preliminary Status Report immediately prior to a hearing on October 27, 2005:

> Over the past several years, auditors have repeatedly reported on NASA's weak financial management and unreliable financial data. In three of the

> past four years, independent auditors reported that they were unable to express an opinion on NASA's financial statements. For example, for fiscal year 2003, NASA made $565 billion in adjustments – more than 37 times its total budget for that year – to correct errors and make other changes to its accounting records. The auditors could not find adequate documentation to support these adjustments. (Emphasis added). (Ex. 6, p.4).

The Government Accountability Office ("GAO") similarly concluded in a report dated October 27, 2005 (GAO-06-216T), that is titled "Long-standing Financial Management Challenges Threaten the Agency's [NASA's] Ability to Manage Its Programs," that:

> NASA has fundamental problems with its financial management operations that not only affect its ability to externally report reliable information, but more importantly, hamper its ability to effectively manage and oversee its major programs .... Since 1990, we have identified NASA's contract management as a high-risk area. (Ex. 7, p.3).

The problems described above from 2005 are still present at NASA. See the major finding from the Hearing of the Senate Committee on Homeland Security and Governmental Affairs, Subcommittee on Federal Financial Management, Government Information, Federal Services and International Security, on March 29, 2007. "One of the worst actors regarding improper payments is NASA, which has been out of compliance with the IPIA every year since the inception of improper payment reporting." (Ex. 8, p.2).

## THE SOLICITATION AND AWARD OF THE PURCHASE ORDER

On June 12, 2003, the GSA awarded Contract No. GS-23F-0258N to Horn for the furnishing of "Recovery Audits." The GSA contract was essentially a blanket purchase order contract under which various executive agencies could place purchase orders in order to obtain recovery audits.

NASA then issued a Request for Quote ("RFQ") NNH04068239Q for Audit Recovery Services on or about July 23, 2004 with Proposals due by August 9, 2004. (Ex. 9). The RFQ included a Statement of Work ("SOW") for Recovery Audits. This Statement of Work provided a Scope of Work on page 9, that included the following language: "The audits will be conducted on payments made from all fixed priced contracts."

Horn responded to the RFQ with its Proposal for Professional Services to Provide Recovery Auditing Services dated August 4, 2004. (Ex. 10). Horn stated at page 12, "We would like to have access to all contracts, agreements and documents that would reflect pricing, terms, allowances, rebate programs, etc." This statement was made in relation to information needed in order for Horn to perform a complete cost recovery audit of NASA's contracts.

In addition, Horn clearly indicated in its proposal at page 36 that Horn anticipated using "subcontract auditors in various locations in the U.S."

On December 23, 2004, NASA issued Order No. NNH05CC28D, for the period beginning on December 23, 2004 through December 22, 2005. (Ex. 11). The Purchase Order called for Horn to receive a 13.5% contingent fee based upon the recovery by NASA of improper payments through the recovery audit process. Notably, the Purchase Order called for Horn to "perform a primary audit recovery on **all contract** payments for the period beginning October 1, 1997 through September 30, 2003" (a period encompassing six fiscal years from FY98 through FY03.) (Emphasis added). The Statement of Work listed, but did not limit, the categories of errors to be found in the recovery audit.

Perhaps the most important features of the Purchase Order from Horn's perspective were the number of years for review (six fiscal years initially and later adding two more) and the fact that "**all contract payments**" were subject to the recovery audit process. (Emphasis added).

On September 1, 2005, NASA apparently was sufficiently pleased with the performance of Horn that NASA awarded Amendment One (1) to Horn. (Ex. 12 modifying Ex. 11 above). Amendment One extended the period of performance by Horn for another year through September 30, 2006, and added payments for review that would include those that were made in FY04 and FY05.

## CONTRACT PERFORMANCE

### Initial Performance

The Purchase Order named Mr. Melvin DenWiddie as the Contracting Officer's Technical Representative ("COTR"). Notably, the Purchase Order invested the COTR with the authority to accept or reject services under this Purchase Order. Such power equated Mr. DenWiddie to the Contracting Officer in many substantial aspects.

Following award of the Purchase Order at the end of December 2004, NASA and Horn had their initial kickoff and pre-audit planning meeting on February 8, 2005 in Washington D.C. Present for NASA was Mr. DenWiddie (the COTR). In this meeting,

NASA and Horn reviewed the Horn Pre-Audit Planning Guide so that NASA would understand how Horn's audit activities would go forward at the individual Payment Centers. (Ex. 13). In addition, Horn specifically inquired if there were any vendors or areas of contracting that were "off limits" to Horn's review; stated differently, Horn inquired if there were any "sacred cows" that Horn must avoid. At the meeting, Mr. DenWiddie determined that he needed to make the Payment Centers aware of the upcoming recovery audits and to educate them on what the Payment Centers should expect from Horn. As a result, Gwendolyn Sykes, NASA CFO, sent an e-mail to that effect on March 4, 2005 to the Payment Centers. (Ex. 14). A copy of this memorandum was not furnished contemporaneously to Horn. This memorandum ultimately surfaced later in the contract performance as a basis for NASA's incorrect position that only fixed price contract payments could be audited.

After the Payment Centers had been notified of the upcoming recovery audits, Horn contacted the Centers to schedule further meetings to review the Pre-Audit Planning Guide with each individual center. (Exhibit 13 is the Pre-Audit Planning Guide for Headquarters, NASA; there were similar Planning Guides for each of the Payment Centers.) The typical meeting at the Payment Centers included the CFO for the Center, the Deputy CFO for the center, the Accounts Payable Manager for the Center, the Procurement Manager, the IT manager and various others. The primary purposes of the meetings were: (1) to inform the Payment Centers of Horn's audit approach and scope, (2) to review electronic data acquisition procedures, (3) to obtain an understanding of the Center's accounts payable procedures, and (4) to discover if there were any limitations to the audit scope that Horn should be aware of. In addition, the meetings allowed both Horn and the Payment Centers to gain some understanding of who would be working on the projects with Horn.

The dates of each meeting held between the Payment Centers and Horn were as follows:

April 1, 2005 – Stennis
April 20, 2005 – Glenn
April 22, 2005 – Goddard/HQ
April 27, 2005 – Johnson
May 17, 2005 – Ames
April 19, 2005 – Kennedy
April 21, 2005 – Marshall
April 26, 2005 – Langley
May 16, 2005 – Dryden

It is noteworthy that no payment center, nor NASA headquarters as described above, indicated that there were any limitations on the scope of Horn's contract payments review during the precontract or early contract phases. Specifically, there was no mention that any review would be limited to fixed price contract payments.

As noted above, an early objective of the Pre-Audit Planning Guide meetings with each of the Payment Centers was to request the electronic data necessary to allow Horn to perform the recovery audits. By July 2005, Horn had received all of the data from the

Payment Centers' Legacy and the new SAP system that replaced the Legacy system. However, Horn found that the initial SAP data had been incorrectly filtered; therefore, Horn had to request the SAP data again. It took NASA until August 2005 before NASA had furnished the electronic data information necessary for Horn to begin the electronic portion of the audits. This delay resulted in at least one month of delay to the Horn recovery audit effort.

This changing of the electronic data systems created much additional, and what should have been unnecessary work for Horn. Nevertheless, Horn performed this additional work and developed a whole new program that allowed Horn to deal with both NASA's systems as if they were one program. Mr. DenWiddie recognized that Horn had provided significant valuable (and added) services for NASA in this regard in his email to the Department of Transportation on November 1, 2005. He said:

> We entered into a contract with Horn & Associates in December 2004. We have been pleased with their work. Our payments are made from several locations in different states. Some of our prior payment systems were outdated and presented significant challenges. The staff from Horn & Associates has effectively worked all of those systems in the various locations to resolve those challenges in order to identify and recover payments that may have been made improperly. They appear to have a good working knowledge of how the Federal payment process differs from the private sector. We are glad to have them on our team.

(Ex. 15). Mr. DenWiddie again endorsed the work of Horn in a later letter of June 30, 2006. (Ex. 16).

In late August 2005, Horn was finally able to start the electronic portion of the recovery audits at each of the Payment Centers with the data obtained. In order to do so, Horn had subcontracted much of that effort to independent on-site auditors who were assigned to specific Payment Centers. In many instances these independent auditors were people with whom Horn had worked for a number of years.

**<u>Other NASA-Caused Problems</u>**

Horn began to encounter more significant NASA-caused problems in November 2005. The initial problems involved Horn's obtaining approval of the improper payment claims that Horn had begun to develop. All the Payment Center's CFOs began to require Horn to also obtain the individual Contracting Officer's ("CO") approval of any claim. This created a problem in a number of cases as the Contracting Officers were in a classic conflict of interest situation. If they supported a claim for an improper payment or an overpayment, they were thereby acknowledging that they had erred by signing off on the invoices for payment in the first place. The Purchase Order with Horn establishing the

recovery audit process mandates that the Center CFO is to approve or disapprove Horn's claims, and does not have a place for the Contracting Officer's approval in the process for the very reasons indicated herein.

Horn brought the claim approval issues to NASA's attention at NASA Headquarters by seeking clarification of the role of the Contracting Officers. Further, Horn sought to have Headquarters issue instructions to the Payment Centers for processing its claims. Mr. DenWiddie indicated that he would proceed to help Horn get clarification of the claims processing and would have a directive issued to the Payment Centers for processing Horn's claims. Unfortunately, no resolution of this issue occurred despite Horn's having requested Mr. DenWiddie on numerous occasions to help it.

