# In the United States Court of Federal Claims

**No. 08-415C**
**Filed: October 31, 2015**

| | |
|---|---|
| * * * * * * * * * * * * * * *   * | |
| **HORN & ASSOCIATES, INC.,** * | |
| * | |
| **Plaintiff,** * | |
| **v.** * | **Counterclaim; Fraud; False Claims** |
| * | **Act; Special Plea in Fraud;** |
| **UNITED STATES,** * | **Contract Disputes Act; Recovery** |
| * | **Audit; NASA; Trial.** |
| **Defendant.** * | |
| * | |
| * * * * * * * * * * * * * * *   * | |

**Robert H. Brunson,** Nelson Mullins Riley & Scarborough LLP, Charleston, S.C., for the plaintiff.  With him was **Stephen D. Martin** and **Patrick C. Wooten**, Nelson Mullins Riley & Scarborough LLP, Charleston, S.C.

**Anna Bondurant Eley**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant.  With her were **David S. Silverbrand**, Commercial Litigation Branch, **Patryk J. Drescher**, Trial Attorney, **Kenneth Woodrow**, Trial Attorney, **Zachary Sullivan**, Trial Attorney, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

Plaintiff, Horn & Associates, Inc. (Horn & Associates), is a recovery audit firm which performed a recovery audit for the National Aeronautics and Space Administration (NASA). Recovery audit firms, like Horn & Associates, identify payment errors and provide assistance in the recovery of erroneous payments from the suppliers or contractors which received the erroneous payments.

Horn & Associates was founded in February 2003 with the intention of performing recovery auditing work for federal, state and local government entities, in addition to

recovery auditing work for the private sector.[1] The principals of Horn & Associates were Tom Horn, Larry Farrar, and Michael Lowery.[2] Tom Horn was the President of Horn & Associates. At the time of the NASA recovery audit, Mr. Lowery was the Chief Executive Officer of Horn & Associates and was responsible for marketing and finding clients,[3] and Mr. Farrar served as Vice President of Marketing and Operations for Horn & Associates. At trial, Mr. Farrar testified that "[w]e've done some county, cities, states, some other federal agencies as well as NASA. Probably 10 or 12 audits at this point." Among the federal agency recovery audits preformed, Horn & Associates worked for the United States Department of Transportation, the United States Department of Homeland Security, the United States Patent and Trademark Office, and the United States Census Bureau.[4]

Horn & Associates' focus on recovery audits for the federal government stemmed from the passage of Section 831 of the Defense Authorization Act for Fiscal Year 2002.

---

[1] As indicated in the complaint, Horn & Associates was incorporated as a "veteran-owned small business, organized and existing under the laws of Utah, with its principal place of business in Salt Lake City, Utah."

[2] Tom Horn testified that he started his first accounting firm in 1980. Mr. Farrar testified he worked for private companies for twenty years, most recently as Vice President/Controller for Montgomery Ward, until 1993 when he joined the largest recovery audit firm in the country. Another Horn & Associates employee, Jennifer Harris, testified that Mr. Lowery was involved in auditing for over thirty years, and he "was an incredibly innovative pioneer in the accounts payable recovery business."

[3] The court noted during the trial that Mr. Lowery was unable to testify at trial for medical reasons, and, with the court's permission, the parties designated his earlier taken deposition as his testimony.

[4] Horn & Associates also employed a number of auditors as subcontractors during contract performance. The subcontractors typically had agreements with plaintiff that stated: "During the term of this agreement Contractor shall earn a commission equal to 40% of revenue generated by claims identified by Contractor and collected for the client by H&A [Horn & Associates]. The commission is calculated as 40% of actual net revenues received from the client for the life of the audit." Per its contract with NASA, Horn & Associates was entitled to a contingency fee of 13.5% for any recovery by NASA that plaintiff identified. Specifically, the contract provided:

> The amount of the Contingency Fee for this order is 13.5%. Payments to the contractor for services under this order will be based on a Contingency Fee Basis after NASA has recovered and received funds for the basic requirements as set forth in the Statement of Work (SOW). There will be no out-of-pocket expenses, costs or other financial obligations or liabilities incurred by NASA, other than the fees identified in this order.

See Defense Authorization Act for Fiscal Year 2002, Pub. L. 107-107, 115 Stat. 1012 (2001). As indicated in the certified claim, described in detail below:

> Congress recognized the need for such recovery audits by passing Section 831 of the Defense Authorization Act for Fiscal Year 2002. This section added a new subchapter to the U.S. Code (31 U.S.C. §§ 3561-3567) that requires federal agencies that enter into contracts exceeding $500,000,000 in a fiscal year to carry out a "cost-effective program for identifying any errors made in paying the contractors and for recovering any amounts erroneously paid to the contractors." Thus, recovery audits became mandated for certain federal agencies like NASA.[5]

The joint stipulations of fact submitted to the court state that "[o]n January 16, 2003, the White House Office of Management and Budget issued Memorandum M-03-07, titled, "Programs to Identify and Recover Erroneous Payments to Contractors." (internal citation omitted) (OMB Memorandum M-03-07). OMB Memorandum M-03-07 indicated the Memorandum was "intended to assist agencies to successfully implement recovery auditing and recovery." OMB Memorandum M-03-07 also stated that "[a]ll classes of contracts and contract payments should be considered for recovery audits." As also jointly stipulated to by the parties, OMB Memorandum M-03-07 indicated that "[a]gency heads may exclude classes of contracts and contract payments from recovery audit activities if the agency head determines that recovery audits are inappropriate or are not a cost-effective method for identifying and recovering erroneous payments."

The General Services Administration (GSA) had awarded Contract No. GS-23F-0258N (the GSA Contract) to Horn & Associates on June 12, 2003. The GSA Contract was a blanket purchase agreement, pursuant to which various executive agencies could solicit offers to contract for recovery auditing services. To comply with the Defense Authorization Act of 2002 and the Improper Payment Information Act of 2002,[6] NASA issued Request for Quote NNH04068239Q (the RFQ) for Audit Recovery Services, and

---

[5] As further indicated by Tom Horn at trial:

> We were beginning to do research and we discovered that in 2002 the Defense Authorization Act was -- there was a piece in there, Section 831 on recovery auditing that was passed that mandated recovery auditing on the federal government, and also that there was an Improper Payments Information Act that was passed as well that mandated some testing on improper payments at government agencies.

[6] As noted in its post-trial briefing, defendant states that "[p]ursuant to an Act of Congress, NASA hired Horn and Associates to conduct a recovery audit to return to the Government hundreds of millions of dollars overpaid to vendors." (internal reference omitted).

the Contracting Officer issued the RFQ to four companies, including Horn & Associates. As indicated in the Contracting Officer's cover letter[7] to the four companies:

> National Aeronautics and Space Administration (NASA) is requesting offers under Request for Quote (RFQ) NNH04068239Q for Audit Recovery services described in the attached Statement of Work (SOW). NASA intends to acquire these services by competing this requirement among several sources on the GSA Federal Supply Schedule Contract, Schedule Number 520 SIN 9, entitled "Financial and Business Solutions (FABS)." Your company is being solicited since it appears on the GSA FABS Schedule's list of eligible contractors.

A Statement of Work was attached to the RFQ, which stated: "The contractor shall perform recovery-auditing services at all 10 NASA Centers for the period beginning October 1, 1997 through September 30, 2003." The Statement of Work attached to the RFQ indicated that: "The audits will be conducted on payments made from all fixed price contracts."

NASA received two proposals in response to the RFQ, one from Horn & Associates and one from Connolly Consulting, Inc. (Connolly Consulting). In the Memorandum for the Record, for the "Award of Contract NNH05CC28D to Horn and Associates, Inc.," the Contracting Officer stated that:

> It was determined by both the Office of Chief Counsel and the Contracting Officer that the proposal received from Connolly Consulting was considered to be non-compliant with the requirements of the RFQ. Connolly Consulting did not provide a contingency fee with a fixed percentage [of recovery], but instead proposed an estimated contingency fee range conditioned upon additional information.

As a result, Horn & Associates was the only responsive offeror. In its proposal, Horn & Associates stated that, in its opinion, NASA needed "a 100% look at the Department's data to gain the full benefit of the recovery audit" and that Horn & Associates "would like to have access to all contracts, agreements and documents that would reflect pricing, terms, allowances, rebate programs, etc."[8]

---

[7] The Contracting Officer who sent the cover letter to the four companies was Janet Langweil. Dean Patterson replaced Ms. Langweil as the contracting officer during performance of the contract in July 2006.

[8] The Contracting Officer noticed a discrepancy in the option periods, specifically option year one, in Horn & Associates' proposal, and requested that Horn & Associates acknowledge the option years as stated in the RFQ. By email, Horn & Associates acknowledged, and agreed to, the option years as stated in the RFQ.

On December 23, 2004, NASA awarded the Order for Supplies or Services, Order No. NNH05CC28D (the NASA Contract) to Horn & Associates for the furnishing of "Recovery Audits," pursuant to the GSA Contract. The NASA Contract indicated that it was "subject to all the terms and conditions of the contractor's GSA Schedule Contract GS-23F-0258N and as amended by the clauses contained herein." Included as an attachment to the NASA Contract was a Statement of Work. The NASA Contract's Statement of Work indicated: "The contractor shall perform a primary audit recovery on all contract payments for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments."[9] The NASA Contract also included a unilateral option for NASA which stated:

(a) The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

The NASA Contract further stated, "[t]he Contracting Officer may exercise the option by written notice to the Contractor within the period specified in the schedule."

The NASA Contract included four option years to extend the term of the audit recovery period.[10] Each option year extended the period of performance by one year and expanded the audit recovery period. For option year 1, the period of performance would be October 1, 2005[11] to September 30, 2006, and the corresponding audit recovery period was 2004-2005. For option year 2, the period of performance was October 1, 2006 to September 30, 2007, and the corresponding audit recovery period was 2006, option year 3 contemplated the period of performance would be October 1, 2007 to September 30, 2008, and the corresponding audit recovery period would be 2007. Finally, for option year 4, the period of performance would be October 1, 2008 to September 30, 2009, and the corresponding audit recovery period would be 2008. For all option years, the

---

[9] As noted above and explained below, the Statement of Work attached to the RFQ differed from the NASA Contract and stated: "The audit will be conducted on payments from all <u>fixed price</u> contracts." (emphasis added).

[10] The original period of performance of the NASA Contract was December 23, 2004 (the date the NASA Contract was awarded) to December 22, 2005.

[11] Despite the original period of performance of the NASA Contract ending December 22, 2005, the first option period began on October 1, 2005. Neither party raised this discrepancy as an issue at trial, and it does not impact the court's decision in the opinion.

contingency fee remained 13.5%.

The NASA Contract only indicated that "the contractor shall perform a primary audit recovery on all contract payments for the period beginning October 1, 1997 through September 30, 2003,[12] identifying overpayments and/or underpayments," and did not identify the types or categories of contract payments Horn should review and present for recovery to NASA.  In its certified claim, Horn & Associates indicated that

> Horn presented NASA over 400 claims for recovery in 15 different classes on September 30, 2006. The claims fell into the following classes: Obligations over paid; Prompt Pay Interest Calculation Errors; Statement Claims; Payment Errors; Cash Discounts; Regular Duplicate Payments; Award Fees Overpaid; Interest on Overpayments; Prepayment Discounts; Pricing Claims; Miscellaneous Charges; Obligation Overpaid; and Tax Charged in Error.

The Contracting Officer's denial of the certified claim did not address the recovery classes identified by Horn & Associates.

Performance of the NASA Contract

Payment Centers

Horn & Associates attempted to preform a recovery audit at nine of NASA's payment centers.  The centers were: Goddard Space Flight Center (Goddard), Lyndon B. Johnson Space Center (Johnson), John F. Kennedy Space Center (Kennedy), Stennis Space Center (Stennis), George C. Marshall Space Flight Center (Marshall), John C. Glenn Research Center (Glenn), Langley Research Center (Langley), Hugh L. Dryden Flight Research Center (Dryden), and the Ames Research Center (Ames) (collectively, the NASA Centers). After award of the NASA Contract, Horn & Associates held planning meetings with the NASA Centers to discuss the audit.[13] During performance of the NASA Contract, according to defendant, Horn & Associates submitted a total of 444 claims to NASA for collection and payment. NASA approved and paid 45 of them.

---

[12] As indicated in the defendant's responses to plaintiff's interrogatories and in the parties' joint stipulations of fact, the total amount of contract payments made by NASA during fiscal year 2004 was estimated at $10,872,558,720.53, and the total amount of contract payments made by NASA during fiscal year 2005 was estimated at $10,806,837,873.44.

[13] Horn & Associates held planning meetings in April of 2005 at the following NASA Centers: at Stennis on April 1, 2005, at Kennedy on April 19, 2005, at Glenn on April 20, 2005, at Marshall on April 21, 2005, at Goddard and at NASA Headquarters on April 22, 2005, at Langley on April 26, 2005, at Johnson on April 27, 2005.  In May of 2005, Horn & Associates held planning meetings at Dryden on May 16, 2005, and at Ames on May 17, 2005.

Prior to the planning meetings at the NASA Centers, on February 8, 2005, Horn & Associates participated in a pre-audit planning meeting at NASA headquarters. On March 4, 2005, after the pre-audit planning meeting, an internal NASA memorandum was issued by Gwendolyn Sykes, NASA's Chief Financial Officer, to all NASA Centers, which indicated that Horn & Associates was to audit "payment records of fixed price contracts." The contracting officer technical representative at the time, Melvin DenWiddie, issued an email to all NASA Centers on May 18, 2005, stating the contract for Horn & Associates' recovery audit was for the audit of "all contract payments." NASA, therefore, provided Horn & Associates with payment data for all contracts, not just payment data for fixed price contracts. As acknowledged by defendant, "[t]he data itself, however, was admittedly not perfect."

Mr. DenWiddie testified that "at the various NASA centers, we had what was known as the Legacy accounting systems. And most of those systems were manual systems that were not automated and of course, they were not integrated," and, that further, each center had its own accounting system. NASA, therefore, switched to a SAP system. Mr. DenWiddie, indicated, however, that "[i]t was somewhat of an unfortunate event actually, because the Legacy systems that we had throughout the centers, at the time of the implementation of the SAP system, those systems were disconnected and the SAP system was installed to become the official integrated system of record." As Mr. DenWiddie explained when asked what happened to the financial data that had been with the Legacy system after the transition to the SAP system, he indicated that "information was virtually lost because typically what should normally happen, there should be a parallel running of the two systems together so that you could make sure that there was some compliance. In this case, that did not take place so the information from the Legacy systems just disappeared." As a result, in its post-trial briefs, defendant now concedes that, although NASA produced the SAP data to Horn & Associates, that "[t]he production of NASA's SAP data was more problematic." The parties, especially, the defendant, were unable to identify the total amount of contract payments for fiscal years 1998-2003, at issue in the NASA Contract, which called for Horn to "perform a primary audit recovery on all contract payments for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments." The parties have stipulated that:

> NASA's financial system no longer contains data for contract payments made by NASA during FY1998 through FY2003, and therefore NASA was unable to identify the total amount of money it expended on contract payments during those fiscal years, or during the FY1998-2005 period of the Horn Recovery Audit, in response to requests for that information from Horn during discovery. NASA did not reconstruct an estimate of the amount of total contract payments for FY 1998-2005 in response to discovery requests seeking this information.

On June 30, 2006, Mr. DenWiddie wrote a letter to Horn & Associates, indicating:

> Your work on this project has been very impressive. Because our payment files were in several locations on multisystems, some in a manual format, I

wondered how you would overcome that challenge and conduct an effective Agency-wide recovery audit of our payments.

It soon became apparent that your technical capability was centered on your highly-experienced staff. The extensive financial management and recovery auditing experience allowed each challenge to be broken into small components that were easier to resolve. The customizable audit methodology was beneficial in addressing specific unique needs of each NASA Center.

During his testimony, Mr. DenWiddie explained,

I wrote this letter because as I've testified before [14] during this testimony, I thought that Horn was doing an outstanding job. I thought that they were working under very adverse conditions, namely the accounting systems that they had to audit, the people who they had to work with who were opposed to them doing their work, and the fact that they had somehow managed to do an outstanding job, in my view, I thought that somebody, somebody needed to say thank you. And I decided that I would be the one and I did.

Mr. DenWiddie testified that the letter was "my last written communication as a government employee," as he retired on the same day, June 30, 2005.

On September 8, 2005,[15] the NASA Contract was extended for one year through September 30, 2006 by an "Amendment of Solicitation/Modification of Contract," with all terms remaining the same, except the period of performance. The description of the Modification stated in its entirety:

The purpose of this modification exercises Option 1 to conduct Audit Recovery for the period of 2004-2005 as identified in Item 13 of the basic order [the option to extend the term of the contract].

---

[14] Mr. DenWiddie had previously testified:

The recovery audit was a low priority. It was a low priority because the overall audit of the overall financial statements was so very important that the recovery audit activity was something that we had to do because it was a mandate from the presidential level down through OMB. We had to do it. But it was not nearly as important as getting a clean, unqualified opinion on the overall financial statements.

[15] Although the "Amendment of Solicitation/Modification of Contract" was signed by Horn & Associates on September 1, 2005, the "Amendment of Solicitation/Modification of Contract" was not signed by the Contracting Officer until September 8, 2005. The "Amendment of Solicitation/Modification of Contract" stated: the effective date is the date signed by the United States.

> 1.      Clause 7, PERIOD OF PERFORMANCE, shall commence on the effective date of this contract through <u>September 30, 2006</u>.
>
> 2.      The total value of this order remains unchanged.
>
> All other terms and conditions remain the same.

(emphasis in original).

Below is an overview of the number of claims identified and submitted to NASA by Horn & Associates and illustrative examples of the Horn & Associates' interactions with NASA personnel at the centers.[16]

_____

[16] Unfortunately, after discovery, trial, and even post-trial briefing, the parties still do not agree on the number of claims submitted by plaintiff to NASA. As the court first considers the defendant's counterclaims, the court uses the defendant's numbers for the claims, without, at this time, concluding whether the numbers submitted by either party is correct. When there is a discrepancy, the court has footnoted the plaintiff's numbers of claims.

After the court identified the discrepancies relating to the calculation of the number of claims by the parties, as instructed by the court, the parties filed a joint status report. The parties discussed the differences, as follows:

> the cause of the discrepancy is explained by the parties' different characterization of those claims. When they were prepared and submitted, Horn submitted single Statement Claims aggregating outstanding credits owed to the Government by a vendor as reflected on the vendor's books. However, when the Government's expert, Wiley Wright, prepared his expert report, he broke up many of these Statement Claims and treated them as separate claims based on each outstanding credit, because it is the Government's position that such aggregation was inconsistent with the terms of Horn's contract with NASA, and that each outstanding credit should instead have been presented as a separate claim

(internal citation omitted).  The parties claimed, "[a]s a result, where Horn's spreadsheet reflects a single Statement Claim, the Government's spreadsheet treats that as several separate claims, all under the same claim number. . . .   This different treatment of Statement Claims by the parties on their respective post-trial spreadsheets is responsible for the following apparent discrepancies."

The parties further explained two unique discrepancies, first:

> Horn's spreadsheet listed Claim No. 2232, which was a Statement Claim, as having been submitted at Glenn Research Center. However, in the months following the end of the Recovery Audit in 2006, Claim No. 2232 was identified on various spreadsheets as having been submitted to

a. Goddard

According to defendant, regarding activity at Goddard, Horn & Associates submitted a total of 231 claims.[17]  This was by far highest portion of the claims identified by Horn & Associates and submitted to NASA.[18]  Prior to the audit, Mr. Farrar testified that he believed "Goddard was designated as one of the biggest centers and certainly one of the bigger opportunities that we had."[19]  Despite this, the sole claim for Goddard approved

---

Johnson Space Center, rather than to Glenn. On the parties' spreadsheets, Horn listed Claim No. 2232 as a single entry submitted to Glenn, whereas the Government listed Claim No. 2232 as two entries submitted to Johnson.

(internal citations omitted). Second, regarding Claim No. 2053, the parties explained:

As noted in the Court's May 19, 2015 Order, Claim No. 2053 was included on Horn's spreadsheet, but was not listed on the Government's spreadsheet. While the actual claim file for Claim No. 2053 was not introduced as an exhibit at trial, Claim No. 2053 was included on the spreadsheet submitted by Sam Lenck, the CFO at Kennedy Space Center, to NASA HQ following the end of the Recovery Audit reporting on the status of the Kennedy claims. On its post-trial claims spreadsheet, the Government inadvertently omitted Claim No. 2053 at Kennedy.

[17] Plaintiff identified and submitted 223 claims for Goddard on its chart of claims.

[18] In its certified claim, Horn & Associates explained the difference in the number of claims generated by the different NASA locations:

The differences in claim potentials found at each of the above payment centers can be explained in a couple of ways. It is partially a reflection of the size of the payment center but more likely the amount of contract payments administered by the center. But, the more important reason for this claim's purposes is the fact that it is a reflection of the level of cooperation, or lack thereof, by that payment center with Horn staff [sic] The level of cooperation in many instances was so bad (i.e. it was a breach of the duty of cooperation imposed by the contract on NASA), that Horn had to reassign some of its audit teams on one or more occasions at some of the centers to other locales.

[19] Mr. Farrar also indicated:

When we did our initial look at the centers and we also discussed them in our meeting with Melvin [DenWiddie] the first of February, we were trying to identify which centers were bigger than others, where the biggest opportunity might have been. So we identified, with Melvin, basically in that meeting the four centers that were the largest and had the biggest opportunity would be Goddard, Kennedy, Johnson and Marshall.

and processed by NASA was an SGT Inc. claim, for $1,163.44 dollars.[20]

Maggie Baumbach was the primary subcontractor for Horn & Associates to work at Goddard.[21] Ms. Baumbach begin work at Goddard in September 2005. Mr. Farrar offered testimony that three months after arriving at Goddard, Ms. Baumbach "was becoming very frustrated because she was having an extremely hard time getting her claims presented. And at that point, she -- I don't believe she had any claims processed, and certainly none collected," and that "nobody would meet with her."

After eight months of working on the Goddard recovery audit, Ms. Baumbach left the Goddard recovery audit, claiming that "I couldn't afford to continue with no income. I had been months and months at this and we had, nobody had a claim that was in the channel to be paid, to be collected from the vendor, and so that was a big factor." In an email dated April 17, 2006, to Mr. Lowery, Mr. Farrar, and Jennifer Harris, another Horn & Associates employee, Tom Horn explained that he spoke with Ms. Baumbach and she indicated that it was "just too hard and doesn't want to be the front person. I told her we were staffing the place with more people and that we would have a good person to handle the communications . . . and give guidance if she wants to continue to help us, but she pretty much declined." The email indicated, however, "[t]his actually may not be all bad as she seems to be willing to help us with the outstanding items (so she can get paid) and help with a smooth transition to the new guys." The email from Tom Horn to Mr. Lowery, Mr. Farrar, and Jennifer Harris continued, "It does not sound like she has really audited that much at Goddard. She said she did a few contract reconciliations, looking mainly for dups [duplicate payments] and believes she has only skimmed the surface. She hasn't looked at possible interest claims, or for that matter, a lot of other claim types which may or may not be there."

Subsequently, in May of 2006, three auditors replaced Ms. Baumbach: Dan Lizana,[22] Steven Smith and Marie Beckey. Mr. Lizana indicated that once he arrived at

--------

[20] Defendant now believes that 15 claims identified and submitted by Horn & Associates at Goddard were valid, and another claim, an Aerospace Corp. claim was partially valid. At the time NASA approved two claims, but only processed the one claim for SGT Inc. claim. The other claim, a different Aerospace Corp. claim, was approved for payment, but not processed by NASA.

[21] Ivan Sherman worked at Goddard with Ms. Baumbach. Mr. Sherman, however, only worked part-time.

[22] Regarding his position with Horn & Associates, Mr. Lizana testified at trial that he "first heard about the position through Craigslist." Mr. Lizana described his philosophy of recovery auditing as follows: "I think recovering auditing, it's not a quantitative assessment of your skills, meaning it's not having done it for 30 years, in my opinion, whether you have a CPA and so forth. I think recovering auditing is about the type of skills that you have."

Goddard, "the two individuals that I recall and we were introduced to, the points of contact was [sic] Yvette Blackwell -- she was the Supervisor for the examiners and she was our point of contact -- and that week we were introduced to Sandra Brown, who was her superior, who was going to be responsible for denying and accepting the claims." Like Ms. Baumbach, Mr. Lizana felt frustrated at NASA's handling of Horn & Associates' claims. For example, according to Mr. Lizana, one claim "was not outright rejected. But our explanation was NASA was not interested really in pursuing this claim because this was a cost type contract and DCAA [Defense Contract Audit Agency] will check it at close-out." As indicated in an email from Ms. Brown to Mr. Lizana:

> My position remains that until either Procurement and/or DCAA determines that Swales [& Associates[23]] has violated their contractual agreement with NASA Goddard, I am at no liberty to act upon your claim. Validation of your claim has to be supported in conjuction [sic] with the audit/findings of Procurement and/or DCAA. [[24]]

Mr. Lizana worked on the Goddard recovery audit until the end of contract performance.

　　b. <u>Johnson</u>

　　According to defendant, Horn & Associates identified and submitted to NASA a total of 145[25] claims related to the Johnson recovery audit, only 19 of which were approved and processed by NASA.[26] Johnson was the center that generated the second

---

[23] The Swales & Associates claims were the largest identified by Horn & Associates during performance of the NASA Contract.

