# In the United States Court of Federal Claims

**No. 8-415C**
**Filed: May 25, 2017**

```
* * * * * * * * * * * * * *   *
```
|  |  |  |
|---|---|---|
| **HORN & ASSOCIATES, INC.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| v. | * | **Contract; Breach; Good Faith and** |
| | * | **Fair Dealing; Bad Faith; Recovery** |
| **UNITED STATES,** | * | **Audit; NASA; Trial.** |
| | * | |
| **Defendant.** | * | |
| | * | |
```
* * * * * * * * * * * * * *   *
```

**Robert H. Brunson**, Nelson Mullins Riley & Scarborough LLP, Charleston, S.C., for the plaintiff. With him was **Patrick C. Wooten**, Nelson Mullins Riley & Scarborough LLP, Charleston, S.C.

**Anna Bondurant Eley**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With her were **Kenneth Woodrow**, Trial Attorney, **Zachary Sullivan**, Trial Attorney, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch and **Chad A. Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice.

**O P I N I O N**

**HORN, J.**

**FINDINGS OF FACT**

Plaintiff, Horn & Associates, Inc. (Horn & Associates), is a recovery audit firm which performed a recovery audit for the National Aeronautics and Space Administration (NASA). Recovery audit firms, like Horn & Associates, identify payment errors and provide assistance in the recovery of erroneous payments from the suppliers or contractors which received the erroneous payments.

Horn & Associates was founded in February 2003 with the intention of performing recovery auditing work for federal, state and local government entities, in addition to recovery auditing work for the private sector.[1] The principals of Horn & Associates were

---

[1] As indicated in the complaint, Horn & Associates was incorporated as a "veteran-owned small business, organized and existing under the laws of Utah, with its principal place of business in Salt Lake City, Utah."

Tom Horn, Larry Farrar, and Michael Lowery.[2] Tom Horn was the President of Horn & Associates. At the time of the NASA recovery audit, Mr. Lowery was the Chief Executive Officer of Horn & Associates and was responsible for marketing and finding clients,[3] and Mr. Farrar served as Vice President of Marketing and Operations for Horn & Associates. At trial, Mr. Farrar testified, as of the time of trial, that "[w]e've done some county, cities, states, some other federal agencies as well as NASA. Probably 10 or 12 audits at this point." Among the federal agency recovery audits preformed, Horn & Associates worked for the United States Department of Transportation, the United States Department of Homeland Security, the United States Patent and Trademark Office, and the United States Census Bureau.[4]

Horn & Associates' focus on recovery audits for the federal government stemmed from the passage of Section 831 of the Defense Authorization Act for Fiscal Year 2002. See Defense Authorization Act for Fiscal Year 2002, Pub. L. 107-107, 115 Stat. 1012 (2001). As indicated in plaintiff's November 20, 2007 certified claim, described below:

> Congress recognized the need for such recovery audits by passing Section 831 of the Defense Authorization Act for Fiscal Year 2002. This section added a new subchapter to the U.S. Code (31 U.S.C. §§ 3561-3567) that requires federal agencies that enter into contracts exceeding $500,000,000

---

[2] Tom Horn testified that he started his first accounting firm in 1980. Mr. Farrar testified he worked for private companies for twenty years, most recently as Vice President/Controller for Montgomery Ward until 1993 when he joined the largest recovery audit firm in the country. Another Horn & Associates employee, Jennifer Harris, testified that Mr. Lowery was involved in auditing for over thirty years, and he "was an incredibly innovative pioneer in the accounts payable recovery business."

[3] The court noted during the trial that Mr. Lowery was unable to testify at trial for medical reasons, and, with the court's permission, the parties designated his earlier taken deposition as his testimony.

[4] Horn & Associates also employed a number of auditors as subcontractors during contract performance. Typically, the subcontractors, had agreements with plaintiff that stated: "During the term of this agreement Contractor shall earn a commission equal to 40% of revenue generated by claims identified by Contractor and collected for the client by H&A [Horn & Associates]. The commission is calculated as 40% of actual net revenues received from the client for the life of the audit." By the terms of its contract with NASA, Horn & Associates was entitled to a contingency fee of 13.5% for any recovery by NASA that plaintiff identified. Specifically, the contract provided:

> The amount of the Contingency Fee for this order is 13.5%. Payments to the contractor for services under this order will be based on a Contingency Fee Basis after NASA has recovered and received funds for the basic requirements as set forth in the Statement of Work (SOW). There will be no out-of-pocket expenses, costs or other financial obligations or liabilities incurred by NASA, other than the fees identified in this order.

in a fiscal year to carry out a "cost-effective program for identifying any errors made in paying the contractors and for recovering any amounts erroneously paid to the contractors." Thus, recovery audits became mandated for certain federal agencies like NASA.[5]

The joint stipulations of fact submitted to the court state: "[o]n January 16, 2003, the White House Office of Management and Budget issued Memorandum M-03-07, titled, "Programs to Identify and Recover Erroneous Payments to Contractors." (internal citation omitted) (OMB Memorandum M-03-07). OMB Memorandum M-03-07 indicated the Memorandum was "intended to assist agencies to successfully implement recovery auditing and recovery." OMB Memorandum M-03-07 also stated that "[a]ll classes of contracts and contract payments should be considered for recovery audits." As also jointly stipulated to by the parties, OMB Memorandum M-03-07 indicated that "[a]gency heads may exclude classes of contracts and contract payments from recovery audit activities if the agency head determines that recovery audits are inappropriate or are not a cost-effective method for identifying and recovering erroneous payments."

The General Services Administration (GSA) had awarded Contract No. GS-23F-0258N (the GSA Contract) to Horn & Associates on June 12, 2003. The GSA Contract was a blanket purchase agreement, pursuant to which various executive agencies could solicit offers to contract for recovery auditing services. To comply with the Defense Authorization Act of 2002 and the Improper Payment Information Act of 2002,[6] NASA issued Request for Quote NNH04068239Q (the RFQ) for Audit Recovery Services, and the Contracting Officer issued the RFQ to four companies, including Horn & Associates. As indicated in the Contracting Officer's cover letter to the four companies:

> National Aeronautics and Space Administration (NASA) is requesting offers under Request for Quote (RFQ) NNH04068239Q for Audit Recovery services described in the attached Statement of Work (SOW). NASA intends to acquire these services by competing this requirement among several sources on the GSA Federal Supply Schedule Contract, Schedule Number 520 SIN 9, entitled "Financial and Business Solutions (FABS)." Your company is being solicited since it appears on the GSA FABS Schedule's list of eligible contractors.

---

[5] As further indicated by Tom Horn at trial:

> We were beginning to do research and we discovered that in 2002 the Defense Authorization Act was -- there was a piece in there, Section 831 on recovery auditing that was passed that mandated recovery auditing on the federal government, and also that there was an Improper Payments Information Act that was passed as well that mandated some testing on improper payments at government agencies.

[6] As noted in its post-trial briefing, defendant states that "[p]ursuant to an Act of Congress, NASA hired Horn and Associates to conduct a recovery audit to return to the Government hundreds of millions of dollars overpaid to vendors." (internal reference omitted).

A Statement of Work was attached to the RFQ, which stated: "The contractor shall perform recovery-auditing services at all 10 NASA Centers for the period beginning October 1, 1997 through September 30, 2003." The Statement of Work attached to the RFQ indicated that: "The audits will be conducted on payments made from all fixed price contracts."

NASA received two proposals in response to the RFQ, one from Horn & Associates and one from Connolly Consulting, Inc. (Connolly Consulting). In the Memorandum for the Record, for the "Award of Contract NNH05CC28D to Horn and Associates, Inc.," Janet Langweil[7] stated that:

> It was determined by both the Office of Chief Counsel and the Contracting Officer that the proposal received from Connolly Consulting was considered to be non-compliant with the requirements of the RFQ. Connolly Consulting did not provide a contingency fee with a fixed percentage [of recovery], but instead proposed an estimated contingency fee range conditioned upon additional information.

As a result, Horn & Associates was the only responsive offeror. In its proposal, Horn & Associates stated that, in its opinion, NASA needed "a 100% look at the Department's data to gain the full benefit of the recovery audit" and that Horn & Associates "would like to have access to all contracts, agreements and documents that would reflect pricing, terms, allowances, rebate programs, etc."[8]

On December 23, 2004, NASA awarded the Order for Supplies or Services, Order No. NNH05CC28D (the contract) to Horn & Associates for the furnishing of "Recovery Audits," pursuant to the GSA Contract. The contract indicated that it was "subject to all the terms and conditions of the contractor's GSA Schedule Contract GS-23F-0258N and as amended by the clauses contained herein." Included as an attachment to the contract was a Statement of Work. The contract's Statement of Work indicated: "The contractor shall perform a primary audit recovery on all contract payments for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments."[9] The contract also included a unilateral option for NASA which stated:

---

[7] The Contracting Officer who sent the issued for the Memorandum for the Record was Janet Langweil. Dean Patterson replaced Ms. Langweil as the contracting officer during performance of the contract in July 2006.

[8] The Contracting Officer noticed a discrepancy in the option periods, specifically option year one, in Horn & Associates' proposal, and requested that Horn & Associates acknowledge the option years as stated in the RFQ. By email, Horn & Associates acknowledged, and agreed to, the option years as stated in the RFQ.

[9] As noted above, and explained further below, the Statement of Work attached to the RFQ differed from the contract and stated: "The audit will be conducted on payments from all fixed price contracts." (emphasis added).

(a)     The Government may extend the term of this contract by written notice to the Contractor within 30 days; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b)     If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c)     The total duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

The contract further stated, "[t]he Contracting Officer may exercise the option by written notice to the Contractor within the period specified in the schedule."

The contract included four option years to extend the term of the audit recovery period. The original period of performance of the contract was December 23, 2004 (the date the contract was awarded) to December 22, 2005. Each option year extended the period of performance by one year and expanded the audit recovery period. For option year 1, the period of performance would be October 1, 2005[10] to September 30, 2006, and the corresponding audit recovery period was 2004-2005. For option year 2, the period of performance was October 1, 2006 to September 30, 2007, and the corresponding audit recovery period was 2006, option year 3 contemplated the period of performance would be October 1, 2007 to September 30, 2008, and the corresponding audit recovery period would be 2007. Finally, for option year 4, the period of performance would be October 1, 2008 to September 30, 2009, and the corresponding audit recovery period would be 2008. For all option years, the contingency fee remained 13.5%.

The contract indicated that "the contractor shall perform a primary audit recovery on <u>all</u> contract payments for the period beginning October 1, 1997 through September 30, 2003,[[11]] identifying overpayments and/or underpayments," (emphasis added) but did not specify the types of contract payments Horn & Associates should review and present for recovery to NASA. In its certified claim, Horn & Associates indicated that

Horn presented NASA over 400 claims for recovery in 15 different classes on September 30, 2006. The claims fell into the following classes: Obligations over paid; Prompt Pay Interest Calculation Errors; Statement

---

[10] Despite the original period of performance of the contract ending December 22, 2005, the first option period began on October 1, 2005. Neither party raised this discrepancy as an issue at trial, and it does not impact the court's decision in this opinion.

[11] As indicated in the defendant's responses to plaintiff's interrogatories and in the parties' joint stipulations of fact, the total amount of contract payments made by NASA during fiscal year 2004 was estimated at $10,872,558,720.53, and the total amount of contract payments made by NASA during fiscal year 2005 was estimated at $10,806,837,873.44.

Claims; Payment Errors; Cash Discounts; Regular Duplicate Payments; Award Fees Overpaid; Interest on Overpayments; Prepayment Discounts; Pricing Claims; Miscellaneous Charges; Obligation Overpaid; and Tax Charged in Error.

<u>Payment Centers</u>

Horn & Associates attempted to perform recovery audits at nine of NASA's payment centers. The centers were: the Goddard Space Flight Center (Goddard), the Lyndon B. Johnson Space Center (Johnson), the John F. Kennedy Space Center (Kennedy), the John C. Stennis Space Center (Stennis), the George C. Marshall Space Flight Center (Marshall), the John C. Glenn Research Center (Glenn), the Langley Research Center (Langley), the Hugh L. Dryden Flight Research Center (Dryden), and the Ames Research Center (Ames) (collectively, the NASA Centers). After award of the contract, Horn & Associates held planning meetings with the NASA Centers to discuss the audit.[12] During performance of the contract, according to defendant, Horn & Associates submitted a total of 402 claims to NASA for collection and payment. NASA approved and paid 40 of them.

Prior to the planning meetings at the NASA Centers, on February 8, 2005, Horn & Associates participated in a pre-audit planning meeting at NASA headquarters. On March 4, 2005, after the pre-audit planning meeting, an internal NASA memorandum was issued by Gwendolyn Sykes, NASA's Chief Financial Officer, to all NASA Centers, which indicated that Horn & Associates was to audit "payment records of fixed price contracts." The contracting officer technical representative at the time, Melvin DenWiddie, issued an email to all NASA Centers on May 18, 2005, stating the contract for Horn & Associates' recovery audit was for the audit of "all contract payments." NASA, therefore, eventually provided Horn & Associates with payment data for all contracts, not just payment data for fixed price contracts. As acknowledged by defendant, "[t]he data itself, however, was admittedly not perfect."

Mr. DenWiddie testified that "at the various NASA centers, we had what was known as the Legacy accounting systems. And most of those systems were manual systems that were not automated and of course, they were not integrated," and, that, further, each center had its own accounting system. NASA, therefore, switched to a SAP system. Mr. DenWiddie, indicated, however, that "[i]t was somewhat of an unfortunate event actually, because the Legacy systems that we had throughout the centers, at the time of the implementation of the SAP system, those systems were disconnected and the SAP system was installed to become the official integrated system of record." As Mr. DenWiddie explained when asked what happened to the financial data that had been

---

[12] Horn & Associates held planning meetings in April of 2005 at the following NASA Centers: at Stennis on April 1, 2005, at Kennedy on April 19, 2005, at Glenn on April 20, 2005, at Marshall on April 21, 2005, at Goddard and at NASA Headquarters on April 22, 2005, at Langley on April 26, 2005, at Johnson on April 27, 2005. In May of 2005, Horn & Associates held planning meetings at Dryden on May 16, 2005, and at Ames on May 17, 2005.

associated with the Legacy system after the transition to the SAP system, he indicated that "information was virtually lost because typically what should normally happen, there should be a parallel running of the two systems together so that you could make sure that there was some compliance. In this case, that did not take place so the information from the Legacy systems just disappeared." As a result, in its post-trial briefs, defendant now concedes that, although NASA produced the SAP data to Horn & Associates, that "[t]he production of NASA's SAP data was more problematic" than the production of the Legacy data. The parties, especially, the defendant, were unable to identify the total amount of contract payments for fiscal years 1998-2003, at issue in the contract, which called for Horn to "perform a primary audit recovery on all contract payments for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments." The parties have stipulated that:

> NASA's financial system no longer contains data for contract payments made by NASA during FY1998 through FY2003, and therefore NASA was unable to identify the total amount of money it expended on contract payments during those fiscal years, or during the FY1998-2005 period of the Horn Recovery Audit, in response to requests for that information from Horn during discovery. NASA did not reconstruct an estimate of the amount of total contract payments for FY 1998-2005 in response to discovery requests seeking this information.

> On June 30, 2006, Mr. DenWiddie wrote a letter to Horn & Associates, indicating:

> Your work on this project has been very impressive. Because our payment files were in several locations on multisystems, some in a manual format, I wondered how you would overcome that challenge and conduct an effective Agency-wide recovery audit of our payments.

> It soon became apparent that your technical capability was centered on your highly-experienced staff. The extensive financial management and recovery auditing experience allowed each challenge to be broken into small components that were easier to resolve. The customizable audit methodology was beneficial in addressing specific unique needs of each NASA Center.

During his testimony, Mr. DenWiddie explained,

> I wrote this letter because as I've testified before [13] during this testimony, I thought that Horn was doing an outstanding job. I thought that they were

---

[13] Mr. DenWiddie had previously testified during the trial:

> The recovery audit was a low priority. It was a low priority because the overall audit of the overall financial statements was so very important that the recovery audit activity was something that we had to do because it was a mandate from the presidential level down through OMB. We had to do it.

working under very adverse conditions, namely the accounting systems that they had to audit, the people who they had to work with who were opposed to them doing their work, and the fact that they had somehow managed to do an outstanding job, in my view, I thought that somebody, somebody needed to say thank you. And I decided that I would be the one and I did.

Mr. DenWiddie testified that the letter was "my last written communication as a government employee," as he retired on the same day, June 30, 2005.

On September 8, 2005, the contract was extended for one year through September 30, 2006 by an "Amendment of Solicitation/Modification of Contract," with all terms remaining the same, except the period of performance. The description of the Modification stated in its entirety:

The purpose of this modification exercises Option 1 to conduct Audit Recovery for the period of 2004-2005 as identified in Item 13 of the basic order [the option to extend the term of the contract].

1.      Clause 7, PERIOD OF PERFORMANCE, shall commence on the effective date of this contract through <u>September 30, 2006</u>.

2.      The total value of this order remains unchanged.

All other terms and conditions remain the same.

(emphasis in original).

Below is an overview of the 402 claims identified and submitted to NASA by Horn & Associates and illustrative examples of the Horn & Associates' interactions with NASA personnel at the NASA Centers.[14] As indicated by defendant, NASA recovered payments, and paid Horn its contingency fee, on 40 of those submissions during the audit period."

---

But it was not nearly as important as getting a clean, unqualified opinion on the overall financial statements.

[14] The court notes that the number of claims at the various NASA Centers in this opinion differs from those in the court's earlier opinion. <u>See</u> <u>generally</u> <u>Horn & Assocs., Inc. v. United States</u>, 123 Fed. Cl. 728 (2015). In the earlier opinion the court indicated that "[u]nfortunately, after discovery, trial, and even post-trial briefing, the parties still do not agree on the number of claims submitted by plaintiff to NASA. The court uses the defendant's numbers for the claims, without, at this time, concluding whether the numbers submitted by either party is correct. When there is a discrepancy, the court has footnoted the plaintiff's numbers of claims." <u>Id.</u> at 735 n.16. After the court issued its decision, the court instructed the parties to work together to generate a joint submission reflecting all of the claims. The parties, although still at odds about the merits of the claims, were able submit the joint submission, which the court uses as a basis to discuss the number of claims at each of the NASA Centers.

Goddard

According to parties, Horn & Associates identified and submitted to NASA a total of 223 claims related to the Goddard recovery audit. This was by far highest portion of the claims identified by Horn & Associates and submitted to NASA.[15] Prior to the audit, Mr. Farrar testified that he believed "Goddard was designated as one of the biggest centers and certainly one of the bigger opportunities that we had."[16] Despite this, the sole claim for Goddard approved and processed by NASA was an SGT Inc. claim, for $1,163.44 dollars.[17]

Initially, Maggie Baumbach was the primary subcontractor for Horn & Associates to work at Goddard.[18] Ms. Baumbach begin work at Goddard in September 2005. Mr. Farrar offered testimony that three months after arriving at Goddard, Ms. Baumbach "was becoming very frustrated because she was having an extremely hard time getting her claims presented. And at that point, she -- I don't believe she had any claims processed,

---

[15] In its certified claim, Horn & Associates explained the difference in the number of claims generated by the different NASA locations:

> The differences in claim potentials found at each of the above payment centers can be explained in a couple of ways. It is partially a reflection of the size of the payment center but more likely the amount of contract payments administered by the center. But, the more important reason for this claim's purposes is the fact that it is a reflection of the level of cooperation, or lack thereof, by that payment center with Horn staff [sic] The level of cooperation in many instances was so bad (i.e. it was a breach of the duty of cooperation imposed by the contract on NASA), that Horn had to reassign some of its audit teams on one or more occasions at some of the centers to other locales.