A second major problem developed during the first six months of 2006. It is actually more accurate, in hind sight, to say that it resurfaced. The Johnson Space Center (one of the payment centers) indicated to Horn that they would not approve claims for overpayments on any types of contracts other than fixed price contracts. Horn has subsequently learned that this improper limitation on Horn's contractual (recovery audit) activity first arose in the Memorandum to Payment Center CFO's from Gwendolyn Sykes on March 4 (previously mentioned and found at Ex. 14) where she opined improperly that the Horn activity only involved a review of payments on fixed price contracts. Apparently, June Boeckel, the Director of Accounting at Johnson, found this memorandum and used it as a basis for her contractually improper decision to limit Horn's activity. Such a restriction prevented Horn from meeting its contractual obligations to NASA, and prevented NASA from complying with the Recovery Audit Act. More importantly, as shown above, the Purchase Order clearly contemplated Horn's looking at payments from all types of contracts. Johnson's staff then shared this improper position with the other payment centers during their weekly Wednesday conference calls, and each of the payment centers began to breach the Horn contract by refusing to review claims submitted by Horn from payments made on any contract other than fixed price contracts.

This limitation of the scope of the recovery audit review was clearly a breach of Horn's contract with NASA as it improperly narrowed the scope of the recovery audit process to such a degree that it would be impossible for any recovery auditor to recover its actual costs invested in the process through the receipt of the contractually-mandated contingent fees much less recover any type of profit margin. In order to demonstrate the impact of this breach, one only needs consider the fact that fixed price contracts only encompass approximately 12 percent of NASA's contracts. (Ex. 17, p.1). This problem fatally infected the process and led to the current claims situation.

Ironically, at the very same time that Johnson was improperly interfering with Horn's audit by refusing to review, approve, and process recovery audit claims on cost contracts, the Marshall Space Flight Center was not only allowing such reviews of payments on

cost contracts, but they were also advancing and approving claims on such cost contracts. The inconsistency of NASA's positions at different payment centers further exacerbated the problems.

Perhaps again the most startling part of this scenario is that Mr. Patterson of NASA, via email of September 8, 2006, finally acknowledged that Horn was entitled to conduct recovery audits of payments on **all contracts**. (Ex. 18). This breach by NASA is all the more startling in that this issue had apparently been in existence since Ms. Syke's memorandum in March '05, without Horn's knowledge until it was raised in '06 by the various payment centers, as they began to use the issue as alleged justification for their dramatically and improperly limiting the scope of Horn's work. Since NASA later notified Horn that it was not going to extend Horn's contract, this clarification by Mr. Patterson was too late in the contract to have any aid for Horn in the recovery audit process. Moreover, it demonstrates that NASA now recognizes that the earlier directives to limit review to fixed price contract payments was a breach of the contract.

It should be noted that at the same time Mr. Patterson was clarifying the issue regarding cost contracts (the vast majority of NASA's contracts) and fixed price contracts, he was making other improper and contractually-improper limitations on the scope of Horn's recovery auditing by interfering with the review of open contracts, contracts with provisional rates pending audit by the DCAA, contracts with provisions for advance payments to non-profit organizations that conduct research and development work, and contracts that authorize progress payments. (Ex. 18).

**Further Performance Issues**

Horn made monthly trips to Washington, D.C. to visit with Mr. DenWiddie to encourage and push for the instructions for claims processing consistent with the original terms of Horn's Purchase Order. However, nothing was ever accomplished and to our knowledge instructions were never issued to the Payment Centers by the Headquarters CFO's Office. On June 30, 2006 Mr. DenWiddie retired, and Horn never received notice of who was the new COTR.

Following the retirement of Mr. DenWiddie, Horn was left without a regular source of contact in that there was no contractually-assigned COTR. Thus, Horn began to request meetings with Ms. Gwendolyn Sykes, the CFO at NASA headquarters to attempt to get clarification on how the recovery audit process could go forward as intended by the underlying statutory framework, but more importantly, by the terms of Horn's Purchase Order.

Horn finally was able to meet with four individuals from NASA Headquarters on August 3, 2006. Those in attendance on behalf of NASA were Dean Patterson, NASA Procurement Manager, Carrie Causey, another Procurement Manager, Andrea Davis,

NASA Contract Specialist and Charles McIntosh, NASA Branch Manager and Assistant to Terry Bowie, Deputy CFO of NASA; present on behalf of Horn were Mike Lowery and others. This meeting marked the first time that Horn had been orally informed that Dean Patterson was replacing Janet Langweil as the Contracting Officer. (To date Horn has never received written confirmation of a change in the Contracting Officer.) Mr. Patterson acknowledged in the meeting that the scope of work from the RFQ had been expanded when the Purchase Order was issued such that there were no contract restrictions for Horn's recovery audit. Accordingly, NASA through Dean Patterson was to issue a directive to the Payment Centers allowing Horn to audit **all contracts** in accordance with the terms of the Purchase Order. In addition, the directive was to give the Payment Centers guidance on Horn's claims processing and accounting for the Centers. Horn was to receive a copy of this directive. Horn has informally heard from some of the Payment Centers that a directive was issued, but that it was different from what had been described to Horn, and agreed by Horn and NASA during that meeting. From discussions with various Payment Centers the directive, while supposedly lifting the non-cost contract limitation, apparently imposed new improper restrictions. (Ex. 18). Consequently, when Mr. Patterson finally issued his clarification, it was too late in the contract process (as NASA shortly thereafter notified Horn that it was not going to extend the Horn contract) and it imposed other contractually-improper limitations on Horn's recovery audit activity.

Also, during that same meeting, Charles McIntosh, the Assistant to the Deputy CFO of NASA, indicated that NASA wanted to "see Horn made whole on this project." To date, Horn has seen nothing indicative of NASA's carrying through on that representation.

On August 24, 2006, Mr. Patterson sent Horn a letter stating that there would be no exercise of the next or second available option. This decision was rather startling to Horn, as no mention had been made of this decision in the meeting with Horn a mere three weeks earlier. This seems rather ironic and unbelievable. Thus, the Purchase Order with its one year extension option expired on September 30, 2006.

**Results of Horn's Recovery Audit Work**

As will be set forth in more detail below, Horn found approximately $121 million of claims for various classifications of improper payments or overpayments. These claims covered many different types of payment problems, and they were found at all the NASA payment centers. Each of the claims submitted by Horn had supporting documentation to prove the overpayment or improper payment had occurred.

At no payment center, with certain limited exceptions like at the Marshall Space Flight Center and sometimes at the Goddard Center and occasionally at the Kennedy Center, was there any meaningful joint review of the submitted claims at a level above the clerk level. In other words, none of the payment centers other than Marshall tried to avail

themselves of important information found by Horn that would enable NASA, and thereby Horn, to obtain a return on the recovery audit effort. One possible reason for the payment centers' lack of cooperation was their perception that they needed additional information from NASA Headquarters. Such information apparently was not forthcoming.

**Post Contractual Events**

On November 16, 2006, NASA issued its Performance and Accountability Report for Fiscal Year 2006 ("PAR") to the GAO, Congress and OMB. On pages 70-71 of the PAR, NASA stated that its recovery audit activity had resulted in finding $256,254.53 in identified improper payments based on a review of $57,439,000,000.00 in payments by NASA in Fiscal Years 97-05 (which is the period of review from the Horn contract.) (Ex. 19).

The NASA report is patently false. Horn, the only private recovery auditing entity looking at contract payments by NASA during this time, and therefore the recovery auditing activity identified in the PAR, was significantly restricted by NASA's refusing to review, approve and process claims from non-fixed price contracts, which comprise the vast bulk of NASA contracting, until the last month of its work. As shown above, Horn was limited for the most part to pursue improper payments from fixed price contracts which only comprise approximately 12% of NASA's contract payments. It was only in the final three weeks of the Horn contract that Horn was supposedly allowed to audit all types of contracts based on a change of instructions from NASA Headquarters. However, NASA Headquarters imposed other limitations that improperly interfered with Horn's efforts by continuing to refuse to review, approve and process claims. Thus, unlike the statement in the PAR, no entity reviewed $57.439 billion in contract payments for the years indicated.

By letter dated December 21, 2006, NASA, by Dean Patterson, determined that, of the approximately $121 million reported by Horn as being improper payment claims, all but approximately $246,000.00 of the claimed dollars allegedly lacked "sufficient documentation ... for NASA to proceed with recovery action, or the claim [was] not a recoverable improper payment." (Ex. 20). Horn responded to this letter by noting that each of the claims had been presented in triplicate with supporting background documentation to the various payment centers as required by NASA. Horn submits that there will be no evidence of such a contemporaneous claim-by-claim review by NASA that would establish such a lack of sufficient documentation. (Ex. 21).

A meeting took place on January 31, 2007 at Goddard Space Flight Center to discuss Horn's audit findings. Present from NASA were the following personnel: Dean Patterson, Contracting Officer; Andrea Davis, Contract Specialist; and Bruce Ward, Senior Advisor, CFO's Office at NASA Headquarters. Present for Horn were Mike

Lowery and Marie Beckey, DC audit manager, and Dan Lizana, senior auditor. Horn presented information showing that it had uncovered $80 million in improper, erroneous overpayments plus another $40 million of interest claims. It appeared at the meeting that NASA was going to pursue approximately $1.5 to $2 million in claims, but that amount has since been reduced to approximately $246,000. Once again at the meeting NASA representatives stated that they did not intend for Horn to audit open contracts, closed contracts and cost type contracts.