[24] The role that the Defense Contract Audit Agency (DCAA) played in the NASA audit by Horn & Associates was a source of ongoing tension between the parties. Ms. Brown, in explaining the above quoted email testified:

> They [DCAA] are our periodic auditors for these type contracts, cost types. They perform periodic audits and sometimes not in the contractual agreement that goes back and they look at where they've not adjusted a rate or use the wrong rate, and all those things. They do that performance audit that we look to happen that will take care of that 40 million [in the Swales & Associates claim identified by Mr. Lizana] if in fact that was a valid adjustment that had not happened.

[25] Plaintiff identified and submitted 120 claims for Johnson on its chart of claims.

[26] In its chart of claims, defendant states, however, that although one of the claims, the West Group Payment Center claim, was approved and processed, it was not a valid claim because "it is for an amount of less than $100, and was submitted by Horn in contravention of the plain terms of Horn's scope of work in its contract." Defendant does not seek recovery for the West Group Payment Center claim.

most claims in Horn's recovery audit, and the 146 claims from Johnson are more than were generated at every other center combined, excluding Goddard.

Tom Hott was the primary subcontractor who worked for Horn & Associates at Johnson.[27] Michael Colby also worked on the Johnson recovery audit. The Johnson recovery audit was the first recovery audit for Mr. Colby. Mr. Hott's wife, Beth Hott, worked off-site supporting the Johnson recovery audit. Tom Hott testified that neither he nor his wife had ever performed a recovery audit of a federal government agency before the Johnson recovery audit.

Regarding the Johnson recovery audit, Mr. Hott indicated that initially the audit "went fine. We had access to their records and we had a nice place to work in front of the vault where the records were kept, and it was easy for us to come up with a program to start the audit effectively and efficiently." Mr. Hott, explained, however, "[t]hen when we began turning in claims, they were, the claims were immediately denied." Regarding the process for presenting claims, Mr. Hott testified:

> On a regular basis, the first person was Pat Bright. Pat was the supervisor of the accounts payable department. She reported to June Boeckel who was, as I understand it, the director of accounting at the time. And June reported to Marilyn Sampay who was the deputy CFO responsible for the conduct of the audit, according to our contract. And then I had a few occasions with John Beall, the CFO of the Johnson Space Center.

When asked on cross-examination why he did not he did not hire more people to work on the audit with him, Mr. Hott testified that "[i]t didn't make a lot of sense to spend a tremendous amount more money to bring in additional resources. We were already getting screwed to the hilt."[28]

---

[27] As indicated at trial, after the Johnson recovery audit, Mr. Hott indicated that he "decided to start a tree farm, Hott Tree Farm. And I grow container-grown trees for the landscaping and nursery industry now. So I'm semi-retired. I decided to quit accounting and dig in the dirt."

[28] Mr. Hott explained his frustration at working on the Johnson recovery audit:

> June Boeckel, who was Pat's supervisor, was very reluctant to accept or approve claims and would create argumentation on the claims that had nothing to do with the merits of the claims themselves, again causing unusual time delays, especially when you consider the fact that we would turn in a claim and it would be weeks or months before we would get the information back. This caused a severe time problem because we continued to try to work under one scenario and knowing full well that we would have to go back and go through all of the claims, all of the contracts again and all of the payments again.

c.  Kennedy

According to defendant, Horn & Associates identified and submitted to NASA a total of eighteen[29] claims related to the Kennedy recovery audit, only two of which were approved and processed by NASA. Brock Young was the primary subcontractor for Horn & Associates to work at Kennedy. Mr. Young had not performed a federal government agency audit before the Kennedy recovery audit. He indicated that he would recover forty percent "of what was collected by Horn & Associates" for the recovery audit claims that he identified.[30] Mr. Young took part in the pre-audit meeting at Kennedy on April 15, 2005, and he testified that Mr. Farrar and Jennifer Harris, from Horn & Associates attended the meeting along with Sam Lenck, Deputy Chief Financial Officer for Kennedy and Brenda Brooks, the Kennedy supervisor over accounts payable from Kennedy.

Mr. Young expressed frustration with the lack of action by NASA with respect to the claims he submitted to NASA. Mr. Young also was frustrated by the role of Mr. Lenck, who viewed his role as "to act as the middleman between Mr. Young and the contracting officer, Ms. Solum."[31] Mr. Young indicated that he first talked to Mr. Lenck and he would take the documents, "which would be the contract file, the mods [modifications], and the invoices in question, and we'd go through it in that form. And that's what I'd review with NASA is all the data with them so they would have everything they needed to look at the claim." After that, Mr. Young testified,

> I would typically never hear back from them. So what I thought was happening was Sam was going to approve it and send it where it needed to be sent, like to the vendor, things of that nature. Later on I found out what he was really doing was he was facilitating the process, but he was leaving it up to the contracting officers to approve. So then at that point, I was assuming they were going to the contracting officers. The thing is I was never getting anything back, so I don't know what actually happened.[32]

---

[29] Plaintiff identified and submitted nineteen claims for Kennedy on its chart of claims.

[30] As noted above, forty percent was a typical percentage among Horn & Associates' subcontractors, although Jennifer Harris testified that her agreement with Horn & Associates called for a fifty percent payout. In May of 2006, Ms. Harris became an employee of Horn & Associates.

[31] Ms. Solum was a contracting officer for the contracts awarded and audited at issue at Kennedy, and not the contracting officer for the Horn & Associates recovery audit for the NASA Contract.

[32] Mr. Young also testified:

> [W]e called a meeting. In that meeting, we had Leslie Solum, we had Leslie's boss, we had a legal representative as well there. Steve Chance was the COTR, that's the Contract Officer Technical Representative is what a COTR is, COTR. And then we had myself, Sam Lenck, Brenda Knox, or

Mr. Young continued to work on the Kennedy recovery audit until the end of contract performance.

### d. Ames

According to defendant, Horn & Associates submitted a total of six claims related to the Ames recovery audit, but only two of the six claims were approved and processed by NASA.[33] According to John Lee, Deputy Chief in Financial Management Division for NASA at Ames, Bob Schuler was the only subcontractor for Horn & Associates to work at Ames. He began working in November 2005, and stayed at Ames for three weeks.

### e. Dryden

According to defendant, Horn & Associates identified and submitted to NASA a total of three[34] claims related to the Dryden recovery audit, two of which were approved and processed by NASA.[35]   Valerie Zellmer, NASA's Chief Financial Officer at Dryden

---

Brenda Brooks was there, and I think one or two other people as well. So it was a pretty big meeting. There's [sic] roughly 10 people in this meeting. We went through everything, decided that yes, there's definitely something there and we were to pursue it.

. . .

When I left that meeting, what was supposed to take place next was Leslie Solum should have had it reviewed and sent out a letter to the vendor to try to collect the money. The agreement was that yes, it looks like something was there, so what was supposed to happen was she was supposed to send the information to the vendor saying either explain to us why it is not valid or remit the money.

Mr. Young testified, however, that "[n]othing happened actually," and "that was the last anything ever happened to it."

[33] In its chart of claims, defendant states, however, that although one of the claims, the Physical Sciences Inc. claim, was approved and processed, it was not a valid claim "because it falls below the $100 threshold established by Horn's contract." As with the previously identified West Group Payment Center claim, defendant does not seek recovery for the Physical Sciences Inc. claim.

[34] Plaintiff identified and submitted two claims for Dryden on its chart of claims.

[35] In its chart of claims, defendant noted that the remaining claim, the Infinity Tech claim was partially valid, but "Dryden did not collect the discount amount because of its small size, and the fact that it had occurred so far in the past."

testified that two auditors, Penny Parker and Jim Cudlip, worked on the Dryden audit.[36] Ms. Zellmer testified the auditors arrived at the end of July 2005 and "left before Labor Day of 2005." Ms. Zellmer indicated that she expected the auditors to return after Labor Day, but neither Ms. Parker nor Mr. Cudlip returned to Dryden.

      f.  <u>Glenn</u>

According to defendant, Horn & Associates identified and submitted to NASA a total of six claims[37] related to the Glenn recovery audit, five of which were approved and processed by NASA According to Vickie Hagerman, Supervisor of NASA Accounting Reports Branch, and the point of contact for the recovery audit at Glenn, Tom Reese was the only subcontractor for Horn & Associates to work at Glenn, and began working in November 2005, and worked for "about six months, onsite, offsite." Jennifer Harris submitted claims related to Glenn as well on behalf of plaintiff.

      g.  <u>Langley</u>

According to defendant, Horn & Associates identified and submitted to NASA a total of fourteen[38] claims related to the Langley recovery audit, four of which were approved and processed by NASA. According to James Michael, Deputy Chief Financial Officer for Finance at Langley, Ken Respess worked on the Langley recovery audit for Horn & Associates, arriving in October of 2005.[39] He worked for approximately two weeks. Jennifer Harris submitted claims related to Langley as well.[40]

---

[36] Ms. Zellmer also indicated that, "I can remember two. I thought there were three, but I definitely remember two," which she identified as Penny Parker and Jim Cudlip.

[37] Plaintiff identified and submitted seven claims for Glenn on its chart of claims.

[38] Plaintiff identified and submitted seven claims for Langley on its chart of claims

[39] According to Mr. Michael, auditors had originally arrived in July 2005, but he could not remember how many, only testifying that "I think it was about three or four, but I don't know exactly how many. It was more than one, less than five, but I don't remember exactly how many."

[40] In particular, Ms. Harris had sent out letters for collection with the signature of Deputy Chief Financial Officer Kerry Christian. Langley did not approve of Ms. Harris' actions, as Mr. Michael testified, after discovery of Mr. Harris' actions, "at that point I know that we expressed our dissatisfaction. I don't recall in what way we did. I know that Kerry Christian was very upset at that time that that letter had gone out with his name at the bottom of it." Further Langley did not believe the claims were valid, as Mr. Michael testified that Langley "did not believe they were overpayments at all," she also testified that NASA "actually received checks from the vendor."

h. Marshall

According to defendant, Horn & Associates identified and submitted to NASA a total of twenty-one[41] claims related to the Marshall Recovery audit, eleven of which were approved and processed by NASA.[42] James "Chip" Edgerton, was the primary subcontractor for Horn & Associates to work at Marshall.  He employed two additional auditors to work with him, John Crochet and Michael Mescher, with whom he had worked on pervious recovery audits. Consistent with other subcontractors, Mr. Edgerton indicated that he would recover 40 percent of whatever Horn & Associates was able to recovery for its audit claims that he identified. Mr. Edgerton attended the April 21, 2005 pre-audit meeting at Marshall with Mr. Mescher, Mr. Farrar, and Jennifer Harris from Horn & Associates, and John Alexander and Becky Black from Marshall.

Mr. Edgerton indicated that he began the recovery audit in June 2005 with Mr. Crochet and Mr. Mescher, but after a week, Mr. Crochet did not return because "[t]here was never enough work for three people," and Mr. Masker worked for two or three weeks a month for the rest of 2005, but did not return in 2006 because "[w]e didn't have enough complete files to audit." Mr. Edgerton also indicated that he frequently had to request documents again and again. Mr. Edgerton left Marshall at the end of May 2006, with the intention of returning once

> it was worked out of how to get the complete files, then we could ramp it back up, bring in either Mike [Mescher], Jack [Crochet] and myself or bring in some, if we had other audits going on right then we couldn't drop those, so we would find other associates that we could use to bring in to help work on the audit.

Mr. Edgerton, however, did not return to Marshall. When asked to summarize his experience at Marshall, Mr. Edgerton indicated that "[t]hey were nice people, but . . . you know, that they had their work to do and their work came first. And so our files came second. So it was, you know, it was a -- it wasn't a combative relationship, it's just that their jobs came first and ours came second."

i. Stennis

The parties agree that Horn & Associates did not submit any claims regarding its recovery audit for Stennis. Mr. Edgerton testified that he was expected to handle the recovery audit at Stennis, but he decided not to go, believing he would encounter the same problems with NASA that he had at Marshall. Mr. Edgerton testified that he did not go to Stennis because

---

[41] Plaintiff identified and submitted nineteen claims for Marshall on its chart of claims.

[42] In its chart of claims, defendant states, however, that although the SAP Public Services Inc. claim was approved and processed, the claim was only a partially valid claim.  The court also notes that one claim at Marshall, which was approved and processed by NASA was for Bulk Gas Helium for Stennis.

[w]e were working at Marshall. We were trying, that was one of the big centers that had a lot of accounts payable. It had a lot of records. If we weren't getting the records from Marshall why would, you know, why take the time and money to go down to Stennis and have the same problem and just, you know, create another problem?

<u>End of the Contract</u>

On July 17, 2006, Terry Bowie, Deputy Chief Financial Officer of NASA, indicated to NASA personnel at Johnson that "I have asked the legal people to look into suspending the contract until we have settled out on the issues raised by Horn in terms of what the contract calls for and what they are entiltle [sic] too [sic] for payment." According to the parties' joint stipulations, on July 24, 2006, NASA Centers were informed that they were to limit Horn & Associates' recovery audit to fixed price contracts only. Dean Patterson, who had become the Contracting Officer in July 2006,[43] informed Horn & Associates on July 31, 2006, that:

> In light of performance concerns that NASA has regarding Contract NNH05CC28D, you are advised to restrict your current audit recovery reviews to fixed priced contracts. A meeting will be held, with your participation, to address performance concerns, contract interpretations and whether or not it is in the government's best interest to exercise the option.

On August 15, 2006, Terry Bowie, the NASA Deputy Chief Financial Officer issued a memorandum to all NASA Centers regarding the March 4, 2005 internal memorandum from Gwendolyn Sykes, the NASA Chief Financial Officer and stated:

> A previous message regarding the program and contract with Horn and Associates, Inc[.] (Horn) indicated the company would be working with each Center to conduct an examination of payment records of only fixed price contracts. This limitation is not consistent with language in the NASA-Horn contract. Therefore, Centers please work with Horn to conduct an examination of all contracts. This direction is valid until September 30, 2006, when the current performance period on the Horn contract will expire.

Ten days after Mr. Bowie's memorandum to the NASA Centers, on August 24, 2006, Contracting Officer Patterson, informed Horn & Associates, that NASA would not exercise a second option year on the NASA Contract, and, on September 30, 2006, the period of performance under the contract would end. On August 28, 2006, Contracting Officer Patterson sent an e-mail to all NASA Centers informing them "that a decision has

---

[43] As indicated above, Janet Langweil was contracting officer for the NASA Contract before Dean Patterson becoming the contracting officer for the NASA Contract in July 2006.

been made not to exercise the option under [the NASA Contract] and to let the current period of performance end September 30, 2006. Until that time, the contract permits Horn & Assoc. to review all contractual documents and associated financial records in the performance of their audit recovery activities."

Thereafter, on August 31, 2006, Charles McIntosh, a NASA branch manager and the assistant to Terry Bowie, the NASA Deputy Chief Financial Officer, sent an email to each of the offices of the deputy chief financial officers for each of the payment centers and asked them to identify all the claims related to the Horn & Associates audit.   Mr. McIntosh wrote:

> As you know, there has been quite a bit of discussion over work that has been done by Horn & Associates, Inc. regarding recovery audits and claims that resulted from their work. In order for the agency to collect monies that they claim are due, a thorough review of the claims in the attached document, including contract and any other document as necessary to support or deny the claim.[44]

---

44 The email also instructed the centers to determine:

> 1) If the claim is a valid claim that represents an amount that can/should be recovered (note: Horn receives payment on amounts that have actually been collected)
> 2) If the amount should be recovered, please establish an accounts receivable in SAP and request a refund
> 3) If the amount of the claim is not a valid amount that is deemed recoverable, please provide information that explains/supports why we do not consider the amount to be valid
> Keep in mind that we normally do not request refunds on the following, (but not limited to) types of contracts:
>
> > (A) Open contracts that are subject to final review at close-out
> > (B) Contracts with provisional rates that are pending audit by DCAA
> > (C) Contracts with provisions for advanced payments for nonprofit organizations that conduct experimental or research and development work
> > (D) Contracts which authorize progress payments.

Although not necessarily critical to consideration of defendant's counterclaim, Mr. McIntosh's email takes on a greater importance when considering if NASA breached the contract.  NASA personnel used the above A-D framework, quoted immediately above in this footnote, to decline to process Horn & Associates' claims after the end of contract performance.  For example, on February 8, 2007, NASA produced a document entitled "Goddard Space Flight Center/Regional Finance Office Determination of the Validity/Non-validity of Horn Claims." The document indicated: "We have reviewed this spreadsheet we received from headquarters OCFO on January 31, 2007 . . . . We used the criteria

As indicated above, according to defendant's numbers, Horn & Associates identified and submitted a total of 444 claims[45] to NASA, and NASA approved and paid 45 claims. In its amended complaint, Horn & Associates noted that "[i]n spite of the improper impediments raised by NASA, Horn identified approximately $121 million of claims for various classifications of improper payments. Each claim was submitted to NASA with supporting documentation proving the improper payment. Yet to date, only $197,285.47 dollars [sic] of claims have been processed by the Payment Centers."] Despite having only been compensated in the amount of $197,285.47, Horn & Associates claims in the amended complaint that "Horn found the following recovery audit claim potentials at each NASA Payment Center included in the recovery audit process: Ames - $138,536.17; Dryden - $12,443.76; Glen - $17,318.44; Goddard - $97,799,329.39; Johnson - $20,183,307.33; Kennedy - $2,915,935.08; Langley - $40,451.99; and Marshall - $272,041.50. The total recovery audit claim potentials for all Payment Centers were $121,379,363.66."[46]

As noted above, the NASA Contract ended on September 30, 2006. After the end of the recovery audit, NASA declined Horn & Associates' offer of a "formal review" of all claims, ostensibly to try and demonstrate entitlement to the $121,379,363.66 in potential claims. NASA, however, did meet with Horn & Associates personnel to discuss the various remaining claims. In the meeting at the end of January 2007, Mr. Lowery, Mr. Lizana, and Marie Beckey, another subcontractor, from Horn & Associates, met with Bruce Ward, the chief assistant in NASA's Chief Financial Officer's office, Andrea Davis, a contract specialist, Jon Wolz,[47] the Goddard Deputy Chief Financial Officer, Sandra

---

received below from headquarters OCFO to make our determinations." The document indicated, among other criteria:

> Generally, NASA will consider claims for contract payment errors under the following circumstances to be inappropriate:
>
> a. Resulting from cost-type contacts subject to final contract audit that have not been completed.
>
> b. Resulting from cost-type contacts subject to final contract audit that were completed and prior to final payment of the contractor's final voucher, all prior interim payments made under the contract were accounted for and reconciled.

[45] As reflected above, plaintiff identified and submitted a total of 403 claims.

[46] Plaintiff does not seek a 13.5% contingency fee of the $121,379,363.66 in damages, but in its post-trial brief, plaintiff identified "$54,730,976 in estimated contingency fees Horn would have received in the non-breach world." According to plaintiff, subtracting the $26,634.00 in contingency fees that Horn & Associates actually received, "results in lost profits damages of $54,704,343."

[47] Mr. Wolz is incorrectly identified incorrectly as "John Walls" in the trial transcript.

Brown, and Contracting Officer Patterson, from NASA in which Horn & Associates presented information showing it had identified claims with approximately $81 million in improper, erroneous overpayments, as well as an additional $40 million of interest and penalty claims. Mr. Lizana indicated, however, that as soon as Horn & Associates began their presentation of claims, both Mr. Ward and Ms. Davis said "that they could not approve this [Swales & Associates] claim because it was in the purview of DCAA, and it was a cost type contract."[48] Mr. Lizana emphasized that for each claim NASA's "response was more of the same. It was, okay this is DCAA involved matters, and it's a cost type contract. Move on there's nothing to see here, and so forth. And so it was -- Frankly, it was frustrating." Mr. Lizana testified that the meeting

> got to a point where, at one point in the meeting Mike [Lowery] leaned over and said, listen, I've been in a recovery auditing bill [sic] for a long time. Every client that I've ever worked for, they wanted the money back. They were helpful and cooperative. Can you tell me why NASA doesn't want the money?

Horn & Associates' final meeting with NASA took place on February 9, 2007, again attended by Mr. Lowery, Ms. Beckey, Mr. Lizana on behalf of Horn & Associates, and Mr. Ward, Ms. Davis, Mr. Wolz, Ms. Brown, and Contracting Officer Patterson, on behalf of NASA. Horn & Associates represented in the certified claim that, "[t]he only thing accomplished during this meeting was the commitment from NASA that someone from the CFO's [Chief Financial Officer's] Office would supply Horn with a list of all our claims with comments on whether the claim was approved or denied and why the claim was being denied. Such a complete report has never been received."

NASA subsequently internally reviewed the Horn & Associates claims that were presented to NASA. An example of the review is the February 8, 2007, "Goddard Space Flight Center/Regional Finance Office Determination of the Validity/Non-validity of Horn Claims."[49]  After review, Contracting Officer Patterson sent a March 13, 2007 letter to Horn & Associates, regarding the agency position with respect to issues between Horn & Associates and NASA. Contracting Officer Patterson stated, "[w]hile the contract document (citation to SOW [statement of work]) gave Horn the right to review *all* contracts, at this time it is inappropriate to determine if in fact overpayments have taken place on cost-type contracts that have not been completed." (emphasis in original). Contracting Officer Patterson explained, "[t]his is due to the fact that open contracts are still in the administrative phase of open payment cycles." Regarding interest on overpayments, Contracting Officer Patterson indicated:

---

[48] In discussing the Swales & Associates claim at issue in the meeting with Mr. Ward and Ms. Davis, Mr. Lizana testified, "[t]his claim, it's big. It's a big claim . . . it could be 20 million dollars, it could be 15 million dollars, depending on what rate, a formal rate information we get."

[49] The document was generated one day before the final meeting with Horn & Associates.

The $40,619,548.71 identified by Horn as "interest on overpayments" can not [sic] be accepted as valid claims. This is because they are from open cost contracts or in accordance with the Federal Acquisition Regulation 32.614, "the responsible official shall apply interest charges to any contract debt unpaid after 30 days from the issuance of a demand."

(internal citation omitted). In addition, Contracting Officer Patterson tried to explain that, "[w]ith further respect to those claims that were identified as overpayments, but the CFO/DCFO [Chief Financial Officer/Deputy Chief Financial Officer] determined that the overpayment had been satisfied by a setoff against another invoice in accordance with FAR 32.611, the Debt Collection and Offset Act and the authority granted by the treasury to setoff debts due the government, that such payments are not in fact debts due to the government."[50] Contracting Officer Patterson concluded that:

At this time NASA has determined that $221,310.39 has been approved for debt collection under the contract. The fee on this amount will be remitted to Horn once collection has been made. An amount of $7,862.71 has been remitted to Horn & Associates to date."[51]

Additionally, Contracting Officer Patterson informed Horn & Associates that "[t]his is the final agency position with respect to of [sic] the issues between the parties.  NASA is committed to an equitable closeout of the subject contract."

On November 20, 2007, Horn & Associates filed a certified claim with NASA. The certified claim was addressed to "Dean S. Patterson, Procurement Manager, Janet S. Langweil, Contracting/Ordering Officer, Carrie Causey, Procurement Manager, NASA/Headquarters Procurement Office," and was signed by Tom Horn as president of Horn & Associates. Tom Horn signed the certified claim which indicated:

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

---

[50] Citing the NASA Contract, Contracting Officer Patterson indicated that NASA would not accept claims for payments outside the scope of period of performance, or for claims less than $100.00. Contracting Officer Patterson also indicated that, "[w]ith respect to Prompt Payment Interest calculation, the cited Prompt Payment Act Provision applies only to interest on progress payments under construction contracts, when the performance for which the payment was made is deficient and thus the payment has not been earned. This provision does not apply by analogy to other contract payment adjustments."

[51] At trial, defendant's expert witness indicated that the amount of claims recovered by NASA was $208,954.91, and Horn & Associates was paid $28,209.00.

At trial, Tom Horn indicated that he understood a certified claim to be an opportunity for "really submitting our facts and circumstances regarding what we felt was a breach of our contract, and then a certified claim would have some remedies for the damages." Tom Horn acknowledged at that point in time that he had no experience submitting certified claims to the federal government and he did not draft the claim, but did review it before filing it. Nonetheless, Tom Horn testified that the claim was made in good faith and that Horn & Associates "submitted data that supports our claim and to the best of my knowledge and belief it was complete data for the certified claim."