[16] Mr. Farrar also indicated:

> When we did our initial look at the centers and we also discussed them in our meeting with Melvin [DenWiddie] the first of February, we were trying to identify which centers were bigger than others, where the biggest opportunity might have been. So we identified, with Melvin, basically in that meeting the four centers that were the largest and had the biggest opportunity would be Goddard, Kennedy, Johnson and Marshall.

[17] Defendant has indicated to the court that it now believes that 14 claims identified and submitted by Horn & Associates at Goddard were valid, and another 2 claims were partially valid. At the time of the audit, however, NASA approved two claims, but only processed the one claim for SGT Inc. The other claim, a different Aerospace Corp. claim, was approved for payment, but not processed by NASA.

[18] Ivan Sherman worked at Goddard with Ms. Baumbach. Mr. Sherman, however, only worked part-time.

and certainly none collected," and that "nobody would meet with her."

After eight months of working at Goddard on the recovery audit, Ms. Baumbach left the Goddard recovery audit, claiming during her testimony at trial that "I couldn't afford to continue with no income. I had been months and months at this and we had, nobody had a claim that was in the channel to be paid, to be collected from the vendor, and so that was a big factor." In an email dated April 17, 2006, to Mr. Lowery, Mr. Farrar, and Jennifer Harris, another Horn & Associates employee, Tom Horn explained that he spoke with Ms. Baumbach and she indicated that it was "just too hard and doesn't want to be the front person. I told her we were staffing the place with more people and that we would have a good person to handle the communications . . . and give guidance if she wants to continue to help us, but she pretty much declined." The email indicated, however, "[t]his actually may not be all bad as she seems to be willing to help us with the outstanding items (so she can get paid) and help with a smooth transition to the new guys." The email from Tom Horn to Mr. Lowery, Mr. Farrar, and Jennifer Harris continued: "It does not sound like she has really audited that much at Goddard. She said she did a few contract reconciliations, looking mainly for dups [duplicate payments] and believes she has only skimmed the surface. She hasn't looked at possible interest claims, or for that matter, a lot of other claim types which may or may not be there."

Subsequently, in May of 2006, three auditors replaced Ms. Baumbach: Dan Lizana,[19] Steven Smith and Marie Beckey. Mr. Lizana indicated that once he arrived at Goddard, "the two individuals that I recall and we were introduced to, the points of contact was [sic] Yvette Blackwell -- she was the Supervisor for the examiners and she was our point of contact -- and that week we were introduced to Sandra Brown, who was her superior, who was going to be responsible for denying and accepting the claims."[20] Like Ms. Baumbach, Mr. Lizana felt frustrated at NASA's handling of Horn & Associates' claims. For example, according to Mr. Lizana, one claim "was not outright rejected. But our explanation was NASA was not interested really in pursuing this claim because this was a cost type contract and DCAA [Defense Contract Audit Agency] will check it at close-out." As indicated in an email from Ms. Brown to Mr. Lizana:

> My position remains that until either Procurement and/or DCAA determines that Swales [& Associates] has violated their contractual agreement with NASA Goddard, I am at no liberty to act upon your claim. Validation of your claim has to be supported in conjuction [sic] with the audit/findings of

---

[19] Regarding his position with Horn & Associates, Mr. Lizana testified at trial that he "first heard about the position through Craigslist." Mr. Lizana described his philosophy of recovery auditing as follows: "I think recovering auditing, it's not a quantitative assessment of your skills, meaning it's not having done it for 30 years, in my opinion, whether you have a CPA and so forth. I think recovering auditing is about the type of skills that you have."

[20] In between the time of the recovery audit and the testimony at trial, Sandra Brown changed her name to Sandra Gardin.

Procurement and/or DCAA.[21]

Mr. Lizana worked on the Goddard recovery audit until the end of contract performance.

Johnson

According to parties, Horn & Associates identified and submitted to NASA a total of 121 claims related to the Johnson recovery audit, only 19 of which were approved and processed by NASA.[22] Johnson was the center that generated the second most claims in Horn & Associates' recovery audit, and the 121 claims from Johnson are more than were generated at every other center combined, excluding Goddard.

Tom Hott was an accountant and the primary subcontractor who worked for Horn & Associates at Johnson. Michael Colby also worked on the Johnson recovery audit. The Johnson recovery audit was the first recovery audit for Mr. Colby. Mr. Hott's wife, Beth Hott, worked off-site supporting the Johnson recovery audit. Tom Hott testified that neither he nor his wife had ever performed a recovery audit of a federal government agency before the Johnson recovery audit.

Regarding the Johnson recovery audit, Mr. Hott indicated that, initially, the audit "went fine. We had access to their records and we had a nice place to work in front of the vault where the records were kept, and it was easy for us to come up with a program to start the audit effectively and efficiently." Mr. Hott, explained, however, "[t]hen when we began turning in claims, they were, the claims were immediately denied." Regarding the process for presenting claims, Mr. Hott testified:

> On a regular basis, the first person was Pat Bright. Pat was the supervisor of the accounts payable department. She reported to June Boeckel who was, as I understand it, the director of accounting at the time. And June reported to Marilyn Sampay who was the deputy CFO responsible for the

---

[21] The role that the Defense Contract Audit Agency (DCAA) played in the NASA audit by Horn & Associates was a source of ongoing tension between the parties. Ms. Brown, in explaining the above quoted email testified:

> They [DCAA] are our periodic auditors for these type contracts, cost types. They perform periodic audits and sometimes not in the contractual agreement that goes back and they look at where they've not adjusted a rate or use the wrong rate, and all those things. They do that performance audit that we look to happen that will take care of that 40 million [in the Swales & Associates claim identified by Mr. Lizana] if in fact that was a valid adjustment that had not happened.

[22] Defendant states, however, that although one of the claims, the West Group Payment Center claim, was approved and processed, it was not a valid claim because "it is for an amount of less than $100, and was submitted by Horn in contravention of the plain terms of Horn's scope of work in its contract."

conduct of the audit, according to our contract. And then I had a few occasions with John Beall, the CFO of the Johnson Space Center.

When asked on cross-examination why he did not hire more people to work on the audit with him, Mr. Hott testified that "[i]t didn't make a lot of sense to spend a tremendous amount more money to bring in additional resources. We were already getting screwed to the hilt."[23]

Kennedy

According to parties, Horn & Associates identified and submitted to NASA a total of eighteen claims related to the Kennedy recovery audit, only two of claims submitted were collected, and neither claim was approved by NASA. Brock Young was the primary subcontractor for Horn & Associates to work at Kennedy. Mr. Young had not performed a federal government agency audit before the Kennedy recovery audit. He indicated that he would recover forty percent "of what was collected by Horn & Associates" for the recovery audit claims that he identified.[24] Mr. Young took part in the pre-audit meeting at Kennedy on April 15, 2005, and he testified that Mr. Farrar and Jennifer Harris, from Horn & Associates attended the meeting along with Sam Lenck, Deputy Chief Financial Officer for Kennedy and Brenda Brooks, the Kennedy supervisor over accounts payable from Kennedy.

Mr. Young expressed frustration with the lack of action by NASA with respect to the claims he submitted to NASA. Mr. Young also was frustrated by the role of Mr. Lenck, who viewed his role as "to act as the middleman between Mr. Young and the contracting officer, Ms. Solum."[25] Mr. Young indicated that he first talked to Mr. Lenck and he would

---

[23] Mr. Hott explained his frustration at working on the Johnson recovery audit:

> June Boeckel, who was Pat's supervisor, was very reluctant to accept or approve claims and would create argumentation on the claims that had nothing to do with the merits of the claims themselves, again causing unusual time delays, especially when you consider the fact that we would turn in a claim and it would be weeks or months before we would get the information back. This caused a severe time problem because we continued to try to work under one scenario and knowing full well that we would have to go back and go through all of the claims, all of the contracts again and all of the payments again.

[24] As noted above, forty percent was a typical percentage among Horn & Associates' subcontractors, although Jennifer Harris testified that her agreement with Horn & Associates called for a fifty percent payout. In May of 2006, Ms. Harris became an employee of Horn & Associates.

[25] Ms. Solum was a contracting officer who worked on the contracts awarded at Kennedy, but was not the contracting officer for the Horn & Associates recovery audit for the contract.

take the documents, "which would be the contract file, the mods [modifications], and the invoices in question, and we'd go through it in that form. And that's what I'd review with NASA is all the data with them so they would have everything they needed to look at the claim." After that, Mr. Young testified,

> I would typically never hear back from them. So what I thought was happening was Sam was going to approve it and send it where it needed to be sent, like to the vendor, things of that nature. Later on I found out what he was really doing was he was facilitating the process, but he was leaving it up to the contracting officers to approve. So then at that point, I was assuming they were going to the contracting officers. The thing is I was never getting anything back, so I don't know what actually happened.[26]

Mr. Young continued to work on the Kennedy recovery audit until the end of contract performance.

Marshall

According to the parties, Horn & Associates identified and submitted to NASA a total of nineteen claims related to the Marshall Recovery audit, eleven of which were approved and processed by NASA.[27] James "Chip" Edgerton, was the primary

---

[26] Mr. Young also testified:

> [W]e called a meeting. In that meeting, we had Leslie Solum, we had Leslie's boss, we had a legal representative as well there. Steve Chance was the COTR, that's the Contract Officer Technical Representative is what a COTR is, COTR. And then we had myself, Sam Lenck, Brenda Knox, or Brenda Brooks was there, and I think one or two other people as well. So it was a pretty big meeting. There's [sic] roughly 10 people in this meeting. We went through everything, decided that yes, there's definitely something there and we were to pursue it.
>
> . . .
>
> When I left that meeting, what was supposed to take place next was Leslie Solum should have had it reviewed and sent out a letter to the vendor to try to collect the money. The agreement was that yes, it looks like something was there, so what was supposed to happen was she was supposed to send the information to the vendor saying either explain to us why it is not valid or remit the money.

Mr. Young testified, however, that "[n]othing happened actually," and "that was the last anything ever happened to it."

[27] Defendant states, however, that although the SAP Public Services Inc. claim was approved and processed, the claim was only a partially valid claim. The court also notes

subcontractor for Horn & Associates to work at Marshall. He employed two additional auditors to work with him, John Crochet and Michael Mescher, with whom he had worked on pervious recovery audits. Consistent with other subcontractors, Mr. Edgerton indicated that he would recover 40 percent of whatever Horn & Associates was able to recover for its audit claims that he identified. Mr. Edgerton attended the April 21, 2005 pre-audit meeting at Marshall with Mr. Mescher, Mr. Farrar, and Jennifer Harris from Horn & Associates, and John Alexander and Becky Black from Marshall.

Mr. Edgerton indicated that he began the recovery audit in June 2005 with Mr. Crochet and Mr. Mescher, but after a week, Mr. Crochet did not return because "[t]here was never enough work for three people," and Mr. Masker worked for two or three weeks a month for the rest of 2005, but did not return in 2006 because "[w]e didn't have enough complete files to audit." Mr. Edgerton also indicated that he frequently had to request documents again and again. Mr. Edgerton left Marshall at the end of May 2006, with the intention of returning once

> it was worked out of how to get the complete files, then we could ramp it back up, bring in either Mike [Mescher], Jack [Crochet] and myself or bring in some, if we had other audits going on right then we couldn't drop those, so we would find other associates that we could use to bring in to help work on the audit.

Mr. Edgerton, however, did not return to Marshall. When asked to summarize his experience at Marshall, Mr. Edgerton indicated that "[t]hey were nice people, but . . . you know, that they had their work to do and their work came first. And so our files came second. So it was, you know, it was a -- it wasn't a combative relationship, it's just that their jobs came first and ours came second."

<u>Langley</u>

According to the parties, Horn & Associates identified and submitted to NASA a total of seven claims related to the Langley recovery audit, and NASA paid plaintiff its contingency fee for one of the claims. According to James Michael, Deputy Chief Financial Officer for Finance at Langley, Ken Respess worked on the Langley recovery audit for Horn & Associates, arriving in October of 2005.[28] He worked for approximately two weeks. Jennifer Harris submitted claims related to Langley as well.[29]

---

that one claim at Marshall, which was approved and processed by NASA was for Bulk Gas Helium.

[28] According to Mr. Michael, auditors had originally arrived in July 2005, but he could not remember how many, only testifying that "I think it was about three or four, but I don't know exactly how many. It was more than one, less than five, but I don't remember exactly how many."

[29] In particular, Jennifer Harris had sent out letters for collection with the signature of Langley's Deputy Chief Financial Officer Kerry Christian. Four vendors submitted

Ames

According to parties, Horn & Associates submitted a total of six claims related to the Ames recovery audit, but only two of the six claims were approved and processed by NASA.[30] According to John Lee, Deputy Chief in Financial Management Division for NASA at Ames, Bob Schuler was the only subcontractor for Horn & Associates to work at Ames. He began working in November 2005, and stayed at Ames for three weeks.

Dryden

According to parties, Horn & Associates identified and submitted to NASA a total of two claims related to the Dryden recovery audit, two of which were approved and processed by NASA.[31]  Valerie Zellmer, NASA's Chief Financial Officer at Dryden testified that two auditors, Penny Parker and Jim Cudlip, worked on the Dryden audit.[32]  Ms. Zellmer testified the auditors arrived at the end of July 2005 and "left before Labor Day of 2005." Ms. Zellmer indicated that she expected the auditors to return after Labor Day, but neither Ms. Parker nor Mr. Cudlip returned to Dryden.

Glenn

According to parties, Horn & Associates identified and submitted to NASA a total of six claims related to the Glenn recovery audit, five of which were approved and processed by NASA According to Vickie Hagerman, Supervisor of NASA Accounting

_____

payments to NASA in response to the letters. Langley did not approve of Ms. Harris' actions. As Mr. Michael testified at trial, after discovery of Mr. Harris' actions, "at that point I know that we expressed our dissatisfaction. I don't recall in what way we did. I know that Kerry Christian was very upset at that time that that letter had gone out with his name at the bottom of it." Further Langley did not believe the claims were valid, as Mr. Michael testified that Langley "did not believe they were overpayments at all," and indicated that "as the contract is audited and closed out in the end or during the life of the contract, that we would receive those amounts back or that our final payment would be less because of that. Mr. Michael also testified that NASA "actually received checks from the vendor." NASA did not pay Horn & Associates a contingency fee for three of the vendors, but did pay a contingency fee for a National Instruments claim.

[30] The defendant states, however, that although one of the claims, the Physical Sciences Inc. claim, was approved and processed, it was not a valid claim "because it falls below the $100 threshold established by Horn's contract."

[31] Defendant states that for one of the claims, the Infinity Tech claim, the claim partially valid, but "Dryden did not collect the discount amount because of its small size, and the fact that it had occurred so far in the past."

[32] Ms. Zellmer also indicated that, "I can remember two. I thought there were three, but I definitely remember two," which she identified as Penny Parker and Jim Cudlip.

Reports Branch, and the point of contact for the recovery audit at Glenn, Tom Reese was the subcontractor for Horn & Associates to work at Glenn, and began working in November 2005, and worked for "about six months, onsite, offsite." Jennifer Harris submitted claims related to Glenn as well on behalf of plaintiff.

Stennis

The parties agree that Horn & Associates did not submit any claims regarding its recovery audit for Stennis. Mr. Edgerton, was the primary subcontractor for Horn & Associates to work at Marshall, testified that he was expected to handle the recovery audit at Stennis, but he decided not to go, believing he would encounter the same problems with NASA that he had at Marshall. Mr. Edgerton testified that he did not go to Stennis because

> [w]e were working at Marshall. We were trying, that was one of the big centers that had a lot of accounts payable. It had a lot of records. If we weren't getting the records from Marshall why would, you know, why take the time and money to go down to Stennis and have the same problem and just, you know, create another problem?

End of the Contract

On July 17, 2006, Terry Bowie, Deputy Chief Financial Officer of NASA, indicated to NASA personnel at Johnson that "I have asked the legal people to look into suspending the contract until we have settled out on the issues raised by Horn in terms of what the contract calls for and what they are entitle [sic] too [sic] for payment." According to the parties' joint stipulations, on July 24, 2006, the NASA Centers were informed that they were to limit Horn & Associates' recovery audit to fixed price contracts only. Dean Patterson, who had become the Contracting Officer in July 2006,[33] informed Horn & Associates on July 31, 2006, that:

> In light of performance concerns that NASA has regarding Contract NNH05CC28D, you are advised to restrict your current audit recovery reviews to fixed priced contracts. A meeting will be held, with your participation, to address performance concerns, contract interpretations and whether or not it is in the government's best interest to exercise the option.

On August 15, 2006, Mr. Bowie issued a memorandum to all NASA Centers regarding the March 4, 2005 internal memorandum from Gwendolyn Sykes, the NASA Chief Financial Officer and stated:

> A previous message regarding the program and contract with Horn and Associates, Inc[.] (Horn) indicated the company would be working with each

---

[33] As indicated above, Janet Langweil was contracting officer for the contract before Dean Patterson becoming the contracting officer for the contract in July 2006.

Center to conduct an examination of payment records of only fixed price contracts. This limitation is not consistent with language in the NASA-Horn contract. Therefore, Centers please work with Horn to conduct an examination of all contracts. This direction is valid until September 30, 2006, when the current performance period on the Horn contract will expire.

Ten days after Mr. Bowie's memorandum to the NASA Centers, on August 24, 2006, Contracting Officer Patterson informed Horn & Associates that NASA would not exercise a second option year on the contract, and, on September 30, 2006, the period of performance under the contract would end. On August 28, 2006, Contracting Officer Patterson sent an email to all NASA Centers informing them "that a decision has been made not to exercise the option under [the contract] and to let the current period of performance end September 30, 2006. Until that time, the contract permits Horn & Assoc. to review all contractual documents and associated financial records in the performance of their audit recovery activities."

Thereafter, on August 31, 2006, Charles McIntosh, a NASA branch manager and the assistant to Mr. Bowie sent an email to each of the offices of the deputy chief financial officers for each of the payment centers and asked them to identify all the claims related to the Horn & Associates audit. Mr. McIntosh wrote:

> As you know, there has been quite a bit of discussion over work that has been done by Horn & Associates, Inc. regarding recovery audits and claims that resulted from their work. In order for the agency to collect monies that they claim are due, a thorough review of the claims in the attached document, including contract and any other document as necessary to support or deny the claim.
>
> Please review the attachment and determine:
>
> 1) If the claim is a valid claim that represents an amount that can/should be recovered (note: Horn receives payment on amounts that have actually been collected)
> 2) If the amount should be recovered, please establish an accounts receivable in SAP and request a refund
> 3) If the amount of the claim is not a valid amount that is deemed recoverable, please provide information that explains/supports why we do not consider the amount to be valid
> Keep in mind that we normally do not request refunds on the following, (but not limited to) types of contracts:
>
>> (A) Open contracts that are subject to final review at close-out
>> (B) Contracts with provisional rates that are pending audit by DCAA

17

(C) Contracts with provisions for advanced payments for nonprofit organizations that conduct experimental or research and development work
(D) Contracts which authorize progress payments.