When Horn asked at the meeting why NASA did not seem to want to recover the money identified as overpayments, NASA consistently said that DCAA would find all the errors when the contracts were closed out. As shown above, such tasks are not within DCAA's purview. (See Ex. 4 above.) More importantly, history shows that DCAA does not undertake such audits and does not recover such overpayments. Horn again asked why NASA did not want to recover the improper payment money, to which NASA responded: "Why do you care!" This attitude or position taken by NASA constitutes a material breach of the Horn Purchase Order, a violation of the statutes created by Congress and the regulatory framework created by OMB, and an arrogant disregard of NASA's fiduciary responsibility for the funds entrusted to it as clearly defined in NASA's Financial Management Manual stated below:

> This section prescribes cash management policies to be observed by Centers to ensure effective management of cash and financial operations encompassing billings and collections, deposits and disbursements. Financial activities shall be conducted to ensure that the maximum amount of cash is made available to the Department of the Treasury for purposes of investment and to avoid unnecessary borrowing.

(Ex. 22, p.2).

Horn's last meeting with NASA took place on February 9, 2007 with the same personnel that attended the January 31st meeting. The only thing accomplished during this meeting was the commitment from NASA that someone from the CFO's Office would supply Horn with a list of all our claims with comments on whether the claim was approved or denied and why the claim was being denied. Such a complete report has never been received.

NASA, by Dean Patterson, issued a letter on March 13, 2007, stating that as a result of Horn's work, only $221,310.39 had been approved for collection. (Ex. 23). While the letter indicated that it was "the final agency position with respect to the issues between the parties," the letter contained none of the language that a Final Decision of the Contracting Officer must contain. Moreover, the letter was not responding to a certified claim. As a result, Horn is preparing this Certified Claim for review. An appeal will be immediately taken from the presumed negative response. Ironically, the NASA letter

opens with NASA's falsely indicating that it was "committed to its responsibility to spend taxpayer money prudently." That statement was followed by even more hollow words indicating that NASA was "committed to its responsibility that all funding received by [NASA was] accounted for properly." As shown above, NASA's actions belie such hollow exhortations.

On March 29, 2007, Terry Bowie, Deputy CFO of NASA testified before the Senate Subcommittee on Federal Financial Management, Government Information, Federal Services, and International Security, Committee on Homeland Security and Governmental Affairs. That testimony was patently false, as it again stated, as NASA had said in its PAR Report, that "NASA [and Horn] had reviewed approximately $57 billion of cost and fixed-price contract payments across all programs dating back to 1997." As shown repeatedly above, NASA improperly interfered with Horn's reviewing and pursuing erroneous payments on non-fixed price contracts, and NASA had no other program, apart from the recovery audit program, to review the cost-type contracts. The testimony was also false in that it said that only $256,255 had been identified in erroneous payments when Horn had identified approximately $121 million. (Ex. 24).

Notably, the then-Chairman of the Senate Subcommittee, Sen. Tom Coburn (R-Okl), stated in the hearing that NASA was, "One of the worst actors regarding improper payments ... [and that NASA] had been out of compliance with the IPIA every year since the inception of improper payment reporting." (Ex. 25, p.2).

Horn submitted its Final Management Report dated June 2007. NASA acknowledged receipt of it by letter dated July 19, 2007 from Dean Patterson. NASA then issued its Administrative Report Card declaring that Horn's performance under the Purchase Order was "**OUTSTANDING**." (Emphasis added). (Ex. 26). This glowing report card followed an earlier letter from Mr. DenWiddie which also recognized Horn's overall performance under the contract as being "outstanding." (Ex. 16).

**CLASSES/TYPES OF OVERPAYMENTS FOUND BY HORN**

A normal audit of a large multi-billion dollar entity in the private sector will produce findings of overpayment errors in approximately 50 different classes or types. Horn presented NASA over 400 claims for recovery in 15 different classes on September 30, 2006. The claims fell into the following classes: Obligations over paid; Prompt Pay Interest Calculation Errors; Statement Claims; Payment Errors; Cash Discounts; Regular Duplicate Payments; Award Fees Overpaid; Interest on Overpayments; Prepayment Discounts; Pricing Claims; Miscellaneous Charges; Obligation Overpaid; and Tax Charged in Error.

These recovery audit claim potentials were found at each of the facilities in which Horn performed recovery audits. The total of claim potentials by NASA facility is as follows:

Ames - $138,536.17; Dryden - $12,443.76; Glenn - $17,318.44; Goddard - $97,799,329.39; Johnson - $20,183,307.33; Kennedy - $2,915,935.08; Langley - $40,451.99; and Marshall - $272,041.50. The total for all NASA facilities was $121,379,363.66. (Ex. 27, p.6).

The differences in claim potentials found at each of the above payment centers can be explained in a couple of ways. It is partially a reflection of the size of the payment center but more likely the amount of contract payments administered by the center. But, the more important reason for this claim's purposes is the fact that it is a reflection of the level of cooperation, or lack thereof, by that payment center with Horn staff. The level of cooperation in many instances was so bad (i.e. it was a breach of the duty of cooperation imposed by the contract on NASA), that Horn had to reassign some of its audit teams on one or more occasions at some of the centers to other locales.

Horn found the above claim potentials despite the significant breaches of the contract by NASA that are described above. In other words, Horn uncovered this level of erroneous payments even though NASA failed to cooperate; failed to review, approve, and process Horn's claims for overpayments on all contracts; and breached the terms of the Purchase Order in other ways. As is explained in more detail, without the breaches by NASA, Horn would have uncovered the quantum amounts described above and below.

In the following paragraphs, Horn will describe many of the types of overpayments found during the Horn review. The examples of claims discussed herein, and in some instances also attached hereto, demonstrate that: (1) Horn identified and presented proof of significant overpayments by NASA; (2) NASA has documentation of such significant overpayments; and (3) one part of NASA would approve a certain type of claim, but yet another part of NASA would deny the very same type of claim. The examples provided are not intended to be a complete set of all claims for each of the claim types described below. Rather, they are submitted only as examples of the claim types.

## Duplicate Payments

Typically, duplicate payments are two or more payments for the same exact item(s), invoice, services or performance. Generally, duplicate payments are among the most common errors generated by automated payment systems. Likewise, they are for the most part the easiest to identify with basic reporting tools and tracking systems.

With regard to identifying duplicate payments Horn had access to the vouchers, purchase orders, modifications, and other relevant payment information included in the contract folder. Horn, which has a depository of payment data for NASA contracts, isolated the payments thought to be duplicate payments. Those payments were regularly queried and researched by the audit teams at the Centers.

Paid invoices at Centers were for the most part properly designated (stamped paid) and approved by the authorized personnel. Horn's findings centered on contracts with a high volume of transactions. More specifically as invoices and contract modifications increased, so too did the likelihood of finding a duplicate payment. Of the duplicate payments that were identified, every instance occurred as a result of paying both an original voucher and a copy of that voucher for the same item. Consequently, fees that were paid on cost vouchers had a high likelihood of being paid twice.

SAP, which is the current payment system utilized by NASA, was not generally available to Horn's audit team. "Read only" access to SAP had been discussed with key personnel several times during the audit. Horn was told by the Centers' Deputy Chief Financial Officers that NASA could grant Horn access to utilize SAP. To Horn's knowledge, permission was never granted by any Center. Horn did not have the convenience of tracking, researching or verifying payments in the SAP system. Therefore, Horn had to request information from examiners to substantiate Horn's findings, greatly impacting Horn's productivity and the productivity of the payment center working with Horn.

Exhibit 28 is Horn's Claim Number 2249. It is a duplicate payment by John H. Glenn Research Center to DATASTREAM SYSTEMS INC. Invoice number 07158, dated 10/15/97, was paid once on 12/10/97 in the amount of $6,475.00; it was paid **again** to the contractor on 5/7/98 in the amount of $8,711.54. Several elements made detection difficult. The first payment in the amount of $6,475.00 was a faxed copy of the original invoice and was charged to contract number 10651F. It was short paid by $2236.54 because of the deduction of travel expenses not authorized. The second payment in the full amount of $8711.54 (the original invoice) was paid under the same faxed copy invoice number and date, but was charged to contract number 36284F. A simple review of the Exhibit shows that NASA paid the precise same invoice on the two occasions.

Horn's auditor had the opportunity to work directly with the supplier in certain instances. For the most part, all of the "approved or collected" claims for the audit were those where Horn was allowed to participate in the contact with the supplier. In those instances, the supplier had no difficulty in addressing the overpayments and readily refunded the money to NASA. Horn found, for the most part, the suppliers had identified nearly all of the overpayments at the time the remittance was received. In almost every instance, the overpayments were identified on their Aged Trial Balances from the date of cash application of NASA's checks.

Exhibit 29 is Horn's Claim Number 2195 for a duplicate payment by the Goddard Space Center to GLOBAL SCIENCE & TECHNOLOGIES, INC. in the amount of $481,219.30. The duplicate payment was identified by one of our proprietary computer programs using NASA's payment history data. Horn then verified the overpayment by pulling the invoice copies, an original with a payment date of 11/19/03 with a paid stamp

and a unique payment number, and a copy of that invoice with a payment date of 12/24/03 with its own paid stamp and a different number.

Horn showed both invoices to the invoice processing clerk, who confirmed on NASA's SAP system that the cost invoice had indeed been paid twice. The invoice processor placed a call to the accounting department of Global Science and Technologies ("GST"), leaving a voice mail message explaining the overpayment and requesting that the erroneous payment be repaid. The phone call was returned the next day (the last week of December 2005). In a voice mail, the GST accounting manager said that "Yes, it was a duplicate payment. However, since GST had some small invoices open, the duplicate would not be repaid, but would be used to offset invoices." Without addressing the lack of logic in GST's position on the overpayment and the alleged nonpayment of other costs (that were never documented) and the lack of any contemporaneous documentation of this in the payment files, no such offset was ever accomplished with proper accounting to Horn's account. Horn spent the next six months with Goddard's financial management attempting to effect a deduction from current invoices, or a reconciliation to get the item into the Debt Collection process (notices and ultimate deductions by the Department of the Treasury from payments by any agency on upcoming payments.) In June of 2006, Accounting Manager Evette Blackwell tried to get the file moved into the reconciliation process, but was not successful. In a meeting, Goddard's CFO John Wolz said "Why don't we just deduct this?" But whenever someone tried to set it up for deduction, someone else would prefer to reconcile the file, and the issue would die. As of Horn's last visit to the center, nothing had ever been done to effect collection of this overpayment. Requests for details resulted in the following answer: "It is not among the items approved by the centers." **This one single erroneous payment, which almost everyone connected with NASA recognizes was an erroneous payment, is almost double the amount of erroneous payments reported in NASA's November 16th PAR Report and the amount reported by Terry Bowie in his testimony before the Senate Subcommittee.** And the discussion of this type of erroneous payment does not even address the fact that NASA (and its recovery auditor) was entitled to interest on the erroneous payment for a period of now almost four years.