In its summary of the certified claim, Horn & Associates stated:

Horn is entitled to recover $279,000,000.00 representing its damages resulting from the breach of the contract by NASA. A different measure of those damages limited only to the overpayments that Horn found (despite the breaches described above) is $14,700,000. Alternatively and also as certified herein, Horn is entitled to recover at a minimum $7,028,200.96, representing the costs incurred by Horn including a reasonable overhead and profit thereon.

Under the heading, "Remedies for NASA's Breaches," the certified claim stated:

The remedy available to Horn for NASA's material breaches of the Purchase Order is that Horn should be put in the same economic position it would have been in but for NASA's improper breaches. Such a remedy is not unlike the remedy available to Horn should the breach be considered a constructive change to the Purchase Order. While the law requires Horn to establish not only that NASA has breached the Purchase Order, Horn must also establish the existence of some amount of damages. It is important to note that Horn is not required to establish its damages with a finite degree of accuracy; rather, Horn may establish its approximate damages so long as there is a reasonable basis for Horn's computation.

For the first calculation of damages, identified as "Traditional Breach Damages," Horn & Associates stated: "The appropriate remedy is to put Horn in the same position it would have been <u>but for</u> the NASA material breach." (emphasis in original)." Horn & Associates claimed that "Horn will prove that NASA would have recovered $2,068,000,000 of payments erroneously made by NASA, if NASA had not breached the contract with Horn," and "[i]t is only a simple mathematical operation to then determine what Horn's percentage of recovery would be as compensation for its work on the NASA contract. Horn's contingent fee was 13.5% of that recovered sum which would have been $279,000,000.00."[52]

_____

[52] Horn & Associates appears to have reached this number by taking the total amount of all contract payments on all types of contracts for Fiscal Years 1997-2005 ($57,439,000,000.00), multiplied by the "OMB's pronouncement above that the Government's error rate for making erroneous payments is 4%," and assuming a 90% collection rate for all improper payments = $2,068,000,000.00. Multiplying Horn &

For the second calculation of damages in the certified claim, labeled as an "Alternative Remedy," Horn & Associates claimed that:

> Horn should, at a minimum, be entitled to recover a considerable sum based solely on the limited number of contract payments that Horn was allowed to review despite the material breaches by NASA. Horn's work uncovered in excess of $121,000,000 in erroneous payments. Application of the 90% recovery factor indicates that NASA would have recovered $109,000,000 by following through on these erroneous payments as NASA was required to do under its contract with Horn. Assuming such recovery, then Horn would be entitled to be paid 13.5% of the recovered funds or $14,700,000. Thus, that amount would be the sum to which Horn is entitled to put it in the same position it would have been in, but for the NASA breaches, with the further proviso that it only addresses the limited contract payments that Horn actually could review despite the significant and material breaches by NASA.

For the third calculation of damages in the certified claim, labeled as a "Further Alternative Remedy," Horn & Associates claimed that:

> Even should NASA determine, improperly Horn believes, that the sums above are not an appropriate measure of Horn's damages, Horn is entitled to recover its actual costs and expenses incurred by Horn and its independent subcontractors. Horn has contacted each of its independent subcontractors and had them review the time they devoted and the costs they incurred. Likewise, Horn has reviewed its own records to determine time and expenses devoted on this contract by Horn staff. The sum of all such time and expenses plus an overhead and profit factor of 18% is $7,028,200.96. The information is presented on an individual basis for each Horn member, employee or subcontractor. Further, the information is broken out on a monthly basis. Supporting all this information are expense records and time diaries that were used to construct the documents.

(internal citation omitted). Horn & Associates also indicated:

> Horn should be entitled to receive at a bare minimum, compensation for its actual costs incurred. Such damages are often called "reliance damages." Such damages, while not placing Horn in the same position it would have been, but for the breaches by NASA, would at least compensate Horn for its out-of-pocket expenses and for the time devoted to the performance of the Purchase Order.

_____

Associates' 13.5% contingency fee times $2,068,000,000.00 results in an amount of $279,000,000.00.

Exhibit 42 to the certified claim[53] was the "Audit Cost Index," and included an "Audit Cost Summary, which listed all the expenses of Horn & Associates employees and subcontractors, as well as "Auditor Expenses Paid by Horn." The summary indicated the total expenses for 2005 were $3,265,402.04, for 2006 the expenses were $3,753,731.31, and the auditor expenses were $9,067.61, for a total of $7,028,200.96. The $7,028,200.96 is the same amount listed in the "Further Alternative Remedy," which stated: "Horn has contacted each of its independent subcontractors and had them review the time they devoted and the costs they incurred. Likewise, Horn has reviewed its own records to determine time and expenses devoted on this contract by Horn staff. The sum of all such time and expenses plus an overhead and profit factor of 18% is $7,028,200.96."

After the summary, the Audit Cost Index was divided into three sections: "Horn & Associates, Inc., Recap of Expenses Reimbursed to Auditors," "2005 Expense Summary for each Horn Member, Employee or Subcontractor," and "2006 Expense Summary for each Horn Member, Employee or Subcontractor." The first section "Horn & Associates, Inc., Recap of Expenses Reimbursed to Auditors," identified $9,067.61 of expenses, and included items such as "NASA Postage," "Ames Expenses," and "Dryden Expenses."[54] For the expense summary of each Horn employee or subcontractor, the form identified the following categories: "Date, Days, Hours, Hourly Rate, $ for Hours, Trans, Meals, Lodging, Per Diem, Travel Miles, Miles @ Eff Rate, Supplies/Equip., Total." The expense summary for each year also listed the "Avg time spent on NASA per week in addition to above time," and "Overhead at 18%." The summaries included all twelve months from each employee or subcontractor. The individual months for each employee were further broken down to include: "Mgmt, Auditor Position, Date, Days, Hours, Activity, Location, Hourly Rate, $ for Hours, Trans, Meals, Lodging, Per Diem, Travel Miles, Miles @ Eff Rate, Supplies/Equip."

With regard to the language: "Horn should be entitled to receive at a bare minimum compensation for its actual costs incurred," at trial, Tom Horn acknowledged that he did not give any significance to the term "actual costs incurred," explaining it "really didn't register with me when I read this, reviewed the certified claim." Tom Horn also indicated regarding the "Further Alternative Remedy," which stated "Horn is entitled to recover its actual costs and expenses incurred by Horn and its independent subcontractors," that the term "actual costs and expenses," "really didn't have any significance because it really didn't register with me when I reviewed the document." Mustapha Wai, who worked for the Office of Inspector General (OIG) for NASA indicated when he first heard of Horn & Associates' certified claim:

---

[53] There were 42 exhibits to the certified claim. Specifically regarding exhibit 42, the Audit Cost Index, the exhibit included the forms for 26 Horn & Associates employees and subcontractors, and totaled 607 pages.

[54] At closing argument, defendant's counsel indicated that, "I don't think we have a huge problem with the nominal expenses of $9,067.61 that are reported on page 7896 of the claim."

As an auditor and my understanding of Horn being a professional audit firm as well, my expectation going forward when I read that was that actual cost incurred and expenses -- actual costs and expenses incurred are actually based -- in accounting terms and audit terms are based on costs actually incurred, whether expensed, which means money going out, or an obligation, which means you've indebted to pay at a later time. But our professional understanding was that there is evidence to substantiate such, whether it is invoice, whether there is billing statements, whether it is timesheets or canceled checks for payments that are being made out, or receiving reports to show supplies purchased, just whatever substantiating evidence that actually substantiates that these are costs that have been incurred in accounting terms, things that we were looking at to see if they support the $7 million.[55]

Tom Horn also testified that he was unaware that the term "actual costs incurred" was a defined term in the Federal Acquisition Regulation.[56]

Tom Horn offered his explanation of the certified claim during his trial testimony and indicated that because the contract with NASA was "a contingency-based contract," "it didn't require us in any part of the contract to maintain our time and expense records." Tom Horn also testified that Mr. Gammon, the previous counsel of record, in a July 2007 letter to Horn & Associates, indicated that:

Horn is otherwise entitled to recover for the actual services and costs/expenses devoted to the NASA-breached contract. And these services/costs/expenses are a combination of the actual Horn services/costs and the services/costs of the independent auditor/contractors who worked on the NASA project for Horn. The legal term for this theory of damages is *quantum meruit.*

. . .

We must impress upon our independent auditors/contractors the need for their immediate and close attention to this project. It is essential that they review the records that they have and that they make a detailed estimate of their time devoted to the NASA project on a daily basis. In that regard, they should preserve what records they have that will buttress their estimate of their actual time. Additionally, they should be cautioned that they may be examined, either in depositions or at trial, on their estimates so that they

---

[55] Mr. Wai, on cross-examination, however, in discussing Horn & Associates' damage theories, indicated that "I don't know the definition of -- the legal definition of reliance. I'm not a lawyer. But out-of-pocket, I can understand that as an accountant. . . . I don't understand what the reliance damages are. I do understand out-of-pocket expenses."

[56] The court notes, however, counsel for plaintiff asked Tom Horn: "Did you know that the term 'actual costs' is used in some documents as defined in the Federal Acquisition Register?" To which Tom Horn replied: "No."

should only claim time that they actually spent. By the same token, it is essential that they recall and save proof of their actually incurred expenses.

(emphasis in original). As reflected in the July 2007 letter, Mr. Gammon had advised Horn & Associates about its certified claim. After his death, and up to, and including trial, defendant's counsel repeatedly questioned whether plaintiff would raise an advice of counsel defense related to Mr. Gammon's assistance with the certified claim.[57]  As Mr. Brunson repeatedly stated before and during trial, plaintiff has no intention of raising an advice of counsel defense and has not done so in this case.

In order to obtain a record of time and expenses, Tom Horn sent to Horn & Associates employees and subcontractors affiliated with the NASA recovery audit a "NASA Recovery Audit Expense Summary" which was "a summary of the time devoted to our project and the expenses on our contract that I sent out to them." Each of the subcontractors, as well as the Horn & Associates employees, who worked on the NASA audit completed the forms, or Horn & Associates filled it out on their behalf. For the subcontractors, the individuals did not select the hourly rate that appears in the expense summary. Mr. Young indicated on cross-examination, "I did not provide the hourly rate." Furthermore, Mr. Farrar indicated that regarding the forms, the subcontractors "were instructed not to" fill out the hourly rate. Tom Horn testified that Horn & Associates had decided to assign rates to the subcontractors "[b]ecause we just felt like we -- Larry Farrar, Mike Lowry and myself -- could determine those rates better than anybody else," and placed that hourly rate on the form plaintiff provided.

On direct examination, one of the subcontractors, Mr. Edgerton, testified he selected an hourly rate of $155.00, "[b]ecause that's the one that I found in the contract for Pricewaterhouse. And it's time and expenses so, you know, why pull a figure . . . out of the air, have something with a basis for it, go back and look at a government contract. That gives you a minimum."[58] Mr. Edgerton indicated that he identified an hourly rate "out of curiosity to see what the time was coming, so since we weren't getting paid from NASA, what it would have been if we hadn't gotten a contract that wasn't a contingency contract." Mr. Edgerton indicated on cross-examination that he was unaware that Horn & Associates used a different hourly rate in submitting the certified claim. The subcontractors also acknowledged not being paid the total amounts listed on expense summaries attached to the certified claim. For example, when asked on cross-examination if he had been "actually paid $682,900.96," that was included in the certified claim, Mr. Hott replied: "Sure wish I had been."

---

[57]After the court's earlier opinion granting plaintiff's motion for partial summary judgment, Mr. Gammon unexpectedly passed away. Mr. Brunson ably replaced Mr. Gammon and zealously represented plaintiff at trial.

[58] On cross-examination, Mr. Edgerton also indicated he selected an hourly rate of $155.00 "based on a 2000 rate that the government was allowing for senior auditors, different classifications in the year 2000."

On cross-examination, Tom Horn testified that in trying to determine an hourly rate, because "recovery auditors didn't post hours because we all worked on a contingency audit basis," "[w]e went out just to the GSA schedule and pulled down just a number of them."[59] Mr. Farrar testified that "we had no basis for hourly rates. We had never billed anybody on an hourly rate. We didn't know what our hourly -- what our work was worth on an hourly basis because it was just then kind of put in as free to operate that way." Mr. Young testified that he had never charged an hourly rate and during the recovery audit at Kennedy, "[w]e didn't track our time, so we did our best to recreate an estimation." Mr. Hott indicated that the expense summary was "intended to be an estimate of with [sic] what we would've normally expected to make under the circumstances."

Mr. Farrar indicated that "[o]ur expectation was that after we filed the claim, and maybe naively on our part, that there would be a lot of conversation once NASA received the claim, and there would be a lot of give and-take back and forth trying to resolve the issue of the breach, and we would come to some solution to resolve it."

On January 25, 2008, Contracting Officer Patterson issued a four page final decision.[60] Contracting Officer Patterson stated that: "This letter is in response to Horn and Associates, Incorporated, hereafter referred to as Horn, claims for $279,000,000.00, $14,700,000.00 and $7,028,200.96 for alleged material breach of NASA Delivery Order NNH05CC28D for Recovery Audit services. The claim is denied in its entirety."[61] Contracting Officer Patterson stated that "Horn asserts that it received no compensation due to a material breach of the order by NASA. To the contrary, Horn received compensation in accordance with the payment terms of the order that was awarded on a contingency fee basis." Contracting Officer Patterson continued:

> The ultimate decision as to what constitutes a debt lies not with Horn, but with the responsible NASA official at each Center in accordance with the

---

[59] Tom Horn explained regarding the GSA schedules:

> Well, the three of us, the three principals, we had a discussion about this, and I went out to the GSA schedule and we first looked at the 520-9, which was the recovery audit schedule of people that were able to do recovery auditing, and we looked at the list and there was only a couple firms at that particular point in time that we noticed on there that did governmental recovery auditing, and those firms did not have an hourly rate on them. They were all contingency-based like us, and we didn't have an hourly rate on our GSA schedule either.

[60] The court cites to the March 13, 2007 letter and the January 25, 2008 final decision, extensively in this opinion. Neither party, however, called the author, Contracting Officer Patterson, to testify at trial.

[61] Prior to the issuance of the final decision, Mr. Ward, the chief assistant in NASA's Chief Financial Officer's office indicated, on December 19, 2007 that "he believed the Horn Certified Claim should be investigated as a 'false claim' to the Government."

SOW and FAR Part 32. Horn did not comply with the delivery order terms and audit as stated under the basic years as awarded, 1998-2003 or fiscal years 1997-2002, and failed to submit the required management report at the end of the initial basic period to allow NASA to evaluate the progression of the audit and make any necessary adjustment to the audit project plan as stated in Task 3 of the order.

Turning to Horn & Associates' remedies, Contracting Officer Patterson addressed Horn & Associates' first remedy for breach:

> The first is a recovery of some $279,000 000.00. This amount sought in quantum, is based on a calculation of 13.5 percent of the $2,068,000,000 amount that Horn contends that NASA could have recovered in erroneous payments. The $2,068,000,000 equates to 4 percent of $57,439,999,999 in NASA payments during the years 1997-2005, with an adjustment for a 90 percent recovery rate. Horn cites to a pronouncement by the Office of Management & Budget (OMB) that "4 percent of all federal payments made are improper or erroneous/overpayments." The amounts claimed have no supportive basis in fact.

(internal citation omitted). For Horn & Associates' second remedy for breach, and the first alternative theory proposed by plaintiff in the certified claim, Contracting Officer Patterson indicated:

> The first "alternative breach remedy" is a calculation based on the "limited number of contract payments that Horn was allowed to review." Horn claims its work uncovered a supposed potential recovery amount of some $109,000 000; applying the 13.5 percent contingency fee provision in the delivery order equates to an amount of $14,700,000 to put [Horn] in the same position it would have been [but for the alleged NASA breaches]. Again, the amount claimed has no basis in fact.

(brackets in original and internal citation omitted).

Finally, for the third remedy of breach and the second alternative theory proposed by plaintiff in the certified claim, the "Further Alternative Remedy," Contracting Officer Patterson indicated:

> Horn seeks a further "alternative remedy" based on entitlement to recover from NASA "actual costs and expenses incurred" by Horn in its performance of the delivery order. Horn claims the actual expense incurred by its staff, "plus an overhead and profit factor of 18 percent," is $7,028,200.96. Horn knowingly and willingly accepted at award a contingency fee payment arrangement for the performance of recovery audit services. Therefore, Horn is not entitled to reimbursement of actual costs incurred.

Contracting Officer Patterson finally determined, "[b]ased on the conclusion that Horn has failed to demonstrate entitlement for an adjustment to the delivery order, and has also materially misrepresented in its claim the facts and circumstances of the performance issues it alleges in its claim under the delivery order, the claim is denied in its entirety."

Ultimately, prior to trial, NASA identified several claims which had been denied during or shortly after the recovery audit, but which NASA subsequently concluded were valid claims that should have been approved for collection, rather than denied. In its post-trial briefing, defendant acknowledged that there were $992,557.38 in valid overpayments that NASA had failed to pursue and process on which Horn & Associates was owed a contingency fee. The court notes, however, that plaintiff takes issue with defendant's characterization of "valid," arguing that:

> Nearly all of the recommended debts submitted by Horn to NASA were valid, meaning that based on the information available to Horn during the audit, the individual claim should have been pursued. As numerous witnesses testified, Horn had no incentive (and, because of the contingent fee nature of the Contract, actually had a disincentive) to spend time working on and submitting recommended debts that Horn's auditors knew to not be valid. Each individual claim submitted by Horn was based on the information available to the Horn auditors at the time, and Horn believed each of those individual claims to have been valid.[62]

After Contracting Officer Patterson issued his final decision, on June 6, 2008, Horn & Associates timely filed a complaint in this court. Like the certified claim, Horn & Associates raised three alternative causes of action, and sought the same amounts: $279,000,000.00 for breach of contract, $17,599,550.00 for constructive partial termination for convenience, and $7,028,200.96 for equitable relief.  In an opinion issued by the court prior to trial, the court granted plaintiff's motion for partial summary judgment regarding contract interpretation. Plaintiff claimed that the contract's Statement of Work directed Horn & Associates to perform a primary audit recovery on all contract payments

---

[62] Plaintiff also argues that:

> Horn contends that the present collectability of any of the individual claims, now 7 or 8 years after Horn's auditors submitted them to the NASA Centers and lacking the complete documentation that was available during the period of performance, is irrelevant to the question of whether NASA materially breached the Contract in 2005-07, and what Horn's damages should be as a result of NASA's breaches. Horn has proved breach by demonstrating NASA's gross misconduct during the period of performance and it has proved damages by establishing what would have happened in the "but for world" if NASA had performed as agreed. The claims files today are a very extensively proved, but marginally relevant side show.

between October 1, 1997 through September 30, 2003,[63] whereas defendant argued that "the purchase order was for the auditing of fixed price contracts," for that same time period because the RFQ was limited to audits "on payments made from all fixed price contracts." (emphasis in original). The court concluded that the Statement of Work attached to NASA Contract signed by Horn & Associates and the Contracting Officer determined the scope of the agreement between the parties and required the plaintiff to perform a primary audit recovery on all contract payments for the time period specified. See Horn & Assocs., Inc. v. United States, 104 Fed. Cl. 121, 136 (2012).

After the court's decision, plaintiff filed an amended complaint, albeit without specific mention of the three claims and their specific dollar amounts. Instead, plaintiff listed a single cause of action, breach of contract, and in the prayer for relief requested that "the Court enter judgment for Horn and against NASA on the breach of contract cause of action and award Horn expectation damages, reliance damages, and/or any other type of damages which the Court deems appropriate, in an amount to be proven at trial."  In response, defendant filed an answer to the amended complaint and a counterclaim.[64] Defendant asserts a counterclaim in this court against plaintiff under the False Claims Act, 31 U.S.C. § 3729 (2012), as well as an affirmative defense[65] under the Special Plea in Fraud statute, 28 U.S.C. § 2514 (2012) and the anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 7103(b)(1) (2012). In count one of its counterclaim, regarding the Special Plea in Fraud statute, defendant argues that "Horn knowingly and deliberately overstated its incurred costs with the intent to cause the United States to pay Horn more than the amount to which Horn knew it was entitled under the contract and pursuant to applicable laws and regulations," and, therefore, "Horn is liable for the forfeiture of its certified claim, in its entirety, pursuant to 28 U.S.C. § 2514." Defendant argues in count two of its counterclaim, regarding the anti-fraud provision of the Contract Disputes Act, that "Horn is unable to support portions of its actual costs claim, as alleged above, due to misrepresentations of fact or fraud," and, therefore, "Horn is liable to the United States pursuant to 41 U.S.C. § 604 for the unsupported portions of its claims, the exact amount to be proven at trial, as well as the United States' costs attributable to reviewing such

---

[63] As noted above, although the NASA Contract had originally called for Horn & Associates to conduct the recovery audit for contract payments made during October 1, 1997 through September 30, 2003, the NASA Contract subsequently was modified to cover contract payments from October 1, 1997 through September 30, 2005.

[64] Defendant had initially filed a counterclaim along with an amended answer to plaintiff's complaint, but subsequently, defendant filed a corrected amended answer and counterclaim, because, despite prior assertions to the contrary, the statements in the answer to the amended complaint were not identical to statements in defendant's original answer.

[65] Although the defendant frames the Special Plea in Fraud statute and the anti-fraud provision of the Contract Disputes Act as affirmative defenses, defendant lists both the Special Plea in Fraud statute and the anti-fraud provision of the Contract Disputes Act as counts to its counterclaim.

parts of its claims." Regarding the False Claims Act, in count three of its counterclaim, defendant claims, "Horn knowingly presented, or caused to be presented, a false or fraudulent claim to officers or employees of the United States for payment or approval," and, therefore, "Horn is liable pursuant to the False Claims Act." In count four of its counterclaim, also regarding the False Claims Act, defendant alleges that "[f]or the purpose of getting false or fraudulent claims paid or approved by the Government, Horn knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim," and, therefore, "Horn is liable pursuant to the False Claims Act."

In its post-trial briefing the defendant stated:

> The Government does not pretend that its own performance in connection with the recovery audit was perfect. Indeed, for reasons that we acknowledge fully below, it was not, with the result that, at the conclusion of the audit, Horn was owed an additional contingency fee based upon $992,557.38 in valid overpayments that NASA failed to pursue and process. Horn's own subsequent conduct, however, has wiped out its entitlement to even that amount, and renders it liable to the Government for substantial damages in fraud.

Due to the potential forfeiture of plaintiff's claims under the Special Plea in Fraud statute, or the potential forfeiture of the unsupported portions of plaintiff's claims under the anti-fraud provision of the Contract Disputes Act, the court addresses defendant's counterclaim and affirmative defenses before addressing plaintiff's claims. This opinion is issued following a lengthy trial, and after review of all the information now in the record.[66]

## DISCUSSION

Defendant argues that:

> [H]aving failed to make the profit that it expected on the NASA recovery audit, Horn submitted a certified claim that alleged various contractual breaches and demanded $7,028,200.96 in 'actual costs incurred' in performing the NASA recovery audit. Although presented as a figure that was exact to the penny and ostensibly supported by backup documentation, this amount was, in truth, neither actual nor incurred, but rather represented an arbitrary, inflated amount that Horn thought NASA might pay.

According to defendant, this decision to submit the certified claim, in the view of the government was "quintessential fraud under the FCA [False Claims Act], Special Plea in Fraud, and the CDA's antifraud provision, and it mandates the forfeiture of Horn's breach

---

[66] As indicated above, also before the court are the post-trial filings by the parties, which even today, do not agree on the number of claims submitted by plaintiff or how to characterize the claims.

claims, and renders Horn liable for statutory fines, and payment to the Government of the unsupported $7 million amount, plus the costs of review." The government summarizes its argument by claiming:

> The overarching reality is simply that, when Horn represented in its certified claim that its claimed hours, rates and overheads were "actual," when in truth, aside for a nominal amount of claimed expenses, those costs *did not exist, were not real, were never paid and were not liabilities*, it made a false statement for purposes of the FCA, Special Plea in Fraud, and the CDA's Anti-Fraud provision. In other words, Horn's representations to the Government regarding the nature of these purported expenses were false under any reasonable interpretation.

(emphasis in original).

> In response, plaintiff claims that:

> Each of these counterclaims is based on the inclusion of the phrase "actual costs incurred" in the third measure of damages in Horn's Certified Claim and the Government's erroneous contention that the mere inclusion of those words irrespective of the context automatically transforms the Certified Claim into a submission for payment on a cost-type contract. Horn's Certified Claim, however, was not a request for payment on a cost-type contract. Rather, it was effectively a complaint asserting liability of NASA for breach of a contingency fee contract.

Plaintiff, therefore, argues that "NASA fails to meet the elements of the counterclaims asserted and its fraud claims could only have merit if one suspends common sense, ignores context, and relies on unproved assumptions instead of reality."