NASA personnel used this A-D framework to decline to process Horn & Associates' claims after the end of contract performance. For example, on February 8, 2007, NASA produced a document entitled "Goddard Space Flight Center/Regional Finance Office Determination of the Validity/Non-validity of Horn Claims." The document indicated: "We have reviewed this spreadsheet we received from headquarters OCFO on January 31, 2007 . . . . We used the criteria received below from headquarters OCFO to make our determinations." The document indicated, among other criteria:

> Generally, NASA will consider claims for contract payment errors under the following circumstances to be inappropriate:
>
> a. Resulting from cost-type contacts subject to final contract audit that have not been completed.
>
> b. Resulting from cost-type contacts subject to final contract audit that were completed and prior to final payment of the contractor's final voucher, all prior interim payments made under the contract were accounted for and reconciled.

In an email from June Boeckel, referring to the A-D framework, Ms. Boeckel indicated: "As you can see from the above clarification, many of the claims you have submitted fall into this category and we will not be approving them for recovery."[34] At trial, Ms. Boeckel confirmed that she took the lead in reviewing Horn & Associates' claims at Johnson, and that she did not approve claims that fell within the A-D categories.

As indicated above, Horn & Associates identified and submitted a total of 402 claims[35] to NASA, and NASA approved and paid 40 claims. In its amended complaint, Horn & Associates noted that "[i]n spite of the improper impediments raised by NASA, Horn identified approximately $121 million of claims for various classifications of improper payments. Each claim was submitted to NASA with supporting documentation proving the improper payment. Yet to date, only $197,285.47 dollars [sic] of claims have been processed by the Payment Centers." Despite having only been compensated in the amount of $197,285.47, Horn & Associates claims in the amended complaint that "Horn found the following recovery audit claim potentials at each NASA Payment Center

---

[34] The court notes that Ms. Boeckel's email was not addressed to plaintiff, but was language that she drafted for her colleague John Beall to send to Horn & Associates. At trial, plaintiff's counsel asked Ms. Boeckel: "And then at the top there's the email back from you to Mr. Beall. And in that email you're writing for Mr. Beall a memo for him to send to Mr. Hott. Is that right?" Ms. Boeckel answered: "Yes."

[35] As reflected above, plaintiff identified and submitted a total of 402 claims.

included in the recovery audit process: Ames - $138,536.17; Dryden - $12,443.76; Glen - $17,318.44; Goddard - $97,799,329.39; Johnson - $20,183,307.33; Kennedy - $2,915,935.08; Langley - $40,451.99; and Marshall - $272,041.50. The total recovery audit claim potentials for all Payment Centers were $121,379,363.66."[36]

As noted above, the contract ended on September 30, 2006. After the end of the recovery audit, NASA declined Horn & Associates' offer of a "formal review" of all claims, ostensibly to try and demonstrate entitlement to the $121,379,363.66 in potential claims. NASA, however, did meet with Horn & Associates personnel to discuss the various remaining claims. In the meeting at the end of January 2007, Mr. Lowery, Mr. Lizana, and Marie Beckey, another subcontractor, from Horn & Associates, met with Bruce Ward, the chief assistant in NASA's Chief Financial Officer's office, Andrea Davis, a contract specialist, Jon Wolz,[37] the Goddard Deputy Chief Financial Officer, Sandra Brown, and Contracting Officer Patterson, from NASA in which Horn & Associates presented information showing it had identified claims with approximately $81 million in improper, erroneous overpayments, as well as an additional $40 million of interest and penalty claims. Mr. Lizana indicated, however, that as soon as Horn & Associates began their presentation of claims, both Mr. Ward and Ms. Davis said "that they could not approve this [Swales & Associates] claim because it was in the purview of DCAA, and it was a cost type contract."[38] Mr. Lizana emphasized that for each claim NASA's "response was more of the same. It was, okay this is DCAA involved matters, and it's a cost type contract. Move on there's nothing to see here, and so forth. And so it was -- Frankly, it was frustrating." Mr. Lizana testified that the meeting

> got to a point where, at one point in the meeting Mike [Lowery] leaned over and said, listen, I've been in a recovery auditing bill [sic] for a long time. Every client that I've ever worked for, they wanted the money back. They were helpful and cooperative. Can you tell me why NASA doesn't want the money?

On January 31, 2007, Bruce Ward sent an email to a number of NASA personnel, which stated, in part:

---

[36] Plaintiff does not seek a 13.5% contingency fee of the $121,379,363.66 in damages, but in its post-trial brief, plaintiff identified "$54,730,976 in estimated contingency fees Horn would have received in the non-breach world." According to plaintiff, subtracting the $26,634.00 in contingency fees that Horn & Associates actually received, "results in lost profits damages of $54,704,343."

[37] Mr. Wolz is incorrectly identified incorrectly as "John Walls" in the trial transcript.

[38] In discussing the Swales & Associates claim at issue in the meeting with Mr. Ward and Ms. Davis, Mr. Lizana testified, "[t]his claim, it's big. It's a big claim . . . it could be 20 million dollars, it could be 15 million dollars, depending on what rate, a formal rate information we get."

Center CFOs: The contracting officers and I met with representatives of Horn and Associates (HA) today to discuss the status of the claims for Improper payments. As a result of this meeting and with legal counsel concurrence, we agreed to begin a process of meeting at the Centers with the Contracting Officer, HA and me to review the documents and justification that the Centers used to deny the claims, for the purpose of reaching a final determination on the validity or non-validity for each claim.

. . .

Terry Bowie wanted me to make sure that the respective Center CFO signed off on the denied Invalid claims before we have the meetings with HA at the Centers. I have attached the file that we will use for selection and you can easily see the claim numbers and information for each claim that will be reviewed. Starting with Goddard, prior to the meeting, the Center CFO should deliver to me a signed statement that they have reviewed the claims and determined that they are not valid claims for improper payments. Probably the easiest way to do this would be to prepare a memorandum stating your determination of invalidity, with the claim numbers Indicated thereon.

Horn & Associates' final meeting with NASA took place on February 9, 2007, again attended by Mr. Lowery, Ms. Beckey, and Mr. Lizana on behalf of Horn & Associates, and Mr. Ward, Ms. Davis, Mr. Wolz, Ms. Brown, and Contracting Officer Patterson, on behalf of NASA. Horn & Associates represented in the certified claim that, "[t]he only thing accomplished during this meeting was the commitment from NASA that someone from the CFO's [Chief Financial Officer's] Office would supply Horn with a list of all our claims with comments on whether the claim was approved or denied and why the claim was being denied. Such a complete report has never been received."

Subsequently, NASA internally reviewed the Horn & Associates claims that were presented to NASA. For example, in February 2007, at Johnson, Gwen Obert re-reviewed the claims submitted by Horn & Associates at Johnson. Ms. Obert subsequently denied all of the claims that were originally denied during contract performance at Johnson. Another example of the review is the February 8, 2007, "Goddard Space Flight Center/Regional Finance Office Determination of the Validity/Non-validity of Horn Claims."[39] After review, Contracting Officer Patterson sent a March 13, 2007 letter to Horn & Associates, regarding the agency position with respect to issues between Horn & Associates and NASA. Contracting Officer Patterson stated, "[w]hile the contract document (citation to SOW [statement of work]) gave Horn the right to review *all* contracts, at this time it is inappropriate to determine if in fact overpayments have taken place on cost-type contracts that have not been completed." (emphasis in original). Contracting Officer Patterson explained, "[t]his is due to the fact that open contracts are still in the administrative phase of open payment cycles." Regarding interest on overpayments, Contracting Officer Patterson indicated:

---

[39] The document was generated one day before the final meeting with Horn & Associates.

> The $40,619,548.71 identified by Horn as "interest on overpayments" can not [sic] be accepted as valid claims. This is because they are from open cost contracts or in accordance with the Federal Acquisition Regulation 32.614, "the responsible official shall apply interest charges to any contract debt unpaid after 30 days from the issuance of a demand."

(internal citation omitted). In addition, Contracting Officer Patterson tried to explain that, "[w]ith further respect to those claims that were identified as overpayments, but the CFO/DCFO [Chief Financial Officer/Deputy Chief Financial Officer] determined that the overpayment had been satisfied by a setoff against another invoice in accordance with FAR 32.611, the Debt Collection and Offset Act and the authority granted by the treasury to setoff debts due the government, that such payments are not in fact debts due to the government."[40] Contracting Officer Patterson concluded that:

> At this time NASA has determined that $221,310.39 has been approved for debt collection under the contract. The fee on this amount will be remitted to Horn once collection has been made. An amount of $7,862.71 has been remitted to Horn & Associates to date.[41]

Additionally, Contracting Officer Patterson informed Horn & Associates that "[t]his is the final agency position with respect to of [sic] the issues between the parties. NASA is committed to an equitable closeout of the subject contract."

On November 20, 2007, Horn & Associates filed a certified claim with NASA. The certified claim was addressed to "Dean S. Patterson, Procurement Manager, Janet S. Langweil, Contracting/Ordering Officer, Carrie Causey, Procurement Manager, NASA/Headquarters Procurement Office," and was signed by Tom Horn as president of Horn & Associates. On January 25, 2008, Contracting Officer Patterson issued a four page final decision. Contracting Officer Patterson stated that: "This letter is in response to Horn and Associates, Incorporated, hereafter referred to as Horn, claims for $279,000,000.00, $14,700,000.00 and $7,028,200.96 for alleged material breach of NASA Delivery Order NNH05CC28D for Recovery Audit services. The claim is denied in

---

[40] Citing the contract, Contracting Officer Patterson indicated that NASA would not accept claims for payments outside the scope of period of performance, or for claims less than $100.00. Contracting Officer Patterson also indicated that, "[w]ith respect to Prompt Payment Interest calculation, the cited Prompt Payment Act Provision applies only to interest on progress payments under construction contracts, when the performance for which the payment was made is deficient and thus the payment has not been earned. This provision does not apply by analogy to other contract payment adjustments."

[41] At trial, defendant's expert witness indicated that the amount of claims recovered by NASA was $208,954.91, and Horn & Associates was paid $28,209.00.

its entirety."[42] Contracting Officer Patterson stated that "Horn asserts that it received no compensation due to a material breach of the order by NASA. To the contrary, Horn received compensation in accordance with the payment terms of the order that was awarded on a contingency fee basis." Contracting Officer Patterson continued:

> The ultimate decision as to what constitutes a debt lies not with Horn, but with the responsible NASA official at each Center in accordance with the SOW and FAR Part 32. Horn did not comply with the delivery order terms and audit as stated under the basic years as awarded, 1998-2003 or fiscal years 1997-2002, and failed to submit the required management report at the end of the initial basic period to allow NASA to evaluate the progression of the audit and make any necessary adjustment to the audit project plan as stated in Task 3 of the order.

Ultimately, prior to trial, NASA identified several claims which had been denied during or shortly after the recovery audit, but which NASA subsequently concluded were valid claims that should have been approved for collection, rather than denied. In its post-trial briefing, defendant acknowledged that there were $992,557.38 in valid overpayments that NASA had failed to pursue and process on which Horn & Associates was owed a contingency fee. The court notes, however, that plaintiff takes issue with defendant's characterization of "valid," arguing that:

> Nearly all of the recommended debts submitted by Horn to NASA were valid, meaning that based on the information available to Horn during the audit, the individual claim should have been pursued. As numerous witnesses testified, Horn had no incentive (and, because of the contingent fee nature of the Contract, actually had a disincentive) to spend time working on and submitting recommended debts that Horn's auditors knew to not be valid. Each individual claim submitted by Horn was based on the information available to the Horn auditors at the time, and Horn believed each of those individual claims to have been valid.[43]

---

[42] Prior to the issuance of the final decision, Mr. Ward, the chief assistant in NASA's Chief Financial Officer's office indicated, on December 19, 2007 that "he believed the Horn Certified Claim should be investigated as a 'false claim' to the Government."

[43] Plaintiff also argues that:

> Horn contends that the present collectability of any of the individual claims, now 7 or 8 years after Horn's auditors submitted them to the NASA Centers and lacking the complete documentation that was available during the period of performance, is irrelevant to the question of whether NASA materially breached the Contract in 2005-07, and what Horn's damages should be as a result of NASA's breaches. Horn has proved breach by demonstrating NASA's gross misconduct during the period of performance and it has proved damages by establishing what would have happened in

After Contracting Officer Patterson issued his final decision, on June 6, 2008, Horn & Associates timely filed a complaint in this court. Like in the certified claim, Horn & Associates raised three alternative causes of action, and sought the same amounts: $279,000,000.00 for breach of contract, $17,599,550.00 for constructive partial termination for convenience, and $7,028,200.96 for equitable relief. In an opinion issued by the court prior to trial, the court granted plaintiff's motion for partial summary judgment regarding contract interpretation. Plaintiff claimed that the contract's Statement of Work directed Horn & Associates to perform a primary audit recovery on all contract payments between October 1, 1997 through September 30, 2003,[44] whereas defendant argued that "the purchase order was for the auditing of fixed price contracts," for that same time period because the RFQ was limited to audits "on payments made from all fixed price contracts." (emphasis in original). The court concluded that the Statement of Work attached to the contract signed by Horn & Associates and the Contracting Officer determined the scope of the agreement between the parties and required the plaintiff to perform a primary audit recovery on all contract payments for the time period specified. See Horn & Assocs., Inc. v. United States, 104 Fed. Cl. 121, 136 (2012).

After the court's decision, plaintiff filed an amended complaint, albeit without specific mention of the three claims and their specific dollar amounts. Instead, plaintiff listed a single cause of action, breach of contract, and in the prayer for relief requested that "the Court enter judgment for Horn and against NASA on the breach of contract cause of action and award Horn expectation damages, reliance damages, and/or any other type of damages which the Court deems appropriate, in an amount to be proven at trial." In response, defendant filed an answer to the amended complaint and a counterclaim. Defendant asserted a counterclaim in this court against plaintiff under the False Claims Act, 31 U.S.C. § 3729 (2012), as well as an affirmative defense under the Special Plea in statute, 28 U.S.C. § 2514 (2012) and the anti-fraud provision of the Contract Disputes Act, 41 U.S.C. § 7103(b)(1) (2012).

In its post-trial briefing the defendant stated:

> The Government does not pretend that its own performance in connection with the recovery audit was perfect. Indeed, for reasons that we acknowledge fully below, it was not, with the result that, at the conclusion of the audit, Horn was owed an additional contingency fee based upon $992,557.38 in valid overpayments that NASA failed to pursue and process. Horn's own subsequent conduct, however, has wiped out its entitlement to

the "but for world" if NASA had performed as agreed. The claims files today are a very extensively proved, but marginally relevant side show.

[44] As noted above, although the contract had originally called for Horn & Associates to conduct the recovery audit for contract payments made during October 1, 1997 through September 30, 2003, the contract subsequently was modified to cover contract payments from October 1, 1997 through September 30, 2005.

even that amount, and renders it liable to the Government for substantial damages in fraud.

Following a lengthy trial, and after reviewing of all the information in the record, the court first addressed defendant's fraud counterclaims due to the potential forfeiture of plaintiff's claims under the Special Plea in Fraud statute, or the potential forfeiture of unsupported portions of plaintiff's claims under the anti-fraud provision of the Contract Disputes Act, and denied all of defendant's fraud counterclaims. See generally Horn & Assocs., Inc. v. United States, 123 Fed. Cl. 728. The court concluded that the defendant had failed to establish that Horn & Associates intended to deceive the government, which is required to establish liability under the False Claims Act or to warrant forfeiture under the Special Plea in Fraud statute or the antifraud provision of the Contract Disputes Act. See id. at 787-88. This opinion addresses the issue of plaintiff's allegations of breach of contract by NASA, and the government's counter allegations of breach of contract by Horn & Associates under the contract. The court, therefore, turns to plaintiff's claims of breach of contract.

## DISCUSSION

Plaintiff states that "[i]n this suit, Horn is pursuing a single cause of action for breach of contract," and "NASA committed numerous breaches of its duties under the contract." Defendant responds that "Horn breached its contract with NASA," and claims that, regarding plaintiff's allegations, "Horn has not met its burden of proving that the centers failed to timely review and pay Horn's claims within a reasonable time."

Prior to addressing the breach of contract allegations, the court identifies the relevant contract sections, as well as the legal standards for contract interpretation. To review, on December 23, 2004, NASA awarded the contract to Horn & Associates for the furnishing of "Recovery Audits." The contract indicated that it was "subject to all the terms and conditions of the contractor's GSA Schedule Contract GS-23F-0258N and as amended by the clauses contained herein." Regarding the data available to plaintiff, the contract provided, in part: "In the performance of this contract, it is anticipated that the Contractor may have access to, be furnished, or use the following categories of data (which may be technical data, computer software, administrative, management information, or financial, including cost or pricing). . . ." Regarding payment to Horn & Associates, the contract provided:

The amount of the Contingency Fee for this order is 13.5%. Payments to the contractor for services under this order will be based on a Contingency Fee Basis after NASA has recovered and received funds for the basic requirements as set forth in the Statement of Work (SOW). There will be no out-of-pocket expenses, costs or other financial obligations or liabilities incurred by NASA, other than the fees identified in this order.

The contract included four unilateral options for NASA, and the contract stated, "[t]he Contracting Officer may exercise the option by written notice to the Contractor within

the period specified in the schedule." Each option year extended the period of performance by one year and expanded the audit recovery period. For option year 1, the period of performance would be October 1, 2005 to September 30, 2006, and the corresponding audit recovery period was 2004-2005. For option year 2, the period of performance was October 1, 2006 to September 30, 2007, and the corresponding audit recovery period was 2006, option year 3 contemplated the period of performance would be October 1, 2007 to September 30, 2008, and the corresponding audit recovery period would be 2007. Finally, for option year 4, the period of performance would be October 1, 2008 to September 30, 2009, and the corresponding audit recovery period would be 2008. For all option years, the contingency fee remained 13.5%. As indicated above, only the first option year was executed.

Incorporated into the contract as an attachment to the contract was a Statement of Work. The Scope of Work for the Statement of Work indicated: "The contractor shall perform a primary audit recovery on all contract payments for the period beginning October 1, 1997 through September 30, 2003, identifying overpayments and/or underpayments."

Subtask 3.2 of the Statement of Work provided that:

The strategy for identifying lost funds should address all tasks required to identify lost funds due to overpayment. At a minimum, the strategy should include: (1) a methodology for identifying documents for auditing; (2) a plan for acquiring and verifying only the documents and data in the possession of NASA; (3) a process for obtaining and analyzing financial data required for the audit; (4) criteria and outline for analyzing discrepancies; (5) review of payment processing procedures; and (6) outline of the audit process.