Horn identified $953,150 of overpayments for this category.

## Cash Discount

The term "Cash discount" is a universally accepted and easy to understand business practice. The OMB, in its M-06-23 memorandum (Ex. 5, p.15), accepts universal understanding of the term by simply stating "*Payment Errors* are errors resulting from duplicate payments, errors on invoices or financing requests; **failure to reduce payments by applicable sales discounts, cash discounts,** rebates or other allowances; payments for items not received; mathematical or other errors in determining payment amounts and executing payments; and the failure to obtain credit for returned merchandise."

The term "discount" pursuant to FAR Subpart 32.9 (Prompt Payment) means an invoice payment reduction offered by the contractor for payment prior to a specific date. With respect to the Improper Payments Act, if a payment has met the terms of early pay (for whatever reasons) and the discount is not taken (by the Government), then the payment is considered to be erroneous and is subject to recovery. It is Horn's experience that discounts earned but not taken are among the easiest claims to document and recover from suppliers or contractors.

Horn's claims for "discounts earned but not taken" were not initially received as legitimate contract debts owed to NASA. Early discussions revealed that NASA Centers did not recognize their failure to take earned discounts as overpayments or improper payments. The Centers did not feel it was warranted to recover discounts on invoices that were erroneously paid in full without deducting the earned cash discounts. Further, there was no effort to demand recoveries of the amount overpaid on the following vouchers via offsets or credit memos. Additionally, Horn discovered no cases where contractors automatically (or voluntarily) applied a rebate or credit to the contract for discounts earned but not taken.

There is, as of September 30, 2006 (Horn's last date in NASA payment centers), still much confusion throughout all NASA regarding the handling of cash discount terms. In interviews with the Centers' CFO's or Deputy CFO's during the Pre-Audit Planning Meeting, Johnson, Kennedy and Ames computed cash discounts based on the date of the supplier's invoices. Marshall computed the cash discount date from the date of the receipt of the invoice. Goddard and Glenn computed the cash discount date from the latter of the Invoice date, receipt of invoice date, or receipt of goods or services date.

NASA also failed to deduct cash discounts from invoices in line for payment at quarterly closings. There is a common practice to capture and pay all invoices set up in the system at closings regardless of the correct prompt payment date or cash discount date. The concept is, the computers will be busy with accounting period closing transactions and will not be able to process invoices on a timely basis for several weeks. Rather than inconvenience the suppliers, NASA simply pre-paid all invoices set up, a week or so before accounting period closings. Their sole goal appeared to be the avoidance of paying interest for those invoices which might be paid late since interest paid for late payment was tracked and was part of the performance evaluation for the center and its financial management. Unfortunately, there is no report to measure interest earned but not taken. Most of the dollars identified in this claim category are for cash discount earned by this advancement of payment date, but no discount deducted. Horn pointed this problem out virtually every month during its audit period. The centers were waiting for direction from Headquarters which, to Horn's knowledge, never came. In January of 2007, NASA Headquarters decided to allow the Centers to approve or decline claims without further instruction. The Centers have stated (without comment from Headquarters) that it is their prerogative to pay invoices within cash discount terms

without deducting the earned discount. This failure to deduct cash discount earned is in conflict with NASA Financial Management and Treasury guidelines

Exhibit 30 is an example of a cash discount earned but not taken. It is Claim Number 1997 for Johnson Space Center, in the amount of $1,059.05. The invoices from Dauphin North America carried 1 ½% terms if paid within 20 days. The invoices were paid promptly with no deduction for cash discount. **This claim was collected from the supplier promptly after the presentation of our claim.**

Another example of a cash discount earned but not taken, **even after it was pointed out by Horn's auditors**, is claim # 1065, dated 7/18/2006, in the amount of $179,343.87. This is the result of payments by NASA of $89,671,032.65 to Honeywell Technology Solutions. (Ex. 31). This claim identified invoices bearing cash discount terms of "BTR for payment by (date)" in the Discount Terms section of the invoice. The terms for this vendor were a .002 "discount rate" if paid by a specific date. Goddard paid these seven invoices totaling over $89 million dollars within the cash discount terms stated on the invoices. Goddard did not wish to collect the overpayment from "their customers" but awaited instructions from NASA Headquarters. NASA Headquarters finally decided that all claim approvals should come from the centers. The center declined the claim with no explanation. This essentially constitutes a gift to Honeywell Technology Solutions at taxpayers expense without the provision by NASA of a Form 1099-G.

Claims in the following categories relate to this same concept: Prepayment Discount and Interest Calculation Errors totaling $181,967.51. These categories were discussed in the Final Management Report but will not be described in greater detail herein. (Ex. 27).

Horn identified $1,898,881 in overpayments for this category.

## Pricing Claims

Pricing claims were directly related to the line-item pricing found on a contractor's invoices as compared to the agreed-upon pricing for that particular line item in the contract.

By way of example, Horn's Claim #2296, dated 2/6/06, in the amount of $30,250.46, was such a pricing claim. (Ex. 32). It covers invoices where the hourly wages were billed and paid at a different or incorrect rate from the rate set in the contract. SAP Public Services, the company that made the incorrect billing, was very cooperative with the Horn auditor and Marshall Space Flight Center in resolving this claim. As a result, NASA, and thereby Horn, collected this claim.

The Praxair claims, #1998 in the amount of $37,750.00 (Ex. 33), and #1999 in the amount of $32,501.79, both dated 4/18/06 (Ex. 34), at Kennedy Space Center involved rental charges for 500 liter dewars (liquid nitrogen/storage containers), as well as residual

credit. Praxair had charged rental charges beyond those allowed in the contract. The COTR for that particular contract partially agreed with these claims; he said the vendor was allowed to charge the rental charges until 2004 (potentially invalidating that portion of the claim). On further review, Horn never found anything within the contract or modifications to support such a limitation of the claims. The remaining amount ($29,031.79) was due for overcharges on "cool down" or erroneous extensions on "residual credit". When Horn met with the COTR, the claims were partially approved as set forth above. However, Horn later was informed that "the claims were not approved by the center" without any explanation. This disapproval is not supported by the contracts.

The latter examples demonstrate one of the greatest challenges faced by Horn on this contract: getting all involved parties to agree with the proper meaning and purpose of contract sections. There were times when NASA's General Counsel, Procurement, and Accounting either at Headquarters, at a particular payment center, or at both, had entirely different interpretations of the same language within the contract. In the end the claims were not approved as to these varying interpretations. Horn identified, during the abbreviated time of its review, $1,456,209 in overpayments for this category.

## Award Fees Overpaid

As part of the normal review of all payments related to specific contracts, Horn specifically examined the payment of any award fees under the particular contract. This type of error typically occurs when a payment center pays out more in provisional payments than was earned for a specific time period. This type of overpayment would occur because, as the payment center would become aware of the overpayment, they would deduct the award fee overpayment from the next award fee payment issued (in the next period). However, when they reconciled that contract period (i.e. subtracted the provisional award fee payments from the earned award fee for the period) they would often take the new credit from the bottom line of the later invoice which resulted in a portion of the improperly paid award fee being perpetuated through the later payments on the contract (in other words, NASA failed to receive the full credit for the overpayment.) The bottom line is that NASA paid the vendor more than was earned for the time periods in question.

Horn found this type of overpayment claim in four instances at the Goddard Center. The claims were initially approved by the Goddard Center's management and referred to the contracting officer. However, the contracting officer had been replaced by another contracting officer. The new CO wanted the previous CO to review the claim. Everyone agreed the overpayment was made; however, the new CO wanted to wait until the contract was closed for final review before collecting. The overpayment had occurred almost two years earlier leaving the government with money due and no plan to collect.

While Horn has been advised by NASA that claim # 2292, dated 7/28/06 in the amount of $150,880.00 has been approved for payment, Horn has not been paid for it. (Ex. 35).

Because of the stalling by Goddard in pursuing this obviously valid type of claim, Horn auditors were forced to concentrate their efforts elsewhere. This resulted in not all examples of this type of claim being uncovered during the abbreviated review by Horn.

Horn has identified $187,675.13 in overpayments for this category.

## Rebate Earned but not Taken

As described above, the term discounts pursuant to FAR Subpart 32.9 (Prompt Payment) means an invoice payment reduction offered by the contractor for payment prior to its due date. Moreover the term "discount" in the appropriate context is used interchangeably with rebate or a refund. With respect to the Improper Payments Act, if a payment has met the terms of early pay (for whatever reasons) and the discount is not taken (by the Government), then the payment is considered to be improper and is subject to recovery.

The Rebate claims Horn & Associates identified and recommended for recovery are consistent with the definitions of the Improper Payments Acts and the guidelines for discounts of all kinds in the Prompt Payment section of FAR. Among the number of claims identified, rebates not taken were not a significant portion of our claims. Only a fraction of the contract payments we audited offer rebate incentives. Of the rebates that were offered, most did not meet NASA's requirements.