## I.     Special Plea in Fraud

As noted above, in its counterclaim, defendant argues that "Horn knowingly and deliberately overstated its incurred costs with the intent to cause the United States to pay Horn more than the amount to which Horn knew it was entitled under the contract and pursuant to applicable laws and Regulations," and, therefore, "Horn is liable for the forfeiture of its certified claim, in its entirety, pursuant to 28 U.S.C. § 2514." In its post-trial brief, defendant argues that evidence at trial proved, by the use of the phrase "actual costs incurred," plaintiff made multiple false statements with actual knowledge of their falsity. Defendant also claims that "[a]lthough engineered to appear as a claim for actual costs incurred, Horn's claim sought significant dollar amounts beyond any costs incurred and was in fact a 'negotiating ploy' and submitted to get NASA to 'pay attention.'"

Plaintiff responds that "[a]lthough the Government asserts that the third measure of damages in Horn's Certified Claim was 'engineered to appear as a claim for actual

costs incurred,' it failed to prove this claim. Rather, the evidence showed that the Certified Claim was not misleading and was not intended to mislead." (internal citation omitted).

The Special Plea in Fraud statute provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514; see also Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d 1348, 1365 (Fed. Cir. 2013), reh'g denied, 563 F. App'x 769 (Fed. Cir.), cert. denied, 135 S. Ct. 167 (2014). In Kellogg Brown & Root, the United States Court of Appeals for the Federal Circuit unequivocally held that "[o]n its face, the statute is limited to those circumstances where the Government proves fraud 'in the proof, statement, establishment or allowance' of a claim not in the execution of a contract." Id. at 1366 (footnote omitted).

Previous decisions by Judges of the United States Court of Federal Claims have indicated that "[t]he statutory forfeiture contemplated by 28 U.S.C. § 2514 is broad. Earlier, the Court of Claims held that, upon a finding that claims are based on 'a contract under which [a contractor] practiced fraud against the Government,' as defined by this statute, 'all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.' Little v. United States, 138 Ct. Cl. 773, [778,] 152 F. Supp. 84, 88 (1957)." Veridyne Corp. v. United States, 83 Fed. Cl. 575, 586 (2008); see also Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. 488, 496 (2011), aff'd, 728 F.3d 1348 (Fed. Cir. 2013), reh'g denied, 563 F. App'x 769 (Fed. Cir.), cert. denied, 135 S. Ct. 167 (2014). In AEY, Inc. v. United States, the court noted that Little has served as the basis for decisions in this court holding that fraud in the performance of a contract leads to forfeiture of all claims arising out of the contract." AEY, Inc. v. United States, 114 Fed. Cl. 619, 628 (2014).

As articulated by a Judge of the United States Court of Federal Claims:

In order to satisfy § 2514, however, the fraud alleged must be related to the contract at issue. Little v. United States, 138 Ct. Cl. 773, 152 F. Supp. 84, 87-88 (1957). Fraud in an unrelated transaction will not lead to forfeiture under this statute. However, when fraud is committed in regard to the very contract upon which the suit is brought, the court will not divide the contract and allow recovery on part of it. Id.; UMC Electronics v. United States, 43 Fed. Cl. 776, 791 (1999), aff'd, 249 F.3d at 1340 ([Fed. Cir.] 2001).

In order to prevail in its defense of fraud under 28 U.S.C. § 2514, the "burden is on the government to establish by clear and convincing evidence

that the claimant has committed the fraud alleged." Glendale [Federal Bank, FBS v. United States], 239 F.3d at 1379; UMC Electronics, 43 Fed. Cl. at 791 (internal citation omitted). This requirement has more specifically been rendered in the following way: "in order that a misrepresentation be fraudulent . . .it must be both consciously false and intended to mislead." E. Allan Farnsworth, Farnsworth on Contracts, § 4.12 (2d Ed.1998). Thus, for the purposes of § 2514, the government must show: 1) that the plaintiff made a false statement to the government knowing that it was false; and 2) that this statement was intended to deceive the government. Glendale, 239 F.3d at 1379.

Am. Heritage Bancorp v. United States, 61 Fed. Cl. 376, 385-86 (2004). In Brown Construction Trades, Inc. v. United States, 23 Cl. Ct. 214 (1991), the court explained the breadth of the statutory intent in 28 U.S.C. § 2514:

> This statute has been held to require the forfeiture of any claim affected by fraud, whether intrinsic to the claim or in the presentment of the claim. Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. 619, 641, 124 F. Supp. 608, 620 (1954) ("this statute goes further than merely banning fraudulent claims.  It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim.").

> The Court of Claims has ruled that where fraud is committed in the course of a contract to which the suit pertains, it may not isolate the affected part and allow suit to proceed on the remainder.  The practice of a fraud on part of a contract condemns the whole.  The rule is set out in Little v. United States, 138 Ct. Cl. 773, 778, 152 F. Supp. 84, 87-88 (1957):

>> It is true that the forfeiture statute [28 U.S.C. § 2514] was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government.  But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it.  Since plaintiff's claims are based entirely upon contract V3020V-241, a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.

> Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government.  See also New York Mkt. Gardeners' Ass'n v. United States, 43 Ct. Cl. 114, 136, 1907 WL 832 (1908).

Brown Constr. Trades, Inc. v. United States, 23 Cl. Ct. at 216; see also Ab-Tech Constr., Inc. v. United States, 31 Fed. Cl. 429, 435-36 (1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995). But see Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. at 499.[67]

As noted above, in an appeal from the trial court, in Kellogg Brown & Root, the United States Court of Appeals for the Federal Circuit noted the government had argued for "a finding of fraud, supporting forfeiture, 'when fraud in the contract performance undermined the legitimacy of the contract upon which the plaintiff sought compensation.'" Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d at 1365-66. The Federal Circuit, quoting from the trial court decision regarding the Brown Construction decision, indicated that:

> This is an impermissibly broad reading of the law. The Court of Federal Claims correctly limited the statute:
>
>> A valid cause of action under [the Forfeiture Statute] must be tied to the submission of a claim, whether in producing false proof to support a claim, see, e.g., [Kamen Soap Prods. Co. v. United States, 124 F. Supp. 608, 622 (Ct. Cl. 1954)]

---

[67] In Kellogg Brown & Root Services, Inc. v. United States, the Court of Federal Claims questioned Brown's holding:

> Several decisions have seized upon this language as justification that all claims must be forfeited by a contract that is "tainted" by fraud, without regard to the alleged fraud's connection to a submitted claim. See, e.g., Brown Constr. Trades, Inc. v. United States, 23 Cl. Ct. 214, 216 (1991). In doing so, these cases overlook Little's predicate factual finding that false proof had been submitted in a related claim under the contract.
>                               . . .
> In analyzing the applicability of the forfeiture statute, the Brown Construction court expanded the scope of the targeted conduct under the statute, while somehow relying on Little, 152 F. Supp. at 87–88, Kamen Soap, 124 F. Supp. at 620, and New York Market, 43 Ct. Cl. at 114, by stating that "28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government." Id. (emphasis added). As a consequence, the court effectively read out of the law the requirement that the fraud relate to the "proof, statement, establishment, or allowance" of claim, a hallmark of every precedential Court of Claims case analyzing claims under the forfeiture statute. See also Ab–Tech Constr., Inc. v. United States, 31 Fed. Cl. 429, 435–36 (1994) (repeating that forfeiture statute requires forfeiture of all claims tainted by fraud without requiring such fraud relate to "proof, statement, establishment, or allowance" of a claim), aff'd, 57 F.3d 1084 (Fed. Cir. 1995) (unpublished table decision) (per curiam).

Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. at 500.

(forfeiting claim because falsified documentation was submitted in presentation of claim), or in falsely establishing the claim, see, e.g., [N.Y. Mkt. Gardeners' Ass'n v. United States, 43 Ct. Cl. 114, 136 (1908)] (Government's objection to claim based on contractor's not fulfilling contract specification, i.e., "establishment" of a false claim).

Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d at 1366 (quoting Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. at 501) (alterations in original); see also Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States, 116 Fed. Cl. 338, 379 (2014); AEY, Inc. v. United States, 114 Fed. Cl. at 628-29;[68] Ulysses, Inc. v. United States, 110 Fed. Cl. 618, 649 (2013) ("[S]uch an expansive reading of the FFCA [Forfeiture of Fraudulent Claims Act] is not warranted by the language of the statute.").

Under the Special Plea in Fraud statute, "the government must 'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'" Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1341 (Fed. Cir.) (quoting Comm. Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir.), reh'g denied (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 558 U.S. 990 (2009); see also Veridyne Corp. v. United States, 758 F.3d 1371, 1376-77 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d at 1365 ("To prevail, the Government must prove its allegations by clear and convincing evidence."); Railway Logistics Int'l v. United States, 103 Fed. Cl. 252, 257-58 (2012). In Glendale Federal Bank, FSB v. United States, the United States Court of Appeals for the Federal Circuit "explained that '[t]o prevail under [28 U.S.C. § 2514] the government is required to establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'"[69] Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (brackets in original) (quoting Comm. Contractors, Inc. v. United States, 154 F.3d at 1362); see also Young-Montenay, Inc. v. United States, 15 F.3d 1040,

---

[68] As noted in AEY, "[i]n upholding the trial court's decision in KBR I, the Federal Circuit did not address that court's interpretation of the continuing validity of Little. The Federal Circuit only confirmed the invalidity of much of its progeny." AEY, Inc. v. United States, 114 Fed. Cl. at 629.

[69] The "clear and convincing" standard applies to proof under the Special Plea in Fraud statute, 28 U.S.C. § 2514, as opposed to the preponderance of the evidence standard applicable to the False Claims Act, 31 U.S.C. § 3729, and the Contract Disputes Act, 41 U.S.C. § 604. See UMC Elecs. Co. v. United States, 249 F.3d 1337, 1338-39 (Fed. Cir. 2001) ("The government must prove a violation of the Contract Disputes Act and False Claims Act by a preponderance of the evidence. Under the Special Plea in Fraud, the government must prove its allegations by clear and convincing evidence." (citing Comm. Contractors, Inc. v. United States, 154 F.3d at 1362)).

1042 (Fed. Cir. 1994) ("Under 28 U.S.C. § 2514, the government bears the burden of proving that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." (citing McCarthy v. United States, 670 F.2d 996, 1004, 229 Ct. Cl. 361, 373 (1982), abrogated on other grounds by Slattery v. United States, 635 F.3d 1298 (Fed. Cir. 2011))); Veridyne Corp. v. United States, Veridyne Corp. v. United States, 105 Fed. Cl. 769, 808, modified, 107 Fed. Cl. 762 (2012), aff'd in part, rev'd in part, 758 F.3d 1371 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014);[70] Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. 547, 584 (2006) ("The contractor must knowingly present the false claim with the intention of being paid for it."), aff'd, 557 F.3d 1332 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 558 U.S. 990 (2009); O'Brien Gear & Mach. Co. v. United States, 219 Ct. Cl. 187, 199, 591 F.2d 666, 672 (1979); Miller v. United States, 213 Ct. Cl. 59, 68, 550 F.2d 17, 22 (1977); Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. 619, 641, 124 F. Supp. 608, 620 (1954).

Mere negligence, inconsistency, or discrepancies are not actionable under the Special Plea in Fraud statute. See Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584; Veridyne Corp. v. United States, 105 Fed. Cl. at 801; Grand Acadian, Inc. v. United States, 105 Fed. Cl. 447, 458 ("'Proof of negligence or ineptitude does not meet the standard of clear and convincing evidence; rather, "[a]n intent to deceive the Government must be proved."'" (bracket in original) (quoting Alcatec, LLC v. United States, 100 Fed. Cl. 502, 517 (2011) (quoting Miller v. United States, 213 Ct. Cl. at 68, 550 F.2d at 22), aff'd, 471 F. App'x 899 (Fed. Cir. 2012))), appeal dismissed (Fed. Cir. 2012). The United States Court of Appeals for the Federal Circuit has described the clear and convincing evidence standard as follows:

> "A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is '*highly probable*.'"

Am-Pro Prot. Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (quoting Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993)) (emphasis in original); see also Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. 496, 525 (2013) (citing Am-Pro Prot. Agency, Inc. v. United States, 281 F.3d at 1239–40 (other citation omitted)), recons. denied, 2013 WL 3199299 (Fed. Cl. Mar. 29, 2013).

"The court may . . . consider circumstantial evidence in making its determination." Alcatec, LLC v. United States, 100 Fed. Cl. at 517 (citing Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. at 642, 124 F. Supp. at 620). With respect to the court's

---

[70] The court in Veridyne also has indicated that, regarding 28 U.S.C. § 2514, "[a] predicate for forfeiture under this statute is the establishment of fraud, although the statute itself does not articulate the elements of fraud." Veridyne Corp. v. United States, 105 Fed. Cl. at 801.

analysis of circumstantial evidence to demonstrate clear and convincing evidence of fraud, the United States Court of Claims explained:

> About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts Every event in the universe is linked to every other event. One cause produces an effect, and that effect in turn becomes a cause thus all events from the beginning of time are woven into one complete pattern. It is difficult, therefore, to make up a story that is not part of this one continuous design It is like a patch on a suit of clothes—it may be made out of the same cloth, may look the same in the middle, but will show around the edges, because it is not a part of the original garment. Likewise made-up story will not fit into the scheme of events, because it is not a part of it. It will not, therefore, stand close examination.  One made-up story calls for another and the last fabrication will not tally with the next fact.

Kamen Soap Prods. Co. v. United States, 129 Ct. Cl. at 642, 124 F. Supp. at 620.

Once fraud is established, "[t]he use of the word 'shall' [in 28 U.S.C. § 2514] makes the judgment of forfeiture obligatory on the court; the court has no discretion to turn a blind eye to an attempt, whether successful or not, to commit fraud in the statement of a claim against the United States." Am. Heritage Bancorp v. United States, 61 Fed. Cl. at 385; see also Farkas v. United States, 57 Fed. Cl. 134, 146 (2003) (quoting Miller v. United States, 213 Ct. Cl. at 68, 550 F.2d at 22), aff'd, 95 F. App'x 355 (Fed. Cir. 2004) ("Section 2514 amounts to a 'silver bullet' which, in the present case, would require that [plaintiff's] claim be forfeited if it is shown by clear and convincing evidence that [plaintiff] acted or made false or misleading statements with the 'intent to deceive the Government.'"). Forfeiture under the Special Plea in Fraud statute "carries no monetary penalties other than the forfeiture itself."  Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584. "The forfeiture counterclaim carries no monetary penalties other than the forfeiture itself." Id.; see also Barren Island Marina, Inc. v. United States, 44 Fed. Cl. 252, 257 (1999) ("The plain meaning of the statute [28 U.S.C. § 2514] is that the value of the forfeiture is not restricted or even linked to the value of the loss sustained by the government. For this reason, the forfeiture is not, strictly speaking, a remedy. Additionally, because forfeiture under § 2514 requires demonstration of fraud-intentional conduct-the forfeiture is more akin to punishment."), appeal dismissed, 54 F. App'x 329 (Fed. Cir.), vacated by 57 F. App'x 427 (Fed. Cir.), and appeal dismissed, 66 F. App'x 878 (Fed. Cir. 2003).

Although the Special Plea in Fraud Statute does not require the court to render a judgment of forfeiture when a contractor practices fraud against the government "in some other unrelated transaction," when a contractor commits fraud "in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it." Little v. United States, 138 Ct. Cl. 773, 778, 152 F. Supp. 84, 88 (1957). The claims that a contractor asserts in court, therefore, may be forfeited as long as the fraudulent conduct that serves as the basis for the forfeiture is

related to the contract from which the claims are derived.  See Daff v. United States, 31 Fed. Cl. 682, 697 (1994) ("Although . . . fraud does not have to occur in the court proceeding itself, it plainly has to be relevant to the present assertion of a claim in court, arising out of the same transaction or contract." (citing Little v. United States, 138 Ct. Cl. at 778, 152 F. Supp. at 87–88), aff'd, 78 F.3d 1566 (Fed. Cir.), reh'g denied, reh'g en banc suggestion declined (Fed. Cir. 1996); see also Veridyne Corp. v. United States, 105 Fed. Cl. at 806 ("A plaintiff's claim will be forfeited under 28 U.S.C. § 2514 even if only part of its claims is [sic] false."  (citing Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1341)); Barren Island Marina, Inc. v. United States, 44 Fed. Cl. at 256 ("Based on the Little case, there is no question that all claims arising under the contract are subject to forfeiture."). A fraudulent invoice submitted to a contracting officer during the performance of the same contract that is the subject of a contractor's claims, therefore, may result in the forfeiture of the contractor's claims under the Special Plea in Fraud statute. See Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 61 (1993) ("The statute does not specify where such claims must be presented in order to invoke the statute.   Claims for payment before a contracting officer are as subject to 'proof, statement, establishment, or allowance' as are claims before the Court of Federal Claims."); see also Jerman v. United States, 96 Ct. Cl. 540, 552 (1942).

As a starting point, for defendant's counterclaim to be successful, defendant must demonstrate that the counterclaim is "tied to the submission of a claim, whether in producing false proof to support a claim, . . . or in falsely establishing the claim." Kellogg Brown & Root Servs., Inc. v. United States, 728 F.3d at 1366 (citations omitted). For the third measure of damages, titled "Further Alternative Remedy," Horn & Associates' claim certified:

> Even should NASA determine, improperly Horn believes, that the sums above are not an appropriate measure of Horn's damages, Horn is entitled to recover its actual costs and expenses incurred by Horn and its independent subcontractors. Horn has contacted each of its independent subcontractors and had them review the time they devoted and the costs they incurred. Likewise, Horn has reviewed its own records to determine time and expenses devoted on this contract by Horn staff. The sum of all such time and expenses plus an overhead and profit factor of 18% is $7,028,200.96. The information is presented on an individual basis for each Horn member, employee or subcontractor. Further, the information is broken out on a monthly basis. Supporting all this information are expense records and time diaries that were used to construct the documents.

(internal citation omitted). Defendant argues the key phrase, and the one that demonstrates plaintiff's fraud, is: "Horn is entitled to recover its actual costs and expenses incurred by Horn and its independent subcontractors."[71] (emphasis added). Plaintiff

---

[71] In its post-trial briefs, defendant claims that "Horn made multiple four false statements with actual knowledge of their falsity," but then only identifies one category of false statements: "Horn Knowingly Made False Statements Concerning Documentary Support For Its 'Actual Costs Incurred.'"

argues that defendant has constructed a "disingenuous premise" on which to base its counterclaim argument. Plaintiff also responds that "the Horn witnesses testified credibly and consistently that they did not intend to state a claim for actual costs incurred," and point to the fact that "the Government chose not to present testimony from any witness who received the Certified Claim to say they were misled by it."

Mr. Farrar offered testimony that the certified claim was not meant to reflect the actual costs incurred, and despite that phrase, Mr. Farrer indicated that "quite frankly, I don't know how much clearer we could make it than this." Mr. Farrar pointed to the language of the certified claim stating: "It is important to note that Horn is not required to establish as damages with a finite degree of accuracy. Rather Horn may establish approximate damages so long as there is a reasonable basis for Horn's computation." Mr. Farrar also noted that for the third measure of damages, the "Further Alternative Remedy:"

> We clearly state in the last sentence of paragraph two, "According to all of this information, our expenses records and time diaries that were used to construct the documents." If we had actual expenditure documents, we wouldn't have had to construct the documents. So I think that clearly again demonstrates that we're approximating or constructing the documents to support our claim -- our remedy.

(quoting the certified claim). On direct examination, plaintiff's counsel asked Mr. Farrar, "[a]t the time that you reviewed the certified claim before it was submitted, what was your understanding of the term 'actual cost incurred?'" Mr. Farrar responded that "[m]y understanding of that term -- first of all, that term simply meant to me that you're talking about actual time and expenses incurred." When the government asked if "it's true that Horn did not pay its subcontractors the amount of $1,889,306 as set forth in this spreadsheet, correct?" Mr. Farrar reiterated that "[w]ell again, we can't pay our subcontractors if we haven't been paid. So, I mean, technically speaking we had not paid this at that point in time because we hadn't been paid for [sic] NASA."

With regard to the language, "Horn should be entitled to receive at a bare minimum compensation for its actual costs incurred," at trial, Tom Horn acknowledged that he did not give any significance to the term "actual costs incurred," explaining "it really didn't register with me when I read this, reviewed the certified claim." Tom Horn further indicated regarding the "Further Alternative Remedy," which stated, "Horn is entitled to recover its actual costs and expenses incurred by Horn and its independent subcontractors," that the term "actual costs and expenses," "really didn't have any significance because it really didn't register with me when I reviewed the document."

The "Further Alternative Remedy" language of the certified claim also indicated that "[s]uch damages while not placing Horn in the same position it would have been but for the breaches by NASA would at least compensate Horn for its out-of-pocket expenses and for the time devoted to the performance of the purchase order." Tom Horn testified that the time devoted was the same as costs to him, because "we didn't actually pay out

41

anything to our subcontractors or to ourselves. The only thing we had was the value of our time." On cross-examination, Tom Horn had the following exchange with defendant's counsel:

And that's a document that at the top says Horn and Associates, Inc., NASA Audit Cost Summary. Do you see where I'm reading?

A: Yes.

Q: And there is a column for personnel, correct?

A: Yes.

Q: There is a column for the year 2005?

A: Yes.

Q: There's a column for the year 2006.

A: Yes.

Q: There is a column that states auditor expenses paid by Horn.

A: Correct.

Q: And there is a total column.

A: Correct.

Q: Is that correct? Now speaking specifically of the total column, these amounts total to $7,028,200.96. Is that correct?

A: Yes.

Q: And that is the same amount that you are seeking as your third measure of relief in the certified claim, correct?

A: Yes.

Q: Okay. Now in this total column there are a number of values. And my question to you is this, is there a single amount in this total column that was actually invoiced by Horn and paid to its subcontractors? Let me break it out. Is there a single amount in this total column that was actually paid by Horn to its subcontractors?

A: There may have been an instance where we've paid some expenses possibly. I don't remember right offhand.

Q: But other than expenses, there are no amounts that appear in this NASA audit cost summary that were paid by Horn to any of the individuals listed in the personnel column. Isn't that the case?

A: There may have been some salaries paid to some of the three principals, but for the most part these were not paid out.

Q: Okay. Now, just to be clear, you believe that the principals received, I believe you indicated that the principals of Horn that appear in the personnel column may have received some salary. Did I understand it correctly?

A: Yeah, but it would be, I'm telling you, it would be really minute because we didn't have any money.

Q: But these exact figures, which are down to the penny, do not represent exact amounts that were paid to Horn principals or any of its subcontractors. Is that the case?

A: The expenses in there were exact amounts.[72] I mean that we paid ourselves.

Q: Were any other amounts, other than the expenses, amounts that were made to Horn's subcontractors and principals?

A: No.

In its post-trial briefs, counsel for Horn & Associates includes the following question and answer:

Did Horn not actually pay any of its members, employees, or subcontractor the billing rates shown in the third measure of damages? Of course Horn did not pay those rates, as everyone was working on a contingency basis and the rates were obviously billing rates, not cost rates. These were not revelations; they were facts that were never in dispute. That the Government presented this "proof" as if it were making some important revelation reveals its case as an exercise in legal pretense and nothing more.

In addition to identifying that plaintiff did not pay the actual costs incurred, defendant argues further evidence of fraud is that Horn & Associates also did not conform to the FAR's definition of actual costs incurred. Defendant correctly notes that FAR §

_____

[72] The "Audit Cost Summary" reflected the "expenses reimbursed to Auditors" in the amount of $9,067.61.

31.001 defines "actual costs" as "amounts determined on the basis of costs incurred, as distinguished from forecasted costs," 48 C.F.R. § 31.001 (2015), and argues that "[t]he term 'actual costs incurred' is one that is common in the accounting industry, and its meaning is no different from that provided in the FAR." On direct examination, in response to the question: what was your understanding how the term actual costs incurred was defined in the FAR, Mr. Farrar states that "I did not know it was in the FAR," and that "I just had no reason to think that I needed to -- I don't -- the way I think I don't think I have to look in FAR to see if every term that's used is defined in FAR. I would have never thought of that." Tom Horn also was unaware that the term "actual costs incurred" was a defined term in the FAR. Defendant argues that "[a]lthough Mr. Horn professed ignorance of the specific FAR definition of 'actual costs incurred,' Mr. Horn is a CPA and former auditor who dealt with invoices and payments every day." (internal citation omitted). As noted above, Horn & Associates argues that "NASA presented no testimony that, upon receiving the Certified Claim, anyone with responsibility for reviewing and acting upon it received it in the way the Government now argues, as a statement of Horn's actual costs and expenses incurred as defined by the FAR."[73] Moreover, regarding the defendant's argument about the FAR, plaintiff states:

> In keeping with its façade of outrage, the Government devotes the majority of the counterclaim portion of its Response to arguing the undisputed point that Horn's third measure of damages was not based on "actual costs incurred" as defined by the FAR. Horn agrees, as it always has told NASA from the beginning, that the claim was not based on "actual costs incurred" as defined by the FAR.