Subtask 3.3 of the Statement of Work provided that:

The contractor shall identify all lost funds, discrepancies and improprieties. The contractor shall calculate the proper amount to be collected. The Contractor shall provide a list of all recommended debts to the NASA CFO and the appropriate Center Deputy CFO for Finance. The Center Deputy CFO shall be responsible for posting approved debts to the accounting system.

Individual debts must be for amounts of $100 or greater and cannot consist of more than two unique invoices.
For each debt recommended for collection, the Contractor shall:
1. provide documentation to support that the claim is owed
2. provide the original accounting classification of the improper payment
3. calculate the total amount of the debt. Total amount of the debt should include:

> a. Principle (original) amount of the debt
> b. Accrued interest for debts greater than days past due.
> c. Penalties for debts over 90 days past due.
> d. Administrative costs associated with tracking the unpaid debt.

> NASA will review and verify all debts. All debts will be posted by NASA within a reasonable time. Once the NASA has verified the debt and posted the debt to the accounting system, NASA will provide the contractor a claim number for tracking purposes. NASA will pay the contractor's fee monthly based on the amount debts collected.

Attachment B to the Statement of Work stated in chart form the option years, the periods of review and the percentage of recovery plaintiff would receive:

**ATTACHMENT B**

**CONTINGENCY FEE SCHEDULE**

| Period | Audit Recovery | Fee Percentage | |
|---|---|---|---|
| Base Year | 1998- 2003 | Contractor Percentage of Recovery | 13.5% |
| Option Year 1 | 2004 | Contractor Percentage of Recovery | 13.5% |
| Option Year 2 | 2005 | Contractor Percentage of Recovery | 13.5% |
| Option Year 3 | 2006 | Contractor Percentage of Recovery | 13.5% |
| Option Year 4 | 2007 | Contractor Percentage of Recovery | 13.5% |

"Contract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)) ("The starting point for any contract interpretation is the plain language of the agreement."); Beard v. United States, 125 Fed. Cl. 148, 158 (2016); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483–84 (2013).

"""In contract interpretation, the plain and unambiguous meaning of a written agreement controls.""" <u>Arko Exec. Servs., Inc. v. United States</u>, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting <u>Hercules Inc. v. United States</u>, 292 F.3d 1378, 1380–81 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2002) (quoting <u>Craft Mach. Works, Inc. v. United States</u>, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." <u>SUFI Network Servs., Inc. v. United States</u>, 785 F.3d 585, 593 (Fed. Cir. 2015) (citing <u>Coast Fed. Bank, FSB v. United States</u>, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); <u>see also</u> <u>Northwest Title Agency, Inc. v. United States</u>, 2017 WL 1521598, at *3 (Fed. Cir. Apr. 28, 2017); <u>Canpro Investments Ltd. v. United States</u>, 130 Fed. Cl. 320, 347 (2017); <u>Beard v. United States</u>, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ."). The United States Court of Appeals for the Federal Circuit stated in <u>Massie v. United States</u>:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'"

<u>Massie v. United States</u>, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (<u>quoting</u> <u>McAbee Constr., Inc. v. United States</u>, 97 F.3d 1431, 1435, <u>reh'g denied and en banc suggestion declined</u> (Fed. Cir. 1996); (internal citations omitted)); <u>Jowett, Inc. v. United States</u>, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (<u>quoting</u> <u>McAbee Constr., Inc. v. United States</u>, 97 F.3d at 1435 and <u>Harris v. Dep't of Veterans Affairs</u>, 142 F.3d 1463, 1467 (Fed. Cir. 1998)); <u>Harris v. Dep't of Veterans Affairs</u>, 142 F.3d at 1467; <u>see also</u> <u>Coast Professional, Inc. v. United States</u>, 828 F.3d 1349, 1354 (Fed. Cir. 2016); <u>Shell Oil Co. v. United States</u>, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014) (noting that a contract must be interpreted in context, giving meaning to the document as a whole) (citing <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004); <u>Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.</u>, 169 F.3d 747, 752 (Fed. Cir. 1999)); <u>McHugh v. DLT Solutions, Inc.</u>, 618 F.3d 1375, 1380 (Fed. Cir. 2010); <u>Giove v. Dep't of Transp.</u>, 230 F.3d 1333, 1340–41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); <u>Gould, Inc. v. United States</u>, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." <u>Lockheed Martin IR Imaging Sys., Inc. v. West</u>, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." <u>Abraham v.</u>

Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." Air–Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." Medlin Const. Group, Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

Dynetics, Inc. v. United States, 121 Fed. Cl. 492, 512 (2015); see also Marquardt Co. v. United States, 101 Fed. Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

The Federal Circuit also has indicated that "'[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.'" Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379 (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380–81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002)); see also Northwest Title Agency, Inc. v. United States, 2017 WL 1521598, at *3; LAI Servs., Inc. v. Gates, 573 F.3d at 1314; Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); Hunt Constr. Grp., Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract . . . . The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." (citations omitted)); Beard v. United States, 125 Fed. Cl. at 158 (quoting Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1288 (Fed. Cir. 2008)) ("In construing the meaning of a contractual provision, the court does not interpret the disputed term or phrase in isolation, but "construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative.").

It has been "'a fundamental precept of common law that the intention of the parties to a contract controls its interpretation.'" Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA, 619 F.3d 1364, 1367 (Fed. Cir. 2010) (quoting Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971))); Alvin, Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); see also Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer. . . ."); see also Canpro Investments Ltd. v. United States, 130 Fed. Cl. at 347 ("Contract interpretation requires determining the intention of the parties.").

28

As indicated above, the court previously issued a decision on contract interpretation. In considering the plaintiff's motion for partial summary judgment on an issue of contract interpretation, plaintiff claimed that the contract's Statement of Work directed Horn & Associates to perform a primary audit recovery on all contract payments between October 1, 1997 through September 30, 2003, whereas defendant argued that "the purchase order was for the auditing of fixed price contracts," for that same time period because the RFQ was limited to audits "on payments made from all fixed price contracts." (emphasis in original). The court determined that "[t]he Statement of Work attached to the Order signed by Horn and the Contracting Officer determined the scope of the agreement between the parties and required the plaintiff to perform a primary audit recovery on all contract payments for the time period specified." See Horn & Assocs., Inc. v. United States, 104 Fed. Cl. at 136.[45]

In this court, Horn & Associates has alleged a breach of its contract by NASA, first alleging that "NASA committed numerous breaches of its duties under the contract." More colorfully, plaintiff contends that NASA "failed to heed its duty to cooperate, deliberately breached its contract, ignored its duty of good faith, covered its tracks with lies, and left Horn & Associates for dead. NASA must be held accountable by this Court, if not for its betrayal of the trust of the American people, then at least to Horn for its proven losses."

It is well settled that "[t]o recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."[46] San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir.), reh'g denied (Fed. Cir. 1989); see also Shell Oil v. United States, 130 Fed. Cl. at 34; Barlow & Haun, Inc. v. United States, 118 Fed. Cl. 597, 620 (2014); Cooley v. United States, 76 Fed. Cl. 549, 555–56 (2007) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959).

---

[45] The defendant argues in its post-trial briefs that the court's decision did not "actually rule on summary judgment that a breach of the parties' contract had occurred. As such, the question of the occurrence of breach, and the materiality of that breach, remains for the Court to decide based upon the trial record." The defendant also states that "[f]or purposes of this post-trial brief only, and, without prejudice to any future right to appeal, the Government recognizes as law of the case the Court's March 20, 2012 summary judgment holding that the parties' contract 'determined the scope of the agreement between the parties and required the plaintiff to perform a primary audit recovery on all contract payments for the time period specified.'" (quoting Horn & Assocs., Inc. v. United States, 104 Fed. Cl. at 136).

[46] As recently indicated by a Judge of the United States Court of Federal Claims, "[t]o satisfy this fourth element, the plaintiff also must show that: '(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty.'" Shell Oil v. United States, 130 Fed. Cl. 8, 34 (2017) (quoting Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005)).

The court first notes that it is uncontested that Horn & Associates had an express contract with the government. The joint stipulations of facts state, "[o]n December 23, 2004, NASA awarded Order No. NNH05CC28D to Horn for Recovery Audit Services." Moreover, plaintiff states that "[i]t is undisputed that a valid contract existed between Horn and NASA," and, moreover, in defendant's post-trial briefs, defendant notes that "[t]he contract that NASA awarded Horn was an enormous undertaking."

NASA Headquarters

Horn & Associates first points to the conduct of NASA's headquarters and argues that "NASA's thorough, material breach of the Contract began with the initial apathy and indifference of NASA Headquarters ('HQ')'s senior financial management to the Recovery Audit. This resulted in a series of structural and operational impediments to Horn's ability to complete a successful Recovery Audit," and claims that "NASA HQ's failure to cooperate, as manifested in structural/operational impediments to a successful Recovery Audit." Plaintiff, citing to the testimony of the original contracting officer's technical representative, Melvin DenWiddie, argues that the "recovery audit was a low priority," and argues that "[i]ndeed, the Recovery Audit was such a low priority for NASA senior management (outside of Mr. DenWiddie), that when Mr. DenWiddie retired at the end of June 2006, NASA's remaining senior financial management actively contemplated suspending the Recovery Audit 'till we get a handle on what we want the contractor [Horn] to do." Plaintiff notes that "[e]ighteen (18) months into the Contract, and more than a year after Horn auditors had first begun submitting recommended debts to the Centers, the NASA Deputy CFO did not know what NASA wanted Horn to be doing."

Plaintiff also points to the data it did, and did not, receive from NASA as evidence of a breach. The plaintiff argues that "[n]ot only did NASA fail to provide a complete set of this payment data in a timely manner, but NASA *never* provided a complete set of this payment data." (emphasis in original). The defendant responds that "Horn's expectations were also not based upon the terms of the parties' actual contract; indeed, the contract contains no requirements *whatsoever* for the provision of electronic data, let alone requirements of the type envisioned by Horn," and that "the contract does not obligate NASA to provide its electronic data in any particular format, it does not obligate the agency to filter the data in any particular way for Horn's benefit, and it does not establish any timetable by which data will be provided."[47] (emphasis in original).

The court notes, however, as indicated above, the defendant has conceded that "[t]he data itself, however, was admittedly not perfect." As explained in the findings of fact,

---

[47] The court agrees with defendant that the contract does not explicitly state when NASA specifically had to provide data to plaintiff, but it did provide that plaintiff was to conduct the audit and provided that "[i]n the performance of this contract, it is anticipated that the Contractor may have access to, be furnished, or use the following categories of data . . ." and the Statement of Work, which was incorporated into the contract as an attachment, required plaintiff to have a strategy  to have "a plan for acquiring and verifying only the documents and data in the possession of NASA;" as well as "a process for obtaining and analyzing financial data required for the audit. . . ."

NASA had switched accounting systems from a Legacy system to the SAP system, and in the process, "the information from the Legacy systems just disappeared." Therefore, although Horn & Associates received SAP data from NASA, the defendant agency, was unable to identify the total amount of contract payments for fiscal years 1998-2003, and the defendant admits "[t]he production of NASA's SAP data was more problematic" than the production of the Legacy data.[48]

The defendant also claims that plaintiff's desire to have the data within 30 days of the engagement was "formed solely from Horn's private sector experience. Horn had clearly performed no due diligence to gain an understanding of the complexities of NASA's electronic payment data prior to contract award and apparently was surprised to learn about NASA's massive, and extremely disruptive, transition to SAP in the year 2003, and its varied legacy data systems throughout the payment centers at the time of the initial preaudit planning meeting." Defendant further argues that, nevertheless, "the evidence at trial demonstrated that NASA did attempt to comply with Horn's requests," and cites to Larry Farrer's testimony that in a "typical audit," "when we go in and try to get the data is anywhere from a 30- to 60-day process." Defendant claims that "[t]he evidence of record shows that, in the April and May 2005 timeframe, Horn met with the various NASA payment centers, and had obtained most of the Legacy data by June." (internal citations omitted). Defendant also claims that "[t]he story is fairly similar with respect to NASA's SAP data," and that plaintiff was contacted by Melvin Denwiddie [sic] about productions of the SAP data in May of 2005, "[a]fter Horn responded in May 2005, NASA produced its SAP data to Horn in July 2005, *i.e.*, again within the 30 to 60-day window that the Horn witnesses described as reasonable based upon their experience in the private sector."

Plaintiff disagrees with defendant that the data was provided within that window, and points to the testimony of Jennifer Harris who worked on obtaining and analyzing NASA's data. In response to plaintiff's counsel's question at trial: "What, if any, communications had Horn & Associates had with Ms. Kroeger[[49]] between February and May [of 2005] with respect to the SAP data?" Ms. Harris testified that "[w]e had not made any progress." In response to the question, "then after May 2, [2005] do you recall when

---

[48] As noted above, the parties have stipulated that:

NASA's financial system no longer contains data for contract payments made by NASA during FY1998 through FY2003, and therefore NASA was unable to identify the total amount of money it expended on contract payments during those fiscal years, or during the FY1998-2005 period of the Horn Recovery Audit, in response to requests for that information from Horn during discovery. NASA did not reconstruct an estimate of the amount of total contract payments for FY 1998-2005 in response to discovery requests seeking this information.

[49] Ms. Harris testified that Pam Kroeger was the individual who was responsible for getting the SAP data for plaintiff.

Horn & Associates finally received SAP data?" Ms. Harris responded, "I believe we received it sometime in June." Ms. Harris also noted that:

> [W]e signed a contract in December of 2004. So, at this point, it was September of 2005. We were running to the end of our deadline, you know, and we were still at the point in trying to just gather the data needed to do the audit. So it was becoming critical. You know, certainly this is something we would expect to get in the first 30 days of an engagement traditionally. So it was certainly concerning that we had not received it, you know, nine months after. We really still didn't feel that comfort level that we'd received 100 percent of the information we needed to do a good job.

In response to the question at trial, "[w]hat was the state of the SAP data when it was provided to Horn & Associates?" Ms. Harris answered that "it was very clear that it was incomplete. There was quite a bit of missing information, which led to a lot of concern because, you know, without that information the data is suspect."

The court agrees with plaintiff that "[f]irst and foremost, the Contract here, by its very nature, created a unique interdependence between the good faith performance of NASA and the ability of Horn or any recovery auditor to succeed." Plaintiff was dependent on NASA providing data in the first instance and in a format that was usable to perform the audit plaintiff was contracted to perform. The court finds compelling plaintiff's argument that "[t]he notion that NASA expected Horn, under the Contract, to perform a recovery audit on tens of billions of dollars in payments over six fiscal years *without* electronic data, and to complete that task within one year (or two years after the Contract was extended), is completely unrealistic." (emphasis in original).

In addition, plaintiff points to "misinformation" about the scope of the audit. As noted above, after a February 8, 2005 pre-audit planning meeting at NASA headquarters, Gwendolyn Sykes, NASA's Chief Financial Officer, issued an internal NASA memorandum on March 4, 2005 indicating that Horn & Associates was to audit "payment records of fixed price contracts." Despite Mr. DenWiddie's May 18, 2005 email to the NASA Centers that the contract for Horn & Associates' recovery audit was for the audit of "all contract payments," plaintiff argues that "Ms. Sykes' memorandum, and the concept behind it, continued to reverberate even after the Recovery Audit had ended." As discussed below, at Johnson, NASA personnel, at times, limited review of the audit to fixed price contracts. Horn & Associates' auditor at Johnson, Tom Hott, testified at trial that "[a]pparently, June Boeckel discovered, somehow or another, a memo or a communication of some sort from Gwendolyn Sykes who was the CFO of all of NASA as I understand. She sent a memo to the Center CFOs indicating that we were to look at fixed-price contracts." Plaintiff argues that "Horn was significantly damaged by the Sykes memorandum because of the confusion it caused before the Recovery Audit had even begun at the Centers, but also because it continued to plague the entire Recovery Audit effort."

Plaintiff argues, in addition, that NASA's headquarters "lack of guidance from NASA HQ regarding how to process claims and to pay Horn" was a breach of the contract. Plaintiff notes that:

Although NASA awarded the Contract to Horn in December 2004—and although Horn auditors were submitting recommended debts to the Centers in earnest by the summer of 2005— not until the Recovery Audit was almost over in September 2006 did NASA HQ develop and finalize a protocol by which the Centers should approve recommended debts, post those debts to their financial management systems, and then account for recaptured funds and paying Horn's contingent fee.

Plaintiff cites to an April 2006 email from John Alexander, the Deputy Chief Financial Officer at Marshall, to Mr. DenWiddie and Charles McIntosh, which stated, in part,

we believe that HQ should be responsible for the payments to Horn and Associates. HQ has this se [sic] up as their contract now and is carrying the obligation for the agency. It seems logical, therefore, that HQ should make the disbursements against that contract. If the centers pay their portion, we will have to set up Horn and Associates as a vendor and then part of the costs will be on the Center and the rest on HQ. We believe this will be a more difficult, tedious process than if HQ paid all of the items.

Plaintiff argues this failure to have a system in place "to approve recommended debts, collect the outstanding funds, and compensate Horn . . . nearly a year after Horn auditors began submitting recommended debts to the Centers" was a breach of the contract.

Plaintiff also points to the conduct of NASA headquarters at the end of the contract to prove breach. As indicated above, the Deputy Chief Financial Officer of NASA, Terry Bowie, indicated to NASA personnel in an July 17, 2006 email that "I have asked the legal people to look into suspending the contract until we have settled out on the issues raised by Horn in terms of what the contract calls for and what they are entitle [sic] too [sic] for payment." According to the parties' joint stipulations, on July 24, 2006, NASA Centers were informed that they were to limit Horn & Associates' recovery audit to fixed price contracts only. The Contracting Officer, Dean Patterson, subsequently informed plaintiff that:

In light of performance concerns that NASA has regarding Contract NNH05CC28D, you are advised to restrict your current audit recovery reviews to fixed priced contracts. A meeting will be held, with your participation, to address performance concerns, contract interpretations and whether or not it is in the government's best interest to exercise the option.

On August 15, 2006, Mr. Bowie issued a memorandum to all NASA Centers regarding the March 4, 2005 internal memorandum from Gwendolyn Sykes, the NASA Chief Financial Officer and stated:

> A previous message regarding the program and contract with Horn and Associates, Inc[.] (Horn) indicated the company would be working with each Center to conduct an examination of payment records of only fixed price contracts. This limitation is not consistent with language in the NASA-Horn contract. Therefore, Centers please work with Horn to conduct an examination of all contracts. This direction is valid until September 30, 2006, when the current performance period on the Horn contract will expire.