The very concept of a discount or qualification to reduce the cost of a product or service on a variable basis is totally foreign to all of the center's accounting concepts. The invoice processor would never check to see if an earned rebate was taken. If the Contracting Officer does not physically reduce the price on the voucher or invoice, the rebate will never be taken.

Exhibit 36 is a rebate claim approved and collected by the Marshall Space Center. It involved a rebate offered by Silicon Graphics Federal Inc. in the amount of $48,875.18. The rebate was offered and accepted, but yet NASA paid the full amount of the invoice without deducting the rebate.

## Statement Audit - Open Credits

One of the most useful tools in a recovery audit is a review of vendors' statements. A financial audit will typically request a statement from a pre-determined sample of vendors. The Horn review at NASA included a review of statements from **all** vendors identified by NASA.

In response to such a request from an auditor, it is a common practice by corporate credit managers to simply send a list of open invoices as a reply. Horn continued to follow up with such vendors until NASA received a complete listing of all open items: invoices, credits and unapplied cash items. Sometimes, the vendor simply provided a current copy of their "aged trial balance," which typically will show all the above information. This is an important process in the audit review. Technically, a complete audit would point out every conceivable overpayment or underpayment. When a statement is received with an overpayment or underpayment that has not been identified through a review of the client data, the reviews are modified or tweaked until the open item is identified.

A common complaint of suppliers to the Federal Government is that it is almost impossible to return an overpayment to a federal agency. A supplier can spend months in endless dialog with federal agencies about overpayments with little results. The "Recovery Audit Act" attempted to simplify this process for the vendors and the federal agencies. The process is relatively straightforward. If the Contract in which the overpayment or underpayment occurred is still open, the recovered funds (less the recovery auditors' fee) is returned to the contract. If the contract is closed, the funds (less the recovery auditors' fee) are returned to the Department of the Treasury. In either event, the recovery auditor who found the overpayment is properly compensated.

All NASA Centers have rules regarding the handling of checks and credit memos. Goddard, for example, returns all checks that cannot be identified to a specific contract or overpayment within 48 hours. On numerous occasions, checks for open credit memos or overpayments identified by Horn were returned because the Centers' rules did not include appropriate directions as to how to deal with checks sent as a result of the work of recovery auditors.

Horn Claim # 2593, dated 8/01/06 in the amount of $62,711.25, reflects three open credits from SAP Public Services, dated March and June of 2004. (Ex. 37). When contacted, SAP was happy to have someone research the items and authorized payment to the Marshall Space Flight Center. This money had been lost to NASA for over two years, and may have been lost forever but for the work of Horn.

Horn Claim # 2581, dated 8/23/06, in the amount of $72,882.32, included a statement from Hamilton Sundstrand that reflected almost $730,000 of open credits dating back to 12/31/96 (almost 10 years) (Ex. 38). The notes on the statement indicated "Contract Closeout Process." This was an instance where the vendor, being aware of credits being due NASA for almost 10 years, appeared to be content to keep the money with no indication of an expected date for Contract resolution. Horn found that it was not the practice at Johnson Space Center at the time of the Horn audit to charge suppliers with interest for the loss of use of overpayment funds.

By the finish of the Horn recovery audit, 80% of the NASA vendors had provided Horn with their statements. The review of the Vendors' statements was only partially completed due to the breaches by NASA of the Horn contract. Nevertheless, Horn was able to identify $943,214 in overpayments for this category of overpayment claims.

## Interest On Overpayments Claims

Interest claims are a significant portion of the Horn findings at Goddard, Kennedy and Johnson Space Flight Centers. Each overpayment Horn & Associates identified has a corresponding interest claim. In a measured way the interest claims illustrate both the cost to the government and the inappropriate and improper benefit to contractors for the use of erroneously paid government funds. To reiterate the findings from the House Science and Technology Committee, Subcommittee on Space and Aeronautics, hearing on October 27, 2005:

> Over the past several years, auditors have repeatedly reported on NASA's weak financial management and unreliable financial data. In three of the past four years, independent auditors reported that they were unable to express an opinion on NASA's financial statements. For example, for fiscal year 2003, **NASA made $565 billion in adjustments – more than 37 times its total budget for that year – to correct errors and make other changes to its accounting records. The auditors could not find adequate documentation to support these adjustments**. (Emphasis added).

(Ex. 6, p.4).

Horn found that all of the NASA centers appeared to be extremely proficient in following the guidelines regarding interest payments due to contractors on invoices paid by NASA more than 30 days beyond the guidelines defined in the Prompt Payment Act. On the other hand, Horn was amazed to find that NASA was loathe to recover interest from the very same contractors when they had received payments erroneously and thereby had improperly had the use of the money. Horn heard countless NASA employees refer to their vendors/suppliers repeatedly as "my customers." As such, these NASA people operated frequently to the detriment of NASA, the Federal government and the U.S. taxpayers. While each center meticulously recorded (systematically) every dollar of Prompt Payment Interest paid by NASA, there was no training or procedure in place at any center to recapture **any of the interest on the $565 billion** (referred to above) that had been erroneously held, interest free, by NASA's suppliers, for sometimes as long as 10 years. The $565 billion is the amount of payments and adjustments for only one year of the multiyear contract between Horn and NASA.

The Government's right to property (including money) is a longstanding right. The precedent was established by a number of common law cases and later codified in FAR. NASA clearly has the authority to assess interest on contract debt arising from an overpayment. The DCAA audit manual recommends that interest for overpayments be calculated from the date of the overpayment to the date of repayment (DCAA Contract Audit Manual - Page 893) (Ex. 39). Subject to a Systems Audit, DCAA may also grant a contractor direct submission status. One of the key goals of such an audit is to determine if a contractor's billing system can properly accrue costs, track variances and overpayments. In a very practical sense the contractor's billing system should immediately discover overpayments due to pricing errors, if one should occur. An approved billing system that meets DCAA standards should be regarded as the governments advance notice that all contract debt beyond 30 days is subject to interest penalties.

Horn's findings are interest claims in which the vendor received a payment and did not return the funds within 30 days. Horn calculated interest from the date of the overpayment or duplicate payment to the date of the individual Horn claim based on the U.S. Treasury Rates, Pub. L. No. 92-41, 85 Stat. 97 (2000).

When computing interest on indirect cost rate overpayments, FAR 42.709-4 says "consider the overpayment to have occurred, and interest to start accumulating, from the midpoint of the contractor's fiscal year end. Use an alternate equitable method if the cost was not paid evenly over the fiscal year." Section 42 of FAR is very specific with regard to charging interest and penalties on indirect cost rate overpayments. Horn has provided NASA with a number of claims recommending the recovery of millions of dollars stemming from indirect cost overpayments.

Adjustments for costs exceeding the cost burdens, ceiling rates and approved indirect rates were often applied well after the 90 day fiscal year-end closeout period. On some occasions these adjustments were applied years after they had been incurred. As the Debt Collection Improvement Act ("DCIA") concludes, the contractor's use of government funds beyond 30 days is a concern. The FAR authorizes Contracting Officers to charge interest from the time of the overpayment to the time of payment (indirect cost overpayments). All of the 533 contracts reviewed by Horn at Goddard had this clause referenced in the contracts. Similarly, the contracts reviewed at Johnson had the same clause.

The interest claims were presented to Goddard and Johnson Space Flight Centers regularly. Their response was that they had not been given guidance from NASA Headquarters to approve interest claims. Their position was that, if Headquarters gave the "OK," then they would approve the interest claims on the unsettled overpayments. However interest Claims from closed contracts, and overpayments that were already paid back to NASA would not be approved for the recovery.

An example of a vendor who responded to a Horn claim for interest on overpayments is The Xerox Corporation. Claim #JSC – 2417, dated 4/10/06 in the amount of $11,057.79, covers the recovery of interest on seven overpayments. The interest recovered ranged from 90 to 217 days from overpayment to collection. (Ex. 40).

Horn identified $40,619,548.71 in potential overpayments in this category.

## Payment Errors

Payment Errors is a category of overpayments where the particular error does not fit within any of the other categories explained above. They are categorized as such if an invoice is overpaid as a result of a mathematical or other type of error that resulted in the invoice being paid at a higher amount than it should have been. These claims are more complicated than the claim types described above, such as "Discounts earned but not taken" or "Duplicate Payments". The following paragraphs represent examples of some of these overpayments and, in some cases, the ways Horn identified these types of errors.

Horn reviewed contract payments which included vouchers authorized for payment by the Contracting Officer including some that were subject to a later audit by DCAA. Horn's findings revealed that, among contracts authorized for Direct Submission (those contracts which have received advance approval from DCAA for billing without going through the usual and normal contractual safeguards), significant variances occurred with regard to cost over billing. On some Direct Submission contracts about 30 to 40% of the vouchers over billed on cost. In some instances, those overpayments were credited back to NASA on subsequent vouchers, often beyond 90 days. On a number of contracts contractors credited a voucher only to over bill the same cost on the very same voucher. Horn termed this as a "tunneling cost". The overpayment may go unnoticed because the line items are adjusted on the next voucher or within 30 days, however the total amount over billed was still outstanding. From the recovery vantage point, under DCAA Manual 8-503.2 – Interest, the use of government property (rights to the use of money), no matter whether it is $25K or it is $500K over 5 years, the overpayment is still a debt owed to NASA.

Indirect rates were charged to NASA on vouchers where the direct labor hours or direct costs were not expensed on the same voucher. Indirect charges for which there are no direct charges are overpayments. G&A, Overhead, Materials Burden, B&D and R&D are cost pools associated with its allocation base. Contractors are allowed to adjust for changes in provisional rates on adjustment vouchers or during contract closeout.