The court believes defendant established that although the certified claim stated the claim was based on "actual costs incurred," plaintiff did not incur the costs identified in the claim. Nor did plaintiff pay the amounts to its subcontractors, except expenses, listed in the certified claim. The court, however, does not agree with defendant that the use of the words "actual costs incurred" by themselves meets the definition of fraud. Nor

---

[73] In a footnote, Horn & Associates argues that "[b]ecause the Government chose not to call any witness who actually reviewed the Certified Claim when it was submitted (although they were available), there is no evidence that NASA actually understood the third measure of damages differently than Horn intended it, or as the Government's own expert testified was evident to him upon first reading." Plaintiff claimed, therefore, that the court should apply the principle "'that where a party fails to call a witness available to him and who has knowledge of material facts, the court may draw the inference that the testimony of the witness concerning those facts would have been unfavorable to the party.'" (quoting Day & Zimmerman Servs. v. United States, 38 Fed. Cl. 591, 603, appeal dismissed, 12 F.3d 49 (Fed. Cir. 1997)). Plaintiff argues, therefore, that "the Court can presume that the witnesses' testimony would have been unfavorable to the Government on this issue, which further supports the conclusion that the Government's counterclaims are entirely manufactured." The court notes that although Mustapha Wai, who testified at trial, worked for the OIG during the NASA audit and reviewed the certified claim after it was submitted, defendant did not call either contracting officer involved in the NASA Contract to address Horn & Associates' certified claim.

does the use of the phrase "actual costs incurred" evidence per se fraud on the plaintiff's part. The court does not believe the words by themselves, however wrongly chosen by plaintiff, automatically demonstrates the intent to defraud the government. Here, Horn & Associates did not bill the government for its time, it was performing the contract as a recovery audit firm, and the contract with NASA was "a contingency-based contract," which only contemplated payment to Horn & Associates for any successful recovery by NASA.  The 13.5 percent contingency fee provision in the NASA Contract did not require Horn & Associates to document its hours, expenses or billing rates. As Tom Horn explained, "it didn't require us in any part of the contract to maintain our time and expense records." The court believes Tom Horn, as a CPA, should have been more aware of the meaning of the phrase "actual costs incurred."

As reflected repeatedly in this opinion, plaintiff's contract was a contingency contract, and plaintiff was placed in a difficult position to try and recover monies it believed it was entitled to as a result of the work plaintiff had completed under the NASA Contract. Horn & Associates was convinced that NASA had breached the NASA Contract, making complete performance impossible, including the roadblocks NASA employees put in the way of contract performance, first by reading the NASA Contract to include only fixed price contracts, and then the failure to make files available, and the failure to cooperate with Horn & Associates personnel by failing to pursue collection of the overpayments owed the government which were identified and submitted by plaintiff. Absent pursuit and collection of the claims by NASA, monies due plaintiff, as a contingency fee under the NASA Contract, would remain unavailable to plaintiff. As noted above, under the NASA Contract, plaintiff would only be paid if NASA collected on an overpayment discovered and identified to NASA by Horn & Associates, which had to be invoiced and collected by NASA.

Plaintiff's certified claim was submitted following the end of contract performance of this contingency fee contract, and after the relationship between the plaintiff and the government broke down and plaintiff considered the government to have breached the NASA Contract. The records in this case, therefore, were generated after the NASA Contract was ended. In order to arrive at a damages figure for the certified claim that represented what Horn & Associates believed it had expended on the recovery audit, Horn & Associates inartfully described its potential costs as "actual costs and expenses" in its certified claim. There is no evidence in the record, however, that Horn & Associates or its principals intended to defraud the government or to submit a false claim. The court believes plaintiff's choice of words, "[s]upporting all this information are expense records and time diaries that were used to construct the documents," as well as that plaintiff provided the government with the reconstructed expense records and time diaries, led to confusion and, consequently, suspicion of the plaintiff on the part of the government. Moreover, from the start of contract performance, the relationship between the parties was poor at best. By claiming records were a reconstructed submission as the certified claim against the government, Horn & Associates left itself vulnerable to a suspicion of fraud and submitting false statements. After listening to, and observing, the Horn & Associate witnesses and reviewing Mr. Lowery's deposition, despite poor drafting choices by Horn & Associates, the court does not believe Horn & Associates ever intended to

defraud the government. The court believes, as supported by testimony at trial, that Horn & Associates was unsure how collect from the government for their efforts expended on the contract awarded to it. The government did not process the overpayments Horn & Associates believed it had discovered and properly submitted to NASA, and, therefore, Horn & Associates was not being paid.[74] Only after the termination of the NASA Contract, did Horn & Associates suggest an actual costs method of payment. As a recovery audit firm, Horn & Associates was not well versed in how to select an hourly rate, or calculate its time. The court believes Horn & Associates made numerous mistakes in formulating the certified claim, but does not believe the mistakes rises to the level of fraud. Moreover, the submission of alternative theories and dollar values in the alterative remedies submitted to the government is further indication that the claims submitted by the plaintiff involved reconstructed numbers based on the best information available not on precise records.

The court notes the difference between this case and a more typical fraudulent records case is striking. For example, in Alcatec, LLC v. United States, the court found that the plaintiff had committed fraud in performing an indefinite-delivery, indefinite quantity, fixed-rate contract, which compensated the plaintiff for performing services that included a monthly inspection of mobile homes. See generally Alcatec, LLC v. United States, 100 Fed. Cl. 502. Like Horn & Associates, the plaintiff in Alcatec was a small business contractor that had no experience providing similar services to the government. See id. at 505. The Alcatec plaintiff admitted that it invoiced for "duplicate inspections," but asserted that its over-billing of defendant "was a product of mistake and confusion and not the result of a scheme to intentionally defraud the Government." Id. at 517. Noting that the "routine nature" of the monthly inspections "was at the heart of the performance that FEMA contracted for," id. at 521, the Alcatec court concluded that the plaintiff committed fraud by intentionally falsifying the dates that appeared on inspection reports. See id. at 518. There is no suggestion of anything like that type of intentional fraud in this case.

This case is also vastly different from Chapman Law Firm LPA v. United States, 113 Fed. Cl. 555 (2013), aff'd, 583 F. App'x 915 (Fed. Cir. 2014). In Chapman, "plaintiff falsified inspection reports for the East Dale Avenue, Trenton Street, Mount Elliott Avenue, and Chester Street properties, which served as supporting documentation for its claim to the management fee provided for conducting routine inspections under the parties' contract." Id. at 601. The plaintiff in that case, Chapman Law Firm LPA,

> represented that routine inspections had occurred on the East Dale Avenue property on dates that lawn care services were provided, by creating routine inspection reports for the Trenton Street property which represented that an inspector had visited the property, which was contradicted by the post-hoc creation of the reports, the failure of the post-hoc reports to recognize that a fire had destroyed the property, and Frank Chapman's direction to use any interaction with the Trenton Street property as evidence of a routine

---

[74] As noted above, for the 44 claims recovered by NASA, the total value was $208,954.91 and the fee paid to Horn & Associates was $28,209.00.

inspection, and by uploading questionable routine inspection reports for the Mount Elliott Avenue and Chester Street properties.

Id. In both Alcatec and Chapman, the court found intentional fraud under the Special Plea in Fraud statute. The court does not believe the facts in the above captioned case warrant the same conclusion.

The court does not find the phrase, "actual costs incurred" alone to be proof positive of fraud for Horn & Associates' certified claim, nor does the court find the plaintiff's conduct demonstrates fraud in the context of the specific facts of the case currently under review. Although defendant points to plaintiff's failure to understand how the term "actual cost incurred" was a term of art in the FAR, defendant is unable to demonstrate how this failure to understand demonstrates intentional fraud. In its post-trial brief, Horn & Associates argues that "Horn's claims should not be forfeited under the Special Plea in Fraud Statute," because "NASA has failed to prove the elements of knowledge and intent. Because the burden necessary to prove a Special Plea in Fraud is much higher [than for the False Claims Act and the Contract Disputes Act], the claim fails." The court concludes that, although plaintiff should have been more precise in its choice of language, defendant has failed to prove the requisite intent to establish fraud. Therefore, Horn & Associates is not found to have practiced, or attempted to practice, a fraud against the United States under the defendant's claims with respect to the Special Plea in Fraud statute. Plaintiff's claims are not forfeited as a result.

## II.   False Claims Act

In its counterclaim, defendant also argues that "Horn is liable pursuant to the False Claims Act" because "Horn knowingly presented, or caused to be presented, a false or fraudulent claim to officers or employees of the United States for payment or approval." Defendant claims "[f]or the purpose of getting false or fraudulent claims paid or approved by the Government, Horn knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim," and, therefore, "Horn is liable pursuant to the False Claims Act." In its post-trial brief, defendant contends that Horn & Associates, in advancing its claim, "made multiple false statements concerning documentary support for its 'actual costs incurred.'" Horn & Associates responds that "NASA must prove the following elements: (1) the claim presented was false; and (2) the presenter knew that the claim was false or fraudulent," and Horn & Associates argues that "[h]ere, the Government has not established either element of its FCA counterclaim."

As indicated by the United States Supreme Court, "'[t]he False Claims Act was adopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts.'" Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter, 135 S. Ct. 1970, 1973 (2015) (quoting S. Rep. No. 99–345, at 8 (1986), 1986 U.S.C.C.A.N. 5266, 5273). The False Claims Act, 31 U.S.C. § 3729,[75] provides that any person who –

---

[75] The False Claims Act was amended in 2009. See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4(a), 123 Stat. 1617, 1621. The amendments are

**(1)** knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

**(2)** knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

**(3)** conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

**(4)** has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

**(5)** authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

**(6)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

**(7)** knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

---

treated "as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date." § 4(f), 123 Stat. at 1625. See AEY, Inc. v. United States, 114 Fed. Cl. at 633 ("The amended provision, 31 U.S.C. § 3729(a)(1)(B), took effect as if enacted on June 7, 2008 and applies to all claims under the False Claims Act that were pending on or after that date."). As noted above, Horn & Associates submitted its certified claim on November 20, 2007, and NASA denied Horn & Associates' certified claim in its entirety on January 25, 2008.

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000[76] plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729(a) (emphasis in original); see also Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter, 135 S. Ct. at 1973;[77] U.S. ex rel. Heath v. AT & T, Inc., 791 F.3d 112, 115 (D.C. Cir. 2015) ("The False Claims Act, 31 U.S.C. §§ 3729 et seq., broadly proscribes the knowing or reckless submission of false claims for payment to the federal government or within a federally funded program.").

---

[76] "The Department of Justice, by regulation, has increased the penalties for FCA [False Claims Act] violations to a minimum of $5,500.00 and a maximum of $11,000.00." Alcatec, LLC v. United States, 100 Fed. Cl. at 526 n.13 (citing 28 C.F.R. § 85.3(a)(9)); see also Veridyne Corp. v. United States, 105 Fed. Cl. at 808 n.30; Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890; Civil Monetary Penalties Inflation Adjustment, 64 Fed. Reg. 47,099–01, 47,104 (Aug. 30, 1999). The regulation at 28 C.F.R. § 85.3 states:

The civil monetary penalties provided by law within the jurisdiction of the respective components of the Department, as set forth in paragraphs (a) through (d) of this section, are adjusted in accordance with the inflation adjustment procedures prescribed in section 5 of the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, Pub. L. 101–410, effective on or after September 29, 1999, as follows:

(a) Civil Division.

…

(9) 31 U.S.C. 3729(a), False Claims Act, violations: minimum from $5,000 to $5,500; maximum from $10,000 to $11,000.

28 C.F.R. § 85.3 (2015). The court has the discretion to impose penalties within the statutory range. See Morse Diesel Int'l, Inc. v. United States, 79 Fed. Cl. 116, 125 (2007), recons. denied, 81 Fed. Cl. 311 (2008). Although in its post-trial briefing defendant seeks $11,000.00 in False Claims Act penalties, defendant's counterclaim has two separate counts for False Claims Act penalties. Therefore, if the court were to find two separate violations of False Claims Act, the court could impose penalties in an amount up to $22,000.00

[77] Although the United States Supreme Court in Kellogg Brown & Root addressed the False Claims Act, because the case was brought as a civil qui tam action, "filed by private parties, called relators, 'in the name of the Government,'" Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter, 135 S. Ct. at 1973, the holding by the Supreme Court does not impact this case. In addition, the Supreme Court also addressed the Wartime Suspension of Limitations Act which is not at issue in the above captioned case.

The term "claim" is defined in the False Claims Act as:

Includ[ing] any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (2006). [78] The False Claims Act also states:

---

[78] The revised, and current, version of the False Claims Act is substantively similar to the prior version, but is organized slightly differently. The current version states:

**(a) Liability for certain acts.--**

**(1) In general.**--Subject to paragraph (2), any person who--

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

**(D)** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

**(E)** is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

**(F)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

the terms "knowing" and "knowingly" mean that a person, with respect to information –

**(1)** has actual knowledge of the information;

---

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

. . .

 **(b) Definitions.**--For purposes of this section--

**(1)** the terms "knowing" and "knowingly" --

**(A)** mean that a person, with respect to information--

**(i)** has actual knowledge of the information;

**(ii)** acts in deliberate ignorance of the truth or falsity of the information; or

**(iii)** acts in reckless disregard of the truth or falsity of the information; and

**(B)** require no proof of specific intent to defraud;

**(2)** the term "claim"--

**(A)** means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

**(i)** is presented to an officer, employee, or agent of the United States; or

**(ii)** is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

**(I)** provides or has provided any portion of the money or property requested or demanded; or

**(II)** will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729 (2012).

**(2)** acts in deliberate ignorance of the truth or falsity of the information; or

**(3)** acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b) (2006).

Congress rejected requiring a specific intent to defraud under the False Claims Act.  See 31 U.S.C. § 3729(b).  Instead, Congress adopted a knowing standard, defined as "actual knowledge of the falsity," acting in "deliberate ignorance of the truth or falsity," or "acting in reckless disregard of the truth or falsity." Id.; see also Ulysses, Inc. v. United States, 110 Fed. Cl. at 642. The standard was designed to address "the problem of the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know." See S. Rep. No. 99-345, at 21 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5286.  Thus, the False Claims Act covers not just those who set out to defraud the government, but also those who ignore obvious deficiencies in a claim.

Therefore, the critical issue before the court is whether plaintiff had "knowledge," as defined by the False Claims Act, to include reckless disregard, that the claims plaintiff submitted to the government were false or fraudulent.  To prove a violation of the False Claims Act, the government can, but need not, prove that a party intended to deceive the government. See United States v. TDC Mgmt. Corp., 24 F.3d 292, 298 (D.C. Cir. 1994); see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1340 ("no proof of specific intent to defraud is required." (quoting 31 U.S.C. § 3729(b))); Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 524. The False Claims Act requires only that the government prove that a party knowingly, as defined under the False Claims Act, submitted a claim with reckless disregard to the truth or falsity of the information. See 31 U.S.C. § 3729(b); United States v. TDC Mgmt. Corp., 24 F.3d at 298; see also Ulysses Inc. v. United States, 117 Fed. Cl. 772, 781 (2014); Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States, 116 Fed. Cl. at 379 (quoting 31 U.S.C. § 3729(b)) ("while the FCA does not require proof of specific intent to defraud, it does require that the person or entity acted with knowledge. The statute defines "knowing" or "knowingly" to "mean that a person" "with actual knowledge of the information" either "acts in deliberate ignorance of the truth or falsity of the information" or "acts in reckless disregard of the truth or falsity of the information."); Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 n.2 (2008) ("Section 3729(b) provides that the terms 'knowing' and 'knowingly' 'mean that a person, with respect to information-1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.'"), superseded in unrelated part by statute, Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4, 123 Stat. 1617, 1621. The United States Court of Appeals for the Federal Circuit has noted that, "[f]or purposes of the FCA [False Claims Act], a contractor is deemed to have known that a claim it submitted was false if it had actual knowledge of the falsity of the claim or if it

acted in deliberate ignorance or reckless disregard of the truth or falsity of the claim." Comm. Contractors, Inc. v. United States, 154 F.3d at 1362.

Reckless disregard has been characterized as "'an extreme version of ordinary negligence,'" United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 530 F.3d 980, 983 (D.C. Cir.) (quoting United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997)), reh'g en banc denied (D.C. Cir. 2008), or "aggravated gross negligence" such as when the party "deliberately avoided learning the truth." United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1274-75 (D.C. Cir. 2010); see also United States ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 945 n.12 (10th Cir. 2008); Trafalgar House Constr., Inc. v. United States, 77 Fed. Cl. 48, 53 (2007) ("'Reckless disregard' has been defined as an "'aggravated form of gross negligence.'" (quoting UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 792 n.15 (1999) (quoting United States ex rel. Aakhus v. Dyncorp, Inc., 136 F.3d 676, 682 (10th Cir. 1998)), aff'd, 249 F.3d 1337 (Fed. Cir. 2001))), aff'd, 274 F. App'x 898 (Fed. Cir. 2008); Riley Constr. Co. v. United States, 65 Fed. Cl. 264, 270 (2005) ("The legal standard that may apply is 'reckless disregard.' This has been defined in the case law as something more than gross negligence, or 'gross negligence plus.'").[79]

A failure to make a minimal examination of records can constitute deliberate ignorance or reckless disregard, and a contractor that deliberately ignores false information submitted as part of a claim can be found liable under the False Claims Act. See United States v. TDC Mgmt. Corp., 24 F.3d at 298; see also Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23 (An applicant who submitted estimates of the quantities of the materials billed to the government prepared by his workmen, but substantially overbilled due to misrepresentation, resulted in a finding of "extreme negligence" for which he was found liable under the False Claims Act.). The court in Miller v. United States noted that a contractor cannot be saved by relying on local government officials in preparing its claims. See Miller v. United States, 213 Ct. Cl. at 70, 550 F.2d at 23. The

---

[79] Black's Law Dictionary defines gross negligence as:

A lack of even slight diligence or care. The difference between *gross negligence* and *ordinary negligence* is traditionally said to be the omission of even such diligence as habitually careless and inattentive people do actually exercise in avoiding danger to their own person or property. . . . A conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages. — Also termed *reckless negligence; wanton negligence; willful negligence; willful and wanton negligence; hazardous negligence; magna neglegentia*. . . . . "Negligence is gross if the precautions to be taken against harm are very simple, such as persons who are but poorly endowed with physical and mental capacities can easily take. . . . As it originally appeared, this was very great negligence, or the want of even slight or scant care.  It has been described as a failure to exercise even that care which a careless person would use."

Black's Law Dictionary 1197 (10th ed. 2014) (emphasis in original) (citations omitted).

court found the applicant in <u>Miller</u> had the responsibility to ensure the claims were accurate, and the contractor had in fact signed the claims, "evidencing his agreement to the figures it contained." <u>Id.</u>; <u>see also Riley Constr. Co. v. United States</u>, 65 Fed. Cl. at 268-69 (The Senate Committee Report on the False Claims Act states that "'those doing business with the Government have an obligation to make a limited inquiry to ensure that the claims they submit are accurate.'" (citation omitted)). When the claims are prepared in a "sloppy or unsupervised fashion" and it results in overcharging the government, there is reckless disregard. <u>See</u> 132 Cong. Rec. H9, 382-03 (1986) (statement of Rep. Berman, as sponsor of the 1986 amendment to the False Claims Act). Although a person must make at least a minimal examination of the records, the examination need be only "reasonable and prudent under the circumstances." <u>United States v. Bourseau</u>, 531 F.3d 1159, 1168 (9th Cir. 2008) (quoting S. Rep. No. 99-345, at 21), <u>cert. denied</u>, 555 U.S. 1212 (2009). Courts have found reckless disregard when a plaintiff failed to review claims that either he or another person prepared before submitting them. <u>See Miller v. United States</u>, 213 Ct. Cl. at 70, 550 F.2d at 23; <u>United States v. Krizek</u>, 111 F.3d at 942. In <u>Krizek</u>, the United States Court of Appeals for the D.C. Circuit upheld the district court's conclusion that plaintiff acted with reckless disregard in failing "utterly" to review the false submissions made on his behalf in violation of the False Claims Act when, plaintiff doctor let his wife complete the submission of claims to the local Medicare carrier; the wife did not attempt to establish how much time was actually spent with each patient; and the doctor did not review the submission. <u>See United States v. Krizek</u>, 111 F.3d at 942. Indeed, a person generally cannot escape liability by claiming to have relied on others in preparing the claim. <u>See id.</u>; <u>see also Miller v. United States</u>, 213 Ct. Cl. at 70, 550 F.2d at 23. <u>But see Riley Constr. Co. v. United States</u>, 65 Fed. Cl. at 270 ("Mr. Riley would have had reason to rely on Douglas, the former Navy ROIC, as an expert in submitting claims. Such reliance, if it exists, may be relevant in considering the various counterclaims.").

In <u>Daewoo</u>, the Federal Circuit rejected the plaintiff's argument that a claim can only be fraudulent it if rests upon false facts, not if it rests upon a baseless calculation, stating: "It is well established that a baseless certified claim is a fraudulent claim." <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d at 1339. "'[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the "claim for payment."'" <u>See Ulysses, Inc. v. United States</u>, 110 Fed. Cl. at 642 (quoting <u>United States v. Rivera</u>, 55 F.3d 703, 709 (1st Cir. 1995)) (alteration in original). "[I]n deciding whether a given false statement is a claim or demand for payment, a court should look to see if, within the payment scheme, the statement has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." <u>United States v. Rivera</u>, 55 F.3d at 709. In order to determine the number of false claims a contractor submitted to the government, the United States Supreme Court has stated: "A correct application of the statutory language requires . . . that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." <u>United States v. Bornstein</u>, 423 U.S. 303, 312 (1976).[80] The Supreme Court's

---

[80] <u>United States v. Bornstein</u> analyzed an earlier version of the False Claims Act, but the guidance of the United State Supreme Court remains relevant to the court's interpretation

guidance in United States v. Bornstein has been interpreted to require courts to ask: "'With what act did the defendant submit his demand or request and how many such acts were there?'" United States v. Krizek, 111 F.3d at 939. When a fraudulent claim consists of multiple components, the submission of an aggregate claim, rather than its individual components, is the act that creates liability under the False Claims Act. See Miller v. United States, 213 Ct. Cl. at 71–72, 550 F.2d at 23–24 (rejecting an argument that a contractor had asserted sixteen false claims under an earlier version of the False Claims Act, "eleven based on invoices used in calculating the monthly billings plus five, one for each of the monthly consolidated billings," because "the invoices are like tally sheets used in calculating a final figure to present to the Government; they are not the claim itself"); see also United States v. Woodbury, 359 F.2d 370, 378 (9th Cir. 1966) (rejecting the argument that a penalty could be assessed under an earlier version of the False Claims Act for each document that was attached to fraudulent applications for payment).

An innocent mistake or mere negligence, such as a math error or flawed reasoning, may be excused. See United States v. Sci. Applications Int'l Corp., 626 F.3d at 1274 (citing S. Rep. No. 99-345, at 7); United States ex rel. Fowler v. Caremark RX, L.L.C., 496 F.3d 730, 742 (7th Cir.) (citations omitted), reh'g and suggestion for reh'g en banc denied (7th Cir. 2007), cert. denied, 552 U.S. 1183 (2008), overruled on other grounds by Glaser v. Wound Care Consultants, Inc., 570 F.3d 907 (7th Cir. 2009); Riley Constr. Co. v. United States, 65 Fed. Cl. at 269 (noting that the False Claims Act was not intended to punish honest mistakes and mere negligence (citing S. Rep. No. 99-345 at 7)); see also United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999).

Thus, under the False Claims Act, there must be a showing of more than an innocent mistake or mere negligence. See Ulysses, Inc. v. United States, 117 Fed. Cl. at 780 (quoting UMC Elec. Co. v. United States, 43 Fed. Cl. at 795 ("'Under the False Claims Act there must be a showing by the government of more than innocent mistake or mere negligence.'")); Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States, 116 Fed. Cl. at 379; Riley Constr. Co. v. United States, 65 Fed. Cl. at 269. The government is required to show the knowing presentation by the contractor of information known to be "false or fraudulent." See Young-Montenay, Inc. v. United States, 15 F.3d at 1043. The government has "the burden to allege and prove that the statements were false under any reasonable interpretation." United States v. Adler, 623 F.2d 1287, 1289 (8th Cir. 1980). The burden of proof on the government in this regard is by a preponderance of the evidence. See Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d. at 1340 (citing 31 U.S.C. § 3731(c); Comm. Contractors, Inc. v. United States, 154 F.3d at 1362).[81]

---

of amended versions of the False Claims Act. See United States v. Krizek, 111 F.3d 942, 939 n.1 (D.C. Cir. 1997).

[81] As noted above, the preponderance of the evidence standard which applies to proof under the False Claims Act is a less rigorous standard than the clear and convincing standard of proof applied under the Special Plea in Fraud statute. See UMC Elecs. Co. v. United States, 249 F.3d at 1338-39.