Ten days after Mr. Bowie's memorandum to the NASA Centers, on August 24, 2006, Contracting Officer Patterson, informed Horn & Associates that NASA would not exercise a second option year on the contract, and, on September 30, 2006, the period of performance under the contract would end. Thereafter, on August 31, 2006, Charles McIntosh, a NASA branch manager and the assistant to Mr. Bowie, sent an email to each of the offices of the deputy chief financial officers for each of the centers and asked them to identify all the claims related to the Horn & Associates audit. Mr. McIntosh wrote:

> As you know, there has been quite a bit of discussion over work that has been done by Horn & Associates, Inc. regarding recovery audits and claims that resulted from their work. In order for the agency to collect monies that they claim are due, a thorough review of the claims in the attached document, including contract and any other document as necessary to support or deny the claim.
>
> Please review the attachment and determine:
>
> 1) If the claim is a valid claim that represents an amount that can/should be recovered (note: Horn receives payment on amounts that have actually been collected)
> 2) If the amount should be recovered, please establish an accounts receivable in SAP and request a refund
> 3) If the amount of the claim is not a valid amount that is deemed recoverable, please provide information that explains/supports why we do not consider the amount to be valid
> Keep in mind that we normally do not request refunds on the following, (but not limited to) types of contracts:
>
>> (A) Open contracts that are subject to final review at close-out
>> (B) Contracts with provisional rates that are pending audit by DCAA
>> (C) Contracts with allowances for advanced payments for nonprofit organizations that conduct experimental or research and development work

(D) Contracts which authorize progress payments.

This guidance was applied by the NASA Centers. For example, at Johnson, in a September 6, 2006 email from June Boeckel, regarding plaintiff's claims, she referred to the A-D framework and indicated: "As you can see from the above clarification many of the claims you have submitted fall into this category and we will not be approving them for recovery."[50] At trial, Ms. Boeckel confirmed that she took the lead in reviewing Horn & Associates' claims at Johnson, and that she did not approve claims that fell within the A-D categories. Ms. Boeckel also had the following exchange with plaintiff's counsel on cross-examination about the McIntosh email:

> [Q.] That was an email that Mr. Macintosh [sic] sent from NASA headquarters to all of the centers or at least, certainly he sent to Johnson Space Center, right?
>
> A. Correct.
>
> Q. And when you read this statement, "Keep in mind we normally do not request funds on the following, but not limited to types of contracts." And then he listed A, B, C, and D.
>
> A. Request refunds.
>
> Q. Refunds do not normally request refunds.
>
> A. Mm-hmm.
>
> Q. You understood that criteria as eliminating all the cost plus contracts from the scope of the recovery audit at Johnson, correct?
>
> A. Correct.
>
> Q. You understood that was guidance from headquarters not to consider cost contracts, right?
>
> A. Correct.
>
> Q. Marilyn Sampay forwarded that to you and asked you to take the lead on applying these criteria to the claims that had been submitted by Horn and Associates at Johnson, right?

---

[50] As noted above, Ms. Boeckel's email was not addressed to plaintiff, but was language that she drafted for her colleague John Beall to send to Horn & Associates. At trial, plaintiff's counsel asked Ms. Boeckel: "And then at the top there's the email back from you to Mr. Beall. And in that email you're writing for Mr. Beall a memo for him to send to Mr. Hott. Is that right?" Ms. Boeckel answered: "Yes."

A. Right.

In addition, Ms. Boeckel sent an email to Mr. McIntosh on September 18, 2006, in which she said: "You will notice that we denied many claims based on the criteria you sent us and it is provided on the spreadsheet." Plaintiff argues that the McIntosh email "essentially gutted" the earlier NASA headquarters message that "Centers please work with Horn to conduct an examination of all contracts." Moreover, plaintiff claims that "[t]he effect of the McIntosh memorandum on the efforts of Horn to perform the recovery audit was immediate and devastating." The plaintiff also noted that Charles McIntosh did not testify at trial, and regarding NASA's conduct under the audit, indicated that "the only representative from NASA headquarters who appeared to explain this conduct at trial was Terry Bowie – and he was under subpoena from the Plaintiff."

In addition, NASA personnel used this A-D framework to decline to process Horn & Associates' claims after the end of contract performance. For example, on February 8, 2007, NASA produced a document entitled: "Goddard Space Flight Center/Regional Finance Office Determination of the Validity/Non-validity of Horn Claims." The document indicated: "We have reviewed this spreadsheet we received from headquarters OCFO [Office of Chief Financial Officer] on January 31, 2007 . . . . We used the criteria received below from headquarters OCFO to make our determinations." The document indicated, among other criteria:

> Generally, NASA will consider claims for contract payment errors under the following circumstances to be inappropriate:
>
> a. Resulting from cost-type contacts subject to final contract audit that have not been completed.
>
> b. Resulting from cost-type contacts subject to final contract audit that were completed and prior to final payment of the contractor's final voucher, all prior interim payments made under the contract were accounted for and reconciled.

Regarding the McIntosh email, defendant cites to the testimony of Gwen Obert, who reviewed the claims after the end of the contract at Johnson. Ms. Obert testified that her view of the four categories from the McIntosh email was that, "[b]asically these were general categories that claims were falling into. However, it was my understanding that we were to look at each claim independently and review each claim regardless of what category it fell into." Therefore, the defendant argues that

> having abdicated to its responsibility to present anything but speculation as to the meaning of this document, Horn has failed to meet its burden of proving that the McIntosh email, in fact, constituted a breach of contract in this case, particularly in a context where the evidence of record demonstrates that it had virtually no net effect upon the manner in which claims were reviewed, and where any short term effect that the email may

have had at Johnson was quickly corrected by the full merits review ultimately conducted by Gwen Obert and her team. As such, the McIntosh email is insufficient to establish breach.

The court disagrees with defendant's characterization. The McIntosh memorandum had effects at Johnson, which were testified to at trial by Ms. Boeckel. Moreover, although Ms. Obert claimed to have re-reviewed all the Johnson claims, her review took place after the end of the contract, in February 2007, and as plaintiff stated, "[t]he fundamental problem with the Government's position is that NASA's breach persisted throughout the time Horn was attempting to conduct the audit. The Boeckel review took place in September 2006 at the very end of the contract period. NASA could not undo its breach five months after the performance period of the contract is over. The harm was already done."[51] Furthermore, on cross-examination, plaintiff's counsel and Ms. Obert had the following exchange

[Q.] it says that you didn't retain copies of initial denied claims if there were no objections to the determination. That's not based on anything you knew based on your firsthand knowledge, is it?

A. Based on review with Pat at the time when we were doing this letter, that is the information that I understood.

Q. Right. You never personally interacted with Tom Hott, much less gave him back his files, true?

A. Right, but I did have the compact disc.

Q. Okay. And the compact disc that you're referring to. Do you have any idea where that came from or what the circumstances were of its creation?

A. They were provided by the auditor.

Q. To whom?

A. To Pat Bright.

Q. And did you understand that that was the same compact disc that had been provided to headquarters?

A. I was not aware of that.

Q. Did you understand that that compact disc did not purport to include all of the documentation relating to the claims?

---

[51] Without determining whether or not she was correct in her post-contract evaluations, the court notes that Ms. Obert did not change any of the original denials of plaintiff's claims by Ms. Boeckel.

A. It was my understanding that they should have, but I was completely aware --

Q. Did you think they did or not?

A. They did not because I looked at -- we were saying they did not, and I looked at those discs. I have those discs.

Q. So is it fair to say for the claims that have an asterisk on them on your spreadsheet, as a generalization you did not have enough information to know whether those were good claims or not?

A. I reviewed the notes and information that Pat had and she was in those meetings, and I had no objection to the information she provided.

Q. The question was is it fair to say for the claims that have an asterisk by them on your list on this exhibit that you did not have enough information yourself to make a determination as to whether or not they were valid claims?

A. When I drafted this letter I felt comfortable with the information that I did have from Pat Bright, but we did not have all the backup.

From Ms. Obert's own testimony, the record suggests that she did not have all the materials that Mr. Hott had when he originally compiled and presented the claims to NASA officials, not did she meet with Mr. Hott. Moreover, as plaintiff argues in its post-trial briefs, "Ms. Obert's claims review 'do over' five months after the audit and without the benefit of a full set of documents₂ or any input from the Horn auditors does not somehow 'cure' the admitted breach that occurred during the period of performance. Again, NASA failed to perform at the time performance was due, and that is a breach of contract."

In addition to the allegations of breach by NASA headquarters, Horn & Associates also raised allegations of breach related to specific NASA Centers where the plaintiff preformed the recovery audit. Defendant generally responds that each of the centers did not breach the contract and specially argues that "Horn has not met its burden of proving that the centers failed to timely review and pay Horn's claims within a reasonable time." As the court examined the impact of the McIntosh email at Johnson, the first NASA Center that the court examines is Johnson.

<u>Johnson</u>

As noted above, the Johnson recovery audit generated the second most claims, but only a fraction of the claims were approved and recovered.[52] Horn & Associates' main

---

[52] Plaintiff identified and submitted 121 claims for Johnson only 19 of which were approved and processed by NASA.

on-site auditor was Tom Hott, although Michael Colby also worked on the Johnson recovery audit and Beth Hott, supported the Johnson recovery audit off-site. Mr. Hott indicated that initially the audit "went fine. We had access to their records and we had a nice place to work in front of the vault where the records were kept, and it was easy for us to come up with a program to start the audit effectively and efficiently." Mr. Hott, explained, however, "[t]hen when we began turning in claims, they were, the claims were immediately denied." Mr. Hott explained when NASA personnel began to work with Horn & Associates, at the beginning of the contract they relied on the Gwendolyn Sykes memorandum. Mr. Hott testified "she [Marilyn Sampay] and June and Pat basically said they were going to ignore Mr. Denwiddie's [sic] direction and they were going to bank on the letter by Ms. Gwendolyn Sykes at the start of the audit which indicated we could only look at fixed-price contracts." Regarding the process for presenting claims, Mr. Hott testified:

> On a regular basis, the first person was Pat Bright. Pat was the supervisor of the accounts payable department. She reported to June Boeckel who was, as I understand it, the director of accounting at the time. And June reported to Marilyn Sampay who was the deputy CFO responsible for the conduct of the audit, according to our contract. And then I had a few occasions with John Beall, the CFO of the Johnson Space Center.

Mr. Hott was generally unsuccessful in getting the claims he submitted approved. He first noted that he had challenges working with Ms. Sampay and Mr. Beall:

> Marilyn Sampay, who was the deputy CFO charged with the responsibility under our contract guidelines and under our contract, period, to process the claims, had pushed the process down so far down the line in the management spectrum that she distanced herself from the audit and would not, would not, I guess, force her folks that worked for her to process claims or to review them on the merits. That caused a detachment of management from the audit process which is extremely detrimental. And John Beall exacerbated that situation from the standpoint that he completely distanced himself and would not hold Marilyn accountable to do her job as it was spelled out in our contract. It was such an extreme degree that it kept us from getting to -- through the audit.

Mr. Hott also indicated at trial that he encountered challenges with the NASA personnel that he worked with more closely. Regarding Pat Bright, he testified at trial:

> Pat was very cordial, initially, and Pat, we had very good access, all the records, and we had a nice place to do our work. She was certainly reluctant to accept any kind of a claim which is understandable because it's on her watch. However, when claims that were very clear were being presented and turned down with denials, without discussion and review on the merits of the claim, it caused unusual amounts of time of research and of further discussion with trying to get meetings with others to try to get the claims

understood and processed. There was a reluctance to have those kinds of discussions and meetings and there was a lot of talk about, well, we don't do it that way. We don't file those kinds of claims against our customers.

From his trial testimony, however, it appeared that most of the challenges Mr. Hott faced were with Ms. Boeckel. Mr. Hott testified regarding Ms. Boeckel:

June Boeckel, who was Pat's supervisor, was very reluctant to accept or approve claims and would create argumentation on the claims that had nothing to do with the merits of the claims themselves, again causing unusual time delays, especially when you consider the fact that we would turn in a claim and it would be weeks or months before we would get the information back. This caused a severe time problem because we continued to try to work under one scenario and knowing full well that we would have to go back and go through all of the claims, all of the contracts again and all of the payments again.

Mr. Hott explained that he was willing to do the work again, "[b]ut the delay of the claims, and delay and the like of interchange of information back and forth, which we would normally be accustomed to in a recovery audit, caused considerable, considerable time delays." As a result, Mr. Hott testified that "the time delays made it virtually impossible, and the stumbling blocks that we ran into made it virtually impossible to complete the audit on a timely basis, because too much work was doubled and redoubled and redoubled again, unfortunately."

As explained above, Ms. Boeckel also relied on the guidance in the McIntosh email to deny all claims based on interest on overpayment if they were cost-type contracts or if the claims were based on contracts with provisional rates which were included in the A-D framework. Even before the guidance from NASA headquarters, Johnson was not moving quickly to resolve plaintiff's submitted claims. For example, regarding claims for cost rate adjustments, Ms. Boeckel testified on direct examination with plaintiff's counsel:

Q. Now you see the email from Ms. Lile to you on June 28th, 2006 here?

A. I see it.

Q. And she indicates, I believe, that as of the end of now, June 2006, the issue of claims on cost rate adjustments was still not resolved. Is that fair?

A. I'm reading it.

Q. It's right after the $7,500 number, the remaining claims relate to cost rate adjustments which is still not totally resolved.

A. Correct.

Q. So it's true, as of June 2006, the issue of whether these types of claims on the cost rate adjustments could be approved or not?

A. Correct.

Q. And you were in a holding mode on these claims at this time, correct?

A. Correct.

Q. And would it be fair to you to characterize your knowledge at this point that based on the fact these claims were in A. holding pattern that they were in fact continuing to stack up at this time?

A. If he was still doing, if he was still working on them I assume that they would be, which, whatever ones he had worked up would be on hold.

Q. And that means they hadn't been resolved one way or the other?

A. Correct.

Moreover, Mr. Hott testified that at the end of the contract, he had submitted a number of claims that were not yet acted upon to NASA. Mr. Hott indicated that

> initially they were -- and weeks before that or months before that they were allowing the claims to stack up. And when the stacks got too high on Pat Bright's desk she asked me to hold them in my office, and we had three desks full of claims that were not being reviewed. And then eventually she started reviewing them and giving us, giving them back to us with a denial by, she had created a cover sheet which was with the A-B-C-D, and then began circling those as she felt that they applied to that particular claim.

At trial, plaintiff's counsel also referred Mr. Hott to a September 11, 2006 email he received from John Beall which stated in part:

> This past week we did receive a list of the JSC [Johnson Space Center] claims you submitted to Headquarters for recovery consideration. We also, as I believe you know, received a reminder from Headquarters that we do not normally request refunds on the following type contracts:
>
> a. Open contracts that are subject to final audit at close-out.
>
> b. Contracts with provisional rates that are pending audit by DCAA.
>
> c. Contracts with provisions for advanced payments for non-profit organizations that .conduct experimental or research and development work.

d. Contracts which authorize progress payments.

We also, apologize for any delay in reviewing the claims as we waited for clarification from Headquarters. Now that we have the clarification we are in the process of reviewing the claims and will provide feedback as soon as possible on our findings. Please keep in mind that if any of the claims submitted fall into the above categories we may not be approving them for recovery. Thanks for your patience and understanding. I look forward to a successful completion of this recovery effort.

Mr. Hott had the following exchange with plaintiff's counsel at trial regarding the email:

A. That's when I was notified that JSC [Johnson Space Center] and headquarters were recommending that our claims not be processed on open contract items for the A-B-C-D reasons.

Q. Well, you see the A-B-C-D on this document?

A. Yes, I do.

Q. Okay, are those the A-B-C-D reasons you're referring to?

A. Yes, they are.

Q. What was your understanding was the origin of that list and what it meant?

A. The origin of the list came from headquarters as I understood it. How it was developed I don't know exactly, but what it meant was our efforts of a year and a half would be relatively useless.

Mr. Hott also testified that "I had no idea that it [the list] was being sent to headquarters, but the corporate office of Horn was responsible for sending information into the contracting officer on a periodic basis, as I understand it. I'm not sure what they were sending them." Furthermore, plaintiff's counsel had the following exchange with Mr. Hott about the email:

[Q.] If those types of contracts were not to be approved, claims on those types of contracts, is that what was causing you concern?

A. Extreme heartburn. Yes, sir.

Q. And again, why would that cause you heartburn?

A. We would have a lot of our efforts over a year and a half, all the claims that we would have written, 98 percent of the dollar value would be wiped out and we would receive no revenue for our efforts for a year and a half.

Q. Before September of 2006, and this is about two weeks before the end of the contract period, what notice did you have that you were limited to fixed- price contracts in your review at the Johnson Space Center?

A. The only definitive -- I didn't have anything definitive. I had discussions from June Boeckel and Pat Bright and Marilyn Sampay in June, and of course in that period on through July and August and September we did not have anything definitive until this memo came down from John Beall. And at that point I did not consider it definitive even at that time.

Defendant responds to plaintiff's arguments about the audit at Johnson by arguing that although

Mr. Hott testified as to claims 'stacking up' at Johnson, and Horn relies upon that testimony heavily in its brief, the evidence at trial previously noted proves that a *major* cause of any such delays was Mr. Hott's own aggressive and repeated submission of meritless claims in areas (notably cash discount and interest) where he had been unequivocally informed by the agency that his approach to the recommended debts was contrary to Federal law and Government contracts practice.

(internal citation and footnote omitted; emphasis in original). Therefore, defendant argues that "[h]aving created or substantially contributed to the alleged review and processing problem, Horn should not be heard to complain."

Goddard

The center with the most claims identified by Horn & Associates in the audit was at Goddard. As Mr. Farrar, one of the principals of Horn & Associates, testified, prior to the beginning of the audit, "Goddard was designated as one of the biggest centers and certainly one of the bigger opportunities that we had." As explained above, only one claim at Goddard was approved and processed by NASA, which was the SGT Inc. claim, for $1,163.44 dollars, despite the 223 claims submitted to NASA for review by plaintiff during the course of the audit.

Initially, the auditor on site at Goddard for Horn & Associates was Maggie Baumbach. In addition, Ivan Sherman worked part-time at Goddard with Ms. Baumbach. Ms. Baumbach begin work at Goddard in September 2005. At Goddard, Jon Wolz was Deputy Chief Financial Officer for finance, and for the recovery audit, Mr. Wolz delegated the review and approval process to Sandra Brown.

Mr. Farrar offered testimony that three months after arriving at Goddard, Ms. Baumbach "was becoming very frustrated because she was having an extremely hard time getting her claims presented. And at that point, she -- I don't believe she had any claims processed, and certainly none collected," and that "nobody would meet with her." Mr. Farrer visited Goddard himself in December and testified that:

> [W]e were still having the same issues, meaning that Maggie was still generating claims, she was having an extremely hard time getting meetings set up to present those claims. So I flew out there to both do training with Maggie in addition to trying to set meetings up to possibly review the claims while I was there. I personally tried to set meetings up with John Wolz . . . the DCFO at Goddard. I tried to set meetings up with him. I tried to set meetings up with his assistant who he referred us to occasionally, and I can't remember his last name, but it was Tim[53] somebody. And Sandra Brown. I never could get a meeting set up with Wolz or Tim, but I did run into Sandra in the hallway and told her that we were having problems getting the claims presented. She said that she would meet, she wasn't available to meet with me while I was there, but she would meet with Maggie the following week.

At trial, Ms. Baumbach discussed with plaintiff's counsel one claim in particular that she believed had merit, and the process at Goddard.