Vouchers with mathematical errors are considered to be an improper invoice and thus an improper payment. If indirect rates on the vouchers are negotiated, approved, and become final, the contractor shall not be reimbursed in excess of those amounts. Many

of the contract payments audited by Horn revealed costs that exceeded the indirect rates throughout the contract. Horn's findings resulted in uncovering sizable overpayments on a number of vouchers in a contract period. Some indirect rates were double and triple the approved rates.

Because contractors are required to undergo a Systems Audit by DCAA for accruing costs, theoretically the variances should have been identified each month for the necessary adjustments. Furthermore, if a contractor projects an increase in their incurred indirect cost they are required to submit an Indirect Cost Rate Proposal with at least a 180-day notice. Some of the overpayments Horn identified qualify for interest and penalties under FAR 52.242-3.

Contracting officers at most Centers appeared to be extremely guarded about the recovery audit rate verification process. In a number of the Centers Horn had little success in reconciling variances (large variances in a number of cases) even with access to the indirect rates. Under FAR, Contracting Officers must maintain all information pertaining to the contract including the indirect rate agreements. NASA is a client of DCAA of which provides contract audits and assistance with establishing final rates as well as closeout and settlement of the contracts assigned them.

Individual contract payments were rarely reviewed for the sole purpose of the recovery of an improper payment. A DCAA Memorandum, dated December 29, 2005, pointed out to DoD that the focus of a recovery audit is on the Department or Agency's books and records and not the contractor records; therefore, DCAA would not normally become involved in the recovery audit efforts. (Ex. 4).

As a result, Horn's recovery audit findings are beneficial to NASA as DCAA does not perform recovery audits and the Contracting Officers are not allowed to audit their own contracts; therefore, they can utilize Horn's findings for adjustments, offsets, repayments or to request a price analysis audit if the situation warrants.

Also, Horn's findings can assist in NASA's contract closeout procedures, as contractors are required to reconcile all open credits, review all payments and pay debts owed to NASA. The recovery audit findings can expedite that process. The findings may also assist Contracting Officers in establishing pre-negotiated positions for deciding provisional rates for similar contracts. As Horn's findings have revealed, some contracts are prone to indirect cost overpayments, as they may need to increase rates or initiate ceilings.

Contracting Officers should distribute copies of the indirect cost rate agreement to the payment offices for the contract files. About 40% of the contracts Horn reviewed did not have the latest rate agreement or the approved rate among the contract records. The cost pool allocation for each contract should also be available to examiners and the AP team.

In one instance NASA received a check in the amount $700,000 dollars for a downward rate adjustment. After an audit of all the vouchers, up to the date of the check, the contractors actually owed another $700,000 for the reimbursement of costs in excess of the agreed rates. In another instance a check of $56,000 dollars could not be reconciled without the rate to which the adjustment was based on.
Horn identified $74,790,338 in potential overpayments in this category and an additional $274,668 under the category of Obligation Overpaid which actually falls within the above description.

Claim number 2227, dated 4/18/2006, in the amount of $135,709.82 addresses several adjustments on voucher #16, for the billing period from 20-Feb-1999 to 05-March-1999 (Ex. 41). On March 12, 1999, Space Gateway Support informed NASA of the overbilling that was to be adjusted on Voucher # 17. However, no adjustment was made on Voucher #17 nor on any later voucher. Despite the lack of any documentation establishing that the overpayment had been recovered, Kennedy Space Center informed Horn that the $138,709.82 overpayment was recovered in some unidentified later reconciliation, but it did not share the reconciliation information with Horn.

## Remaining Claims

Horn has not addressed in detail, claims in the following categories: Rebate Claims - $48,875; Tax Charged in Error - $17,570; Miscellaneous Charges added to Invoice in Error - $6,815; Sales Tax Overcharge - $323; and Short Shipped - $129. These claims are all addressed in the Final Management Report (Ex. 27) by Horn, but will not be described in detail herein.

## BREACHES OF CONTRACT BY NASA

### Breach of Contract

An unjustified and material failure to perform in accordance with the obligations imposed upon a party by the contract is a breach of contract. Restatement Second of Contracts, § 237 (1981). The obligations of the party under the contract can be explicitly stated in the terms of the contract, or they may be implied simply by virtue of two parties owing such duties to one another.

Every contract, both governmental and private, contains such implied duties that each contracting party owes to the other party. Among those implied duties are the duties of cooperation and fair dealing with the other party and the duty to act in good faith.

The factual setting described above is replete with examples of NASA's having breached both of those implied duties that NASA owed to Horn. By way of example, NASA owed the following duties to Horn: (1) provide reasonable access to the contract files; (2)

timely meet to review Horn work product; (3) verify and timely approve debts or erroneous payments to be pursued; and (4) timely pursue valid claims with a degree of intensity designed to recover the debts owed to the United States. Each of those duties falls under the implied duty of cooperation and fair dealing. In addition, were NASA acting pursuant to its implied duty to act in good faith towards Horn, it would have met each of those duties by fully cooperating with Horn.

**Change to the Contract**

In addition, the Purchase Order explicitly required and allowed Horn to review **all** contract payments occurring during a six fiscal year period (1997-2003) plus an additional two fiscal years (2004-05) added to Horn's contract by the issuance of Modification No. 1. As noted above, NASA refused to process claims on non-fixed price contracts, and NASA interfered with Horn by refusing to review, approve and process claims on such contracts until the final 20 days of the contract period. This interference by NASA clearly and materially breached the express agreement between NASA and Horn.

While it could possibly be argued that NASA had the right to change the terms of the Purchase Order to limit the types of contracts available for Horn's review, no such formal change order was made. Even if it were made, such a change would be a material change to the Purchase Order which would require NASA to compensate Horn with an equitable adjustment for such a major limiting factor.

Since NASA issued no such formal change to the Purchase Order, Horn could similarly argue that such a limiting change made after the issuance of the Purchase Order, actually made almost a year, to a year and one-half after issuance of the Purchase Order was a constructive change to the Purchase Order. And, a constructive change requires NASA to equitably adjust the Purchase Order for that material change.

**Constructive Partial Termination**

NASA might also argue that NASA had the right to limit the scope of Horn's work under the Purchase Order to fixed price contracts by making a **de facto** partial and constructive termination for the convenience of the Government. First, such an argument would be rather hollow in light of the fact that NASA issued no such termination order citing any termination provision; thus it would be a constructive termination at best. Second, and more importantly, such an argument would merely be semantics in that Horn would still be entitled to recover its incurred costs plus a reasonable profit thereon under the termination for convenience clause.

**REMEDIES FOR NASA'S BREACHES**

The remedy available to Horn for NASA's material breaches of the Purchase Order is that Horn should be put in the same economic position it would have been in but for NASA's improper breaches. Such a remedy is not unlike the remedy available to Horn should the breach be considered a constructive change to the Purchase Order. While the law requires Horn to establish not only that NASA has breached the Purchase Order, Horn must also establish the existence of some amount of damages. It is important to note that Horn is not required to establish its damages with a finite degree of accuracy; rather, Horn may establish its approximate damages so long as there is a reasonable basis for Horn's computation. See Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965).

Through discovery Horn could potentially establish the precise number and amounts for all contract payments made by NASA during the stated fiscal years covered by the contract. However, it is appropriate for Horn to rely on the NASA PAR report and testimony of NASA to the Senate Subcommittee where it determined that NASA had contract payments on all types of contracts for Fiscal Years 1997-2005 (the window of the Horn contract) in the amount of $57,439,000,000.00. (Ex. 19). Horn can then establish, based on recovery auditing, that a certain amount or percentage of such payments, if made in the private sector, would involve overpayments or improper/erroneous payments. However, once again, it is appropriate for Horn to rely on OMB's pronouncement above that the Government's error rate for making erroneous payments is 4%. (Ex. 1).

Taking the above information together, NASA would have had $2,297,000,000 in erroneous payments that Horn would have discovered but for NASA's breaches of the Horn contract.

Horn can then establish that, when someone aggressively pursues such a quantity of overpayments or improper/erroneous payments, the agency or recovery auditor can expect a return of a stated percentage. Horn and its independent expert can prove that the experience of recovery auditors in both the public and private sector are that at least 90% of payments identified as being erroneous are ultimately recovered by the entity or agency that has contracted for the recovery audit. From that exercise, Horn can establish by a preponderance of the evidence that it would have uncovered a similar amount of overpayments or improper/erroneous payments, and that aggressive pursuit by NASA consistent with the terms of the Purchase Order would have resulted in NASA's recovering such an amount.

From the above, Horn will prove that NASA would have recovered $2,068,000,000 of payments erroneously made by NASA, if NASA had not breached the contract with Horn.

It is only a simple mathematical operation to then determine what Horn's percentage of recovery would be as compensation for its work on the NASA contract. Horn's contingent fee was 13.5% of that recovered sum which would have been $279,000,000.00.

(Note, the amount of payments made during the fiscal years is the important factor; the amount of contracts awarded during those years is not.)

By way of example utilizing Horn's actual experience in performing the limited amount of recovery auditing at NASA, Horn, despite the limitations and breaches of contract by NASA on the Horn contract coupled with the overall lack of cooperation and interference by NASA, uncovered in excess of $121,000,000.00 in such overpayments or improper/erroneous payments. By applying the stated percentages above, provided by the expert based upon his years of experience in the recovery auditing field, NASA would recover 90% of that amount or $109,000,000. Horn would be entitled to receive 13.5% as its fee or $14.7 million in order to put it in the same position it would have been in but for the breaches by NASA.