As indicated in <u>Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States</u>:

> To establish [plaintiff's] liability under the FCA, the government must prove by a preponderance of the evidence, <u>Daewoo</u>, 557 F.3d at 1340, that "(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; [and] (3) the contractor knew the claim was false or fraudulent." <u>Young–Montenay, Inc. v. United States</u>, 15 F.3d 1040, 1043 (Fed. Cir. 1994). The government has "the burden to allege and prove that the statements were false under any reasonable interpretation." <u>United States v. Adler</u>, 623 F.2d 1287, 1289 (8th Cir. 1980).

<u>Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States</u>, 116 Fed. Cl. at 379 (footnote omitted); <u>see</u> <u>also</u> <u>Ulysses, Inc. v. United States</u>, 110 Fed. Cl. at 641 ("The Government must prove the elements of an FCA claim by a preponderance of the evidence.").

"To bring [a] FCA [False Claims Act] claim, the Government is not tasked to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages." <u>Veridyne Corp. v. United States</u>, 105 Fed. Cl. at 808; <u>see</u> <u>also</u> <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d at 1341 ("The Court of Federal Claims did not err in concluding that Daewoo violated the False Claims Act. Because the court did not find that the government incurred damages from Daewoo's false claim, the court properly assessed only the statutory penalty."); <u>see</u> <u>also</u> <u>Comm. Contractors, Inc. v. United States</u>, 154 F.3d at 1371-72 ("[A] contractor can be held liable for submitting a false claim even if the goods it delivered are of the same quality as the goods specified in the contract, provided that the contractor acted with the requisite knowledge that the corresponding claim was false.  But while the contractor may be liable in that situation, it is liable only for FCA penalties, not damages. . . .  In order to recover FCA damages, the government must prove that it sustained an actual loss as a result of the contractor's false or fraudulent claim." (citations omitted)); <u>Alcatec, LLC v. United States</u>, 100 Fed. Cl. at 526 ("To bring an FCA claim, the Government does not have to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages." (citing <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d at 1341; <u>Young–Montenay, Inc. v. United States</u>, 15 F.3d at 1043 (absent proof of harm, the government can recover penalties, but not damages))); <u>AEY, Inc. v. United States</u>, 114 Fed. Cl. at 633 n.17 ("In essence, Section 3729 imposes a penalty on a person who knowingly presents a false claim wholly apart from proof of any specific damages.").

In <u>Rex Trailer Co. v. United States</u>, the United States Supreme Court stated, "there is no requirement, statutory or judicial, that specific damages be shown, and this was recognized by the Court in <u>Marcus</u>." <u>Rex Trailer Co. v. United States</u>, 350 U.S. 148, 152-53 (1956). In <u>Rex Trailer</u>, the United States Supreme Court summarized <u>United States ex. rel. Marcus v. Hess</u>, 41 F. Supp. 197, 218 (W.D. Pa. 1941), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>,

127 F.2d 233 (3d Cir.), cert. granted, 317 U.S. 613 (1942), and rev'd on other grounds, 317 U.S. 537, and reh'g denied, 318 U.S. 799 (1943), superseded by statute on other grounds as recognized in Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, reh'g denied, 130 S. Ct. 3351 (2010), by noting that, in the 1940s, the United States District Court for the Western District of Pennsylvania concluded that plaintiff was liable for the statutory penalty for submission of a false claim, but not damages, as damages were not proven. See Rex Trailer Co. v. United States, 350 U.S. at 152-53. Although the Supreme Court's discussion in Rex Trailer focused on the Surplus Property Act, the Supreme Court referred to Marcus, which involved the False Claims Act, in determining that proof of damages was not necessarily required in the assessment of a civil remedy or statutory penalty. See id. at 153 n.5 ("On several of the projects involved in the Marcus case, fraud was discovered by the Government in time for payments to be withheld. At trial [on the False Claims Act] in the District Court defendants urged that there could be no recovery of a penalty or forfeiture in these instances in which no actual damages could be shown. The District Court held that failure to show actual damages in these instances would not preclude recovery under the statute. United States ex rel. Marcus v. Hess, 41 F. Supp. 197, 218. The judgment of the District Court [in Marcus] was affirmed here. See United States v. Rohleder, 157 F.2d 126, 129 [(3d Cir. 1946)].").

Defendant initially argues:

> [W]e established at trial that the entirety of Horn's certified claim should be forfeited under the Special Plea in Fraud. In so doing, we established that, for the same reasons, Horn is liable to the Government for damages under the CDA's Anti-Fraud provision, 41 U.S.C. §7103(c)(2), and the FCA, 31 U.S.C. § 3729. The evidence at trial is more than sufficient to prove, by a preponderance of the evidence, that Horn, with actual knowledge, falsely depicted its fabricated numbers as "actual costs," made false statements concerning its hourly rate, overhead, and level of supporting documentation, and did so with the intent to deceive or mislead the Government. *Commercial Contractors*, 154 F.3d at 1362. Moreover, it is clear, by far more than a preponderance of the evidence, *id.*, that Horn acting again with actual knowledge of the falsity of the misstatements contained in its certified claim, presented a false or fraudulent certified claim for payment or approval, within the meaning of the FCA. See 31 U.S.C. §§ 3729, 3731. As such, in addition to forfeiting its claim under the Special Plea in Fraud, Horn is liable to the Government for penalties under the FCA, and for the unsupported part of its certified claim and the costs of review under the CDA.

As determined above, the court concluded that plaintiff has not violated the Special Plea in Fraud statute, nor has defendant demonstrated fraud by a clear and convincing standard, nor that the use of the phrase "actual costs incurred" in and of itself did not evidence fraud. Nor does the court believe the phrase "actual costs incurred" demonstrates fraud under the preponderance of the evidence standard of the False

Claims Act, which as noted by the United States Court of Appeals for the Federal Circuit in Am-Pro, is a lower standard of proof than the clear and convincing one. See Am-Pro Prot. Agency, Inc. v. United States, 281 F.3d at 1240. The court shares plaintiff's concern that, "[a]lthough NASA's brief states legal principles for each counterclaim in a separate 'law' section, it does not apply the facts of this case to each separate claim and each element of the claims. Instead, NASA conflates the three claims into a one-size-fits-all analysis."

Alternatively, defendant argues that "should the Court not credit the Government's evidence of the company's specific intent and attempt to defraud, Horn is still liable at a minimum for a violation of the FCA based upon a finding that it certified the claim in reckless disregard for the document's truth or falsity." Defendant alleges that "there is no serious question that Horn's use of the phrase 'actual cost' to describe costs that were nothing of the kind, constitutes a statement that is, *at a minimum*, made with reckless disregard under the FCA." (emphasis in original). In response, plaintiff states that "Horn did not violate the False Claims Act," and argues that "[t]he Government relies on the false assumption that the Certified Claim should be judged as if it was a submission for payment pursuant to a cost-type contract. To do so would simply ignore reality. In reality, Horn's Certified Claim intentionally reads like a complaint in a civil action for breach of contract that asserts three alternative damages theories." The court is persuaded that given the multiple damage theories Horn & Associates included in the certified claim, NASA should have been aware of the challenges in submitting a breach claim in a contingency contract for recovery audit services in which NASA allegedly failed to process the overpayments identified. NASA should have been able to understand the plaintiff's difficultly or the inability to assert or document supporting information with certainty. In fact the evidence in the record and statements by the defendant demonstrate NASA could not do so either. Moreover, with the benefit of the alternative methodology in plaintiff's complaint, the Department of Justice should have been aware of the challenges facing the plaintiff in crafting its damages, and should have taken that into account before filing its fraud counterclaims.

Plaintiff believes that "[t]he Government's FCA counterclaims are an attempt to expand dangerously the FCA from its regular and intended context to apply also to good-faith statements of legal theories by parties aggrieved by the Government's breach of its contractual obligations." Plaintiff asserts, "NASA has not proved, by a preponderance of the evidence, under any reasonable interpretation, that Horn knowingly made false or fraudulent statements in its Certified Claim." The government responds that "Horn's claim that its demand for $7,028,200.96 should be considered a 'legal theory of damages' that cannot give rise to liability for fraud is absurd." Defendant argues:

> Horn was not asserting a "legal theory of damages" when it attached hundreds of pages to its certified claim that purported to document hours allegedly worked by its subcontractors, represented those hours as "time devoted" to the project, and stated that "[s]upporting *all this information* are expense records and time diaries."

. . .

In a similar vein, Horn was not asserting a "legal theory of damages" when it fabricated an hourly rate structure that it as a company did not have, and that was either inexplicable or completely contrary to existing source documentation. Finally, Horn was also not asserting a "legal theory of damages" when it placed an overhead charge on the amounts claimed in the certified claim although it had no overhead expenses associated with its subcontractors, the surcharge was duplicative of other amounts in the claim, and there was no basis in any source for the percentage claimed.

(emphasis in original).

Plaintiff is correct that statements of legal theories do not constitute "false claims." As noted by the court in Tyger Construction Co. v. United States, 28 Fed. Cl. 34, 56 (1993), "[a]ttaching FCA liability to expressions of legal opinion would have an impermissibly stifling effect on the legitimate presentation of claims. Indication is absent that Congress intended to penalize good faith disputes over contract liability." Id. Moreover, as the Court of Federal Claims noted in Ulysses, Inc. v. United States, 110 Fed. Cl. 618, the government's False Claims Act counterclaim failed because the defendant failed to prove that plaintiff's underlying CDA claim was factually false. See id. at 645. The Ulysses court explained: "Rather, Plaintiff asserted a different interpretation of the requirements of the First Purchase Order than the Government. So too, Ulysses argued in its claim that by accepting its 112 Parts as components of its 100 Parts, the Government had waived the approved source requirement in the past—a legal position not a factual representation," with the Ulysses court determining that "Plaintiff's interpretation was in essence a legal call about what would meet the requirements of the Purchase Orders Plaintiff informed the Government of its legal position in writing several times." Id.

Despite the foregoing, and even though the undersigned stated in UMC Electronics Co. v. United States, 43 Fed. Cl. at 794, "[a] contractor, upon submission of a claim, who is aware of and takes advantage of a disputed legal issue does not knowingly commit fraud," the undersigned recognized in UMC Electronics that "'[c]ontractors in a False Claims Act case, such as UMC in the instant action, not infrequently contend that their claims were not false because an interpretation of relevant regulations permits their claims," and it "is a matter of law for the court to interpret a relevant statutory or regulatory requirement." Id. Therefore, it is insufficient for plaintiff merely to suggest that its entire claim is a legal theory and, therefore, impossible to be a false claim. Indeed, although as noted above, plaintiff believes that the "Government's FCA counterclaims are an attempt to expand dangerously the FCA from its regular and intended context to apply also to good-faith statements of legal theories by parties aggrieved by the Government's breach of its contractual obligations," it would be a dangerous precedent to allow a contractor to present its certified claim under the guise of a "legal theory," and, thereafter, not to be subject to a False Claims Act counterclaim by the government in all circumstances. It would have been absurd, for example, for the project manager in Daweoo, Mr. Kim, who

had specifically disavowed the truth of the claim during his trial testimony to have been able to argue that the baseless claim was, instead, a legal theory his company was pursing. See Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 585. Therefore, although recognizing plaintiff's argument that the claim was a legal theory, the court looks to the substance of plaintiff's certified claim to see if plaintiff violated the False Claims Act.

The government argues that Horn & Associates acted with "reckless disregard" in the preparation and submission of its certified claim in violation of the False Claims Act. Defendant points to three specific areas which the government believes supports its counterclaim: the hourly rates assigned by Horn & Associates, the records of Horn & Associates' employees and subcontractors referred to in the certified claim, and the overhead rate chosen by Horn & Associates and included in its certified claim.

In its certified claim, Horn & Associates stated that "Horn has reviewed its own records to determine time and expenses devoted on this contract by Horn staff. The sum of all such time and expenses plus an overhead and profit factor of 18% is $7,028,200.96." For support, in the certified claim, Horn provided summaries and records for Horn & Associates' personnel for both years of the audit, 2005 and 2006 which were included as exhibit 42 to the certified claim, titled: "Audit Cost Index,"[82] which listed hourly rates for both Horn & Associates employees and the subcontractor personnel. For example, for the relevant employees and subcontractors involved in the NASA contract for 2006, the certified claim provides the following hourly rates:

| Employee/Subcontractor | 2006 Hourly Rate |
| --- | --- |
| Tom Horn | $300.00 |
| Larry Farrar | $300.00 |
| Mike Lowery | $300.00 |
| James "Chip" Edgerton (subcontractor) | $275.00 |
| Dan Lizana (subcontractor) | $175.00 |
| Steve Smith (subcontractor) | $175.00 |
| Tom Hott (subcontractor) | $250.00 |
| Beth Hott (subcontractor) | $175.00 |
| Ivan Sherman (subcontractor) | $200.00 |

---

[82] Although the NASA Contract was awarded on December 23, 2004, and the period of performance began on December 23, 2004, there is no evidence of any work being done pursuant to the NASA Contract until 2005.

| Maggie Baumbach (subcontractor) | $200.00 |
| Marie Beckey (subcontractor) | $200.00 |
| Scott Beckey (subcontractor) | $200.00 |

Defendant claims that "[n]one of the 'hourly rates' that appear in the certified claim represent actual hourly rates charged either by Horn or its subcontractors during the NASA recovery audit," and argues, "[i]nstead, these 'hourly rates' are wholly contrived by Horn, yet presented by Horn in the certified claim without any suggestion of their true origin."[83] Defendant stresses that

> in addition to intentionally neglecting to evaluate the rate information in its possession, Horn demonstrated aggravated negligence in formulating hourly rates in a manner it simply did not, and could not explain, even if one puts to one side the fact that the ostensible source documentation that Horn used these hourly rates are the rates of sophisticated accounting firms, not small auditing firms or recovery auditors.

Defendant also argues that "Horn crafted the certified claim to create the impression that the claim was based on Horn's books and records by detailing costs to the penny, using a wide variety of hourly rates, and spelling out time to the hour." Plaintiff responds that defendant's statement of spelling out time to the hour, "is nothing more than an attempt by Horn to be transparent and provide NASA with the bases for its third measure of damages." Plaintiff also responds that "Horn never suggested that the third measure of damages was based on Horn's books and records. Indeed, the term 'books and records' does not appear in the Certified Claim. Rather, the Certified Claim expressly states that the documents used to 'construct' the third measure of damages were 'expense records and time diaries.'" Plaintiff's protests to the contrary, the court believes the difference between "books and records" and "expense records and time diaries," is a semantical one. If the only question before this court was could plaintiff be found liable under the False Claims Act for the using the phrase "expense records and time diaries," instead of "books and records" the court would conclude plaintiff could. The court also notes, within the same paragraph in the certified claim of the phrase "expense records and time diaries," plaintiff indicated that: "Horn has reviewed its own records to determine

---

[83] As noted in the Special Plea in Fraud section of this opinion, plaintiff responds in its post-trial brief to defendant's claim in this regard as a question and answer:

> Did Horn not actually pay any of its members, employees, or subcontractor the billing rates shown in the third measure of damages? Of course Horn did not pay those rates, as everyone was working on a contingency basis and the rates were obviously billing rates, not cost rates. These were not revelations; they were facts that were never in dispute.

time and expenses devoted on this contract by Horn staff." Moreover, although plaintiff claims the submission was an attempt to be transparent, the court understands why NASA was skeptical of records that appears to be precise to the penny, but were also labeled as reconstructions.

Plaintiff further claims that:

A cursory review of the third measure of damages shows that the value of the hours was generally a whole number, reflecting the estimate of the number of hours worked multiplied by a specific billing rate, the rates being set in increments of $25/hr. The odd numbers that give rise to the Government's "detailed costs to the penny" argument come from out-of-pocket expenses that Horn actually did spend.

The court notes, however, the "Audit Cost Summary," attached as an exhibit to the certified claim, included the expenses of Horn & Associates employees and subcontractors. For example, the expense summary lists the expenses of subcontractor Brock Young for 2005 as $633,490.47, and lists the expenses of subcontractor James "Chip" Edgerton for 2005 as $286,626.05. The summary included expenses for supplies, and travel costs in addition to the hourly rate. Therefore, the court agrees with defendant that it is not obvious from the certified claim that plaintiff intended to offer an "estimate of the number of hours worked multiplied by a specific billing rate."

As noted above, Tom Horn sent out a "NASA Recovery Audit Expense Summary" to everyone associated with the NASA recovery audit, from the Horn & Associate principals, to Horn & Associate employees, to subcontractors to get the "summary of the time devoted to our project and the expenses on our contract," but Mr. Farrar testified, the subcontractors "were instructed not to" fill out the hourly rate. Tom Horn testified that Horn & Associates had decided to assign rates "[b]ecause we just felt like we -- Larry Farrar, Mike Lowry and myself -- could determine those rates better than anybody else," and that "[w]e were going to assign the hours, not them."

Mr. Farrar, however, admitted during his testimony that, "we had no basis for hourly rates. We had never billed anybody on an hourly rate.  We didn't know what our hourly -- what our work was worth on an hourly basis because it was just then kind of put in as free to operate that way." Mr. Farrar, indicated that "our subcontractors worked on a contingency basis, so they had no idea what an appropriate [sic] should or would be.  So we [the three principals of Horn & Associates] did a lot of debating when we put the certified claim together about how would we -- how do we come up with a rate that makes sense to use in our third remedy?"  Mr. Farrar indicated that:

[W]e decided that well, the best way to try to determine a reasonable rate would be to go out and look at the government's own website, where they actually have bids from other audit firms, and they publish that on their website. And we could actually go out and see what kid [sic] of rates audit firms were charging to perform audit work.

Mr. Farrar continued, stating, "we went out to the GSA website. We pulled examples of audit firms that provided hourly rates for services. We analyzed that and we assigned our own rates to our certified claim based on what we thought should be -- would be about right, based on what our research showed."[84]

Tom Horn's testimony was consistent with the testimony offered by Mr. Farrar. For example, on cross-examination, Tom Horn stated that in trying to determine an hourly rate, because "recovery auditors didn't post hours because we all worked on a contingency audit basis," "[w]e went out just to the GSA schedule and pulled down just a number of them." Tom Horn continued:

> Well, the three of us, the three principals, we had a discussion about this, and I went out to the GSA schedule and we first looked at the 520-9, which was the recovery audit schedule of people that were able to do recovery auditing, and we looked at the list and there was only a couple firms at that particular point in time that we noticed on there that did governmental recovery auditing, and those firms did not have an hourly rate on them. They were all contingency-based like us, and we didn't have an hourly rate on our GSA schedule either.

Notably, Mr. Edgerton, one of the Horn & Associates subcontractors who worked on the recovery audit at Marshall, also reviewed the GSA scale and, despite instructions not to, selected an hourly rate of $155.00 "based on a 2000 rate that the government was allowing for senior auditors, different classifications in the year 2000." Mr. Edgerton indicated that he placed an hourly rate "out of curiosity to see what the time was coming, so since we weren't getting paid from NASA, what it would have been if we hadn't gotten a contract that wasn't a contingency contract." Mr. Edgerton's rate of $155.00 was significantly less than the rate of $275.00 submitted by Horn & Associates. Defendant also identified Mr. Lizana, a Horn & Associates subcontractor, who identified an hourly rate of $62.84, but was listed at $175.00 by Horn & Associates.

Defendant observes that Horn & Associates "never proposed an hourly rate that was *less* than real world information would suggest, belying any claim by the contractor that its baseless hourly rates were truly the product of happenstance or innocent mistake." (emphasis in original). Defendant also claims that "the trial record is clear that, as it formulated its 'hourly rates,' Horn *intentionally ignored*, obvious datapoints that undercut its own notion of what those rates should be." (emphasis in original).

Plaintiff notes that "[w]hile the Government makes much of the fact that certain subcontractors, unprompted by Horn, suggested hourly rates and the Horn principals used rates higher than those suggested, Horn was under no obligation to use the rates suggested by its subcontractors, and Horn never claimed to the Government that it did

---

[84] The government, citing to Mr. Wai's testimony in its post-trial brief, suggests, without any other basis, that Horn & Associates had selected the comparable firms' rates because "that's what NASA is used to paying."

use rates suggested by its subcontractors." Moreover, plaintiff argues that "[t]o the extent the Government believes that Horn, if it were billing the Government on an hourly basis, would have charged lower rates than those used in the Certified Claim, this argument would be relevant only if the Government was disputing its liability for those amounts; it is not relevant for purposes of the counterclaims."   Although plaintiff believes the hourly rate plaintiff chose is irrelevant to any claim of fraud by the government, the court must review the hourly rate chosen to ensure that plaintiff did not include it without any basis, or chose a higher rate, without support, in order to negotiate a more favorable settlement with the government.

Defendant also argues that, in addition to not having support for the hourly rates chosen, plaintiff did not have the records for their subcontractors they claimed to have in the certified claim.  Defendant contends

> it was, at a minimum, extreme recklessness on Horn's part to make an affirmative representation in its certified claim that "[s]upporting *all this information* are expense records and time diaries that were used to construct the documents," when the company principals knew that the company had not, in fact, collected expense records and time diaries from its subcontractors, let alone examined them, and further knew that such documentation was unlikely to exist in the first place.

(quoting the certified claim; emphasis added by defendant; internal citation omitted).

In its certified claim, for the third measure of damages, the "Further Alternative Remedy," Horn & Associates claimed that:

> Even should NASA determine, improperly Horn believes, that the sums above are not an appropriate measure of Horn's damages, Horn is entitled to recover its actual costs and expenses incurred by Horn and its independent subcontractors. Horn has contacted each of its independent subcontractors and had them review the time they devoted and the costs they incurred. . . . The information is presented on an individual basis for each Horn member, employee or subcontractor. Further, the information is broken out on a monthly basis. Supporting all this information are expense records and time diaries that were used to construct the documents.

(internal citation omitted). Plaintiff argues that "[t]he sentence, 'Supporting all this information are expense records and time diaries that were used to construct the documents,' does not support—and actually undermines—the Government's counterclaims," claiming that "to the extent the Government attacks Horn for not having collected and reviewed all of its subcontractors' time records—and instead relying on the subcontractors to use their time records to fill in the template provided to them—such an attack cannot be the basis for liability under the counterclaims. Horn never claimed that it collected and reviewed the materials that its subcontractors used to fill out the time sheets submitted with the Certified Claim." Plaintiff is correct that the plaintiff specifically noted

in the certified claim that "Horn has contacted each of its independent subcontractors and had them review the time they devoted and the costs they incurred." The court notes, however, when the subcontractors entered an hourly rate, Horn & Associates review but chose a different amount because the principals of Horn & Associates felt they "could determine those rates better than anybody else."

Defendant, at closing argument, pointed out that in response to a question, "the documents that the subcontractors submitted to Horn and Associates, as Horn and Associates prepared the certified claim, did not include supporting documentation, correct?" Mr. Farrar testified, "[w]ell, I guess that depends on your definition of supporting documentation. We sent the templates in, which have detailed schedules attached to them to support the total ticket." Defendant also points to Tom Horn's characterization of calculating his time records, in which he indicated in an email, "I'm not sure what other time I spent on NASA as like everybody else I did not track it. I definitely need to add more time. *I guess I will wing* it by adding more hours in each month for all our conference calls, etc." (emphasis added by defendant). On cross-examination, Tom Horn explained that "the winging it was just kind of a flippant comment, but we actually did some [sic] we tried to do the best due diligence that we could with that by looking at various emails and telephone calls." Tom Horn elaborated that because it was a recovery audit for which Horn & Associates would receive a percentage of the recovery,

> we didn't track it, we tried to estimate our time, the three of us, for as I believe I stated yesterday, for emails and other calls to the NASA center, other calls to our auditors. We tried to coordinate where anybody may have had some information on their calendars that we could tie it down. And we knew that, you know, that because we were moving around and talking to all the different centers, there was no way that we tracked it other than try to estimate by emails and by phone calls.[85]

The subcontractors also acknowledged not being paid the total amounts listed on expense summaries attached to the certified claim. At trial, on cross-examination Mr. Lizana had the following exchange with government counsel:

---

[85] Indeed, the reconstruction for the Horn & Associates principals was not much more sophisticated than that of the subcontractors. Tom Horn testified that:

> [T]his particular amount pertained to us three principals where we spent time on the telephone and emails to everybody within the company or emails to NASA personnel. And we got together once we each looked at our calendars and everything and tried to determine the best we could of what our average time spent on this project was. Then we kind of got together as a group, tried to compare the three of us and come up with an amount for each week that we were spending on NASA that we didn't actually have [sic] diary for.

Q: Is it fair to say in the left hand corner of the page underneath that table there's the notation "Recovery auditor GSA schedule?"

A: Yes, I see that.

Q: And in the hourly rate column, there's an hourly rate reported for you of $175. Did you supply the hourly rate information that appears in that column?

A: No.

Q: And you'll notice that there's a total for you of $255,556.54, correct?

. . .

So just to clarify, you did not receive $255,556.84[86] then, right?

A: I can assure you I have not.