Q. So this duplicate payment took place on Christmas Eve 2003, right?

A. Yes.

Q. And you identified this two years later, in 2005.

A. Yes.

Q. It's still sitting there on the books.

A. Correct.

Q. And everybody agrees it's still there on the books.

A. Right.

Q. What happened next?

A. Well, then I guess I went to Tim Kelly to see if he would, see what we can do next to pursue this, and then he suggested I talk to the contracting officer even though it's purely a financial issue, it's not, I don't know, it only, it's only finance that did this, that paid it twice. Anyway, so I met, I guess I

---

[53] The individual was Tim Kelly.

met with the contracting officer and I think they couldn't just reverse it. I don't know why they couldn't. I think the contracting officer can't really reverse things. It would have to be your finance arm that would do that. I guess there would be months that would go by. With this one I think it was a contracting officer couldn't meet with me until like a month and a half later or something because they were very busy with something. Sorry. I'm remembering this in bits and pieces. So anyway, then after the contracting officer did have time and agreed it was a duplicate payment, they still said but NASA owes for other invoices so they're not sure what to do. I guess then after that I think I would periodically bring it up with Tim Kelly and the finance people to see what we can do. Can we try to resolve this in some way.

Q. What would they say?

A. They didn't -- I guess I never got a outright no and I never got a outright yes. It would just sort of shift around, like maybe go talk to this person. It just seemed to get lost and nobody coming out with a decision or how to, when to pursue it as a bill of collection.

Q. When you stopped working on the NASA audit in May of 2005, had this claim been collected?

A. No, it had not. It was very frustrating to me that such a black and white claim had not been collected or even forwarded to a point where it would initiate the collection of it.[54]

After eight months of working at Goddard on the recovery audit, Ms. Baumbach left her position as plaintiff's auditor for the Goddard recovery audit, claiming that "I couldn't afford to continue with no income. I had been months and months at this and we had, nobody had a claim that was in the channel to be paid, to be collected from the vendor, and so that was a big factor." Ms. Baumbach continued: "And that NASA, that it was so frustrating to not be able to get claims that were agreed to processed. It seemed pretty dismal that I would be making any money. When I started I had high hopes that there would be a nice audit here and that I'd have a decent string of income from it, but it just wasn't panning out because claims were not being processed."

---

[54] In a footnote to its post-trial brief, plaintiff notes, "in 2009, more than two years after the Recovery Audit ended, and after this lawsuit was filed, Goddard *did* collect the $481,219.30 duplicate payment back from the vendor, although NASA has not paid Horn its 13.5% contingent fee." (emphasis in original). Plaintiff concludes: "It goes without saying that NASA's denial of a valid duplicate payment claim during the Recovery Audit, and then subsequent collection of the same without compensating Horn, is a clear breach of the express terms of the Contract and the duties of good faith and fair dealing." The court addresses plaintiff's allegations of the breach of the duty of good faith and fair dealing below.

In an email dated April 17, 2006, to Mr. Lowery, Mr. Farrar, and Jennifer Harris, another Horn & Associates employee, Tom Horn explained that he spoke with Ms. Baumbach and she indicated that it was "just too hard and doesn't want to be the front person. I told her we were staffing the place with more people and that we would have a good person to handle the communications . . . and give guidance if she wants to continue to help us, but she pretty much declined." The email indicated, however, "[t]his actually may not be all bad as she seems to be willing to help us with the outstanding items (so she can get paid) and help with a smooth transition to the new guys." The email from Tom Horn to Mr. Lowery, Mr. Farrar, and Jennifer Harris continued, "It does not sound like she has really audited that much at Goddard. She said she did a few contract reconciliations, looking mainly for dups [duplicate payments] and believes she has only skimmed the surface. She hasn't looked at possible interest claims, or for that matter, a lot of other claim types which may or may not be there."[55]

Subsequently, in May of 2006, three auditors replaced Ms. Baumbach: Dan Lizana, Steven Smith and Marie Beckey. Mr. Lizana indicated that once he arrived at Goddard, "the two individuals that I recall and we were introduced to, the points of contact was [sic] Yvette Blackwell -- she was the Supervisor for the examiners and she was our point of contact -- and that week we were introduced to Sandra Brown, who was her superior, who was going to be responsible for denying and accepting the claims." Plaintiff also points to an email sent by Mr. Wolz on May 10, 2006 to John Blair and Melvin DenWiddie, in which Mr. Wolz states: "Jack/Melvin: Tom Horn wants to meet with me and my staff next week for 30 minutes. At this time, I don't know how much longer they plan on being here. I'd like for them to leave." Mr. DenWiddie testified on direct examination:

> Q. Do you recall Mr. Wolz expressing that he would like the Horn associate audit team to leave Goddard Space Flight Center?
>
> A. Yes, many times. I'm surprised that he decided to put it in writing.
>
> Q. You said many times, what do you recall being the reason Mr. Wolz wanted Horn and Associates to leave?
>
> A. Mr. Wolz, the Goddard Space Flight Center had several incidences of improper payments. So Horn and Associates were not necessarily favorites at the Goddard Space Flight Center because there were many opportunities to find payments that had been made improperly.[56]

Like Ms. Baumbach, Mr. Lizana felt frustrated at NASA's handling of Horn & Associates' claims, although he did testify that Ms. Brown was frequently available for meetings. Also,

---

[55] As indicated from Ms. Baumbach's testimony, quoted above, she was frustrated that she could not get claims approved or processed by NASA personnel and had difficulty, at times, even meeting with NASA personnel.

[56] As indicated above, only one claim was approved and processed by NASA at Goddard during the recovery audit.

despite his frustrations, Mr. Lizana worked on the Goddard recovery audit until the end of contract performance. Mr. Lizana testified, however, that there was often not resolution of the claims. He testified on direct examination:

> So when we present a claim, and in this case we mostly present it to Sandra Brown. When we sit down, we have all the information. And we're looking for a response that explains anything that's a technicality, anything that requires us to go get information, all right, anything that perfects the claim. So we're saying, okay, your feedback is helpful because we will know how to segment these claims and how to prepare them in a way that allows you to make a very binary decision, yes or no, approved or denied.

After this process, when asked if the claim was approved or rejected, he testified:

> Rejected, no, not outright rejected during the recovery audit, meaning the time that we were at the facility, no.
>
> Q. Okay. So if it wasn't accepted or outright rejected during the period you were at the site, what did happen during the period at the site?
>
> A. Well, we provided these claims. And essentially, as I said, we wanted a yes or no decision, all right. What is it that I need to provide for a yes or no decision?

Mr. Lizana testified that it would have been helpful to have an answer, even if the answer was no. He indicated without that,

> it left us in limbo, because it wasn't a rejection and it wasn't approval. You can learn a lot from rejecting a claim. If you reject a claim on the technical details, it teaches me, at least as an auditor, okay, these are the things I need to be concerned with from a technical point of view. But if you just reject a claim outright for something that really was nebulous in our understanding, it wasn't instructful -- it didn't provide us instructions to go back and say, hey, this is what we should be doing. And so it was kind of frustrating because you have these responses that really didn't allow us to be more efficient in the way that we presented the claim.

Mr. Lizana also had the following exchange with plaintiff's counsel about presenting claims:

> Q. Does anyone at Goddard Space Flight Center, when you would present a claim that included overpayments during the audit period and overpayments prior to the audit period or after the audit period, did anyone at Goddard Space Flight Center tell you that was beyond your scope? You should remove those and only focus on the period in the audit?

A. At the time of us presenting the claim, no. They didn't bring that up as an issue at the time it presented it.

Q. If someone had brought that up as an issue, would you have complied with those wishes and removed those and reformatted the claim?

A. Absolutely.

In addition, Mr. Lizana testified, even when he was given a reason, it was one that often did not make sense to him. For example, according to Mr. Lizana, one claim "was not outright rejected. But our explanation was NASA was not interested really in pursuing this claim because this was a cost type contract and DCAA [Defense Contract Audit Agency] will check it at close-out." Mr. Lizana said he was also provided the following explanations for not approving the claims by Goddard:

The response was mostly this is a cost reimbursable contract, and we can't go back for this because it's that contract. And therefore we don't recognize this as being a contract that Horn should be doing recoveries on. In addition to that, you also at times you heard the excuse of, okay, this is DCAA, they'll catch it, what have you. And so those were mainly the responses that we would get from most of our claims that we presented.

As indicated in an email from Ms. Brown to Mr. Lizana:

My position remains that until either Procurement and/or DCAA determines that Swales [& Associates] has violated their contractual agreement with NASA Goddard, I am at no liberty to act upon your claim. Validation of your claim has to be supported in conjuction [sic] with the audit/findings of Procurement and/or DCAA.[57]

In light of the foregoing, plaintiff argues that "[b]y not approving or denying recommended debts, Ms. Gardin [Brown] not only breached the express terms of the Contract to validate the recommended debts in a reasonable time, but also breached the duty to cooperate

---

[57] Mr. Lenck, the Deputy Chief Financial Officer at Kennedy, discussed below, testified about the role of DCAA in NASA's contract process:

In cases where NASA is the administrative contracting officer, the Defense Contract Audit Agency will issue an audit report to the administrative contracting officer and then the administrative contracting officer for NASA will actually use that as a guide in negotiating the rates with the contractor. We are not required to accept all of the DCAA recommendations. It's a negotiation process. But we certainly use it as a guide and I will tell you if we don't use a recommendation they make, we will document the files as to why we did not use the rates the Defense Contract Audit Agency recommended.

and the duty not to hinder."[58] Plaintiff also argues that "Ms. Gardin also did not provide the Horn auditors with information they requested that was necessary to complete the Recovery Audit and to perfect the recommended debts."

In response, defendant first concedes that "there were specific problems with review at Goddard," and that "Goddard was slow to evaluate claims, and, at or near the end of the audit, denied Horn's overwhelmingly meritless claims for reasons that were inconsistent with the terms of the Horn recovery audit contract." Defendant notes that Ms. Brown

> testified that she did not initially understand that Horn's contract provided for an audit of all contracts. Thereafter, Ms. Gardin and Goddard Deputy Chief Financial Officer Jon Wolz took the view that, based upon their interpretation of guidance issued by the Office of Management and Budget (OMB),[59] cost contracts should be excluded from Horn's review, notwithstanding the terms of Horn's contract, unless the alleged overpayment involved "[a] true duplicate payment on an invoice" or "a mathematical error possibly." Ms. Gardin was also of the view that OMB guidance did not address Horn's attempt to assess interest on overpayments (again, notwithstanding the terms of Horn's contract). Claims on cost contracts and for interest were denied accordingly.

(internal citations omitted).

In addition, years after the audit, the Department of Justice informed the court, and plaintiff, that it believes that14 claims identified and submitted by Horn & Associates at Goddard were valid, and another 2 claims were partially valid. During the period of

---

[58] As noted above, in between the time of the recovery audit and the testimony at trial, Sandra Brown changed her name to Sandra Gardin. The court refers to her by her name during the recovery audit, Ms. Brown.

[59] Plaintiff argues that:

> [U]nbeknownst to the Horn auditors until the last few days of the Recovery Audit, the Goddard officials charged with reviewing and validating recommended the debts had reached the conclusion on their own that the scope of the Recovery Audit as set forth in the Contract was inconsistent with the U.S. Code and guidance from the Office of Management and Budget ("OMB") and, therefore, was "illegal." On that basis, at the conclusion of the Recovery Audit the officials at Goddard approved only three recommended debts submitted by Horn auditors and denied tens of millions of dollars of recommended debts that had been written on cost-type contracts and contracts with provisional rates.

Plaintiff also contends that "[t]he Government now concedes that it breached the Contract to the extent it denied interest claims because they were written on open cost contracts."

contract performance, NASA approved two claims, but only processed the one claim for SGT Inc. The other claim, a different Aerospace Corp. claim, was approved for payment, but not processed by NASA. Defendant agrees that these claims were: "(1) well grounded and justifiable at the time they were submitted, and (2) denied by Goddard in error." Despite the foregoing, defendant argues, "Mr. Lizana and Mr. Smith, along with Ms. Beckey, proved to be grossly incompetent auditors who, for reasons not reasonably attributable to any action or inaction on the part of NASA, were incapable of performing the work of the contract." Defendant argues that the balance of the claims that were denied by Goddard were proper and therefore, argues that NASA did not breach the contract.

Kennedy

Brock Young was the primary auditor for the Horn & Associates recovery audit to work at Kennedy. Mr. Young started the recovery audit at Kennedy in May 2005 and Mr. Young continued to work on the Kennedy recovery audit until the end of contract performance. Only two of the claims submitted to NASA at Kennedy were collected. The main point of contact for Mr. Young was Sam Lenck, Deputy Chief Financial Officer for Kennedy and Brenda Brooks, the Kennedy supervisor over accounts payable.

At trial, Mr. Young first expressed frustration with the data. He indicated on direct examination with plaintiff's counsel:

[A.] Well, you really can't do an audit without the data. You can do some things. I mean, you can look at the physical paper. Like with NASA, they had paper for everything, so I could go and look at the contract, which is in paper form, and even the transmittals, the payments in paper form. But until you have the data you can't really see what was actually paid. You can't see if you're missing any paper in the audit. You have to have the data to actually do the final part.

Q. When did you receive usable payment data for Kennedy?

A. The data was received either the end of August, first of September 2005 range.

Mr. Lenck confirmed some of the issues with the Mr. Young and data at trial, testified on direct examination that, referring to Mr. Young:

We attempted to provide anything he asked for. I know he was interested in the electronic data, which we attempted to secure for him. It was a little difficult and it was probably a little different at each center. When he came, we were under -- our accounting system was SAP . . . those records were still available, but the system was not operating. So I think our IT people had to get the system back up and running in order to print out, get

electronic information for him, for the auditor. So that may have taken a little time to do that.

Mr. Lenck, however, emphasized that "[t]he records were certainly made available to him. We had records -- our accounts payable files would have included the purchase order or the contract, in addition to all of the billings that the vendors or contractors had requested. He would have certainly had access to those."

Mr. Young also was frustrated by Mr. Lenck, who viewed his role as "to act as the middleman between Mr. Young and the contracting officer, Ms. Solum."[60] Mr. Young indicated that he first talked to Mr. Lenck and he would take the documents, "which would be the contract file, the mods [modifications], and the invoices in question, and we'd go through it in that form. And that's what I'd review with NASA is all the data with them so they would have everything they needed to look at the claim." After that, Mr. Young testified,

> I would typically never hear back from them. So what I thought was happening was Sam was going to approve it and send it where it needed to be sent, like to the vendor, things of that nature. Later on I found out what he was really doing was he was facilitating the process, but he was leaving it up to the contracting officers to approve. So then at that point, I was assuming they were going to the contracting officers. The thing is I was never getting anything back, so I don't know what actually happened.

Plaintiff argues that "[b]y deferring to Ms. Solum to make the decisions about the Cendant[61] recommended debts, Mr. Lenck abdicated the role assigned to him by the Contract and placed approval of the Cendant recommended debts in the hands the person who had a personal and professional interest in finding that she had not approved overpayments."

Mr. Young also explained an additional frustration with Mr. Lenck's process:

> [W]e called a meeting. In that meeting, we had Leslie Solum, we had Leslie's boss, we had a legal representative as well there. Steve Chance was the COTR, that's the Contract Officer Technical Representative is what a COTR is, COTR. And then we had myself, Sam Lenck, Brenda Knox, or Brenda Brooks was there, and I think one or two other people as well. So it was a pretty big meeting. There's [sic] roughly 10 people in this meeting.

---

[60] As noted above, Ms. Solum was a contracting officer for the contracts awarded at issue at Kennedy, and not the contracting officer for the contract at issue in this case.

[61] As indicated in defendant's post-trial brief, "Cendant was a relocation contractor that would assist employees transferred to different NASA Centers by purchasing their homes and providing related services." Mr. Young submitted four claims regarding Cendant during the recovery audit period.

We went through everything, decided that yes, there's definitely something there and we were to pursue it.

Mr. Young testified, however, in response to the question, "what did you understand was supposed to take place next?"

A. When I left that meeting, what was supposed to take place next was Leslie Solum should have had it reviewed and sent out a letter to the vendor to try to collect the money. The agreement was that yes, it looks like something was there, so what was supposed to happen was she was supposed to send the information to the vendor saying either explain to us why it is not valid or remit the money.

Q. What actually did happen?

A. Nothing happened actually.

Q. What do you mean nothing happened?

A. Well, that was the last anything ever happened to it. I followed up with it in January, mid to late January, to find out what had happened with it, where were we. And at that point, that's when I was told that Leslie and Dawn Oliver, the legal representative, was reviewing it and wanted to make some changes. I didn't know that earlier. We would have took care of it earlier.

At trial Mr. Lenck explained his style to defendant's counsel, indicating:

Based on my many years experience in that role -- when I first got there, I thought I knew everything and could make decisions, boom, boom, boom. The longer I was there, I realized that everyone has input. And even if it's like three against one, that one person might be right. So let's hear everybody's opinion and try to see what the facts are. And some people do complain that NASA takes too long to make decisions, but that's why it takes us some time. We want to assure ourselves that we have all the facts, not just facts as told by one person.

Mr. Young expressed further frustration with the lack of action by NASA with respect to the claims he submitted to NASA, one time referring to the process as:

I'd call it the abyss where all the claims went to and I never heard back from them. So it was kind of like getting this area where I was left out standing on okay, what do I do with this? Because it wasn't approved, it wasn't denied. It was just in this limbo of processing role, which didn't make sense to me. And I would never hear back.

Mr. Young also provided a specific example of one claim, in an exchange with plaintiff's counsel:

Q. You submitted it to him, he agreed it was a good claim?

A. He agreed it was a valid claim at that point. So then I went back and wrote it up.

Q. And that's what Exhibit No. 8 reflects, correct?

A. Correct.

Q. And what happened after you submitted this?

A. Well, after I submitted it I turned it in to Sam [Lenck] again as an official claim at this point, and as the official claim, he was going to do what he did. Now this would have been --

Q. Well, just tell me what he did. What happened with respect to this claim? Did he approve it or not?

A. He did not approve it. He said it had to go to the contracting officer for approval. And at that point, I don't know what happened to it. I never saw the claim again until the very end when they were trying to wrap up the audit.[62]

Plaintiff also points to the only two claims that were paid at Kennedy as evidence of the reluctance of NASA to pursue claims. On cross-examination with plaintiff's counsel, Mr. Lenck testified:

Q. So am I correct in understanding from your testimony that Kennedy Space Center never actually approved claims 2085 and 2056, right?

A. I would say more like we pocket approved it because we did not disapprove it.

Q. Okay.

A. We just accepted the money and closed our eyes.

Q. Okay. But Kennedy Space Center did not send those two out for collection, right?

---

[62] The description of this process repeated itself at trial in a dialogue with plaintiff's counsel, with Mr. Young referring to one example: "I don't know what happened with it. I never saw it again, and so there was nothing for me to do with it. It was in this limbo land."

A. No, we didn't.

Q. You got money notwithstanding that you didn't send it out?

A. Correct. And we're assuming it's correct. I never went back and looked.

Mr. Lenck also responded by plaintiff's counsel's question: "And none of the other claims that Mr. Young submitted, with the exception of the Cendant claims, were ever actually even sent out for collection; correct?" by answering: "Claims themselves, no." Defendant responds that "[t]he notion that the Government actually breached its contractual obligation to review and validate claims by reviewing Horn's claims closely through multiple levels of evaluation is entirely absurd." Defendant, argues, as with the other centers, that the auditors, not the government personnel at Kennedy, were the problem, indicating "[i]ndeed, Mr. Young emerged as a major contributor to delay due to the poor quality of his initially submitted claims." Plaintiff responds that "[e]ven if certain claims submitted by Mr. Hott had been meritless, such submissions would not excuse Johnson of its obligation under the Contract to timely review *any* recommended debt that Mr. Hott presented." (footnote omitted; emphasis in original).