Alternatively, Horn should be entitled to receive at a bare minimum, compensation for its actual costs incurred. Such damages are often called "reliance damages." Such damages, while not placing Horn in the same position it would have been, but for the breaches by NASA, would at least compensate Horn for its out-of-pocket expenses and for the time devoted to the performance of the Purchase Order.

## QUANTUM

### Traditional Breach Damages

As noted above, Horn has established conclusively that NASA materially breached its contract with Horn. The appropriate remedy is to put Horn in the same position it would have been **but for** the NASA material breach. In doing so, Horn normally would have to rely on discovery to establish the amount of contract payments made by NASA during the fiscal years from '97 to '05 (which includes the two fiscal years added by Amendment One to the contract.) However, as set forth above, Horn accepts the number furnished by NASA in its PAR report and testimony to the Senate Subcommittee (Ex. 19) where it determined that NASA had contract payments on all types of contracts for Fiscal Years 1997-2005 (the window of the Horn contract) in the amount of $57,439,000,000.00.

Then, Horn normally would have to prove from a preponderance of the evidence what portion of those payments would be expected to be improper or erroneous/overpayments. Once again, Horn accepts OMB's pronouncement and reporting to Congress where OMB acknowledges that 4% of all federal payments made are improper or

erroneous/overpayments. (Ex. 1). Horn from its own experience and from the experience of its independent expert will buttress that admission by NASA by concluding that public agencies do have statistically far more improper or erroneous/overpayments than private industry. Thus, 4% of all NASA's payments during those fiscal years, or $2,297,000,000 constitute improper or erroneous/overpayments.

Horn then correctly recognizes that only a certain percentage of those improper payments are collected from the contractors who received them. Again, from Horn's experience, and also from the experience of its independent expert, Horn knows it would have collected typically 90% of the improper payments identified. While this percentage may seem high, Horn will prove from its own experience and the testimony of its expert that such a high percentage of recovery is accurate even without the added benefit of the Federal Debt Collection Act which provides the Federal Government with extraordinary collection powers. As this testimony will show, private companies who enjoy doing business with other private companies who have made improper or erroneous/overpayments, are quick to return those overpayments when proof of the overpayments is presented to the company in receipt of the improper or erroneous/over payment. This is true even though the paying company does not have the extraordinary collection powers of the Federal Government. Horn submits that the 90% adjustment is conservative. By applying this factor the amount of such overpayments is lowered to $2,068,000,000.

Then, the quantum to which Horn is entitled to recover for NASA's material breach can be determined by simply multiplying that adjusted number by the 13.5% factor that was in the Horn contract. Thus, Horn's compensation to place it in the same position that it would have been but for NASA's breaches of the contract is $279,000,000.00.

**Alternative Breach Remedy**

An alternative remedy for Horn is that Horn should, at a minimum, be entitled to recover a considerable sum based solely on the limited number of contract payments that Horn was allowed to review despite the material breaches by NASA. Horn's work uncovered in excess of $121,000,000 in erroneous payments. Application of the 90% recovery factor indicates that NASA would have recovered $109,000,000 by following through on these erroneous payments as NASA was required to do under its contract with Horn. Assuming such recovery, then Horn would be entitled to be paid 13.5% of the recovered funds or $14,700,000. Thus, that amount would be the sum to which Horn is entitled to put it in the same position it would have been in, but for the NASA breaches, with the further proviso that it only addresses the limited contract payments that Horn actually could review despite the significant and material breaches by NASA.

**Further Alternative Remedy**

In the sections above, Horn has demonstrated the appropriate compensation for Horn to put it in the same position it would have been but for the NASA breaches of contract. It has done so using both OMB's reporting and NASA's testimony to Congress as well as the abbreviated work that Horn could accomplish despite the NASA breaches.

Even should NASA determine, improperly Horn believes, that the sums above are not an appropriate measure of Horn's damages, Horn is entitled to recover its actual costs and expenses incurred by Horn and its independent subcontractors. Horn has contacted each of its independent subcontractors and had them review the time they devoted and the costs they incurred. Likewise, Horn has reviewed its own records to determine time and expenses devoted on this contract by Horn staff. The sum of all such time and expenses plus an overhead and profit factor of 18% is $7,028,200.96. (Ex. 42). The information is presented on an individual basis for each Horn member, employee or subcontractor. Further, the information is broken out on a monthly basis. Supporting all this information are expense records and time diaries that were used to construct the documents.

**NASA Offset**

NASA is entitled to offset against each of those measures of damages, the amount that NASA actually pays Horn. As that money has continued to trickle in, Horn will not set forth that amount. However, Horn believes that figure can be determined without significant difficulty.

(Remainder of page intentionally left blank.)

## CONTRACTOR'S CERTIFICATION OF CLAIM

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Tom Horn
President, Horn & Associates, Inc.
Dated: 11-20-2007

## SUMMARY

As set forth above and as certified herein, Horn is entitled to recover $279,000,000.00 representing its damages resulting from the breach of the contract by NASA. A different measure of those damages limited only to the overpayments that Horn found (despite the breaches described above) is $14,700,000. Alternatively and also as certified herein, Horn is entitled to recover at a minimum $7,028,200.96, representing the costs incurred by Horn including a reasonable overhead and profit thereon.

In closing, Horn expects NASA to review this claim and to render a prompt and fair, equitable decision on the claim. However, Horn has the document referred to above from NASA, the letter from Dean Patterson of March 13, 2007, which indicates that it is the "final agency position" that Horn is only entitled to recover its contractual percentage upon improper payments totaling $221,310.39 when those payments are collected, if ever. Horn considered whether that document constituted a final decision upon which an appeal could be taken. Horn concluded that it was not, and that it was incumbent upon Horn to prepare and certify a claim, which is this document. To the extent that NASA is going to continue to maintain the position set forth in the above letter, and not give this claim a fair review, Horn requests that NASA do so promptly, and render its final decision so that Horn can take an immediate appeal of such a final decision to either the U.S. Court of Federal Claims or the Armed Services Board of Contract Appeals.

Respectfully submitted,

HORN & ASSOCIATES, INC.

By: Tom Horn, President

Attachment: Exhibit Index and Exhibits

cc: Michael Griffin, Administrator, NASA (claim w/o exhibits)
Ronald R. Spoehel, CFO, NASA (claim w/o exhibits)
Terry Bowie, Deputy CFO, NASA (claim w/o exhibits)
Mike Lowery, Horn, Inc.
Larry Farrar, Horn, Inc.
William H. Gammon, Esq., Nelson Mullins LLP

Contract No. GS-23F-0258N/Order No. NNH05CC28D
Horn & Associates, Inc.
Exhibit Index to Certified Claim

November 20, 2007

**EXHIBIT INDEX**

| | |
|---|---|
| Exhibit 1: | OMB Issues Instructions to Agencies and States for Combating Waste, Fraud, and Abuse in Federal Programs, June 19, 2003. |
| Exhibit 2: | Section 831 of the Defense Authorization Act, 31 U.S.C. §§ 3561-3567. |
| Exhibit 3: | OMB Memorandum M-03-07, January 16, 2003. |
| Exhibit 4: | DCAA Memorandum PPD 730.5.13.1, December 29, 2005. |
| Exhibit 5: | OMB Memorandum M-06-23, August 10, 2006. |
| Exhibit 6: | House Science and Technology Committee, Subcommittee on Space and Aeronautics, Status Report, October 27, 2005. |
| Exhibit 7: | GAO Report, GAO-06-216T, October 27, 2005, Long-Standing Financial Management Challenges Threaten the Agency's [NASA's] Ability to Manage Its Programs. |
| Exhibit 8: | Hearing of the Senate Committee on Homeland Security and Governmental Affairs, Subcommittee on Federal Financial Management, Government Information, Federal Services and International Security, March 29, 2007. |
| Exhibit 9: | NASA's RFQ NNH04068239Q for Recovery Audit Services. |
| Exhibit 10: | Horn's Proposal for Professional Services to Provide Recovery Auditing Services, August 4, 2004. |
| Exhibit 11: | NASA's Purchase Order Number NNH05CC28D, December 23, 2004. |
| Exhibit 12: | NASA's Amendment One, September 1, 2005, to the Purchase Order. |
| Exhibit 13: | Horn's Pre-Audit Planning Meeting schedule and Pre-Audit Planning Guide. |
| Exhibit 14: | Gwendolyn Sykes email, March 4, 2005. |
| Exhibit 15: | Melvin DenWiddie email to DOT, November 1, 2005. |
| Exhibit 16: | Melvin DenWiddie letter to Mr. Horn, June 30, 2006. |
| Exhibit 17: | Statement of Terry Bowie, Deputy CFO, NASA, March 29, 2007. |
| Exhibit 18: | Mr. Patterson's email to Mr. Lowery, September 8, 2006. |
| Exhibit 19: | NASA's Performance and Accountability Report. |
| Exhibit 20: | Mr. Patterson's letter to Mr. Horn, December 21, 2006. |
| Exhibit 21: | Horn's response dated December 27, 2006, to Mr. Patterson's letter of December 21, 2006. |
| Exhibit 22: | NASA Financial Management Manual. |
| Exhibit 23: | Mr. Patterson letter to Mr. Horn, March 13, 2007. |
| Exhibit 24: | Terry Bowie, Deputy CFO, NASA, testimony before Senate Subcommittee on Federal Financial Management, March 29, 2007. |
| Exhibit 25: | Senator Tom Coburn statement at hearing dated March 29, 2007. |
| Exhibit 26: | NASA's Administrative Report Card for Horn & Associates, Inc. |
| Exhibit 27: | Horn's Final Management Report, June 2007. |

Contract No. GS-23F-0258N/Order No. NNH05CC28D
Horn & Associates, Inc.
Exhibit Index to Certified Claim

Exhibit 28: Horn's Claim Number 2249, duplicate payment by John H. Glenn Research Center.
Exhibit 29: Horn's Claim Number 2195, duplicate payment by Goddard Space Flight Center.
Exhibit 30: Horn's Claim Number 1997, cash discount earned but not taken by Johnson Space Center.
Exhibit 31: Horn's Claim Number 1065, cash discount earned but not taken by Goddard Space Flight Center.
Exhibit 32: Horn's Claim Number 2296, pricing claim at Marshall Space Flight Center.
Exhibit 33: Horn's Claim Number 1998, pricing claim at Kennedy Space Center.
Exhibit 34: Horn's Claim Number 1999, pricing claim at Kennedy Space Center.
Exhibit 35: Horn's Claim Number 2292, award fees overpaid at Goddard Space Flight Center.
Exhibit 36: Horn's Claim for rebate earned but not taken at Marshall Space Flight Center.
Exhibit 37: Horn's Claim Number 2593, open credits at Marshall Space Flight Center.
Exhibit 38: Horn's Claim Number 2581, open credits at Johnson Space Center.
Exhibit 39: DCAA Contract Audit Manual, p. 893, section 8-503.2 Interest.
Exhibit 40: Horn's Claim Number JSC-2417, interest on over payments at Johnson Space Center.
Exhibit 41: Horn's Claim Number 2227, adjustments on voucher at Kennedy Space Center.
Exhibit 42: Horn's Audit Cost Summary and back-up data.