As noted above, when Mr. Hott was asked on cross-examination if he was "actually paid $682,900.96," by Horn & Associates, Mr. Hott replied: "Sure wish I had been."[87]

Defendant further takes issue with the overhead rate included in the certified claim. In the certified claim, Horn & Associates identified an amount of overhead at $912,948.00, with an overhead rate of eighteen percent. Defendant argues that:

[I]t is clear that Horn had no overhead that could be claimed, and no consistent methodology for making such a calculation. To make a claim for almost a million dollars of overhead under those circumstances is patently unreasonable, and, in combination with Horn's other lapses of professional

---

[86] Defendant's counsel misspoke in identifying the amount as $255,556.84, the summary reflects an amount of $255,556.54.

[87] Mr. Edgerton had a similar exchange on cross-examination:

Q: And this is a similar expense summary to the one we just looked at, but this is for the year 2006.

A: Correct.

Q: And you see a total at the bottom of $141,396.45? Do you see that?
A: Yes, I do.

Q: You were not paid that amount for your work on the NASA audit in 2006, were you?

A: I was not.

judgment, clearly meets, at a minimum, the reckless disregard standard of the FCA.

Defendant claims: "To add insult to injury, Horn then augmented amounts claimed for hours and rates by a charge of 'Overhead at 18%' in a total amount of $912,948. At trial, Mr. Horn and Mr. Farrar were unable to offer a consistent explanation as to what this amount represented, how it was derived, and how it might be justified."[88]

As noted above, in its certified claim, Horn & Associates stated that "Horn has reviewed its own records to determine time and expenses devoted on this contract by Horn staff. The sum of all such time and expenses plus an overhead and profit factor of 18% is $7,028,200.96." At trial, Tom Horn and Mr. Farrar had differing recollections as to what constituted the overhead rate with Tom Horn indicating the overheard rate referred to "payroll taxes and benefits." Mr. Farrar, on the other hand, agreed with the government that Horn & Associates did not use the information in its own accounting system to develop its overhead rate of 18 percent.  Mr. Farrar stated:

> Again, remember that we're a contingency audit firm so we wouldn't have the normal benefits and so forth that add to an hourly billing rate of a company that bills on an hourly basis would have that in their records. So in Horn's case we would not typically have that in our records because we're paying our auditors contingencies fees, we're not providing them with benefits and so forth. So again, we're trying to recapture something here that is very outside the normal way we do business.

Defendant contends that, because Mr. Farrar could not identify what precisely went into the overate rate, "[t]he 18-percent "overhead rate" is effectively a surcharge for services that artificially inflates the amount sought in the claim because, if the hourly rates in the certified claim are billing rates, as Horn & Associates claimed at trial, such rates already have an overhead component built in," citing Tom Horn's testimony that "[a] billing rate is something greater than cost. It would recover cost as well as overhead and profit."

At trial, Tom Horn admitted that the hourly rates prepared for the certified claim "included not only the rate but a [sic] overhead factor and a profit margin factor as well." Tom Horn, however, did not elaborate on the necessity of an overhead rate for plaintiff's

---

[61] Defendant also claims that "[t]he Government's expert examined Horn's books and records and could not develop an 18-percent overhead rate based on the books and records, leading to the unavoidable conclusion that, contrary to Mr. Horn's assertions, that amount was unsubstantiated." The defendant's reliance on Mr. Wright is misplaced as the court indicated at the closing of testimony, although more relevant to breach issues, "Mr. Wright's testimony was all over the place," and the court was troubled by the "lack of clarity" in his testimony.

subcontractors.[89] When discussing the pro forma[90] he prepared, Tom Horn, clarified that "what we were submitting in the certified claim was the value of our time and expenses, benefits, and profit. So that had some profit built into it back at that point in preparing the certified claim." Tom Horn went to explain that "[t]his, we were just really, it was just a ballpark estimate maybe of what we would have paid out. We never paid this out so it was nothing more than coming up with a pro forma to see if the profit was, you know, whether we would have a profit that would be excessive or not." Plaintiff defends the amount for overhead, even if inconsistent among its management team, as a result of trying to capture a figure for damages when Horn & Associates had been expecting payment on a contingency basis. As plaintiff notes, "Horn had not made any actual payments to individuals, but that the amount sought included overhead, representing what Horn would have been paid if the Contract had been on an hourly rate, based on Horn's best *estimates*," (emphasis in original) and no breach had occurred as alleged by plaintiff. Plaintiff argues, as testified to by Mr. Farrar, the identification of the amount of overhead in the claim was to assist the government in evaluating the claim. Mr. Farrar emphasized that Horn & Associates

> attempted to come up with rates that we could use in our documentation that would, as closely as possible, reflect a reasonable hourly rate for our services that we were providing, had we provided those services on an hourly basis. And if, as you look at the schedule, you will notice that we put in the schedule, we broke out the overhead, which included benefits -- the things that you just listed, benefits and so forth. Again, we were trying to be transparent, trying to break that out so we could show it separately and there wouldn't be any question about it.

Defendant also argues that "Horn's overhead rate, which was based upon no source documentation. . . was recognized even by Horn's own expert [Ms. Wills] to be

---

[89] When asked about the overhead rate for subcontractors on cross-examination, Tom Horn indicated, "this was our understanding the way we were to do it for the third measure of damages." In response to the question: why did you conclude that you should be assessing overhead on top of the labor of independent subcontractors? Tom Horn replied: "Well, we had various discussions among ourselves. And we were presenting what the value of our debt. . . ."

[90] As discussed in more detail below, Tom Horn generated a pro forma in March 2008, after the certified claim was filed on November 20, 2007, and the Contracting Officer's decision was issued on January 25, 2008, and in response to OIG initiating an investigation on February 8, 2008 regarding Horn & Associates' certified claim. Mr. Farrar testified that the pro forma was "to see if they made sense, to see if there was something that we misstated, something that was just grossly wrong. We just started, you know, doing internal investigations of our own just to try to figure out, you know, what the heck all the discussion was about." On cross-examination, Mr. Farrar agreed with defendant's counsel that the pro forma was "a projection of billable revenue on an hourly basis to cover expense and profit."

duplicative of other amounts claimed in Horn's certified claim." Defendant further argues that "Horn's own expert recognized — and corrected for – this duplication in her expert report when she calculated Horn's avoided costs."[91]

Defendant makes an additional argument in its post-trial brief, arguing "what is at issue here is *not* merely the company's use of the wrong label to describe its damages, but a scheme to induce the Government to pay the company approximately $7 million that had no relationship at all to any damages that may have been sustained by the company in connection with its performance of the NASA recovery audit." (emphasis in original). In response, plaintiff argues that "[w]hile the Government might have been able to attack Horn based on the quality of its time records if the Government was disputing liability for the $7 million under some tort or contract theory, the Government cannot establish liability under the fraud counterclaims based on this issue." These two sentences crystalize the differences between the parties in contesting the False Claims Act counterclaims, and the fraud counterclaims more generally. The two parties view the certified claim from diametrically different positions, not only as to how the claim was prepared and presented, but also regarding the intention of the plaintiff in filing the claim in the first place. Ultimately, as the court concluded regarding the Special Plea in Fraud counterclaim, the court understands plaintiff to not be attempting to perpetrate a fraud on the government.

With regard to the False Claims Act counterclaims, the defendant has not met its burden of proving a false statement or a reckless one. As emphasized throughout this opinion the NASA Contract was "a contingency-based contract," which only contemplated payment to Horn & Associates following any successful recovery by NASA after Horn & Associates had completed its work to identify the overpayments to the agency for collection. The 13.5 percent contingency fee provision in the contract did not require Horn & Associates to document its hours, expenses or billing rates, nor was there such a requirement in the NASA Contract. Tom Horn explained, the NASA Contract "didn't require us in any part of the contract to maintain our time and expense records." As the drafter of the NASA Contract, NASA was, or should have been, aware that there was no such requirement in the NASA Contract. Moreover, in its certified claim, Horn & Associates indicated to NASA that the records were reconstructions. Plaintiff's counsel's argument that "Horn never claimed to the Government that it did use rates suggested by its subcontractors," could be difficult to understand when plaintiff provided hourly rates and documentation, as well as calculation of the hours worked times the hourly rate to arrive at the expenses for a subcontractor. Exhibit 42 to the certified claim, the "Audit Cost Index," which included all the billing records, was over 600 pages and gave detailed information about the Horn & Associates employee or subcontractor, broken down by

---

[91] Although not clearly stated in the plaintiff's expert report prepared by Ms. Wills, defendant points to the following language from Ms. Wills' expert report as evidence of duplication, "because the hourly bill rates underlying the calculation of the $7,028,200.96 per Exhibit 2 are not hourly cost rates, I developed an estimate of the hourly cost rate for each individual which excluded the other direct costs and applied overhead of 18% to those costs. These costs rates reflect a reduction for the 18% overhead included in the calculated hourly rate, as well as a reduction for profit included in the hourly rates."

hours, tasks, travel, and expenses, among other information. It is understandable how the government believed when first reviewing the information presented that actual expenses and costs of Horn & Associates personnel were being presented in the certified claim. Although the fault for offering potentially confusing information lies with plaintiff, as does inconsistent testimony at trial regarding the overhead rate, the court notes that plaintiff's previous counsel of record did no favors to Horn & Associates by suggesting, "[w]e must impress upon our independent auditors/contractors the need for their immediate and close attention to this project. It is essential that they review the records that they have and that they make a detailed estimate of their time devoted to the NASA project on a daily basis. In that regard, they should preserve what records they have that will buttress their estimate of their actual time." Plaintiff's prior counsel should have been more aware of the confusion that could be created by identifying a total of expenses as a precise figure of $7,028,200.96, and the use of the phrase "actual costs." Likewise, referring to the subcontractors' review of the time and "costs they incurred," was a poor choice of words, as the testimony demonstrated that the subcontractors had not actually billed those costs to plaintiff or kept complete records for Horn & Associates and its subcontractors, given the contingency nature of the NASA Contract.

The language in the certified claim, "[s]upporting all this information are expense records and time diaries that were used to construct the documents," does not constitute recklessness on the part of Horn & Associates or deliberate ignorance of the truth. Even if the wrong choice of words was included by Horn & Associates, the court does not conclude that the reference to the information supporting the certified claim is sufficient to trigger liability under the False Claims Act. Nor can the court determine that Horn & Associates knowingly submitted false information as part of its claims in the context of the contract at issue. The government knew the NASA Contract was a contingency contract and that payment to Horn & Associates and its subcontractors had been relativity minimal. Although, plaintiff's attempts to use the GSA schedule or other models may not have been supported, NASA officials knew the context in which the models and calculations were offered by Horn in furtherance of the alternative claims. The use of the alternative theories by plaintiff suggests uncertainty existed during the plaintiff's preparation of the certified claim, and its calculation of costs. Although typically in breach allegation cases expenses and hourly rates and overhead are submitted in support, the nature of the contingency contract in a recovery audit context added a level of difficult for plaintiff as to how to submit a claim.

Nor should it be said that the choice of rates chosen by Horn & Associates represents a false claim. Although the testimony by Tom Horn and Mr. Farrar did not offer much clarification, as the Horn & Associates principals testified that they "went out just to the GSA schedule and pulled down just a number of them," the court is sympathetic to challenges faced by plaintiff to try to establish its breach of contract claim and figure out how to create an hourly basis for compensation for its principals and its subcontractors in a case in which the plaintiff had had exclusively worked on a contingency basis. Unfortunately, the certified claim includes limited explanation for how Horn & Associates arrived at the hourly rates chosen. Perhaps if Horn & Associates had included more information about the process for calculating its certified claim, as well as better

distinguishing any amounts that had not actually been paid, instead of submitting 600+ pages of reconstructed records, the confusion as to the sincerity of the approach taken by Horn & Associates would have been questioned less by NASA officials in this contingency contract situation.

Least supported, and most concerning to the court, is the inconsistent explanation for the overhead rate. The testimony of Tom Horn and Mr. Farrar demonstrates the inconsistency of calculating an overhead rate, and whether or not overhead was part of the already determined hourly rate for its employees. Nonetheless, as with the billing rates, the court recognizes the challenges to plaintiff when attempting to calculate an overheard rate based on what the company would have been paid, if paid on an hourly rate, instead of the contingency rate contemplated by both parties and the contract. Although defendant has not demonstrated from the testimony at trial or the records before the court that the overhead rate submitted was clearly false or duplicative, and certainly not intentionally or recklessly so, what amount might be compensable in the event a breach by the defendant can be demonstrated remains an open question. As previously indicated by a Judge of this court, "[t]he government has 'the burden to allege and prove that the statements were false under any reasonable interpretation.'" Liquidating Trustee Ester Du Val of KI Liquidation, Inc. v. United States, 116 Fed. Cl. at 379 (quoting United States v. Adler, 623 F.2d at 1289). As plaintiff asserts, "[a]lthough arguing that the numbers in Horn's certified claim were 'inflated,' the Government failed to present any evidence to show what it considered to be *reasonable* rates, hours, expenses, and overhead." (emphasis in original). The government has not met its burden to demonstrate that plaintiff submitted the, hourly rates, subcontractor information, or overhead rate with reckless disregard under the False Claims Act.

In addition to arguing that Tom Horn, on behalf of plaintiff did not act recklessly, plaintiff contends that "the facts of the case do not support a finding that Mr. Horn acted with ordinary negligence,"[92] in trying to support its breach of contract claim under circumstances involving payment through a contingency mechanism. For support, plaintiff points to the fact that "[p]rior to the Contract with NASA, Horn had only worked on two federal government recovery audits," and "[b]efore the NASA Contract, Horn's principals had no experience with government contract disputes, either substantively or procedurally." (footnote omitted). Horn & Associates also indicates that, "when its own efforts to resolve the dispute with NASA were rebuffed and finally rejected, Horn sought out and retained legal counsel with government contracts experience, William H. Gammon, to advise and assist Horn in filing its Certified Claim and pursuing litigation to remedy NASA's breach." Plaintiff also attempts to argue that:

---

[92] The court notes that ordinary negligence is generally insufficient to demonstrate liability under the False Claims Act.  See Riley Constr. Co. v. United States, 65 Fed. Cl. 269. As discussed below, defendant agrees.  Moreover, before addressing ordinary negligence, plaintiff states: "Here, the Court does not need to determine whether Mr. Horn's actions with respect to the preparation and review of the Further Alternate Remedy portion of Horn's Certified Claim, and his subsequent certification of the Claim on behalf of Horn, constitute ordinary negligence. Such a finding, even if made, is insufficient to give rise to FCA liability."

> Having no prior experience with drafting certified claims, or being engaged in contract disputes with the Government, it was reasonable for Mr. Horn to rely on his experienced government contracts attorney to draft the Certified Claim using the appropriate terminology and phrasing, and to document the Certified Claim, in accordance with government contracting practice.

At trial, however, Tom Horn did indicate that although he did not draft the certified claim, he did review it before signing it.

In post-trial briefs plaintiff repeatedly cites to the undersigned's opinion in Gulf Group to demonstrate that Tom Horn was not negligent. See generally Gulf Grp. Enterprises Co., W.L.L. v. United States, 114 Fed. Cl. 258 (2013), appeal dismissed (Fed. Cir. Mar. 2, 2015). Plaintiff argues, for example:

> Mr. Horn's retention of an experienced government contacting attorney, and his reliance on that attorney's knowledge, skill, training and experience in preparing and drafting certified claims, was prudent and reasonable. It did not demonstrate ordinary negligence, and it certainly did not demonstrate "a failure to exercise even that care which a careless person would use," which would be required to make a finding of gross negligence.

(quoting Gulf Grp. Enterprises Co., W.L.L. v. United States, 114 Fed. Cl. at 315 n.87). Despite citation to, and reliance on, the undersigned's opinion in Gulf Group, Gulf Group does not provide much support for the plaintiff's argument that Tom Horn could not be negligent. As noted in Gulf Group:

> the fact that Saud Al Tawash testified that he and Gulf Group did not know how to compile a claim to be submitted to the United States government does not obviate Gulf Group's responsibilities, or Saud Al Tawash's responsibilities as the General Manager of Gulf Group, nor does plaintiff's and Saud Al Tawash's reliance on the attorneys absolve the plaintiff of its responsibilities for submitting inflated and deficient claims. See Link v. Wabash R.R., 370 U.S. at 633-34. Saud Al Tawash signed the cover letter for the 2005 camp package BPA claim, as well the settlement offer form. He testified at trial, however, that he did not look at the claim in detail until his deposition, despite acknowledging that it was the responsibility of everyone involved with the claims to make sure they were accurate. Plaintiff is bound by the actions of its attorneys and its General Manager, Saud Al Tawash. Plaintiff chose to rely on its attorneys to prepare and submit its claims. By giving its attorneys the authority to certify the claims on Gulf Group's behalf, and failing to review the submissions, plaintiff cannot now hide behind the mistakes of its attorneys to avoid liability under the False Claims Act.

<u>Gulf Grp. Enterprises Co,. W.L.L. v. United States</u>, 114 Fed. Cl. at 328.[93] In the above captioned case, Tom Horn chose to rely on Mr. Gammon's framework for the certified claim and present the "further alternative remedy" to "recover its actual costs and expenses incurred by Horn and its independent subcontractors." Additionally, as noted above, with regard to the language, "Horn should be entitled to receive at a bare minimum compensation for its actual costs incurred," at trial, Tom Horn acknowledged that he did not give any significance to the term "actual costs incurred," explaining "it really didn't register with me when I read this, reviewed the certified claim." Tom Horn testified at trial about his lengthy experience as a CPA and as an auditor, but his limited experience with a federal contingency fee recovery audit contract.

Not surprisingly, defendant claims that "Horn's efforts to shoehorn this case into the mold of ordinary negligence are fundamentally flawed," correctly recognizing that "ordinary negligence does not give rise to liability under any of the three fraud statutes at

---

[93] The court notes that Horn & Associates' certified claim differs significantly from the one in <u>Gulf Group</u>, which was not a contingency contract, but rather a standard government contract for fees for services. Unlike Horn & Associates and Tom Horn, individuals in the <u>Gulf Group</u> case,

> in the personages of Attorney Peters, Attorney Hands, and Saud Al Tawash, did not conduct even a minimal inquiry into the accuracy of the claims submitted. Had they done so, they would have seen the inconsistency of the claims and the expense table.  They also should have seen the lack of foundation for the information included in the table.  Moreover, had any one of them carefully reviewed the various claims, they should have noticed that the claims were for more than the BPA call amount. In addition, the attorneys should have been more conversant with government contract law, including the legal status of options, BPAs, and calls. According to his testimony, Saud Al Tawash was a business major and graduate of Tulane University, who has multiple business holdings and experience running companies, including performance of other United States government contracts. It is hard for this court to imagine that, had Saud Al Tawash appropriately reviewed the 2005 Claim and Settlement Offer, he would not have realized that plaintiff stood to recoup more money from its 2005 Claim and Settlement Offer than it would have made, even had the master dollar limit of the BPA been reached and had BPA call 0001 not been terminated. Plaintiff cannot escape the fact that it sought the BPA call dollar limit of $7,000,000.00 in its 2007 claim on a terminated call that was worth only $1,447,457.22.

<u>Id.</u> at 328. Tom Horn indicated at trial that he reviewed the claim, that plaintiff was attempting to assess the damages in a contingency contract situation, and that there was no inconsistency with the amounts in the certified claim.

issue in this case."[94] Defendant is correct, Tom Horn, and therefore, Horn & Associates' mistakes and inartful approach to claim presentation, are not sufficient to trigger liability under the False Claims Act. See Ulysses, Inc. v. United States, 117 Fed. Cl. at 780 (quoting UMC Elec. Co. v. United States, 43 Fed. Cl. at 795) ("'Under the False Claims Act there must be a showing by the government of more than innocent mistake or mere negligence.'").

Therefore, although Horn & Associates, and Tom Horn, in assembling, reviewing and certifying the claim, made mistakes in how information was characterized and presented to the government in the certified claim, none of those mistakes rose to the level of "false statements." Because the court finds that defendant has not demonstrated that plaintiff had knowledge that its claims were false or fraudulent, and had no intention to induce "wrongful payment," United States v. Rivera, 55 F.3d at 709, Horn & Associates is not liable under the False Claims Act. The testimony of the Horn & Associates principals was sincere and forthcoming. There was no indication in their testimony at trial of any intention to defraud the government. The Horn & Associates principals testified, as did numerous subcontractors of Horn & Associates, that plaintiff attempted to recover for the work they had actually performed. Moreover, the subcontractors genially testified that the work was hindered by with a significant lack of cooperation from NASA employees in the various locations and at NASA headquarters, and under conditions in which NASA employees appeared to intentionally create barriers or delays to plaintiff's performance and only a few of the NASA witnesses appeared to have supported the work to be performed under the NASA Contract. At trial, the weight of the sincerity was with the Horn & Associates principals. Defendant's counterclaims for the False Claims Act are dismissed.

## III.   Contract Disputes Act

Finally, defendant argues in its counterclaim, regarding the anti-fraud provision of the Contract Disputes Act, "Horn is liable to the United States pursuant to 41 U.S.C. § 604 for the unsupported portions of its claims, the exact amount to be proven at trial, as

---

[94] Although as the certifying official, Tom Horn's actions are inextricably linked with the plaintiff, defendant emphasizes that "liability under the fraud statutes inures to Horn the Corporation, not Tom Horn the individual," and "Mr. Horn, as an individual, is not the subject of the Government's fraud counterclaims. Rather, it is the *corporation* whose actions and *scienter* are at issue in this case, because it is the *corporation*, and not Tom Horn personally, that would be called upon to pay any fraud judgment." (all emphasis in original). To the extent plaintiff argues otherwise, the court agrees that it is the plaintiff's actions which are at issue. The court does not see the malevolence that defendant does, arguing that "Horn the corporation cannot shield itself from liability for fraud merely upon showing, for example, that Tom Horn personally was careless, ignorant of his responsibilities to assemble a truthful and accurate certified claim, or innocently misplaced trust in his lawyer and others to assemble such a claim on the company's behalf. To suggest otherwise invites legal error into this case." Because the court does not find a false claim, the distinction is not relevant to the resolution of the False Claim Act counts of the defendant's counterclaim.

well as the United States' costs attributable to reviewing such parts of its claims" because "Horn is unable to support portions of its actual costs claim, as alleged above, due to misrepresentations of fact or fraud."

The anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 604 (now 41 U.S.C. § 7103(c)(2)) provides:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

41 U.S.C. § 604.[95] The Contract Disputes Act at 41 U.S.C. § 605(c)(1) (2006) (now 41 U.S.C. § 7103(b)(1) (2012)), requires for a certification of a claim in excess of $100,000.00,

---

[95] The language of the anti-fraud provision of the Contract Disputes Act was slightly altered when it was recodified in 2011 at 41 U.S.C. § 7103(c)(2). See Veridyne Corp. v. United States, 758 F.3d at 1380. The current language of the provision now states:

> If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim.

41 U.S.C. § 7103(c)(2); see also Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 525 ("By the Act of January 4, 2011, Pub. L. No. 111–350, 124 Stat. 3677, the CDA was amended and enacted into positive law. The CDA provisions were relocated from 41 U.S.C. §§ 601–13 (2006) to 41 U.S.C. §§ 7101–09. Comparing 41 U.S.C. § 7103(c)(2) with its source, 41 U.S.C. § 604 (2006), confirms the absence of any substantive change."). Although the minor differences in the revisions to the current versions do not change the court's analysis, the court refers to the anti-fraud provision of the Contract Disputes Act in effect at the time of the events in the above-captioned case. The court notes that in AEY, Inc. v. United States, the plaintiff argued that under the current version of the anti-fraud provision of the Contract Disputes Act, "the antifraud provisions of the CDA supersede the Forfeiture Statute [28 U.S.C. § 2514]," AEY, Inc. v. United States, 114 Fed. Cl. at 627. Plaintiff has not raised a similar argument in the above captioned case.  In AEY, Inc. v. United States, the court declined to address the AEY plaintiff's contention that the 28 U.S.C. § 2514 is superseded by the anti-fraud provision of the Contract Disputes Act, because the court concluded the government had waived its rights under 28 U.S.C. § 2514. See AEY, Inc. v. United States, 114 Fed. Cl. at 632.

the contractor shall certify that--

(A) the claim is made in good faith;

(B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief;

(C) the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and

(D) the certifier is authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 605(c)(1); see Trafalgar House Constr., Inc. v. United States, 73 Fed. Cl. 675, 693 (2006) ("The primary purpose of this certification is to prevent the submission of fraudulent claims."), aff'd, 274 F. App'x 898 (Fed. Cir. 2008).

As noted by the United States Court of Appeals for the Federal Circuit, "[t]he Contract Disputes Act requires that an authorized corporate official certify that 'the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, [and] that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.'" Veridyne Corp. v. United States, 758 F.3d at 1380 (quoting 41 U.S.C. § 605(c)(1) (recodified at 41 U.S.C. § 7103(b)(1)(A)-(D) (2012)). As noted by the trial court in Veridyne, "[a]lthough the anti-fraud provision contains no express requirement that the costs must be 'reasonable,' it presumes that defendant actually has incurred the claimed costs of review." Veridyne Corp. v. United States, 107 Fed. Cl. at 767 (citing 41 U.S.C. § 7103(c)(2)).