<u>Marshall</u>

James "Chip" Edgerton, was the primary subcontractor for Horn & Associates to work at Marshall. Initially, he employed two additional auditors to work with him, John Crochet and Michael Mescher, with whom he had worked on pervious recovery audits. His point of contact for the recovery audit was John Anderson, the Deputy Chief Financial Officer for finance. Mr. Edgerton testified at trial that he began the recovery audit in June 2005 with Mr. Crochet and Mr. Mescher, but after a week, Mr. Crochet did not return because "[t]here was never enough work for three people," and Mr. Masker worked for two or three weeks a month for the rest of 2005, but did not return in 2006 because "[w]e didn't have enough complete files to audit." Mr. Edgerton also indicated that he frequently had to request documents again and again. Mr. Edgerton left Marshall at the end of May 2006, with the intention of returning once

> it was worked out of how to get the complete files, then we could ramp it back up, bring in either Mike [Mescher], Jack [Crochet] and myself or bring in some, if we had other audits going on right then we couldn't drop those, so we would find other associates that we could use to bring in to help work on the audit.

Mr. Edgerton, however, did not return to Marshall. When asked to summarize his experience at Marshall, Mr. Edgerton indicated that "[t]hey were nice people, but . . . you know, that they had their work to do and their work came first. And so our files came second. So it was, you know, it was a -- it wasn't a combative relationship, it's just that their jobs came first and ours came second." Specifically, regarding the files he requested, typically from Ms. Becky Black, Mr. Edgerton indicated that "[o]f the files I requested I

probably received, maybe 60 to 70 percent of a complete file." Mr. Edgerton explained at trial why this was such an issue:

> We didn't have enough complete files to audit. We were -- I was continuously requesting documents or re-requesting documents. And some of these files are, like balloon. They can be, the contract can be for three or four years, five years, you know, ten years, and you would have 20, 30, 40, 50 folders, order folders, that relate to that. If you're missing one of those order folders and you have something, you're missing a later audit folder and you're looking at this audit folder and it says that there was a mistake in payment, how do you know it wasn't corrected in that next one? If you don't have it you can't determine that. So if you don't have the complete file you can't do a complete audit.

Mr. Edgerton testified, regarding Mr. Alexander, although he was available to meet and discuss the claims initially,[63] "it got harder to find him or get in to see him," and when he did, there often was not resolution. For example, Mr. Edgerton discussed the process of review for one claim on direct examination:

> Q. So what was the outcome of this claim at the first meeting you had with Mr. Alexander?

> A. The additional research as to find out if NASA had these Dewars.[[64]]

> Q. Did you present Mr. Alexander with that additional research showing the, I think you mentioned a moment ago, an additional order or purchase order that indicated that NASA had at least 40 of these Dewars?

> A. Yes, there was, it was either email or the order that had the bill of lading that showed the listing of the Dewars and the serial numbers that were on that purchase order or bill of lading. There was a letter that, or an email that was a note that would be, they would check out, make sure that was the case in McCloud, at McCloud.

> Q. After you presented this additional information to Mr. Alexander about this claim, did you follow up with him about having it approved?

> A. Yes, I did.

> Q. Was it approved at that point?

> A. No, it wasn't.

---

[63] In fact, Mr. Edgerton had far greater success in having claims approved and collected than the other Horn & Associates auditors, as more than half of his claims were approved.

[64] A dewar is a storage tank used to store compressed gas.

Q. How many times did you follow up with Mr. Alexander about this claim?

A. At least three times.

Q. At the point when you ended your participation or your work on the recovery audit at Marshall Space Flight Center, what was the status of this claim?

A. It was outstanding, still pending.

Q. Was there any additional information that Mr. Alexander was waiting for?

A. From the information back from the contracting officer or whoever this person was at McCloud.

Q. When the recovery audit ended on September 30th, 2006, what was the status of this claim?

A. It's pending.

Q. What is the status of this claim as you stand here today, to the best of your knowledge?

A. Pending.

Defendant argues that "[a]lthough Mr. Edgerton complained at trial that it became harder over time to get meetings with Mr. Alexander to discuss claims, the examples of purported delays cited by Horn in its brief do not support the inference that Marshall was not evaluating claims appropriately on any large scale."

Plaintiff also points to a September 27, 2006 email from Mr. Alexander to Mr. Edgerton indicating that NASA "received a listing from HQ on items you say were overpaid and asked us to verify." Plaintiff claims that "[t]his e-mail confirms that although the Horn auditors had submitted recommended debts at Marshall between June 2005 and May 2006, as of September 2006 most were still outstanding, and Mr. Alexander was only then turning his attention to his contractual obligation to verify the recommended debts at the prompting of NASA HQ."

Plaintiff also argues that NASA was in breach because of the incomplete production of the files to Mr. Edgerton, and claims that because "Ms. Black was not prompt or complete in her efforts to deliver requested files to the Horn auditors," "[t]he bottleneck created by Ms. Black had a significant impact on Horn's ability to perform the Recovery Audit at Marshall." Defendant, however, points to Ms. Black's testimony argues that "even assuming some delay in processing at Marshall, Horn has failed to establish that such a delay would amount to a material breach of its contract with NASA." In

addition, defendant claims that "[e]ven acknowledging some delay in claims review at Marshall, when one looks beyond Horn's generalized complaints concerning the issue, it appears that the essence of Horn's allegation of breach is, at most, that Marshall delayed completing its review of Horn's meritless claims to Horn's satisfaction."

The conduct of NASA, both at NASA headquarters, and at some of the NASA Centers was not in line with plaintiff's reasonable expectations under the contract, as NASA did not timely review Horn & Associates submitted claims, nor did all of the centers properly consider the claims in accordance with the language of the contract.

<u>Duty of Good Faith and Fair Dealing</u>

Plaintiff also alleges that NASA breached the duty of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." <u>Alabama v. North Carolina</u>, 560 U.S. 330 (2010) (quoting Restatement (Second) of Contracts § 205 (1981)). "Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty 'imposed by a promise stated in the agreement.'" <u>Metcalf Const. Co. v. United States</u>, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 235). "The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's *performance* and not to act so as to destroy the *reasonable expectations* of the other party regarding the *fruits of the contract*." <u>Metcalf Const. Co. v. United States</u>, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting <u>Centex Corp. v. United States</u>, 395 F.3d 1283, 1304 (Fed. Cir .2005) (emphasis in <u>Metcalf Const. Co. v. United States</u>)); <u>see also</u> <u>Agility Public Warehousing Co. KSCP v. Mattis</u>, 852 F.3d 1370, 1383-84 (Fed. Cir. 2017). As explained by the Federal Circuit, "while the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on 'honoring the reasonable expectations created by the autonomous expressions of the contracting parties.'" <u>Metcalf Const. Co. v. United States</u>, 742 F.3d at 991 (quoting <u>Tymshare, Inc. v. Covell</u>, 727 F.2d 1145, 1152 (D.C. Cir. 1984)); <u>see also</u> <u>CanPro Investments Ltd. v. United States</u>, 130 Fed. Cl. 320, 350 (2017).

"Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." <u>Metcalf Const. Co. v. United States</u>, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010)); <u>see also</u> <u>Baistar Mechanical, Inc. v. United States</u>, 128 Fed. Cl. 504, 525 (2016). Notably, "[i]t is well settled that the parties' duty of good faith and fair dealing must be rooted in promises set forth in the contract." <u>Helix Elec., Inc. v. United States</u>, 68 Fed. Cl. 571, 587 (2005). Thus, "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d 817, 831 (Fed. Cir. 2010) (citing <u>Centex Corp. v. United States</u>, 395 F.3d 1283, 1304–06 (Fed. Cir. 2005)); <u>see also</u> <u>Agility Public Warehousing Co. KSCP v. Mattis</u>, 852 F.3d at 1384; <u>Jarvis v. United States</u>, 43 Fed. Cl. 529, 534 (1999) ("The implied duty of good faith and fair dealing does not form the basis for wholly new contract

terms, particularly terms which would be inconsistent with the express terms of the agreement.").

As indicated by a Judge of the United States Court of Federal Claims, "[t]he court applies a reasonableness standard in assessing whether a party breached its duty to cooperate, which requires a factual inquiry that depends upon 'the particular contract, its context, and its surrounding circumstances.'" Baistar Mechanical, Inc. v. United States, 128 Fed. Cl. at 525 (quoting Axion Corp. v. United States, 75 Fed. Cl. 99, 121 (2007)).

In Precision Pine & Timber, Inc., the United States Court of Appeals for the Federal Circuit indicated that "[n]ot all misbehavior, however, breaches the implied duty of good faith and fair dealing owed to other parties to a contract." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 829 (Fed. Cir. 2010). The Federal Circuit further explained that:

> Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch. First, the government enters into a contract that awards a significant benefit in exchange for consideration. Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract. See, e.g., id. at 1350–51; Centex Corp. v. United States, 395 F.3d 1283, 1304–07 (Fed. Cir. 2005); see also Hercules, 516 U.S. 417, 116 S. Ct. 981, 134 L.Ed.2d 47. The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.

Precision Pine & Timber, Inc. v. United States, 596 F.3d at 829 (citing Centex Corp. v. United States, 395 F.3d at 1311). The Federal Circuit subsequently expanded on the language of Precision Pine, after finding a Judge of the United States Court of Federal Claims had read the language of the decision too narrowly. In Metcalf, the Federal Circuit explained that:

> The trial court misread Precision Pine, which does not impose a specific-targeting requirement applicable across the board or in this case. The cited portion of Precision Pine does not purport to define the scope of good-faith-and-fair-dealing claims for all cases, let alone alter earlier standards. The passage cited by the trial court, after saying as a descriptive matter that cases of breach "typically involve some variation on the old bait-and-switch," Precision Pine, 596 F.3d at 829, says that the government "*may* be liable"— not that it is liable *only*—when a subsequent government action is "specifically designed to reappropriate the benefits the other party expected to obtain from the transaction." Id. (emphasis added). Precision Pine then states its holding as rejecting breach for two reasons combined: the challenged government actions "were (1) not 'specifically targeted[' at the

58

contracts,] and (2) did not reappropriate any 'benefit' guaranteed by the contracts." Id.

As that statement indicates, the court in Precision Pine did not hold that the absence of specific targeting, by itself, would defeat a claim of breach of the implied duty—*i.e.,* that proof of specific targeting was a requirement for a showing of breach. When the court said that specific targeting would have been required for breach of the duty *in that case*, id. at 830, it did so in a context in which the more general bargain-impairment grounds for breach of the duty were unavailable, because the suspension-by-court-order provision expressly authorized the suspension, without limitation on the time of compliance with the order. That is enough to make clear that specific targeting is not a general requirement. In addition, the challenged government conduct in Precision Pine occurred in implementing a separate government authority and duty independent of the contract, namely, enforcement of and compliance with the injunction. In that context—as in the legislative context from which Precision Pine borrowed its reference to specific targeting, 596 F.3d at 830 (citing Centex and First Nationwide Bank)—the "specifically targeted" language protects against use of the implied contract duty to trench on the authority of other government entities or on responsibilities imposed on the contracting agency independent of contracts. The present case involves no such concern.

Metcalf Const. Co. v. United States, 742 F.3d at 993. The Federal Circuit instructed the trial court to focus on the broader language of the Federal Circuit's earlier opinions, and specifically:

The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's *performance* and not to act so as to destroy the *reasonable expectations* of the other party regarding the *fruits of the contract.*" Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (emphases added). "Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." Precision Pine, 596 F.3d at 820 n. 1. What is promised or disclaimed in a contract helps define what constitutes "lack of diligence and interference with or failure to cooperate in the other party's performance." Malone, 849 F.2d at 1445.

Metcalf Const. Co. v. United States, 742 F.3d at 991 & 993 (emphasis in original).

In considering the conduct of NASA's headquarters and the four centers discussed, the court believes that the delays by NASA in providing plaintiff the data and the files at the centers, and the confusion discussed above about what was the proper scope of NASA's contracts for plaintiff to review or for NASA to evaluate, what was a proper claim, the length of time NASA personnel took to review plaintiff's claims, as well as NASA personnel's attitude and lack of willingness to necessarily interact with the Horn

& Associates personnel, all had a material impact on Horn & Associates ability to effectively perform the audit during the time allocated for contract performance. All of the foregoing, as described above, all worked against the ability of the plaintiff to perform and ran counter to Horn & Associates' reasonable expectations of NASA's cooperation during contract performance.

Moreover, it appears to the court, even without examining claim by claim, that the processes NASA establish for the evaluation of, and the processing of, the claims by NASA, once submitted by plaintiff to NASA for review and processing, materially impacted Horn & Associates' ability to recover fees. As indicated in the Goddard discussion above, defendant states that 16 claims were: "(1) well grounded and justifiable at the time they were submitted, and (2) denied by Goddard in error." Defendant also stated that: "The Government does not pretend that its own performance in connection with the recovery audit was perfect. Indeed, for reasons that we acknowledge fully below, it was not, with the result that, at the conclusion of the audit, Horn was owed an additional contingency fee based upon $992,557.38 in valid overpayments that NASA failed to pursue and process."

Despite the defendant's arguments to the contrary, NASA's delays in evaluating the claims is evidence of a breach. As noted above, defendant conceded that "Goddard was slow to evaluate claims." At Marshall, Mr. Edgerton testified about the claims he submitted in 2005 still being reviewed and considered at the end of contract performance in September 2006. At Kennedy, Mr. Young testified to claims being discussed, and in some instances, initially approved, but final approval never materializing, and claims disappearing into an "abyss" with no decisions issued by NASA. At Johnson, defendant admitted that "there was a period of time in September 2006 when Johnson *did* deny claims based on the fact that they were written on cost contracts. . . ." (emphasis in original). Although defendant points to Ms. Obert's subsequent review in 2007 and claims that Ms. Boeckel's actions were "transient in nature at the center,"[65] the fact remains the plaintiff's claims were not timely reviewed and decisions were not reached in a timely fashion, often at the very end of the contract, or in the case of Ms. Obert's review, months after the contract concluded. Likewise, the final review by NASA headquarters, although in the presence of Horn & Associates personnel, took place in January and February 2007, months after the contract ended. As noted above, NASA declined plaintiff's offer for a formal review of all of Horn & Associates' claims after the end of contract performance. The contract provided that "NASA will review and verify all debts. All debts will be posted by NASA within a reasonable time." NASA's review, across the board, was not timely and materially affected Horn & Associates. NASA's conduct both hindered Horn & Associates' ability to perform the contract and, moreover, Horn & Associates did not receive the necessary cooperation from NASA personnel at the centers to effectively perform under the contract. See Metcalf Const. Co. v. United States, 742 F.3d at 991.

---

[65] Although the defendant argues the denial of claims on cost contracts was "transient," the court notes that defendant's position in this litigation, as detailed above, was that the contract was limited to review of only fixed price contracts until the court's ruling in plaintiff's favor on plaintiff's motion for partial summary judgment.

As conceded by defendant in a post-trial submission, "[i]t is undisputed that, at Goddard, and also for a time at Johnson, NASA denied all (in the case of Goddard) and most (in the case of Johnson) claims that Horn wrote on cost contracts, regardless of their merits, and that this practice affected both centers' disposition of hundreds of claims submitted by Horn." Defendant, in the next breath argues, "[h]owever, in the final analysis, for all of Horn's allegations of extensive contractual breach by the agency on these and other bases, only 18 of the 363 claims that NASA denied were meritorious, in whole or in part." The court, however, believes this is evidence of a breach by NASA during performance of the contract. The court also finds that the lack of cooperation was directly related to Horn & Associates' ability to review all the contracts in a timely fashion, and NASA's review of the claims that Horn & Associates presented to NASA hindered plaintiff's ability to timely review additional contract files at the NASA Centers, including the centers plaintiff did not focus on initially. As the court finds NASA's conduct was related to the contract, the court believes that this comports with the requirement of the implied duty of good faith and fair dealing to "be rooted in promises set forth in the contract." Helix Elec., Inc. v. United States, 68 Fed. Cl. at 587; see also Precision Pine & Timber, Inc. v. United States, 596 F.3d at 831. Moreover, NASA's actions, described above, materially interfered with Horn & Associates' performance under the contract and destroyed plaintiff's reasonable expectations the under the contract. See Centex Corp. v. United States, 395 F.3d at 1304; see also Metcalf Const. Co. v. United States, 742 F.3d at 993; Kogan v. United States, 112 Fed. Cl. 253, 265 (2013).

In sum, the court concludes that the conduct by NASA headquarters, and the actions taken at the some of the NASA Centers evidences a breach. Although there were not breaches at all the NASA Centers, and, as noted above, plaintiff did not even complete an audit at all the centers, as plaintiff correctly notes, "Horn's Contract was with NASA as a whole, not 10 separate contracts with each of the Centers. A breach by any of the Centers constitutes a breach by NASA." Even if each individual action did not in and of itself rise to a breach, the cumulative effect of all the problems in administering the contract by NASA had a material negative impact on plaintiff and demonstrate a clear breach and interference with contract performance.

Despite the foregoing, and as indicated above, however, "[t]he implied duty of good faith and fair dealing does not form the basis for wholly new contract terms, particularly terms which would be inconsistent with the express terms of the agreement." Jarvis v. United States, 43 Fed. Cl. 529, 534 (1999). Defendant claims that "Horn's brief categorizes every missed advantage and every perceived slight from NASA during the life of the parties' contract as a breach of the implied duty." Rhetoric aside, defendant more specifically argues:

That Horn misunderstands applicable legal framework is apparent in its contentions that NASA breached the implied duty of good faith and fair dealing, because, allegedly: (1) the audit was a "low priority for senior officials," (2) "any overpayments that Horn identified and which were recovered on closed appropriations were not returned to NASA for use, but rather were returned [by operation of law, 31 U.S.C. 1552(b)] directly to the

U.S. Treasury," thus creating a "substantial disincentive" for NASA Centers to approve and collect overpayments on closed or soon-to-be-closed appropriations" and NASA did not inform Horn that that was the case, (3) NASA did not promulgate actual guidance concerning what constituted a valid recommended debt or concerning how to process debts and pay Horn, and (4) the Goddard Deputy CFO generally had a negative "attitude" toward the audit.

(internal citations omitted). The court agrees with defendant that not every action taken by NASA over the life of the contract gave rise to a breach of the implied duty of good faith and fair dealing. Taking the performance under the contract as a whole, however, plaintiff's performance was severely impeded, and defendant's conduct, including a lack of cooperation, prevented plaintiff's ability to complete the totality of the contract requirements. Defendant's conduct demonstrates breach on defendant's part.