National Aeronautics and
Space Administration

**Goddard Space Flight Center**
Greenbelt, MD 20771

January 25, 2008

Reply to Attn of: 210

Mr. Tom Horn
President
Horn & Associates, Inc.
3690 E. Fort Union Blvd., Suite 202
Salt Lake City, UT 84121

Ref: (a) Horn & Associates Certified Clam, dated 11/20/07, received 11/27/2007
(b) NASA letter to Horn & Associates dated 3/13/2007

Dear Mr. Horn:

This letter is in response to Horn and Associates, Incorporated, hereafter referred to as Horn, claims for $279,000,000.00, $14,700,000.00 and $7,028,200.96 for alleged material breach of NASA Delivery Order NNH05CC28D for Recovery Audit services. The claim is denied in its entirety. In accordance with Federal Acquisition Regulation (FAR) 33.211 this serves as the Contracting Officer's Final Decision.

The denial is based on a complete review of the claim and all supporting documentation. It is my determination that Horn has not established entitlement to an adjustment for an alleged breach of the delivery order, and has in fact made misrepresentations of fact in its submission to the Agency.

Horn asserts that it received no compensation due to a material breach of the order by NASA. To the contrary, Horn received compensation in accordance with the payment terms of the order that was awarded on a contingency fee basis. As stated in Exhibit 3 of the claim documentation "OMB Memorandum M-03-7, page 6 of 7, VII, D," "*Contingent fee orders shall preclude any payment to the recovery contractor until recoveries are actually collected by the agency.*" Therefore, in accordance with cited OMB documentation, Horn has in fact received compensation on recovered monies.

The original solicitation was issued with a Statement of Work (SOW) (exhibit 9, Attachment A, Horn claim documentation) specifying only "fixed price contracts" were to be reviewed. Horn proposed to that requirement August 4, 2004, and took no exceptions. In fact, although Horn suggested that the language be revised to "all contracts", Horn's August 4, 2004 proposal and its acceptance were not predicated on "all contracts".

EXHIBIT
3

Had the proposal been submitted from Horn with the caveat that it was only valid if the SOW language was revised to replace "fixed price contracts" with "all contracts", it would not have met NASA's stated requirements and NASA's proposal evaluation team would have developed a finding of a significant weakness or deficiency for Horn's failure to be fully responsive to the terms of the solicitation. Had NASA made a change of this nature to the SOW it would have been necessary, in accordance with the FAR, to do it in the form of an amendment to the solicitation so that all offerors would have had the same opportunity to review and alter their proposals based on what would have been a new requirement. There is no evidence that NASA intended to make this change, or to circumvent the requirements of the FAR.

Shortly after award, the Agency Chief Financial Officer (CFO) sent an email message to the center CFO's addressing the upcoming review of fixed price contracts, which was consistent with the approved SOW the technical organization had provided for this requirement. As Horn had proposed to a solicitation requirement based on a review of "fixed price contracts" only it had an appreciation of the scope of the review and the staffing required from contract start. The proposed contingency fee of 13.5 percent for recovered erroneous payments was, in fact, based on that position; therefore, no derived impact should have resulted from any NASA clarification.

An earlier draft version of the SOW was attached by the then contracting officer to the award document resulting in the administrative error changing the SOW language from "fixed price contracts" to "all contracts". This error was undetected until it was brought to the attention of the contracting officer by Kennedy Space Center personnel. The contracting officer shortly thereafter notified the technical organization of the administrative error. It is not known why a unilateral corrective administrative modification was not issued at that time, as it was an oversight on the part of both parties at the time of award, and did not reflect the solicitation requirement, proposal offer, and acceptance.

To summarize the alleged harm to Horn, they proposed against a SOW that clearly stated that only "fixed price contracts" were to be reviewed, the proposed contingency fee percentage was predicated on that scenario and not "all contracts". To claim that it should be made whole for an obvious administrative error is without merit as the contingency compensation was based solely on recovered funds from NASA approved erroneous payments. Notwithstanding this point, Horn was given access to and reviewed payments for "all contract" types and did identify purported erroneous payments from same.

Further, Horn did not develop and deliver a project plan as required by the delivery order in accordance with Task 2 of the SOW. Horn's proposal on page 13, stated that Horn will submit such document within 10 days after visiting all NASA Centers. The project plan would have allowed NASA to approve the proposed erroneous payment categories, prior to commencement of the actual audit, and would have been the second opportunity early in the contract period for Horn to bring to NASA's attention its desire to audit "all

contracts" not just "fixed price contracts". In accordance with Subtask 3.3 of the subject order, Horn was responsible for identifying all lost funds and providing a list of all recommended debts to NASA's CFO and the appropriate Center Deputy CFO for Finance. The ultimate decision as to what constitutes a debt lies not with Horn, but with the responsible NASA official at each Center in accordance with the SOW and FAR Part 32. Horn did not comply with the delivery order terms and audit as stated under the basic years as awarded, 1998-2003 or fiscal years 1997-2002, and failed to submit the required management report at the end of the initial basic period to allow NASA to evaluate the progression of the audit and make any necessary adjustment to the audit project plan as stated in Task 3 of the order.

The basic delivery order period of performance was for 12 months from October 1, 1997, through September 2003, and was the only guaranteed period of performance. In accordance with NASA FAR Supplement (NFS) 1817.207, Exercise of Options, which states that in addition to determining the option fulfills an existing need, the contracting officer shall determine that there is no change in the scope of the option requirement. Further, the option clause in the order, 52.217-9 Option to Extend the Term of the Contract, only requires that preliminary notice be given if it is contemplated that the option will be exercised, but further states that the preliminary notice does not commit the Government to an extension. Based upon the conditions found at NFS 1817.207, the contracting officer issued a letter dated August 24, 2006 notifying Horn that NASA was not exercising the option.

For the alleged breach by NASA, Horn has suggested several remedies. The first is a recovery of some $279,000,000.00. This amount sought in quantum, is based on a calculation of 13.5 percent of the $2,068,000,000 amount that Horn contends that NASA could have recovered in erroneous payments. The $2,068,000,000 equates to 4 percent of $57,439,999,999 in NASA payments during the years 1997-2005, with an adjustment for a 90 percent recovery rate. Horn cites to a pronouncement by the Office of Management & Budget (OMB) that "4 percent of all federal payments made are improper or erroneous/overpayments." (citing Horn claim, pp. 29-30). The amounts claimed have no supportive basis in fact.

The first "alternative breach remedy" is a calculation based on the "limited number of contract payments that Horn was allowed to review." (Claim, page 30.) Horn claims its work uncovered a supposed potential recovery amount of some $109,000,000; applying the 13.5 percent contingency fee provision in the delivery order equates to an amount of $14,700,000 to put [Horn] in the same position it would have been [but for the alleged NASA breaches]. Again, the amount claimed has no basis in fact.

Horn seeks a further "alternative remedy" based on entitlement to recover from NASA "actual costs and expenses incurred" by Horn in its performance of the delivery order. Horn claims the actual expense incurred by its staff, "plus an overhead and profit factor of 18 percent," is $7,028,200.96. Horn knowingly and willingly accepted at award a

contingency fee payment arrangement for the performance of recovery audit services. Therefore, Horn is not entitled to reimbursement of actual costs incurred.

Based on the conclusion that Horn has failed to demonstrate entitlement for an adjustment to the delivery order, and has also materially misrepresented in its claim the facts and circumstances of the performance issues it alleges in its claim under the delivery order, the claim is denied in its entirety.

This is the final decision of the Contracting Officer. You may appeal this decision to the Agency Board of Contract Appeals (BCA). If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Agency BCA and provide a copy to the contracting officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract/order by number.

With regard to appeals to the Agency BCA, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. The Armed Services Board of Contract Appeals (ASBCA) is NASA's Administrator's authorized representative for hearing appeals of contracting officer final decisions. The Board's mailing address is Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, Falls Church, VA 22041-3208. The ASBCA's operating procedures appear in Part 48, Code of Federal Regulations, Chapter 2, Appendix A. Instead of appealing to the ASBCA, you may bring an action in the United States Court of Federal Claims (except as provided in the Contracts Disputes Act of 1978, 41 U.S.C. §603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

If you have any questions, you may contact me at (301) 286-3294.

Sincerely,

Dean S. Patterson
Contracting Officer
Headquarters Procurement

By Certified Mail