"Congress enacted the fraud provision of the CDA 'out of concern that the submission of baseless claims contributes to the so-called horsetrading theory where an amount beyond that which can be legitimately claimed is submitted merely as a negotiating tactic.'" Veridyne Corp. v. United States, 758 F.3d at 1381 (quoting Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1340); see also Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584 (quoting Sen. Report No. 95–1118, 1978 U.S.C.C.A.N. 5235, 5254) ("This subsection [41 U.S.C. § 604] is included out of concern that the submission of baseless claims contribute to the so-called horsetrading theory where an amount beyond that which can be legitimately claimed is submitted merely as a negotiating tactic. Hence, payment of such a claim by the Government would constitute a windfall to the contractor."). As the trial court in Daewoo indicated, "[u]sing a claim to gain leverage against the United States violates the principle on which Congress enacted the Contract Disputes Act, including its effort to prevent contractors from using the claims process to obtain higher profits. Congress called it 'horse trading.'" Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 570.

"A contractor is liable under the antifraud provision of the CDA when the '"contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the      contractor.

76

. . .'"" Ulysses, Inc. v. United States, 110 Fed. Cl. at 647 (quoting Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1335 (quoting 41 U.S.C. § 604)).  A "misrepresentation of fact" is defined as "'a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.'"  Veridyne Corp. v. United States, 758 F.3d at 1381; see also Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1335 (quoting 41 U.S.C. § 601(9) (now 41 U.S.C. § 7101(9) (2012))); Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 524.

"The government must establish this falsity and intent by a preponderance of the evidence." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1335; see also Veridyne Corp. v. United States, 758 F.3d at 1381; UMC Elecs. Co. v. United States, 249 F.3d at 1338 (citing Comm. Contractors, Inc. v. United States, 154 F.3d at 1362) ("The government must prove a violation of the Contract Disputes Act and False Claims Act by a preponderance of the evidence."); Ulysses, Inc. v. United States, 110 Fed. Cl. at 647 (citing Comm. Contractors, Inc. v. United States, 154 F.3d at 1362) ("While the CDA does not provide a standard of proof, the Federal Circuit has applied the 'preponderance of the evidence' standard to claims brought under the CDA's fraud provision."); Hernandez, Kroone & Assocs., Inc. v. United States, 110 Fed. Cl. at 524 ("The government must establish this falsity and intent by a preponderance of the evidence.").[96]

"To recover under the CDA, the government is required to establish that the contractor made false or fraudulent statements in its submitted claim with an intent to deceive or mislead the government." Comm. Contractors, Inc. v. United States, 154 F.3d at 1362 (citing 41 U.S.C. § 601(7) (now 41 U.S.C. § 7101(7) (2012))); see also Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 584; Chemray Coatings Corp. v. United States, 29 Fed. Cl. 278, 285 (1993) ("In order to obtain reimbursement for a paid claim, defendant must prove that a part of plaintiff's claim is unsupported and that this lack of support is due to fraud or misrepresentation intended by plaintiff to deceive the government." (citing Tyger Constr. Co. v. United States, 28 Fed. Cl. at 58)).

Defendant makes similar arguments for the Contract Disputes Act counterclaims as it did regarding the False Claims Act.  As noted above, according to defendant:

> [W]e established at trial that the entirety of Horn's certified claim should be forfeited under the Special Plea in Fraud.  In so doing, we established that, for the same reasons, Horn is liable to the Government for damages under the CDA's Anti-Fraud provision, 41 U.S.C. §7103(c)(2), and the FCA, 31 U.S.C. § 3729. The evidence at trial is more than sufficient to prove, by a

---

[96] As discussed above in the False Claims Act analysis, the preponderance of the evidence standard applied to proof under the Contract Disputes Act and the False Claims Act is a less rigorous standard than the clear and convincing standard of proof applied under the Special Plea in Fraud statute.  See UMC Elecs. Co. v. United States, 249 F.3d at 1338-39 ("Under the Special Plea in Fraud, the government must prove its allegations by clear and convincing evidence." (citing Comm. Contractors, Inc. v. United States, 154 F.3d at 1362)).

> preponderance of the evidence, that Horn, with actual knowledge, falsely depicted its fabricated numbers as "actual costs," made false statements concerning its hourly rate, overhead, and level of supporting documentation, and did so with the intent to deceive or mislead the Government. Moreover, it is clear, by far more than a preponderance of the evidence, that Horn, acting again with actual knowledge of the falsity of the misstatements contained in its certified claim, presented a false or fraudulent certified claim for payment or approval, within the meaning of the FCA. See 31 U.S.C. §§ 3729, 3731. As such, in addition to forfeiting its claim under the Special Plea in Fraud, Horn is liable to the Government for penalties under the FCA, and for the unsupported part of its certified claim and the costs of review under the CDA.

(citations omitted). In its post-trial brief, defendant also claims that "we established at trial that the entirety of Horn's certified claim should be forfeited under the Special Plea in Fraud. In so doing, we established that, for the same reasons, Horn is liable to the Government for damages under the CDA's Anti-Fraud provision."

Plaintiff contends that "Horn did not violate the Contract Disputes Act," and argues that

> the Government's entire counterclaim depends on its unsupported premise that the third measure of damages was "engineered to appear as a claim for actual costs incurred." In fact, the full language of the Certified Claim reflected that in the third measure of damages, as an alternative, Horn was seeking "reliance damages" that would enable Horn to recover "at least . . . for its out-of-pocket expense and for the time devoted to the performance of the [Contract]." As noted above, the Government presented *no evidence* that any of the intended audience at NASA was confused or mistaken about the meaning of the Certified Claim, and called *no witness* to testify that anyone at NASA actually read the third measure of damages as "a claim for actual costs incurred."

(emphasis in original; bracket in original; citation omitted). Moreover, plaintiff claims that "the Government has not shown that the estimated numbers for hours and expenses were false or fraudulent. Therefore, NASA has not proven, by a preponderance of the evidence, that Horn made misrepresentations of fact."[97]

---

[97] The "Further Alternative Remedy" section of the certified claim states:

> Horn is entitled to recover its actual costs and expenses incurred by Horn and its independent subcontractors. Horn has contacted each of its independent subcontractors and had them review the time they devoted and the costs they incurred. Likewise, Horn has reviewed its own records to determine time and expenses devoted on this contract by Horn staff. The sum of all such time and expenses plus an overhead and profit factor of 18% is $7,028,200.96. The information is presented on an individual basis

As the court determined above, the defendant has not met its burden to prove that Horn & Associates' certified claim violated the Special Plea in Fraud statute or the False Claims Act. As further noted in the False Claims Act analysis above, the court does not believe the phrase "actual costs incurred" automatically demonstrates fraud under the preponderance of the evidence standard. Therefore, as the anti-fraud provision of the Contract Disputes Act applies the preponderance of the evidence standard, defendant's counterclaim for the anti-fraud provision of the Contract Disputes Act must stand on its own and demonstrate Horn & Associates' certified claim contained "a false statement of substantive fact," or demonstrated "conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead."

Addressing arguments specific to the anti-fraud provision of the Contract Disputes Act, defendant, citing to Daewoo v. United States, 73 Fed. Cl. at 570, claims that "[t]he testimony of Horn's principals illustrates that Horn intended to use the 'third alternative remedy' as a means of gaining leverage in its negotiations with NASA. Such a tactic is precisely what the CDA is intended to prevent." Defendant cites to Mr. Farrar testimony that "[o]ur expectation was that after we filed the claim, and maybe naively on our part, that there would be a lot of conversation once NASA received the claim, and there would be a lot of give and take back and forth trying to resolve the issue of the breach, and we would come to some solution to resolve it." Defendant also points to Mr. Lowery's deposition testimony that "our request for damages will be the time and money expended while being completely stonewalled by NASA. It won't be a windfall, but after attorneys fees, it might be enough to marginally recover most of our losses," as evidence, according to defendant, that Horn & Associates "[p]resented as alternative remedies were intended to start a negotiation that would end in settlement." Plaintiff argues that "[t]he first evidence put forward by the Government in support of this theory is the innocuous testimony from Horn's principals that they expected, perhaps naively, that the Certified Claim would start a conversation that would result in negotiations and would eventfully resolve the dispute between the parties."

The unusual breach claim in a contingency fee contract for the recovery audit resulted in the challenges the plaintiff faced to calculate its claim, and the guessimates plaintiff offered, which were not submitted as a negotiating tactic. See Veridyne Corp. v. United States, 758 F.3d at 1381 (quoting Daewoo Eng'g & Constr. Co. v. United States,

---

for each Horn member, employee or subcontractor. Further, the information is broken out on a monthly basis. Supporting all this information are expense records and time diaries that were used to construct the documents.

(internal citation omitted). As noted above, as the beginning of the section "Remedies for NASA's Breaches," in the certified claim, plaintiff stated that: "It is important to note that Horn is not required to establish its damages with a finite degree of accuracy; rather, Horn may establish its approximate damages so long as there is a reasonable basis for Horn's computation."

557 F.3d at 1340) ("Congress enacted the fraud provision of the CDA 'out of concern that the submission of baseless claims contributes to the so-called horsetrading theory where an amount beyond that which can be legitimately claimed is submitted merely as a negotiating tactic.'"). Plaintiff was attempting to structure a claim for the somewhat unusual contingency contract in a field, recovery auditing, which was not a typical government contract. Plaintiff did its best to try to establish its breach damages using alterative damages calculations in a situation with which Horn & Associates had not previously dealt. Moreover, as discussed above, plaintiff had not kept detailed records, nor was it required to do so, as it had not anticipated seeking reimbursement for costs expended, as opposed to collecting its contingency fees.

In Daewoo, the Court of Federal Claims noted that Daewoo had submitted an inflated claim to get the government to "pay attention." See Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 585. The Judge in the Court of Federal Claims stated:

> The Project Manager testified at one point that Daewoo filed at least $50 million of the claim to indicate "the seriousness of the situation" and to get the Government to "pay attention" so it would agree to a cheaper method of constructing embankments. If so, this is further evidence of bad faith. It means that Daewoo submitted a certified claim as a negotiating ploy; that is, for a reason other than an attempt to recover money for which Daewoo believed the Government is liable.

Id.[98] (citations and footnote omitted). As noted above, the Daewoo trial court indicated, "[u]sing a claim to gain leverage against the United States violates the principle on which Congress enacted the Contract Disputes Act, including its effort to prevent contractors from using the claims process to obtain higher profits. Congress called it 'horse trading.'" Id. at 570. Horn & Associates correctly points out that, unlike in Daewoo, its certified claim was submitted after the end of the contract. In the above captioned case, plaintiff notes that the "Recovery Audit was over, the GSA Contract, having been terminated by NASA effective September 30, 2006, more than a year before Horn submitted its Certified Claim. At that point, Horn was not seeking to modify the terms of the Contract, but rather to seek damages for NASA's material breaches of the Contract." Plaintiff, therefore, argues that "[i]ntent cannot be shown by Horn's expectations that the parties would discuss, and possibly settle, the claim after it was submitted." Plaintiff also argues that

> unlike in Daewoo, the allegedly fraudulent claim for $7,028,200.96 in reliance damages was the lowest of the three damages numbers set forth in the Certified Claim. Particularly in light of its reliance on Daewoo, it is bizarre that the Government argues that Horn's third measure of damages of $7,028,200.96 is somehow an attempt to shake-down the Government, but does not make such a claim as to the substantially higher figures of

---

[98] As noted above by the Federal Circuit in affirming the trial court's decision in Daewoo, "[i]t is well established that a baseless certified claim is a fraudulent claim." Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d at 1339.

$269 million and $14.7 million on the primary and secondary measures of damages in Horn's Certified Claim.[99]

(emphasis in original). The court agrees with plaintiff that the plaintiff's claims are factually and temporally different than the one in Daewoo.

The court also recognizes a difference between Tom Horn, as the certifying official in the above captioned case and Mr. Kim, the project manager and the certifying official in Daewoo. As noted by the trial court in Daewoo, "Kim certified the claim for $64 million, and he testified that he expected the Government to pay the entire amount. Later the same day, he recanted that testimony, stating that the claim was for only $13 million." Daewoo Eng'g & Constr. Co. v. United States, 73 Fed. Cl. at 585. At trial, Mr. Kim specifically disavowed the truth of the claim at trial, whereas Tom Horn has not. Tom Horn has continued to maintain the validity of the claim methodologies submitted to NASA in the unusual contingency fee contract at issue.[100] Therefore, despite testimony by plaintiff's witnesses that the third measure of damages was offered, anticipating the start of a conversation, the certified claim and conduct of Horn & Associates is substantially

---

[99] The court notes plaintiff's repeated frustration at the government's focus on only the third measure of damages, which was, by far, the lowest measure of damages. As plaintiff's counsel noted during closing arguments, "the first measure of damages was $279 million; the second was for $14.7 million; and this one was sort of a throw-in $7 million damages claim which we're not even pursuing now because, as our witnesses have testified, that's just not enough to compensate us for our losses on this contract." The court notes, at trial Mr. Wai, who worked in the OIG, stated he did not look at the $279 million claim or the $14.7 million claim, and indicated that

> I didn't look at the $270 million because it was obvious that that was a number that came out of the air, but the $7 million was specifically referred to as actual cost incurred. If Horn had told me that that was not actual cost incurred and that particular portion is going to change or would reflect that, that would have changed, I probably will [sic] have ended my audit or my bosses would have told me to drop the audit.

As noted above, however, Mr. Wai, in discussing Horn & Associates' damages theories, indicated that "I don't know the definition of -- the legal definition of reliance. I'm not a lawyer. But out-of-pocket, I can understand that as an accountant. . . . I don't understand what the reliance damages are." Also as noted above, the court found Mr. Wai to be 'a very troublesome witness," indicating to the parties at the close of testimony, that he had selective memory.

[100] The court also notes a difference between Tom Horn, as the certifying official and the ones in two previous cases before the undersigned. In Gulf Group Enterprises Co., W.L.L. v. United States, 114 Fed. Cl. at 329, the certifying official admitted at trial that the information in the certified claim was incorrect. In Chapman Law Firm, LPA v. United States, 113 Fed. Cl. at 606, the undersigned determined after trial that the certifying official was aware the certified claim was factually false when he certified the claim.

different than that of the plaintiff in <u>Daewoo</u>, and does not demonstrate a violation of the anti-fraud provision of the Contract Disputes Act. Each case must be evaluated on the specific facts of the case presented.

At trial, defendant also attempted to demonstrate that Horn & Associates' conduct after the OIG investigation was initiated demonstrates an intent by Horn & Associates to deceive or mislead. Defendant cites to the fact that "[a]fter the OIG initiated its investigation, Horn attempted to justify its hourly rates. Mr. Horn wrote to Lowery and Farrar in March 2008: 'I think the attached justifies how we came up with our total billing rate for the $7 million number. We can massage the numbers around any way we want. Also, I think the profit % is very reasonable under the risk, reward circumstances of our business.'" Defendant argues that "Mr. Horn had created to show, retroactively, that Horn's selection of the rates presented in its certified claim had been reasonable."

As noted above, after Horn & Associates submitted its certified claim, but before Contracting Officer Patterson issued a final decision, on January 4, 2008, NASA contacted NASA's OIG, alleging that Horn & Associates' certified claim for $7,028,200.96 was questionable and could warrant an investigation as a false claim. The OIG initiated an investigation on February 8, 2008, which lasted for months. In its post-trial briefing, plaintiff noted that "Horn's President, Tom Horn, sent the March 7, 2008 e-mail that the Government argues is a 'smoking gun'[101] and 'an indicia of fraud.' The single sentence pulled out of that email by the Government stated, 'We can massage the numbers around any way we want.'" Plaintiff argues that "Mr. Horn wrote the e-mail after the OIG contacted Horn about its investigation of fraud, a move that shocked and surprised the principals at Horn, particularly because they believed that they had done the best they could do in putting together the claim." On cross-examination, Mr. Farrar explained that:

> At this point in time, if you looked at the dates which is March, after the IG [OIG] contacted us, obviously we were again very shocked and surprised that somebody would think we were doing something in -- you know, totally fraudulent at this -- in this case. And so we were really surprised that the IG contacted us. And so we began to scratch our head and say, you know, we thought we did the best we could to put together the claim, so what's the problem here? So we began, Tom specifically began to run, just run what we would call a pro forma to see if they made sense, to see if there was something that we misstated, something that was just grossly wrong. We

---

[101] In its post-trial briefing, defendant argues that:

> Horn still faced the dilemma of how to make its "estimate" appear reasonable to the auditors. The record contains one smoking gun email, which the Horn witnesses repeatedly attempted to explain away at trial, which indicates, by its plain terms, an attempt by Mr. Horn to get the company's story straight in response to demands by the OIG for substantiation and justification for the company's $7 million demand.

just started, you know, doing internal investigations of our own just to try to figure out, you know, what the heck all the discussion was about.

In response to the question, "[i]t's true then that this spreadsheet is an after the fact attempt to justify the overhead and profit figures set forth in Horn's certified claim," Mr. Farrar testified:

> No, it's not an attempt to justify anything.  What it's -- what it is is it's the Horn principals setting [sic] around, talking about why the IG is filing an investigation on us. And we're trying to determine, did we do something entirely wrong? Did we really overstate something that was just grossly, we just couldn't imagine why there could have possibly been a fraud case started against us at this point. So we were just trying to check everything that we did.

Likewise in response to the question, "when you said, 'We can massage the numbers any way we want,' in conjunction with your pro forma analysis, what did you mean?" Tom Horn explained: "Well, that you could put down there, we didn't know what our expenses and things were going to be at that time. So it was difficult to really put down what a true picture may be at this point in time." Therefore, plaintiff claims that "[c]lear from his testimony is that Mr. Horn, in his email, was *not* referring to the numbers in the Certified Claim." (emphasis in original).

Plaintiff also states that, "the *pro forma* was never sent to the Inspector General or anyone else at NASA."[102] (emphasis in original). Therefore, according to plaintiff, the alleged "smoking gun" sentence "cannot be a basis for Horn's *knowledge* at the time the Certified Claim was submitted because it was written months after the Claim's submission and complete denial." (emphasis in original). Tom Horn testified the pro forma was created in March 2008, after the certified claim was filed on November 20, 2007, after the Contracting Officer's decision was issued on January 25, 2008, and only in response to the OIG initiating an investigation on February 8, 2008 regarding Horn & Associates' certified claim. As noted above, the Federal Circuit has held that "[t]o recover under the

---

[102] As Tom Horn explained on redirect:

> Q: So this pro forma that you did, that you testified about, did you give that to NASA?
>
> A: No, that was just internal use only. I mean –
>
> Q: Did you give it to the Inspector General?
>
> A: I don't -- no.
>
> Q: Okay. Did you do anything with it?
>
> A: Nothing. I mean we disregarded it . . . .

CDA, the government is required to establish that the contractor made false or fraudulent statements in its submitted claim with an intent to deceive or mislead the government." Comm. Contractors, Inc. v. United States, 154 F.3d at 1362. Therefore, although defendant's expert witness, Mr. Wright, at trial agreed with defendant's counsel that, based on his experience with fraud investigations, a post-submission justification could be an indicator of a fraud, plaintiff's creation of a pro forma "to massage the numbers," to review what had occurred, created after the certified claim was submitted and denied by the Contracting Officer, and not shared with the agency, would not demonstrate fraud and does not sustain a claim under the anti-fraud provision of the Contract Disputes Act in this particular case. The court concludes, therefore, that the statements by Tom Horn, although potentially confusing, does not evidence an intent to mislead the government in Horn & Associates' certified claim because the pro forma was created after the Contracting Officer's decision and was not submitted to Contracting Officer Patterson, the OIG, or any other part of the government.

Furthermore, the court does not believe the pro forma was a false statement. The court found Tom Horn's and Mr. Farrar's testimony about the pro forma to be truthful. The Horn & Associates principals appeared to be surprised about the OIG investigation and, because they were unaccustomed to providing hourly rates for a contingency fee recovery audit, they ran the pro forma to try determine if the rates submitted were reasonable. Within the "massage the numbers" email, in the prior sentence, Tom Horn indicated to Mr. Farrar and Mr. Lowery, "I think the attached justifies how we came up with the total billing rate for the $7 million." Even accepting defendant's premise that Tom Horn had created pro forma "to show, retroactively, that Horn's selection of the rates presented in its certified claim had been reasonable," this would demonstrate that Tom Horn was using the pro forma to review the claim after the fact, and not to provide false statements to the government. Tom Horn testified on cross-examination that "[a]ll we were trying to do was to see if, in fact, NASA had paid us the 7 million in the third measure of damages, just what would our financials look like?" Although the choice of was words, "[w]e can massage the numbers any way we want," was unfortunate, similar to a number of statements by plaintiff, it was intended only for internal verification purposes. The court finds that Tom Horn's statement regarding "massaging the numbers" after the OIG investigation began does not in and of itself, given all the facts presented in the trial record, evidence an intent to deceive NASA. Furthermore, the rates provided in the certified claim submitted by Horn & Associates stand or fall on their own, regardless of the actions of Horn & Associates after the OIG investigation was initiated. As determined above, the presentation of the rates was not ideal, but neither was it fraudulent or a false statement. Likewise, the court has addressed in depth the phrase "actual costs incurred" and determined it was not a fraudulent or false statement and does not support the allegation of a violation of the anti-fraud provision of the Contract Disputes Act.

As with defendant's counterclaims for the Special Plea in Fraud and the False Claims Act, the court does not believe the certified claim is evidence of "'a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.'" Veridyne Corp. v. United States, 758 F.3d at 1381. Therefore, the court concludes that

defendant has failed to demonstrate a violation of the anti-fraud provision of the Contract Disputes Act.[103]

## CONCLUSION

Horn & Associates prepared and presented its certified claim in an unorthodox and unfamiliar manner, which led to choosing words in the certified claim which raised the government's suspicions. Nonetheless, after review of the trial testimony, exhibits and post-trial briefings and trying to reconcile fact and numerical calculations which emerged, the court concludes that the defendant has not established Horn & Associates intended to deceive the government, which is required to establish liability under the False Claims Act or to warrant forfeiture under the Special Plea in Fraud statute or the antifraud provision of the Contract Disputes Act. Each allegation of fraud, false claim, or Contract Disputes Act violation must be carefully analyzed based on the specific facts presented in the case and very few cases are factually alike. Breach of contract allegations against the government, in a contingency contract for recovery auditing services, is at best, an unusual situation, with little, if any, useful relevant precedent. The potentially serious consequences for a plaintiff, such as Horn & Associates, suggests caution. Although naïve about government contracts, and less than direct in their presentation, the court does not believe Horn & Associates submitted its certified claims with a reckless disregard for the claims truth or falsity. The court does not find that Horn & Associates violated the False Claims Act with its certified claim identifying a potential breach of the contingency fee contract in which quantification of damages is difficult and imprecise at best, especially when trying to prove that a contingency contract has been breached. Nonetheless, with the requirement to submit a certified claim for a sum certain,[104] to the contracting officer before filing a breach of contract claim at the court, plaintiff attempted, as best it could, with sincerity and without malicious intent or deviousness, to meet the requirement.

Plaintiff would have been faced with a different dilemma of how to present its breach claim for the "Further Alternative Remedy" if it did not include the required sum certain boilerplate language, in which case the government could have argued for dismissal of plaintiff's claim for lack of jurisdiction. Given all the obstacles NASA employees put in plaintiff's path during contract performance, including the failures to cooperate and to collect overpayments identified by plaintiff which were documented in the trial record, there must be a way to review plaintiff's breach allegations. Plaintiff's

---

[103] As a result of finding that the anti-fraud provision of the Contract Disputes Act was not triggered, the court does not reach the potential statute of limitations issue of 41 U.S.C. § 7103(c)(2).

[104] See Meridian Eng'g Co. v. United States, 122 Fed. Cl. 381, 398 (2015) (quoting England v. Swanson Grp., Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004)) ("Although the CDA does not define the term 'claim,' the United States Court of Appeals for the Federal Circuit has defined a 'claim' as a 'written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain[.]'").

presentation of multiple, alternative calculations theories of how to quantify damages for monies plaintiff had identified in the recovery audit as owed to the government, but which the government had not pursued or collected, was the plaintiff's best effort to raise the breach issues in this contingency contract. Precision would have been almost impossible for plaintiff's breach claim for the "Further Alternative Remedy." The government has admitted that for at least $992,557.38 in valid overpayments that Horn & Associates identified, NASA failed to pursue and process, and, therefore, failed to pay plaintiff the contingency feed owed. Contract breach by the defendant, therefore, may well have occurred. Plaintiff did not have an interest to defraud the government or file false claims, rather it tried to establish its entitlement by offering various alternative calculations to establish its breach damages. Defendant's counterclaims are **DENIED**.

   **IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**