Bad Faith

In addition to arguing that NASA breached its implied duty of good faith and fair dealing, plaintiff also suggests that NASA operated under the contract in bad faith, first suggesting that after Melvin DenWiddie retired there was an "era of bad faith," and furthering suggesting that "[t]he evidence reveals NASA's duplicitous scheme to dispatch Horn while using the audit results to mislead the public." Plaintiff alleges that "NASA's breach of its duties to Horn seem to have been a key part in a nefarious scheme to rid itself of Horn, while simultaneously using the results of the Horn audit to convince Congress that NASA did not have excessive improper payments," and claims that NASA was able to accomplish this "by whipsawing Horn – telling it to 'review' all contracts, while secretly informing the centers generally not to approve claims on cost type contracts." Plaintiff continues:

By informing Horn that it would allow a review of all contract types in the Recovery Audit in the August 15, 2006, Bowie Memo, but instructing the centers not to approve recommended debts on cost type contracts in the McIntosh memo, NASA was able to represent to Congress that it had conducted a review of all contract types, while guaranteeing results extremely favorable to NASA. NASA could report the auditors had reviewed all types of contract payments, while reflecting a very low error rate because NASA was secretly approving only claims on the very small percentage of fixed price contracts. At the same time, NASA would be able to end the relationship with Horn without paying significant fees and then re-bid a new contract for an audit limited to fixed price contracts. If challenged by Horn, NASA could take the position that the contract was limited to fixed price only (as it did until the Court ruled otherwise) and it could claim Horn was incompetent because it submitted very few claims that were approved by NASA. This might seem like a plot from a John Grisham novel, but it is exactly what these very high ranking NASA officials – Terry Bowie, Charles McIntosh, and Bruce Ward – did.

(internal citations omitted). Defendant responds that "NASA did not act in bad faith," and "Horn's evidence of bad faith falls far short" of the burden to prove bad faith. Defendant further claims that:

> In a context where Horn bears the burden of proving bad faith with well-nigh irrefragable proof, a close examination of the trial record reveals that Horn's "bad faith" case actually is nothing more than smoke and mirrors, resting upon various Horn witnesses' *perception* of NASA's acts, coupled with attorney argument concerning the manner in which a selection of completely innocuous documents should be interpreted

(emphasis in original).

Bad faith is a very high bar to overcome. In 2002, the Federal Circuit stated that "for almost 50 years this court and its predecessor have repeated that we are 'loath to find to the contrary [of good faith] and it takes, and should take, well-nigh irrefragable proof to induce us to do so.'" Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002) (quoting Schaefer v. United States, 224 Ct. Cl. 541, 633 F.2d 945, 948-49 (1980)) (alteration in original). In 2013, the Federal Circuit reiterated that a plaintiff must overcome the well-established presumption that government officials act in good faith. See Croman Corp. v. United States, 724 F.3d 1357, 1364 (Fed. Cir. 2013) ("The presumption that government officials act in good faith is enshrined in our jurisprudence."); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1337. The Federal Circuit explained that:

> Government officials are presumed to "act 'conscientiously in the discharge of their duties.'" Kalvar Corp., Inc. v. United States, 543 F.2d 1298, 1301 (Ct. Cl. 1976) (quoting Librach v. United States, 147 Ct. Cl. 605, 612 (1959)). Courts have always been "loath to find to the contrary," and to induce a court to abandon the presumption of good faith dealing, "requires 'well-nigh irrefragable proof.'" Id. at 1301-02 (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954)). Thus, [a protestor] must offer clear and convincing evidence that [the government] did not act in good faith in order to prevail on this issue. Am-Pro Protective Agency, 281 F.3d at 1239-40.

Croman Corp. v. United States, 724 F.3d at 1364; see also Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1288 (Fed. Cir. 2010); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir.), reh'g denied (Fed. Cir. 2004) ("[W]hen a bidder alleges bad faith, 'in order to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable.'" (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003)) (alteration in original); CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1582 (Fed. Cir. 1983) (determining that suspicion and innuendo, and the possibility and appearance of impropriety, without "hard facts" inferring actual misconduct, provide an inadequate basis for withholding award of the contract); Torncello v. United

States, 231 Ct. Cl. 20, 45, 681 F.2d 756, 770 (1982) (stating "the government . . . is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary.") (citation omitted); Kalvar Corp. v. United States, 211 Ct. Cl. 192, 198-99, 543 F.2d 1301-1302 (1976), cert. denied, 434 U.S. 830 (1977); Librach v. United States, 147 Ct. Cl. 605,  612 (1959) (stating that "clear evidence to the contrary" is necessary to overcome the presumption in favor of the government); Square One Armoring Serv. Inc. v. United States, 123 Fed. Cl. 309, 329 (2015) (holding that a plaintiff alleging that the government has acted in bad faith must offer well-nigh irrefragable proof in support of its claim); Austin v. United States, 118 Fed. Cl. 776, 790 (2014) ("To overcome this presumption, the plaintiffs must produce 'well-nigh irrefragable proof' of bad faith on the part of the government."); Kogan v. United States, 112 Fed. Cl. at 266.

In Am-Pro Protective Agency, Inc. v. United States, the Federal Circuit considered the extent of proof required to demonstrate that the government acted in bad faith and modernized the language of the "well-nigh irrefragable proof" standard, consistent with its "well-established precedent that a high burden must be carried to overcome" the presumption of good faith. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239. The court determined that the "clear and convincing" standard of proof "most appropriately describes the burden of proof applicable to the presumption of the government's good faith." Id. "Based on this well-established precedent, it logically follows that showing a government official acted in bad faith is intended to be very difficult, and that something stronger than a 'preponderance of evidence' is necessary to overcome the presumption that he acted in good faith, i.e., properly." Id. at 1240; see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("'Almost irrefragable proof' amounts to  'clear and convincing evidence.'" (quoting Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239-40)).

In Am-Pro Protective Agency, Inc. v. United States, the Federal Circuit considered the extent of proof required to demonstrate that the government acted in bad faith and modernized the language of the "well-nigh irrefragable proof" standard, consistent with its "well-established precedent that a high burden must be carried to overcome" the presumption of good faith. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239. The court determined that the "clear and convincing" standard of proof "most appropriately describes the burden of proof applicable to the presumption of the government's good faith." Id. "Based on this well-established precedent, it logically follows that showing a government official acted in bad faith is intended to be very difficult, and that something stronger than a 'preponderance of evidence' is necessary to overcome the presumption that he acted in good faith, i.e., properly." Id. at 1240; see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("'Almost irrefragable proof' amounts to 'clear and convincing evidence.'" (quoting Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239-40)). The Federal Circuit in Am-Pro Protective Agency described the "clear and convincing" standard of proof, as follows:

A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. "Clear and convincing" evidence has

been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is "highly probable."

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240 (quoting Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993)). The Federal Circuit also described the type of proof necessary to establish that a government official acted in bad faith by "clear and convincing" evidence, or "well-nigh irrefragable proof," as it was previously termed:

> In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff. Thus, in Gadsden v. United States, [111 Ct. Cl. 487, 489-90 (1948)] the court compared bad faith to actions which are "motivated alone by malice." In Knotts, [v. United States, 128 Ct. Cl. 489, 492 (1954)], the court found bad faith in a civilian pay suit only in view of a proven "conspiracy . . . to get rid of plaintiff." Similarly, the court in Struck Constr. Co. v. United States, [96 Ct. Cl. 186, 222 (1942)] found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in Librach, [v. United States, 147 Ct. Cl. 605 (1959)], the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240 (quoting Kalvar Corp. v. United States, 211 Ct. Cl. at 192, 543 F.2d at 1302) (citations omitted); see also Galen Medical Assocs., Inc. v. United States, 369 F.3d at 1330 ("'In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff.'" (quoting Torncello v. United States, 231 Ct. Cl. at 45, 681 F.2d at 770)).

Although the court has found breach on the part of the defendant, the court does not find sufficient support for a finding of bad faith on the part of NASA. As defendant conceded above, "the trial record certainly reflects enormous intra-agency confusion over the scope of Horn's contract and over the path forward to deal with the administrative error of having attached the wrong scope of work," however, that alone does not rise to the level of bad faith. Plaintiff's contention that the McIntosh email demonstrates "the bad faith exhibited by NASA in sending this e-mail and in the events surrounding this e-mail, and the fatal blow this e-mail had on what had already become an impossible audit for Horn" is unsupported in the record. The defendant notes in response that "[t]he email in question appears to be nothing more than an additional example of the agency's personnel issuing confusing directions and triggering wholly uncoordinated results. Furthermore, the email was not secret. Although the actual text of the September 1, email was not shared with Horn (nor was there any reason or obligation to do so), there is no question that its substance, as interpreted by the centers who received it, was openly disclosed by those centers with the Horn auditors." The McIntosh email does not indicate bad faith. The McIntosh email, and the conduct of the NASA personnel, discussed extensively above, while inappropriate and improper, does not demonstrate a specific

intent to injure Horn & Associates. See Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581.

Moreover, as indicated by defendant, even a breach of the implied duty of good faith and fair dealing "does not necessarily mean that the party has engaged in any bad faith conduct in connection with the performance of contractual duties." As indicated by a Judge of the United States Court of Federal Claims, "proof of 'bad faith' is not required to show a breach of the implied duty of good faith and fair dealing." Kogan v. United States, 112 Fed. Cl. at 265 (quoting TigerSwan, Inc. v. United States, 110 Fed. Cl. 336, 346 (2013)). Furthermore, the court does believe that plaintiff's statement that the government "did not call a witness from the agency at all to testify in defense of the claims of breach of contract, including allegations of bad faith and lying to Congress," demonstrates that the government was, in fact, operating in bad faith. The allegations of bad faith raised by plaintiff do not meet the high standards required to prove bad faith.

Defendant's Breach Allegations

Defendant, in addition to defending the government's conduct in performance of the contract, also alleges that "Horn breached its contract with NASA," arguing that "[t]he overwhelming evidence at trial proved that Horn was – for reasons not traceable to any wrongdoing on the Government's part – unequipped, unqualified, and incompetent to perform the most basic contractual service that NASA required, i.e., the work of identifying lost funds due to overpayments." Defendant continues, alleging that: "All of the Horn auditors lacked the requisite basic knowledge of government contracting that would allow them to accurately and properly evaluate the transactions they were auditing, and, during the life of the recovery audit, they flooded NASA's payment centers with piles of recommended debts that were inherently worthless." (emphasis in original; internal citation omitted). Defendant also claims that plaintiff was a "poor performer" under the contract. Plaintiff responds that "[s]etting aside NASA's trumped up and unsupported rhetoric about Horn's incompetence, the testimony at trial showed that Horn and its auditors were competent individuals who were ready, willing, and able to perform the recovery audit in the non-breach world."[66] Horn & Associates also points out its extensive recovery audit experience of its employees and subcontractors in the private sector, although indicating that, regarding the lack of experience for federal audits, "[w]hile Horn did not have significant experience performing recovery audits for federal government clients, no recovery auditors had such experience at the time because recovery auditing was not used by the federal government until around the time of the NASA audit." The court notes that Melvin DenWiddie, as the Contracting Officer Technical Representative, wrote a letter to Horn & Associates on June 30, 2006, indicating:

> Your work on this project has been very impressive. Because our payment files were in several locations on multisystems, some in a manual format, I wondered how you would overcome that challenge and conduct an effective Agency-wide recovery audit of our payments.

---

[66] The court notes the defendant, at trial and in its post-trial briefing, was far more focused on what it perceived as the plaintiff's faults, rather than its own conduct under the contract.

It soon became apparent that your technical capability was centered on your highly-experienced staff. The extensive financial management and recovery auditing experience allowed each challenge to be broken into small components that were easier to resolve. The customizable audit methodology was beneficial in addressing specific unique needs of each NASA Center.

On direct examination at trial, Mr. DenWiddie explained,

I wrote this letter because as I've testified before during this testimony, I thought that Horn was doing an outstanding job. I thought that they were working under very adverse conditions, namely the accounting systems that they had to audit, the people who they had to work with who were opposed to them doing their work, and the fact that they had somehow managed to do an outstanding job, in my view, I thought that somebody, somebody needed to say thank you. And I decided that I would be the one and I did.

Defendant also argues that "there was no testimony or evidence at trial that Horn as a company ever attempted to recruit from the pool of experienced auditors that it supposedly had at its fingertips, let alone that any such efforts were rebuffed due to concerns about any aspect of the audit at Goddard or NASA," and notes that "[t]o that end, Horn solicited auditors for Goddard through an advertisement on Craigslist, rather than from any pre-established pool." Regarding his position with Horn & Associates, Mr. Lizana testified at trial that he "first heard about the position through Craigslist." Mr. Lizana described his philosophy of recovery auditing as follows: "I think recovering auditing, it's not a quantitative assessment of your skills, meaning it's not having done it for 30 years, in my opinion, whether you have a CPA and so forth. I think recovering auditing is about the type of skills that you have." Regarding performance at Johnson, although the Johnson recovery audit was the first recovery audit for Mr. Colby, Mr. Hott testified that he had 30 years of experience as a certified public accountant. At Kennedy, Mr. Young had not performed a federal government agency audit before the Kennedy recovery audit, but had been performing audits for 16 years and testified that he had years of experience as an auditor and had performed audits on companies like Albertson's and Winn-Dixie, both of which had billions of dollars of sales per year. At Marshall, Mr. Edgerton testified that he had not performed a federal audit before, but testified that he had been a certified public accountant since 1979 and had performed numerous recovery audits in the private sector.

In addition, the government argues that "Horn breached the parties' contract by failing to provide the resources necessary to complete the audit at the vast majority of NASA's payment centers." Defendant continues:

To that end, the parties' contract required Horn to "provide all resources necessary . . . to perform the work specified in the [scope of work]." In combination, Horn's eight month-long, gross understaffing of the Goddard

audit, its abandonment of the work at Marshall, and its failure to provide a meaningful presence (or, in the case of Stennis, any presence at all) at the remaining payment centers that it did not consider worth its financial constitutes a partial repudiation of its agreement, as well as a material breach.

(internal citations omitted). As explained above, the reason that the centers were not fully staffed was, in plaintiff's view, that there was not enough work to employ more people, especially given NASA's recalcitrance to provide files and process claims and that plaintiff's employees and subcontractors could have accomplished the work of the contract had NASA cooperated with plaintiff and not impeded plaintiff's progress. As indicated above, at Marshall, Mr. Edgerton testified at trial that he began the recovery audit in June 2005 with Mr. Crochet and Mr. Mescher, but after a week, Mr. Crochet did not return because "[t]here was never enough work for three people," and Mr. Masker worked for two or three weeks a month for the rest of 2005, but did not return in 2006 because "[w]e didn't have enough complete files to audit." Mr. Edgerton testified he would have returned to Marshall, but that there were not enough completed files to review. Mr. Hott, believed that given the lack of direction he received at Johnson and without claims being approved and processed, there was not a need for additional personnel. When asked on cross-examination why he did not hire more people to work on the audit with him, Mr. Hott testified that "[i]t didn't make a lot of sense to spend a tremendous amount more money to bring in additional resources. We were already getting screwed to the hilt." Although Horn & Associates eventually replaced Ms. Baumbach at Goddard with three auditors, Ms. Baumbach noted that "it was so frustrating to not be able to get claims that were agreed to processed. It seemed pretty dismal that I would be making any money. When I started I had high hopes that there would be a nice audit here and that I'd have a decent string of income from it, but it just wasn't panning out because claims were not being processed." Finally, at Kennedy, Mr. Young testified that:

Q. If you had received the normal and expected level of cooperation at Kennedy, would you have been able to bring in other resources?

A. Oh, yeah.

Q. And how did you have those at your disposal?

A. Well, I had some resources that I could work on the audit for a little bit, and they stopped when they realized none of the claims were getting approved. They would have kept working. I also had other people that I could bring in on top of that. So I had people that I used for other audits that I could have easily brought in.

Regarding the smaller centers, defendant argues that "[i]t is apparent that Horn lacked the resources to staff NASA's smaller centers appropriately over time." Defendant also emphases that "Horn could not staff anyone in those [Ames, Dryden, Glenn, and Langley] locations long term." Plaintiff responds that "Horn made a conscious decision to

approach the audit by tackling the larger Centers first." Indeed, at trial, Mr. Farrer was asked: "Was it your intention to fully staff and conduct audits at the smaller centers simultaneously with the larger centers?" and Mr. Farrer responded: "No," and elaborated that

> our intent when we went to Ames and Dryden was to simply take the routines that we had developed electronically, and see if we could get some easy claims going in both of those centers while we had the big centers running with full staffing, generating claims and seeing what we could learn from the bigger centers that we could take back to complete the audits at the smaller centers.

Mr. Farrar also indicated:

> When we did our initial look at the centers and we also discussed them in our meeting with Melvin [DenWiddie] the first of February, we were trying to identify which centers were bigger than others, where the biggest opportunity might have been. So we identified, with Melvin, basically in that meeting the four centers that were the largest and had the biggest opportunity would be Goddard, Kennedy, Johnson and Marshall.

Mr. Edgerton, who conducted plaintiff's audit at Marshall explained at trial that he also had intended to perform the audit at Stennis, where plaintiff ultimately did not submit any claims. Mr. Edgerton testified that did not go to Stennis because:

> We were working at Marshall. We were trying, that was one of the big centers that had a lot of accounts payable. It had a lot of records. If we weren't getting the records from Marshall why would, you know, why take the time and money to go down to Stennis and have the same problem and just, you know, create another problem?

The court finds that the plaintiff's approach to the audit, to specifically focus on the largest centers initially was reasonable. The court, as indicated above, believes that NASA's conduct made it difficult for plaintiff to perform the audit at the largest centers. The failure to timely review the claims and work with the plaintiff's auditors at the largest centers had the trickle-down effect of preventing plaintiff from effectively performing the recovery audit on the smaller centers or investing the requisite time and resources given the government's conduct at the largest centers.

Defendant also argues that the failure of the NASA audit stemmed, not from the mistakes of NASA, but from plaintiff's mistaken interpretation of the types of claims the auditors could recover. As was evident at trial, and made more plain in the post-trial briefing, the parties have a fundamental disagreement about what types of claims were recoverable and which types of claims could not be recovered under the contract. Both at trial and in the briefings, the parties spent considerable time analyzing specific claims

and trying to justify, or undermine, the reasons for submitting the claims, and why, or why not, NASA denied the claims.

The defendant does not claim that any failures on plaintiff's part under the contract would preclude the court's finding that defendant breached the contract. Defendant specifically states:

> The Government does not, however, take the position that Horn's breaches excused NASA from any of the agency's own obligations under the contract. Rather, as we will discuss in greater detail in Part XIV of this brief, Horn's performance failures establish that Horn's expectation damages model is speculative and does not prove Horn's damages with reasonable certainty, reflecting incomplete or flawed analysis by Horn's expert, Mary Karen Wills.

Plaintiff, naturally, agrees, noting that, "[b]oth parties agree that the experience and competence of Horn is irrelevant when determining whether or not the Government breached the Contract and that no level of inexperience or incompetence on the part of Horn would excuse the Government's breach." As the parties agree, none of defendant's arguments would preclude the court from finding that defendant committed a breach, the court finds a determination of plaintiff's alleged failures, if any, as relevant only to a damages calculation.

## CONCLUSION

For the reasons discussed above, the court finds that defendant breached the contract with Horn & Associates.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**
